UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| EVELIA RODRIGUEZ; ERIKKA WILSON; A.N., A MINOR; AIDEN GUNDLACH; ZACHARY BUCKUS; RAYMON MARINES; AND J.V. A MINOR on behalf of themselves and all others similarly situated, | CASE NO. 1:23-CV-04953 <br><br> CLASS ACTION |
| Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| BYTEDANCE, INC.; BEIJING DOUYIN INFORMATION SERVICE CO. LTD. F/K/A BEIJING BYTEDANCE TECHNOLOGY CO. LTD.; BYTEDANCE LTD.; BYTEDANCE PTE. LTD.; BEIJING BYTEDANCE TECHNOLOGY CO. LTD.; AND TIKTOK, INC. F/K/A MUSICAL.LY, INC., | |
| Defendants. | |

AMENDED CLASS ACTION COMPLAINT

TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   PARTIES ..............................................................................................................3

      A.   Plaintiffs ......................................................................................................3

      B.   Defendants ..................................................................................................6

           1.   Beijing Douyin Information Service Co. Ltd. f/k/a Beijing
                ByteDance Technology Co. Ltd.................................................6

           2.   ByteDance Ltd. ...........................................................................7

           3.   Beijing ByteDance Technology Co. Ltd. ...................................7

           4.   ByteDance, Inc...........................................................................8

           5.   ByteDance Pte. Ltd. ...................................................................8

           6.   TikTok, Inc. f/k/a Musical.ly, Inc. ...........................................8

      C.   Defendants Operate As A Single Enterprise ..............................................9

III.  JURISDICTION AND VENUE .........................................................................10

IV.   BACKGROUND ................................................................................................12

      A.   Defendants Are Part of A China-Based Tech Conglomerate That
           Markets Multiple Products In The United States.....................................12

      B.   In 2020, ByteDance Began Marketing A New App In The United
           States Designed To Facilitate Video Editing, Which Could Be Used
           To Create Videos And Post Them On A Variety Of Social Media
           Apps. ........................................................................................................14

      C.   Defendants Have a History Of Unlawfully and Covertly Collecting
           Private And Personally Identifiable Data And Content From Users
           of Their Products. .....................................................................................27

      D.   Defendants Use The CapCut App To Continue And Expand Their
           Theft Of Users' Private And Personally Identifiable User Data And
           Content......................................................................................................36

      E.   Defendants Are Unjustly Profiting While Plaintiffs Suffer Harm. .........39

F.     Plaintiffs Could not Have Earlier Discovered Defendants' Wrongful Conduct And Defendants Have Fraudulently Concealed Their Unlawful Conduct, Thereby Tolling Any Applicable Statutes of Limitations. ..........................................................................................41

G.     The Named Plaintiffs Have Been Injured By Defendants' Unlawful Conduct. .....................................................................................................42

H.     Defendants' Privacy Policies And Terms of Use Do Not Constitute Notice of, Or Consent To, CapCut User Data Theft. ...........................45

I.     Defendants Have Failed To Protect the Privacy Rights Of Minors. ......................47

V.     CLASS ALLEGATIONS ........................................................................48

VI.     CAUSES OF ACTION..............................................................................53

FIRST CAUSE OF ACTION  VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 (ON BEHALF OF THE PLAINTIFFS AND THE CLASS) .......................................................53

SECOND CAUSE OF ACTION  VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710 ET SEQ. (ON BEHALF OF THE PLAINTIFFS AND THE CLASS) ...............................................54

THIRD CAUSE OF ACTION  VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510 ET SEQ. (ON BEHALF OF THE PLAINTIFFS AND THE CLASS)........................................58

FOURTH CAUSE OF ACTION  VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. §§ 2701 ET SEQ. (ON BEHALF OF THE PLAINTIFFS AND THE CLASS) ............................................61

FIFTH CAUSE OF ACTION  VIOLATION OF THE CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT CAL. PEN. C. § 502 (ON BEHALF OF THE CALIFORNIA PLAINTIFFS AND THE CALIFORNIA SUBCLASS)........................................................................65

SIXTH CAUSE OF ACTION  VIOLATION OF THE RIGHT OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION (ON BEHALF OF THE CALIFORNIA PLAINTIFFS AND THE CALIFORNIA SUBCLASS)...........................66

SEVENTH CAUSE OF ACTION  INTRUSION UPON SECLUSION (ON BEHALF OF THE CALIFORNIA PLAINTIFFS AND THE CALIFORNIA SUBCLASS)..............................................................................................70

EIGHTH CAUSE OF ACTION  VIOLATION OF THE CALIFORNIA
UNFAIR COMPETITION LAW, BUS. & PROF. C. §§ 17200 *ET SEQ.*
(ON BEHALF OF THE CALIFORNIA PLAINTIFFS AND THE
CALIFORNIA SUBCLASS)............................................................................................73

NINTH CAUSE OF ACTION  VIOLATION OF THE CALIFORNIA
FALSE ADVERTISING LAW, BUS. & PROF. C. §§ 17500 *ET SEQ.* (ON
BEHALF OF THE CALIFORNIA PLAINTIFFS AND THE CALIFORNIA
SUBCLASS)..........................................................................................................................77

TENTH CAUSE OF ACTION  VIOLATION OF THE CALIFORNIA
INVASION OF PRIVACY ACT CALIFORNIA PENAL CODE §§ 630 *ET
SEQ.* (ON BEHALF OF THE CALIFORNIA PLAINTIFFS AND THE
CALIFORNIA SUBCLASS)............................................................................................79

ELEVENTH CAUSE OF ACTION  STATUTORY LARCENY, CAL. PEN.
CODE §§ 484, 496 (ON BEHALF OF THE CALIFORNIA PLAINTIFFS
AND THE CALIFORNIA SUBCLASS)........................................................................83

TWELFTH CAUSE OF ACTION  CONVERSION (ON BEHALF OF THE
CALIFORNIA PLAINTIFFS AND THE CALIFORNIA SUBCLASS)........................84

THIRTEENTH CAUSE OF ACTION  RESTITUTION / UNJUST
ENRICHMENT (ON BEHALF OF THE PLAINTIFFS AND THE CLASS)..................85

FOURTEENTH CAUSE OF ACTION  VIOLATION OF ILLINOIS'S
BIOMETRIC INFORMATION PRIVACY ACT, 740 ILCS 14/1, *ET SEQ.*
(ON BEHALF OF THE ILLINOIS PLAINTIFFS AND THE ILLINOIS
SUBCLASS)..........................................................................................................................86

REQUEST FOR RELIEF....................................................................................................98

DEMAND FOR JURY TRIAL ........................................................................................100

Plaintiffs, individually and on behalf of all others similarly situated (the "Class"), bring this class action complaint by and through undersigned counsel, against Beijing Douyin Information Service Co. Ltd. f/k/a Beijing ByteDance Technology Co. Ltd. ("Beijing Douyin"); Beijing ByteDance Technology Co. Ltd.; ByteDance, Inc.; ByteDance Ltd.; ByteDance Pte. Ltd. ("ByteDance") and TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok, Inc.") (collectively, "Defendants").

## I.      INTRODUCTION

1.      In 2020, Defendants launched a video editing application, CapCut ("the CapCut app"), in the United States.  The app allows users to create, edit and customize videos, which they may then post online on a number of different social media platforms such as Instagram, Facebook, YouTube, Linkedin, and TikTok, the social media platform run by Defendants.  Among other things, the CapCut app allows users to edit videos with various templates, filters, visual effects, and music.

2.      The CapCut app has become extremely popular; it is routinely among the top apps in rankings of weekly downloads in the United States and had more than 400 million downloads globally last year alone,[1] making it the fourth most frequently downloaded app in the world.[2]  As a result, the CapCut app now has more than 200 million monthly active users and is experiencing exponential growth.[3]  The CapCut app is one of the most popular apps for mobile devices in the United States and the world.

---

[1] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[2] https://blog.apptopia.com/worldwide-and-us-download-leaders-2022.

[3] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

3.      The CapCut app is "heavily promoted" by Defendant TikTok, Inc. on its social media platform, which has one of the largest user bases in the world.[4]  The TikTok, Inc. social media platform allows users to post 60-second videos of activities such as dancing, lip-syncing, and stunts, including videos created using the CapCut app.  The TikTok app, like the CapCut app, is among the most downloaded apps available.

4.      The CapCut app facilitates the collection of a wide range of private information from users, including their biometric information.  However, as noted in a March 19, 2023 article in the *Wall Street Journal*, because CapCut is "a tool app, it has largely avoided regulatory scrutiny over its practice in handling user data."[5]

5.      The privacy concerns with respect to the CapCut app are particularly significant. Defendants have used automated software, proprietary algorithms, artificial intelligence, facial recognition, and other technologies to commercially profit from Plaintiffs' and Class Members' identities, unique identifying information, biometric data and information, images, video and digital recordings, audio recordings, clipboard data, geolocation, names, e-mail addresses, passcodes, social media accounts, messaging services, telephone numbers, and other private, non-public, or confidential data and information, or meaningful combination thereof, as more fully set forth herein.

6.      Defendants, through the CapCut app, collected, captured, obtained, stored and, upon information and belief, disclosed and otherwise disseminated Illinois resident CapCut users'

---

[4] *Id.*

[5] *Id.*

biometric information in violation of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS § 14/1, *et seq.* Public policy in Illinois provides that, given the risks of unwanted data collection, Illinois citizens have the right to make decisions about the fate of their unique biometric identifiers and information. Defendants' actions violated those rights.

7. Defendants unjustly profit from the secret harvesting of a massive array of private and personally identifiable CapCut user data and content that they can use for targeted advertising, improvements to Defendants' artificial intelligence technologies, patent applications, and the development of consumer demand for, and use of, Defendants' other products. In addition, Defendants have collected fees from users for cloud storage service and for additional features and effects that are unavailable with the basic app.

8. Users' data may be utilized for various purposes, including tracking users by age, gender, location, operating system, and interest in order to attract marketing and ad sales. By collecting and filtering this user data, Defendants are able to utilize the data to, among other things, improve their sophisticated targeted ad and marketing platform that allows their clientele to target demographics with precision.

9. Defendants' conduct violates statutory, constitutional, and common law privacy, data, biometrics and consumer protection laws and should be enjoined.

## II.   PARTIES

### A.   Plaintiffs

10. **Plaintiff Evelia Rodriguez** is a citizen and resident of Oroville, California. On or about April 13, 2023, Ms. Rodriguez saw an ad on TikTok that showed a video with two pictures of two different people being combined into one image. She wanted to try it, so she downloaded the CapCut app onto her mobile device. Ms. Rodriguez did not read any privacy policy or terms of

use for the CapCut app, nor did she see any discernable hyperlinks to or warnings about these items. She asserts claims for the California Subclass and the Nationwide Class as defined below.

11. While Ms. Rodriguez merely wanted to try out the CapCut app by combining two photos from the photo album on her device, the CapCut app gained access to all of the photos and videos on her device. Since that time, Ms. Rodriguez has used the CapCut app to create additional video content.

12. Ms. Rodriguez expected that CapCut would protect and secure her content against access by or disclosure to unauthorized parties. Ms. Rodriguez did not consent to any third parties accessing her content, user data, and highly sensitive biometric identifiers and information.

13. **Plaintiff Erikka Wilson** is a citizen and resident of Chicago, Illinois. She downloaded the CapCut app around March 2023. Ms. Wilson uses the app to edit videos and images. She does not recall ever reading a privacy policy or terms of use before using the CapCut app. She asserts claims for the Illinois Subclass and the Nationwide Class as defined below.

14. **Plaintiff A.N., a minor,** is a citizen and resident of Chicago, Illinois, who brings this suit by and through her mother and legal guardian, Erikka Wilson, who is, and at all relevant times was, an individual and resident of Chicago, Illinois. A.N. asserts claims for the Illinois Subclass and the Nationwide Class as defined below

15. A.N. uses the CapCut app to edit videos. She is 14 years old and will be in the ninth grade in the Fall, 2023. A.N. used the CapCut app during the seventh and eighth grades.

16. A.N. was able to use the CapCut app without setting up an account or reading a privacy policy or terms of use. A.N. was able to later create an account without obtaining any permission or authorization from a parent.

17.     **Plaintiff Aiden Gundlach** is a resident of Crystal Lake, Illinois, and is currently 19 years old.  He downloaded and began using the CapCut app on or before March 8, 2020, when he was 15 years old.  Mr. Gundlach has been using CapCut for around four years to edit videos related to skateboarding and other content.  He did not read any privacy policy or terms of use for the CapCut app, and he does not recall seeing any hyperlinks or notifications about these items. He asserts claims for the Illinois Subclass and the Nationwide Class as defined below.

18.     **Plaintiff Zachary Buckus** is a resident of Winthrop Harbor, Illinois.  He downloaded and began using the CapCut video editing app on or before November 24, 2021.  He began using the free app and switched to using a paid subscription soon after.  He continues to subscribe to the paid, CapCut Pro version of the app.  Mr. Buckus is over 18 and has been for the full time period he has used CapCut. He uses the app to edit social media, for music promotion, and other video editing. Mr. Buckus has not read any CapCut terms of use or privacy policy, and he does not recall ever seeing them or being prompted to read or accept them.  He asserts claims for the Illinois Subclass and the Nationwide Class as defined below.

19.     **Plaintiff Raymon Marines** is a resident of Monrovia, California.  He downloaded and began using the CapCut app to edit videos around two years ago, in early to mid-2022.  He is an adult, over 18 years old for the duration of his time using CapCut.  Mr. Marines began by using the free CapCut app without creating an account.  Even without creating an account, he was able to edit videos with CapCut, and the app automatically saved his videos.  He then switched to a paid subscription to CapCut Pro, which he has used for around two years. Raymon uses CapCut in his work as a film editor.  He has used CapCut to edit videos of himself and other people, and

he has used the app on his phone and on his PC computer.  Mr. Marines does not recall reading or accepting any privacy policy or terms of use.  He asserts claims for the California Subclass and the Nationwide Class as defined below.

20.     **Plaintiff J.V., a minor,** is a resident of Monrovia, California.  She brings this suit by and through her stepfather and legal guardian, Raymon Marines.  J.V. is currently 14 years old.  She downloaded and began using the CapCut app in July, 2021, when she was 11 years old, without her parents' knowledge or permission.  She continued to use CapCut during much of 2021 and 2022 without her parents' knowledge or consent.

21.     J.V. has used the CapCut app for over two and a half years without ever creating an account. She continues to use the app without logging in.  The app automatically saves her information and content under a user number.  J. V. has used CapCut on her iPad since at least July 29, 2021, and on her phone since at least December 2022.  She uses the app to create and edit videos.  She has created fan pages, "get ready with me" videos featuring her face and her putting on makeup, and other content.

22.     J.V. has not read any CapCut terms of use or privacy policy, and she does not recall ever being presented with this information.  She asserts claims for the California Subclass and the Nationwide Class as defined below.

B.     **Defendants**

1.     **Beijing Douyin Information Service Co. Ltd. f/k/a Beijing ByteDance Technology Co. Ltd.**

23.     Defendant Beijing Douyin Information Service Co. Ltd. f/k/a Beijing ByteDance Technology Co. Ltd. ("Beijing Douyin") is, and at all relevant times was, a privately held company

headquartered in Beijing, China. Defendant Beijing Douyin is a subsidiary of Defendant ByteDance Ltd., which is also headquartered in Beijing, China. The Chinese government owns a 1% share of Defendant Beijing Douyin, which has been described as a "golden share" that allows the Chinese government to, among other things, exercise control over Beijing Douyin.[6] In China, even a minority stake in a private company "makes any state-invested enterprise subject to Beijing's influence and control, no matter how small its investment," because "Chinese law already affords the state privileged status in the governance of any corporation for which it is a shareholder."[7]

### 2. ByteDance Ltd.

24.     Defendant ByteDance Ltd. is, and at all relevant times was, a Cayman Islands corporation headquartered in Beijing, China.

25.     Defendant ByteDance Ltd. owns 100% of Douyin Group (HK) Ltd. f/k/a ByteDance (HK) Co., Ltd., which is headquartered in Hong Kong. Douyin Group (HK) Co., Ltd. in turn owns 99% of Beijing Douyin Information Service Co. Ltd. ("Beijing Douyin"), which is headquartered in Beijing, China. The remaining 1% is owned by China state-owned entities.

### 3. Beijing ByteDance Technology Co. Ltd.

26.     Defendant Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance"), at all relevant times, was a privately held company headquartered in Beijing, China. Defendant Beijing ByteDance was a subsidiary of ByteDance Ltd., which was also headquartered in Beijing, China.

---

[6] https://www.businessinsider.in/stock-market/news/tiktok-parent-bytedance-has-special-stock-owned-by-chinas-government-heres-how-golden-shares-give-beijing-influence-over-the-social-media-giant-/articleshow/99094188.cms. *See also* https://www.wsj.com/articles/xi-jinpings-subtle-strategy-to-control-chinas-biggest-companies-ad001a63.

[7] U.S.-China Economic and Security Review Commission, 2021 Report to Congress, at 9 (Nov. 2021).

In 2022, Beijing ByteDance was renamed Beijing Douyin Information Service Co. Ltd. ("Beijing Douyin").

### 4. ByteDance, Inc.

27.     Defendant ByteDance, Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in Palo Alto, California.  Defendant ByteDance, Inc. is, and at all relevant times was, a wholly owned subsidiary of Defendant ByteDance Ltd.

### 5. ByteDance Pte. Ltd.

28.     Defendant ByteDance Pte. Ltd. is, and at all relevant times was, a Singapore private limited company headquartered in Singapore.

### 6. TikTok, Inc. f/k/a Musical.ly, Inc.

29.     Defendant TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok, Inc.") is, and at all relevant times was, a California corporation with its principal place of business in Culver City, California.[8] Defendant TikTok, Inc. also maintains offices in Palo Alto, California and Mountain View, California.[9]  Defendant TikTok, Inc. is a wholly owned subsidiary of TikTok, LLC, which in turn is a wholly owned subsidiary of TikTok, Ltd., and TikTok, Ltd. – like Defendant ByteDance, Inc. – is a wholly owned subsidiary of Defendant ByteDance Ltd.

---

[8] https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[9] https://www.washingtonpost.com/technologyD/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/; https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

C.      **Defendants Operate As A Single Enterprise**

30.      Defendants do not function as separate and independent corporate entities.  To the contrary, company insiders have acknowledged that Defendant TikTok is "tightly controlled" by Defendant ByteDance and its China-based affiliates.[10]

31.      At all relevant times, Defendants TikTok, Inc. and ByteDance, Inc. have shared offices in Silicon Valley and also have shared employees.  U.S. and China-based employees of the Defendant family of companies perform work concerning the CapCut app that is at the center of the lawsuit.

32.      At all relevant times, Defendant ByteDance has directed the operations of Defendants TikTok, Inc. and ByteDance, Inc. with respect to the CapCut app, and Defendants TikTok, Inc. and ByteDance, Inc. have reported to Defendant ByteDance and its China-based affiliates.

33.      Defendant ByteDance made key strategy decisions for Defendants TikTok, Inc. and ByteDance, Inc., as well as for offices elsewhere in the world, and Defendants TikTok, Inc., ByteDance, Inc. and the other offices were charged with executing such decisions.

34.      At all relevant times, and in connection with the matters alleged herein, each Defendant acted as an agent, servant, partner, joint venturer and/or alter ego of each of the other Defendants and acted in the course and proper scope of such agency, partnership, and relationship and/or in furtherance of such joint venture.  Each Defendant acted with the knowledge and consent of the other Defendants and/or directed, authorized, affirmed, consented to, ratified,

---

[10] https://www.cnbc.com/2021/06/25/tiktok-insiders-say-chinese-parent-bytedance-in-control.html.

encouraged, approved, adopted and/or participated in the acts or transactions of the other Defendants.

35.     At all relevant times, and in connection with the matters alleged herein, Defendants constitute a single enterprise with a unity of interest.

### III.     JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants, and also because more than one Defendant is a citizen or subject of a foreign state.

37.     This Court has personal jurisdiction over Defendants because: (i) they transact business in the United States, including in this District; (ii) they have substantial aggregate contacts with the United States, including in this District; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District, and purposely availed themselves of the laws of the United States.

38.     This Court further has personal jurisdiction with respect to the claims of the Illinois Subclass (defined below) because Defendants used and disseminated data derived directly from Illinois-based CapCut users and exposed residents of Illinois to ongoing privacy risks within Illinois based on the collection, capture, obtainment, disclosure, redisclosure and dissemination of their biometric identifiers and information.  Furthermore, many of the images Defendants used for their unlawful collection, capture and obtainment of biometric identifiers and information were created in Illinois, uploaded from Illinois, and/or managed via Illinois-based user accounts,

computers, and mobile devices. Because of the scope and magnitude of Defendants' conduct, Defendants knew that their collection, capture, obtainment, disclosure, redisclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens. Defendants knew or had reason to know that collecting, capturing, obtaining, disclosing, redisclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite releases would deprive Illinois citizens and residents of their statutorily-protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via their Illinois-managed devices and exposed minors in Illinois to potential surveillance and other privacy harms as they went about their lives within the state.

39.     Furthermore, through the CapCut app, Defendants actively collect information harvested from the Illinois-based devices of Illinois residents, including location information based on users' SIM card and/or IP address.

40.     Defendants use this harvested information to provide users with location-based services directed toward Illinois.

41.     Defendants' deliberate gathering of Illinois users' personally identifiable information is intentionally targeted toward Illinois residents, including Plaintiffs and the Class, and constitutes purposeful activity directed at devices and individuals in Illinois.

42.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in Illinois. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

## IV.    BACKGROUND

**A.    Defendants Are Part of A China-Based Tech Conglomerate That Markets Multiple Products In The United States.**

43.    Defendant ByteDance is one of China's largest technology companies with an estimated valuation of $200 billion.[11]  In the last year alone, the tech conglomerate achieved a gross operating profit of approximately $25 billion.[12]  ByteDance's former CEO, Zhang Yiming, was honored by an organization affiliated with the Chinese Communist Party as one of its "100 outstanding private entrepreneurs."[13]  The list is "something of a guide to who is in the good books of the Chinese authorities."[14]

44.    Defendant ByteDance makes a variety of video and news-aggregation apps.[15]  It "regards its platforms as part of an artificial intelligence company powered by algorithms that 'learn' each user's interests and preferences through repeat interaction."[16]  Defendant ByteDance has pursued a strategy of seeking growth in overseas markets, including specifically the United States.[17]

45.    Defendant ByteDance has generated billions of dollars in annual revenue for its investors.  Investors in Defendant ByteDance and its affiliates include Sequoia Capital China,

---

[11] https://www.hurun.net/en-US/Info/Detail?num=HD7Q8RVHK6WE#totop.

[12] https://www.economist.com/business/2023/04/13/bytedance-tiktoks-chinese-parent-reports-a-record-profit.

[13] https://weekinchina.com/2018/11/loyalty-points.

[14] *Id.*

[15] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[16] https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats; https://www.cotton.senate.gov/?p=press_release&id=1239.

[17] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

Russian billionaire Yuri Milner, Japanese technology giant SoftBank, and large private-equity firms such as KKR, General Atlantic, and Hillhouse Capital Group.[18]

46.     ByteDance has expanded its influence and revenue through a series of acquisitions of apps developed in China, growing to be a dominant force in the social media market.  For example, in 2016, Defendant ByteDance launched an app called "Douyin" in China.  The app allowed users to create videos of themselves and share the videos with friends.  The Douyin app mimicked an existing app, Musical.ly, which was created in 2014.[19]  In 2017, ByteDance introduced an English-language version of the Douyin app for use outside China under the name "TikTok." ByteDance then acquired the Musical.ly app and merged all existing accounts and data into a single app under the "TikTok" name.[20]

47.     The TikTok app has become "one of the world's fastest-growing social media platforms" with a massive American audience.[21]  By November 2019, the TikTok app had been downloaded more than 1.3 billion times worldwide, with more than 120 million downloads in the United States alone.[22]  The TikTok app dominates its top competitors such as Facebook and

---

[18] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123; https://www.reuters.com/article/us-tiktok-cfius-exclusive/exclusive-us-opens-national-security-investigation-into-tiktok-sources-idUSKBN1XB4IL.

[19] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[20] http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

[21] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[22] *Id.*

Instagram.  TikTok recently reported that it has more than 150 million monthly active users in the United States, approaching half of the U.S. population.[23]

**B.  In 2020, ByteDance Began Marketing A New App In The United States Designed To Facilitate Video Editing, Which Could Be Used To Create Videos And Post Them On A Variety Of Social Media Apps.**

48.  The TikTok app provided only basic tools to create and edit videos that users then posted on the app.  In an ongoing effort to expand its offerings and increase its revenue, ByteDance developed a separate app, CapCut, that had far more sophisticated tools that users could employ to create and edit videos, which could then be posted on TikTok as well as a range of other social media platforms, such as YouTube, Instagram, Linkedin, and Facebook.  The CapCut app could be used both by TikTok users and individuals who never downloaded or used the TikTok app.

49.  The CapCut app is a "cloud-based online editor"[24] that has "cloud-based tools"[25] that allow users to edit video, photo, and audio files, among other things.  Information contained in the cloud is stored on servers in data centers, separate and apart from individual user devices.

50.  As discussed more fully below, Defendants maintain that there are several advantages of a "cloud-based" video editor like the CapCut app.  First, "cloud-based tools like CapCut" facilitate collaborative editing of the same video by multiple users utilizing different devices: "Cloud collaboration is a virtual method to collaborate with your team members using cloud-based tools like CapCut. This makes content creation more fun and scalable, as the entire

---

[23] https://variety.com/2023/digital/asia/tiktok-150-million-us-monthly-users-government-ban-1235560251/.

[24] https://www.capcut.com/resource/edite-pro-business-videos-for-smb-smes.

[25] https://www.capcut.com/tools/cloud-collaboration-platform.

team can work on the same project with seamless collaboration."[26]  Second, because CapCut is "cloud-based," an individual user can likewise utilize the app using multiple different devices: "As a cloud-based online editor, you can also quickly access your project using any device and easily edit and review your video."[27]  Finally, because it is "fully cloud-based," CapCut allows users to more easily interact with other online platforms: "CapCut is a fully cloud-based software, meaning it pairs perfectly with many of the channels where ultimately your video content may get uploaded – from TikTok to YouTube and everything in between."[28]

51.    The CapCut app was launched in 2020 in the United States.  The app allows users to edit videos with various templates, filters, visual effects and music to produce videos that look more professional and have a better chance of going viral on social media platforms.[29]  Among other things, users may trim, cut, split or merge videos; change video speed; animate videos using various effects; highlight moments in videos using a freezing feature or slow motion; and add transition effects, music or sounds from a library containing millions of licensed songs.

---

[26] https://www.capcut.com/tools/cloud-collaboration-platform.

[27] https://www.capcut.com/resource/edite-pro-business-videos-for-smb-smes.

[28] https://capcut.world/online-video-editor/.

[29] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.



The CapCut app is a highly advanced video editing app that exceeds the video editing capabilities available on TikTok; for example, the templates feature employs artificial intelligence to allow users to copy the editing style of existing videos.[30] Videos can be edited on almost any device imaginable using CapCut, including a user's PC (Mac & Windows), mobile phone (Android & iOS), or tablet. Defendants advertise CapCut as "more than your typical video editor," providing "a complete package that includes graphic design, team collaboration, and much more" that uses "advanced AI [artificial intelligence] technology infused at every turn . . . ."[31]

52. In addition, CapCut contains speech recognition technology that allows users to translate voices to text (including translating voices into languages other than the original spoken language) that can be, among other things, used to provide captions for videos. "Powered by automatic speech recognition technology, CapCut recognizes speech in the video or audio, creates captions in seconds, and translates the captions into your target language. The auto-created

---

[30] https://www.thespl.it/p/capcut-ai-unlocks-human-creativity.

[31] https://www.capcut.com/creative-suite.

captions will be displayed on the screen in sync with real-time playback."[32]  CapCut's speech to text converter "effectively distinguishes different dialects, languages, and accents with incomparable precision . . . ."[33]

53.    CapCut also contains an "audio extractor" to extract audio from user-provided videos, thereby separating the video from the audio and creating a new audio file that may then be edited using the app.  CapCut has a variety of tools to edit the extracted audio or audio that is part of a video.  Among other things, CapCut has advanced audio editing tools that allow users to edit the pitch of voices contained in audio, distinguish voices from background noise and silence unwanted noise, add voice effects, and tune and transform voices with modulation effects.[34]

54.    CapCut can also transform text into human-sounding voices using advanced artificial intelligence technology.  CapCut's AI voice generator can create a variety of different kinds of voices using different accents, tones, emotions, and languages.  Users can modulate, among other things, voice pitch, volume, speed, and other aspects of sound.[35]

55.    CapCut has developed tools that are further customized to interact with various platforms on which users might decide to post their final videos and other audio-visual material.  For example, CapCut has tools and templates that facilitate the creation of video and other audio-visual content that are compatible with a variety of other video editors and formats, including

---

[32] https://www.capcut.com/tools/video-to-text.

[33] https://www.capcut.com/tools/speech-to-text-converter.

[34] *See, e.g.,* https://www.capcut.com/tools/pitch-changer; https://www.capcut.com/tools/remove-background-noise-from-audio.

[35] *See* https://www.capcut.com/tools/ai-voice-generator.

TikTok's video editor, YouTube intro maker, Instagram video editor, Facebook video editor, YouTube thumbnails and Instagram reels.[36]

56. Users can employ CapCut to edit videos that have been created using the TikTok video editor. They can also create new videos that can be formatted for use with TikTok and the TikTok video editor. CapCut similarly allows users to create or edit videos that are formatted for use with YouTube, Instagram or Facebook and has "a free thumbnail maker with YouTube thumbnail templates and needed materials."[37]

57. CapCut employs artificial intelligence and advanced facial recognition technology to take scans of face geometry that allow users to manipulate facial features appearing in videos or photographs. Multiple reviews of the app have commented on CapCut's facial recognition technology as being an important feature of the app:

- "CapCut's facial recognition technology operates as a boon for photographers aiming for subtlety in enhancement. This technology enables targeted adjustments, guaranteeing that alterations enhance rather than transform. Such precision in portrait editing, where minute changes matter, positions CapCut as an indispensable tool for photographers seeking an ideal blend of artistry and authenticity in their portraits."[38]

- "The success of the Gender Swap Filter on Capcut depends upon its cutting-edge AI technology. Facial Recognition and Landmark Detection: 1. The female-to-male transition process is precisely supported by the filter's AI algorithms, which

---

[36] *See, e.g.*, https://www.capcut.com/create/#social-media.

[37] https://www.capcut.com/create/youtube-thumbnail.

[38] https://videolibrarian.com/articles/essays/capcut-for-photographers-revolutionizing-photo-editing/.

painstakingly determine and record face features in actual time. 2. Feature Manipulation: AI carefully modifies a user's facial characteristics to give a convincing gender switch while preserving total similarity. 3. Voice Modulation: Vocal modulation is a feature of some filter models that analyzes the user's voice and modifies it to seem less female or feminine."[39]

- "By leveraging advanced facial recognition algorithms and machine learning, CapCut's Gender Swap feature automatically analyzes facial features and applies realistic changes to create a convincing transformation. This filter detects and modifies key facial parts, such as the eyes, nose, and mouth, ultimately producing a visually engaging gender swap effect that you can share on social media or use to enhance your storytelling."[40]

- "Many filters can modify your appearance in a fun way or make you look more attractive through facial recognition."[41]

58.     CapCut also contains tools that allow users to communicate with each other or other third parties. For example, when a template is posted on CapCut, users have the ability to like, and comment on, the template.

59.     CapCut offers thousands of different templates. Templates employ catchy titles that are designed to convey information regarding the functions of the various templates, such as "video

---

[39] https://capcutapkmod.website/gender-swap-filter-on-capcut/.

[40] https://capcuttmod.com/how-to-do-gender-swap-filter-on-tiktok-using-capcut/.

[41] https://sharkapk.com/capcut.

face scanner", "2k face scan," "face scanner gimmick", "face recognition ai effect" and "facial recognition technology" template.[42]

60. In addition, CapCut provides users with an option to collaborate and communicate with other users in the editing process by creating a "space" in the cloud and inviting other users to join. Defendants advertise CapCut as the "best cloud collaboration platform."[43] Once a cloud space is created, invited members can access the space from any device and share draft videos for collaborative editing. Users can invite other users to collaborate in a space by, among other things, selecting an option in CapCut to either send an email invitation or a link to the individual they want to invite.[44] Users can then communicate with other users in the space and transfer editing permission to other users so they can edit videos in the space. Users cannot delete a cloud space once it is created.[45]

---

[42] *See, e.g.,* https://www.capcut.com/discover/keyword/video-face-scanner/72368969475; https://www.capcut.com/discover/keyword/face-scanner-gimmic/51956537347; https://www.capcut.com/discover/keyword/2k-face-scan/52329144835; https://www.capcut.com/discover/keyword/face-recognition-ai-effect/70553074179; https://www.capcut.com/discover/keyword/facial-recognition-technology/70888733699.

[43] https://www.capcut.com/tools/cloud-collaboration-platform.

[44] https://www.capcut.com/resource/collaborate-on-capcut-online.

[45] *Id.*



61.     Users can also choose to share videos with other users through the "share for

review" function.[46]  Users may choose to share videos with other users by, among other things,

selecting an option in CapCut to send other users draft or final videos via email or by sending

other users a link.  Videos may be shared for the purpose of having others participate in the

editing process or simply to have others have access to the videos for review.  CapCut saves the

"share history" of users, including the history of which videos they have shared with others and

which videos other users have sent to them to view.  In sum, CapCut's cloud collaboration features

allow users to work together on videos, communicate with each other, exchange comments and

make edits to videos in a shared space.

---

[46] *Id.*



62.     CapCut also offers users a library of copyright-free media assets, including stock videos that they can review, select and use in their video editing projects. Defendants represent that the stock videos they offer have no copyright issues because they are created by professional filmmakers and videographers and licensed for use in other projects. In promoting the stock videos, they provide to CapCut users, Defendants state: "Capcut offers a vast selection of stock videos, animations, and effects organized by themes and uses."[47] "CapCut holds all the aces including massive free animated stock videos tailored for content creators. Not only can you use stock videos for direct editing, but trim, crop, add filters and effects, and change backdrops for specific needs."[48] Users can search the library of stock videos provided by Defendants to CapCut users, select and review the videos, and then incorporate the videos provided by CapCut's video

---

[47] https://www.capcut.com/tools/free-stock-videos.

[48] *Id.*

library into their video editing projects in CapCut and/or utilize the stock videos that are most suitable for their projects.

63. Like user-provided video content, users can edit the stock videos provided by Defendants to produce edited versions of the stock videos using the CapCut app's video editing features. Users can also merge stock video footage into their existing video projects. Defendants describe some potential uses as follows: "Looking for free-to-use stock videos to enhance your editing experience? Want to use free stock videos online for commercial use while eliminating the background from your film footage? CapCut automatically recognizes your movie's faces, enabling you to restyle the backdrop with your chosen images for a better viewing experience."[49]

64. CapCut offers free cloud storage to all users when they sign up for the app.[50] Videos, photos and other data and information stored in the cloud by CapCut are stored independently from user devices on Defendants' servers and are accessible remotely from any device.

65. In promoting its cloud storage services, Defendants state that the privacy of user data saved by CapCut in the cloud is ensured and that user data is safe: "Bring CapCut into your life and enjoy cloud storage for free without compromising on privacy. What's more is that you can access your resources from any device as CapCut is accessible on browsers, Windows, Mac, iOS, and Android devices." "The best cloud storage is secure cloud storage. Bring privacy and

---

[49] *Id.*

[50] https://www.capcut.com/tools/free-cloud-storage.

security into your life with CapCut's free cloud storage. Simply make your account, and rest assured that your data will remain safe whenever you return?"

66.     Defendants charge users of the CapCut app for additional cloud storage as well as for additional features and effects.[51]  Users may obtain additional features and effects by paying for a monthly or yearly subscription to obtain premium features.[52]  Likewise, CapCut charges a variable monthly fee to store videos on the cloud that is dependent on the amount of data that is being hosted.[53]  In addition, as with the TikTok app, the CapCut app collects data from all users, which Defendants can then monetize in a variety of ways, resulting in significant profits.

67.     Defendant ByteDance used a strategy to develop the CapCut app that is similar to the one it employed in developing TikTok, taking an app originally created and developed in China and then marketing it in the United States.  In 2017, ByteDance launched the app in China under the brand name Jianying.  Jianying quickly rose to the top of the Chinese app charts. Meanwhile, ByteDance extended the app's functionality through, among other things, acquisitions of other Chinese-created technology.  In 2018, for instance, ByteDance purchased the startup Shenzhen Lianmeng Technology for $300 million. Shenzhen Lianmeng Technology had previously developed the popular app Faceu, which topped China's free app charts in 2016 and 2017.

---

[51] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[52] https://www.thespl.it/p/capcut-ai-unlocks-human-creativity.

[53] https://productmint.com/how-does-capcut-make-money/#:~:text=CapCut%20Make%20Money%3F-,CapCut%20makes%20money%20by%20charging%20users%20for%20premium%20features.,a%20monthly%20or%20yearly%20subscription.

ByteDance then integrated the firm's technology into Jianying. Once it became the de-facto leader in China, ByteDance sought to market the app in the United States.[54]

68.     ByteDance had one significant advantage in marketing the CapCut app in the United States, that it did not possess when it introduced TikTok to the U.S. marketplace.  When the CapCut app was introduced in the United States in 2020, ByteDance was already a leader in the technology space with a leading social media platform, TikTok.  ByteDance utilized the popular TikTok app to heavily promote its new CapCut video editing app to users in the United States. For example, videos appearing on TikTok that are edited by CapCut direct viewers to the CapCut app, thereby increasing the number of users downloading the CapCut app.[55]

 

---

[54] https://productmint.com/how-does-capcut-make-money/#:~:text=CapCut%20Make%20Money%3F-,CapCut%20makes%20money%20by%20charging%20users%20for%20premium%20features.,a%20monthly%20or%20yearly%20subscription.

[55] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

69. As a result of Defendants' heavy promotion of the CapCut app, it has become one of the most popular apps available in the United States, with more than 200 million monthly active users and global downloads of more than 400 million last year alone.[56]





70. Conversely, the CapCut app has allowed Defendants to dramatically increase the number of videos uploaded to TikTok, and thus the amount of profits that Defendants receive through the TikTok app, because the CapCut app facilitates video creation and has features that make it easy for users to upload videos created or edited using CapCut directly to the TikTok app. As explained by one commentator, "Another important aspect to consider is that CapCut acts as a quasi-user acquisition channel for TikTok and thus ByteDance. By making it easier for people to

---

[56] *Id.*

[57] https://www.thespl.it/p/capcut-ai-unlocks-human-creativity.

edit videos, TikTok has even more members that will upload videos on its platform. And the more and better content is being produced, the more users TikTok will attract."[58]

71.     The CapCut app has allowed Defendants to expand their data collection activities to new individuals who had not previously downloaded their apps, including the TikTok app. Many users of the CapCut app have never downloaded the TikTok app.  Rather, they use the CapCut app to edit videos for their personal use or that they post on other companies' social media apps, such as Instagram, Facebook, YouTube or Linkedin.

72.     Unbeknownst to CapCut users, data collected by the CapCut app may be shared with the TikTok app, thereby further maximizing Defendants' profits.  Information derived from CapCut users may be used to deliver and evaluate tailored advertisements.  In addition, CapCut user data may be shared with third party social network service providers.  Unbeknownst to CapCut users, personal and private information may be collected from users even before they set up an account.[59]

73.     Defendants have unlawfully accumulated private and personally identifiable data and content from CapCut users from which Defendants are unjustly profiting.

**C.      Defendants Have a History Of Unlawfully and Covertly Collecting Private And Personally Identifiable Data And Content From Users of Their Products.**

74.     Defendants have a history of violating the privacy rights of users of their apps.  On November 15, 2020, for example, CBS News 60 Minutes published an investigative report on

---

[58] https://productmint.com/how-does-capcut-make-money/#:~:text=CapCut%20Make%20Money%3F-,CapCut%20makes%20money%20by%20charging%20users%20for%20premium%20features.,a%20monthly%20or%20yearly%20subscription.

[59] https://www.nbcnews.com/politics/white-house/white-house-posts-video-created-using-app-owned-tiktoks-parent-company-rcna77333.

TikTok that raised significant concerns regarding the privacy of user data collected by the TikTok app. In the report, a former member of the U.S. intelligence community stated that "What makes TikTok particularly concerning is its relationship with the Chinese Communist Party in Beijing, the government of China. The Chinese have fused their government and their industry together so that they cooperate to achieve the ends of the state." As the report observed, the TikTok app collected a range of private user data, including "your name, your home address, your personal network, who your friends with, your online viewing habits and a whole host of other pieces of information." In addition, "TikTok asks users for access to their cameras, microphones, photos, videos, and contacts. More obscure data, like 'keystroke patterns,' are collected from everyone using the app." As Senator Josh Hawley noted in the report, the collection of this data was particularly concerning because of TikTok's ownership by ByteDance, "a Chinese parent company that has direct ties to the Chinese Communist Party." As he observed, "under Chinese law, TikTok, ByteDance, the parent, is required to share data with the Chinese Communist Party."

75.     In June 2022, an article in *Buzzfeed News* further confirmed many of these concerns, citing leaked meeting audio from company employees demonstrating that China-based ByteDance has repeatedly accessed non-public data of U.S. TikTok users; as one insider observed, "Everything is seen in China"; Beijing-based engineers had "access to everything."[60] Defendants have since acknowledged that ByteDance engineers were involved in developing the algorithms used in TikTok and that China-based employees have had access to user data.[61] Separately, *Forbes*

---

[60] https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-tapes-us-user-data-china-bytedance-access.

[61] https://www.blackburn.senate.gov/services/files/A5027CD8-73DE-4571-95B0-AA7064F707C1.

reported in October 2022 that Chinese executives used TikTok "to monitor the personal location of some specific American citizens," leading to an investigation by the U.S. government.[62]

76.     In May 2023, Yintao Yu, former head of engineering for Defendant ByteDance's U.S. operations, publicly stated that the Chinese government maintained access to the company's U.S. user data.  He alleged that the Chinese government could monitor ByteDance's work from its headquarters in Beijing and had provided the company with guidance on advancing "core communist values."  "The Committee maintained supreme access to all the company data, even data stored in the United States."[63]  According to Mr. Yu, "the Chinese Communist Party is able to access international and US data through a 'backdoor channel code' in TikTok."[64]  Mr. Yu alleged that ByteDance regularly engaged in a "culture of lawlessness" and that the Chinese Communist Party (CCP) had its own office where it would access all ByteDance data, including data stored in the United States.

77.     Mr. Yu subsequently executed a sworn declaration in June 2023 describing the Chinese Communist Party's access to ByteDance user data, broadly stating, among other things: (1) ByteDance engaged in "blatantly illegal conduct causing me serious concerns"; (2) "Another matter that was known within ByteDance was that the company was being monitored by a special committee of Chinese Communist Party members (the 'Committee') installed at the company. The members of the Committee were not ByteDance employees, they were members of the

---

[62] https://www.forbes.com/sites/emilybaker-white/2022/10/20/tiktok-bytedance-surveillance-american-user-data/?sh=2a6a7f566c2d.  *See also*
https://www.nytimes.com/2022/12/22/technology/byte-dance-tik-tok-internal-investigation.html.

[63] https://thehill.com/policy/technology/4002792-former-executive-of-tiktok-parent-company-claims-china-maintained-access-to-us-data/.

[64] https://www.yahoo.com/lifestyle/tiktok-insider-says-chinese-government-093502126.html.

Chinese Communist Party ('C.C.P.'). However, the Committee members were physically present at ByteDance's offices in Beijing. This was known among the senior executives who discussed the presence of the Committee members at the company."; and (3) "The Committee had access to a superuser credential (also known as a 'god credential') able to view all the data collected by ByteDance, including U.S.-based user data. This was a barrier to any backdoor ByteDance had supposedly installed to protect data from the C.C.P.'s surveillance. The superuser credential was commonly discussed between employees at various levels of the company, including senior executives."[65]

78.     The statements by ByteDance employees and insiders, including statements submitted under penalty of perjury, further establish that ByteDance user data was made available to the Chinese Communist Party and the Chinese government and was in fact accessed by the Chinese Communist Party and the Chinese government.

79.     In November 2022, the Director of the FBI, Christopher Wray, testified before Congress that the FBI had significant "national security concerns" regarding the TikTok app, including "the possibility that the Chinese government could use it to control data collection on millions of users." As Director Wray observed, Chinese law essentially requires Chinese companies to "do whatever the government wants them to in terms of sharing information or serving as a tool of the Chinese government." "And so that's plenty of reason by itself to be extremely concerned."[66]

---

[65] Yintao Yu Decl., Yu v. ByteDance, Inc., No. CGC-23-606246 (Cal. Super. Ct. June 2, 2023).

[66] https://www.npr.org/2022/11/17/1137155540/fbi-tiktok-national-security-concerns-china.

80.     Based on such concerns, TikTok has been banned from government devices.  The U.S. Army initially banned the app on government-owned devices based on concerns specific to Defendants and their close relationship to the Chinese government.[67]  The U.S. Navy, Marines, Air Force and Coast Guard, as well as the Department of Defense and the Transportation Security Administration have likewise banned the TikTok app due to the risk that user data is being sent to China.[68]  In taking such actions, the U.S. Department of Defense noted TikTok's "ability to convey location, image and biometric data to its Chinese parent company, which is legally unable to refuse to share data with the Chinese Government."[69]

81.     Expanding on these measures, United States Senators proposed a bill banning all federal employees from using the TikTok app on government issued phones because it "presents a major security risk."[70]  Agreeing with this proposal, President Biden issued a directive in March 2023 ordering that the TikTok app be removed from all government devices.[71]

82.     More than 30 state governments in the United States have followed federal authorities in banning the TikTok app from government devices, citing privacy concerns.[72]  In

---

[67] https://www.businessinsider.com/us-government-agencies-have-banned-tiktok-app-2020-2.

[68] https://www.businessinsider.com/us-government-agencies-have-banned-tiktok-app-2020-2#1-the-navy-banned-tiktok-from-government-devices-1.

[69] https://www.inc.com/jason-aten/the-department-of-defense-is-warning-people-not-to-use-tiktok-over-national-security-concerns.html.

[70] https://www.reuters.com/article/us-usa-china-tiktok/us-senators-seek-to-ban-federalemployees-from-using-tiktok-on-their-phones-idUSKBN20Z1E4.

[71] https://www.cbsnews.com/news/tiktok-banned-us-government-where-else-around-the-world/.

[72] https://news.yahoo.com/map-here-are-the-states-that-have-banned-tik-tok-on-government-devices-162434392.html#:~:text=TikTok%20is%20banned%20on%20state%20devices%20in%20more%20than%2030%20U.S.%20states.

addition, the State of Montana recently passed legislation that prohibits TikTok from operating within the State and bans downloads of the app within the State.[73]

83.     Based on such national security and privacy concerns, Federal Communications Commissioner Brendan Carr has called on the federal government to completely ban the TikTok app in the United States.  He also urged Apple and Google to remove it from their app stores, citing its "pattern of surreptitious data practices."[74]  As Mr. Carr observed, "All the data is available inside China. We're talking search and browsing history, keystroke patterns, biometrics, potentially including face prints and voice prints being available inside Beijing,"[75]

84.     Likewise, Senator Marco Rubio and Representative Mike Gallagher recently introduced legislation to completely ban TikTok "and other social media companies that are effectively controlled by the CCP from operating in the United States."[76]

85.     Such concerns regarding Defendants' violations of the privacy of users of their apps are not limited to the United States.  Due to similar concerns, the TikTok app has been banned on

---

[73] https://www.msn.com/en-us/news/us/montana-becomes-first-state-to-ban-tiktok-after-governor-signs-bill-into-law/ar-AA1bk7FP?ocid=msedgntp&cvid=a464877bbc2c43ab9af8bcae49e2718f&ei=11; https://apnews.com/article/tiktok-ban-montana-bytedance-a79eb96897d206dbe3ef3b188482d912.

[74] https://techcrunch.com/2022/06/28/fcc-commissioner-writes-to-apple-and-google-about-removing-tiktok/#:~:text=An%20FCC%20Commissioner%2C%20Brendan%20Carr,users%27%20data%20up%20until%20January.

[75] https://www.skynews.com.au/world-news/global-affairs/culture-of-lawlessness-whistleblower-makes-explosive-claims-about-the-tiktoks-shocking-links-to-chinese-communist-party/news-story/1c5f2ef3dcbd1faca66318fa7eb524d2?amp.

[76] https://www.npr.org/2022/11/17/1137155540/fbi-tiktok-national-security-concerns-china; see also https://www.washingtonpost.com/opinions/2022/11/10/marco-rubio-ban-tiktok-america-china-mike-gallagher/.

devices used by staff of the European Parliament, European Commission and the EU Council as well as government devices in Canada and Taiwan.[77]  In addition, India completely banned the TikTok app from devices in that country in 2020.[78]

86.     As authorities have recognized, the privacy concerns are significant, given that Chinese companies have a legal obligation to cooperate with the Chinese government and provide the government with user data they collect.  Thus, for example, Senator Hawley has noted: "all it takes is one knock on the door of their parent company, based in China, from a Communist Party official for that data to be transferred to the Chinese government's hands, whenever they need it."[79]  As a former TikTok employee acknowledged (as reported in the *Wall Street Journal*): "We're a Chinese company ... We answer to China."[80]

87.     Indeed, China-based ByteDance exercises significant day-to-day control over operations in the United States of its affiliates.  As a recent *Washington Post* story reported based on statements by former and current employees, China signs off on all major decisions regarding American operations including decisions regarding American users' data:

> According to current and former employees who reportedly spoke with the Washington Post: China remains [TikTok's] central hub for pretty much everything . . . . Beijing managers sign off on major decisions involving U.S. operations, including from the teams responsible for protecting Americans' data and deciding which videos should be removed. They lead TikTok's design and engineering teams and oversee the software that U.S. employees use to chat with colleagues and manage their work. They're even the final

---

[77] *Id.*

[78] *Id.*

[79] https://www.nbcnews.com/politics/congress/hawley-takes-aim-tiktok-china-congressional-hearing-n1076586.

[80] https://www.wsj.com/articles/tiktok-looking-at-ways-to-shake-off-its-ties-to-china-11574073001.

decision-makers on human resources matters, such as whether an American employee can work remotely.[81]

88.     Other reports from former employees are in accord.  For example, another recent report quoted employees as stating: "'The Chinese execs, they're in control.' . . . 'The American execs are there to smile, look pretty, push away criticism. But ByteDance is still calling the shots behind the scenes.'"[82]

89.     Nonetheless, ByteDance has attempted to obscure its ties to China and obscure the fact that user data is available to individuals in China, including the Chinese communist government.  For example, it has been reported that TikTok eliminated any reference to China from its U.S. privacy policy sometime in 2019 or thereafter, even though the entities with which the policy stated it may share users' data did not change location.[83]

90.     Indeed, TikTok documents demonstrate that TikTok's "messaging" strategy calls for company representatives to "Downplay the parent company ByteDance, downplay the China association, downplay AI."[84]  Based on information and belief, Defendants' corporate strategy to downplay the association with China applies equally with respect to the CapCut app.

91.     As a result of such allegations, the TikTok app was the subject of multiple class action lawsuits consolidated in a federal multidistrict litigation (MDL) proceeding, which

---

[81] D. Harwell and E. Dwoskin, As Washington Wavers on TikTok, Beijing Exerts Control, WASH. POST (Oct. 28, 2022), https://wapo.st/3VjMvLV.

[82] G. Cain, How China Got Our Kids Hooked on 'Digital Fentanyl', COMMON SENSE (Nov. 16, 2022), https://bit.ly/3VLbUhG.

[83] D. Carroll, Is TikTok a Chinese Cambridge Analytica data bomb waiting to explode?, QUARTZ (May 7, 2019), https://bit.ly/3zDuAqO.

[84] C. Stokel-Walker, Inside TikTok's Attempts to 'Downplay the China Association', GIZMODO (July 27, 2022), https://bit.ly/3EV8XnY.

Defendants recently settled for $92 million.[85]  After they agreed to settle the litigation, Defendants publicly acknowledged that the TikTok app, which like CapCut has video editing capabilities, "may collect biometric identifiers and biometric information as defined under U.S. laws, such as faceprints and voiceprints, from your User Content."

92.  Nonetheless, government authorities' investigation into Defendants' violation of user privacy rights continues.  For example, in December 2023, the House Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party sent a letter to the FBI requesting an update on their investigation into the ability of ByteDance, TikTok and the Chinese Communist Party to surveil Americans.  In particular, the Committee cited "recent reports that TikTok's internal platform—which houses its most sensitive information—was inspected in person by Chinese Communist Party (CCP) agents in the lead-up to the CCP's 20th National Congress."  The Committee noted that, "[u]nder the National Intelligence Law of the People's Republic of China (PRC), ByteDance and TikTok are required to assist in CCP intelligence gathering and to provide the CCP with data—including on Americans. These alarming reports reaffirm our concerns regarding the CCP's ability to use TikTok to spy on Americans and influence the content that they consume."[86]

---

[85] *In re TikTok, Inc. Consumer Privacy Litig.*, MDL 2948, No. No. 20-cv-4699 (N.D. Ill.).

[86] chrome-extension://hbgjioklmpbdmemlmbkfckopochbgjpl/https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/12.7.23-scc-letter-to-fbi-tiktok.pdf.

**D.    Defendants Use The CapCut App To Continue And Expand Their Theft Of Users' Private And Personally Identifiable User Data And Content.**

93.    While it has received less scrutiny than the TikTok app, Defendants' CapCut app is no less of a threat to the privacy of its users.[87]  CapCut is an app developed by TikTok's Chinese parent, ByteDance, that affords users powerful tools with which they can edit videos that may then be made public on a variety of social media platforms or remain private with the user.  CapCut is a separate and distinct app that provides tools to users that are not available on the TikTok app, and which can be used by individuals who never download or utilize the TikTok app.  While the CapCut app contains a feature that allows users to post videos directly to TikTok,[88] videos created by CapCut may also be posted to other social media apps, such as YouTube, Instagram, Linkedin and Facebook.

94.    Such videos are prominently featured on social media apps like TikTok and YouTube, which offer feeds of recommended videos that are selected based on each user's interests.

95.    Such videos are an essential element of certain social media platforms' revenue models, which rely on targeted advertisements tied to such user-generated content.  The greater the number of CapCut-generated videos that are uploaded to TikTok, for example, the greater the revenues received by Defendants from the TikTok app.

96.    By prompting users to view videos with which they are more likely to engage (based on data they collect from users), TikTok and other social media platforms have increased their revenues at a significant pace.

---

[87] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[88] https://www.thespl.it/p/capcut-ai-unlocks-human-creativity.

97. The more user data social media platforms such as TikTok have at their disposal, the more efficiently and effectively they can deploy advertising and grow their profits. Thus, to the extent TikTok has access to data from CapCut users, it can grow its revenue and profits even more.

98. Unless publicly shared through the affirmative consent of a CapCut user, videos created using the CapCut app, which often include close-up views of faces and private acts unintended for public consumption, are inherently private, personal and sensitive.

99. Unbeknownst to users of the app, the CapCut app gains access to these private videos. Moreover, the app performs "pre-uploading" of content (videos, etc.), which sends the content to the platform even before the user clicks on "upload" or "post".

100. Likewise, unbeknownst to users, the CapCut app collects a broad array of private and personally identifiable data and content from which Defendants unjustly profit. The CapCut app collects a range of private and personal user data, including photos, audio and videos, as well as location, gender and birthday.[89] The information and data collected by CapCut include highly sensitive biometric identifiers and information that can be used to identify CapCut users. The CapCut app is designed to allow Defendants to possess, capture, and collect such information.

101. CapCut collects personal data from its users to develop a data bank that can then be used for targeted advertising and other purposes.[90]

102. Plaintiffs, the Class, and the Subclasses have a reasonable expectation of privacy in the private and personally identifiable data and content on their devices.

---

[89] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[90] https://nerdschalk.com/who-made-capcut/.

103.    From each device on which the CapCut app is installed, Defendants collect, among other items, the following user data and information:

      a.    username, password, age/birthday, email address, and profile image;

      b.    phone and social network contacts;

      c.    identifier and location information;

      d.    photos and videos and other user-generated content;

      e.    audio data;

      f.    product interaction and usage data;

      g.    crash data;

      h.    dump data;

      i.    performance data; and

      j.    diagnostics data.[91]

104.    Defendants have built into the CapCut app the capacity to collect a range of private and personally identifiable information regarding users, including Mac address, SSID, BSSID, previously configured networks, IMEI information, device ID, IMSI information, phone number, voice mail number, MEID (Mobile Equipment Identifier), ICCID (Integrated Circuit Card Identifier), and SIM serial number.

105.    In addition, Defendants have built into the CapCut app the capacity to collect fine-grained location information and location updates, access files on user devices and store them, and engage in offline data collection.

---

[91] *Id.*

106.     Collection of physical and digital location tracking data is highly invasive of CapCut users' privacy rights.  "Location data is among the most sensitive personal information that a user can share with a company . . .  Today, modern smartphones can reveal location data beyond a mere street address.  The technology is sophisticated enough to identify on which floor of a building the device is located."[92]  Over time, location data reveals private living patterns of CapCut users, including where they work, where they reside, where they go to school, and when they are at each of these locations.  Location data, either standing alone, or combined with other information, exposes deeply private and personal information about CapCut users' health, religion, politics and intimate relationships.

107.     Multiple experts have expressed concerns regarding CapCut's harvesting of users' personal data.  For example, the Special Competitive Studies Project, a technology think tank funded by former Google CEO Eric Schmidt, lists CapCut as one of the Chinese apps that "pose similar challenges" to American security, "particularly with respect to data harvesting, data exploitation, and—possibly—covert influence."[93]

**E.     Defendants Are Unjustly Profiting While Plaintiffs Suffer Harm.**

108.     Defendants possess user/device identifiers, biometric identifiers and information, private videos, and private video images sufficient to create a file of private and personally identifiable data and content for each CapCut user.  Such files can be supplemented over time with additional private and personally identifiable user data and content, and all of this private

---

[92] https://www.law360.com/consumerprotection/articles/1221312/sens-prod-zuckerberg-why-keep-tracking-user-locations-.

[93] https://scsp222.substack.com/p/tiktok-is-the-tip-of-the-iceberg.

and personally identifiable data and information has been, is, and will be used for economic and financial gain.

109.    Defendants' unlawful possession and control over this data and information make tracking and profiling CapCut users, and targeting them with advertising, much more efficient, effective, and lucrative. Such private and personally identifiable data and content are used to analyze CapCut users' income, consumption habits, and preferences. Such information provides guidance as to what methods of advertising will be most effective on particular CapCut users, what products – including Defendants' own products – will be most attractive to particular CapCut users, and how much to spend on particular ads. Defendants unjustly have earned and continue to earn substantial profits and revenues from such targeted advertising and from generating increased demand for and use of Defendants' other products.

110.    Defendants also unlawfully leverage the private and personally identifiable CapCut user data and content to improve their artificial intelligence technologies and file patent applications, thereby unjustly increasing their past, present and future profits and revenues – and their market value.

111.    Meanwhile, Plaintiffs, the Class and the Subclasses have incurred, and continue to incur, harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, private videos and private video images.

112.    Plaintiffs, the Class and the Subclasses also have suffered and continue to suffer harm in the form of diminution of the value of their private and personally identifiable data and content as a result of Defendants' surreptitious and unlawful activities.  Plaintiffs' personal and

private data has a significant commercial value. In 2018, California enacted the California Consumer Privacy Act ("CCPA") which recognizes the significant economic value of such consumer data. The act, among other things, permits businesses to purchase consumer information from consumers directly (Cal. Civ. Code § 1798.125(b)(1)) and permits business to assess and appraise consumer data with a monetary value (Cal. Civ. Code § 1798.125(a)(2)).

113. Plaintiffs and the Class have suffered benefit of the bargain damages, insofar as Defendants took more data than they were authorized to take and used that data for undisclosed and unauthorized purposes. Those benefit of the bargain damages include loss of control over property (their data) that has a marketable value. In addition, Plaintiffs and the Class assigned value to keeping their private data private, which was destroyed when Defendants inappropriately collected their data without adequate notice or authorization and used it for undisclosed purposes.

114. Finally, Plaintiffs, the Class, and the Subclasses have incurred additional data usage and electricity costs that they would not have incurred but for Defendants' covert and unlawful actions.

**F.** **Plaintiffs Could not Have Earlier Discovered Defendants' Wrongful Conduct And Defendants Have Fraudulently Concealed Their Unlawful Conduct, Thereby Tolling Any Applicable Statutes of Limitations.**

115. Each unauthorized collection of private data by Defendants is a separate "wrong" that triggers anew the relevant statute of limitations.

116. Plaintiffs, the Class, and the Subclasses were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part. Plaintiffs and Class members could not with due diligence have discovered the full scope of Defendants' conduct, including because it involves the operation of highly technical proprietary software owned by Defendants and there were no adequate disclosures that would inform a reasonable consumer

regarding the facts as alleged in the complaint. Defendants had exclusive knowledge regarding many aspects of the functioning of the software used with the CapCut platform, yet failed to disclose relevant functions of that software to the public. The earliest Plaintiffs and Class members could have known about Defendants' conduct was shortly before the filing of this complaint.

117.    In addition, the applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their unlawful conduct alleged above – through, among other things, their obfuscation of the source code, misleading public statements, and hidden and ambiguous privacy policies and terms of use.

118.    As a result of Defendants' fraudulent concealment, Plaintiffs lacked actual or constructive knowledge of the relevant facts giving rise to their claims despite their exercising reasonable diligence in attempting to uncover facts giving rise to the claim.

119.    Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiffs, the Class and the Subclasses. Defendants are therefore estopped from relying on any statute of limitations. Defendants' fraudulent concealment is common to the Class and the Subclasses.

**G.    The Named Plaintiffs Have Been Injured By Defendants' Unlawful Conduct.**

120.    During the time that the CapCut app was installed on plaintiffs' devices, Defendants surreptitiously performed, among others, the following actions without notice to or the knowledge and consent of plaintiffs or, in the case of the minor plaintiffs, their legal guardians: (i) Defendants took plaintiffs' user/device identifiers and private videos and audio-visual material from their devices; (ii) Defendants took plaintiffs' biometric identifiers and information (including face geometry scans) from plaintiffs' devices and/or videos; (iii) Defendants took plaintiffs' private

and personally identifiable data and content from plaintiffs' devices; and (iv) Defendants made some or all such stolen data and content accessible to individuals in China – including individuals under the control of the Chinese government.

121.   Defendants performed these acts for the purpose of secretly collecting plaintiffs' private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, and private videos – and using such data and content to track, profile and target plaintiffs with advertisements. Further, Defendants have used plaintiffs' private and personally identifiable data and content for the purpose of developing their artificial intelligence capabilities and patenting commercially valuable technologies. Defendants and others now have access to private and personally identifiable data and content regarding plaintiffs that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from these activities.

122.   Meanwhile, plaintiffs have incurred harm as a result of Defendants' invasion of their privacy rights through their covert taking of plaintiffs' private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, private videos and private video images. Plaintiffs also have suffered harm because Defendants' actions have diminished the value of their private and personally identifiable data and content. Moreover, plaintiffs have suffered injury to their devices. The battery, memory, CPU, and bandwidth of Plaintiffs' devices have been compromised, and as a result, the functioning of those devices has been impaired and slowed, due to Defendants' clandestine and unlawful activities. Finally, Plaintiffs have incurred additional data usage and electricity costs that they and/or their guardians would not have incurred but for Defendants' covert and unlawful actions.

123.    Neither Plaintiffs nor, in the case of the minor plaintiffs, their guardians, ever received notice that Defendants would collect, capture, receive, otherwise obtain, store, and/or use their biometric identifiers, face geometry scans, voiceprints or any of their other biometric information. Defendants never informed plaintiffs or their guardians of the specific purpose and length of time for which their biometric identifiers, face geometry scans, or any of their other biometric information would be collected, captured, received, otherwise obtained, stored, and/or used. Neither Plaintiffs nor, in the case of minors, their guardians, ever signed a written release authorizing Defendants to collect, capture, receive, otherwise obtain, store, and/or use their biometric identifiers, face geometry scans, voiceprints, or any of their other biometric information.

124.    Based on counsel's investigation and analysis, CapCut deliberately designed its Terms of Service and Privacy Policy to decrease the likelihood that a user will receive, notice, or comprehend its terms and conditions or could provide meaningful, express consent to its conditions, in order to encourage users to sign up and not be deterred by accurate and truthful disclosures.

125.    Plaintiffs did not know nor expect that Defendants would collect, store, and use their biometric identifiers and biometric information when they used the CapCut app.

126.    Plaintiffs did not receive notice from Defendants (written or otherwise) that Defendants would collect, store, and/or use their biometric identifiers or biometric information. Plaintiffs did not receive notice from Defendants of the specific purpose and length of time that Defendants would collect, store, and/or use their biometric identifiers or biometric information. Plaintiffs did not give authorization (written or otherwise) for Defendants to collect, store, and/or use their biometric identifiers or biometric information.

127.     Plaintiffs were not aware of, nor do they recall seeing, a retention schedule setting out the guidelines for Defendants to permanently destroy biometric identifiers or biometric information.

**H.     Defendants' Privacy Policies And Terms of Use Do Not Constitute Notice of, Or Consent To, CapCut User Data Theft.**

128.     Defendants have adopted various privacy policies and terms of use for the CapCut app. Certain privacy policies purport to disclose that the CapCut app takes some (but not all) of the private and personally identifiable user data and content above.

129.     Because the CapCut app has taken private and personally identifiable user data – including user/device identifiers –before CapCut users are even presented with the option of signing-up for and creating an account, CapCut users have had no notice of, or opportunity to consent to, the privacy policies and terms of use prior to such theft.  In addition, Web users have browsed the CapCut site, and created content without logging in or creating an account.  CapCut users who have not signed up for an account have no notice of, and cannot consent to, the privacy policies and terms of use.

130.     Moreover, even at the point at which CapCut users have the option to sign-up and create an account, Defendants do not provide such users actual notice of privacy policies or terms of use. Users were able to access the CapCut platform without having to scroll through and read such policies before they were allowed to sign up for the services.  Nor do Defendants present CapCut users with conspicuously located and designed hyperlinks to their privacy policies and terms of use, much less conspicuous warnings accompanying such hyperlinks. The CapCut app thus allows users to utilize the app without effectively placing them on actual or constructive notice of the privacy policies and terms of use as defined under governing law. This lack of actual or

constructive notice deprives CapCut users of the opportunity to accept or reject CapCut's privacy policies and terms of use, rendering such documents unenforceable.

131.    Additionally, certain privacy policies and terms of use are ambiguous as to what conduct they purport to cover. Such privacy policies and terms of use are also substantively and procedurally unconscionable. The ambiguities render meaningless the purported disclosures and requirements in the remainder of these documents, and the substantive and procedural unconscionability render such documents unenforceable.

132.    Moreover, even if CapCut users had knowingly accepted the terms of use (which they did not), they would have a right to seek public injunctive relief in a court of law is unenforceable under California law. *See, e.g., McGill v. Citibank*, 2 Cal. 5th 945 (2017); *Blair v. Rent-A-Center*, 928 F.3d 819 (9th Cir. 2019).

133.    Any attempt to surreptitiously secure minor users' "consent" to CapCut's Terms of Use is unlawful and invalid.

134.    Defendants do not make any attempt to secure the consent of parents or lawful guardians.

135.    Defendants have not obtained consent from the parents or lawful guardians of minor Class Members for their accounts.

136.    Defendants fail to make reasonable efforts to ensure that a parent or lawful guardian of minor Class Members receives direct notice of their practices regarding the collection, use, or disclosure of personal and biometric information.

137.    Defendants do not at any point contact the parents or lawful guardians of minor Class Members to give them notice and do not even ask for contact information for the parents or lawful guardians of Class Members.

138.    Thus, Defendants have no means of obtaining verifiable parental consent for minor Class Members, or the consent of any lawful guardian, before any collection, use, or disclosure of the personal information of minor Class Members.

139.    None of the Plaintiffs or Class Members consented, and/or did not give effective or legally binding consent, to any of the wrongful conduct alleged in this complaint. Moreover, to the extent Defendants contend otherwise, all Plaintiffs who used CapCut as minors expressly disaffirm and disavow any such alleged consent.

**I.      Defendants Have Failed To Protect the Privacy Rights Of Minors.**

140.    Indeed, while Defendants recognize that individuals under age 13 should not be using the CapCut app at all and that the app is not suitable for such underage users, the app does not perform age verification to prevent underage users from using the app. Nor does it take steps necessary to ensure that minor users have obtained parental consent to use the app. Accordingly, Defendants have subjected underage users to a range of privacy violations unnecessarily because Defendants have failed to implement appropriate age verification measures that would prevent them from using the app. The CapCut app does not contain parental controls that are provided by other Internet-based platforms and apps.

141.    Defendants' failure to discourage underage use appears to be intentional. Among other things, as noted above, the TikTok app, which itself is heavily used by younger users, actively promotes use of the CapCut app, which is owned by the same corporate group.

142. As the *Wall Street Journal* has observed, "through its powerful algorithms, TikTok can quickly drive minors—among the biggest users of the app—into endless spools of content about sex and drugs."[94]  In fact, the FTC previously took action against TikTok for its failure to protect children, resulting in a settlement with the FTC and the imposition of a then-record civil Children's Online Privacy Protection Act (COPPA) penalty.  Having lured large numbers of children to the TikTok platform through its powerful algorithms, including children under the age of 13, Defendants then channeled those same underage users to the CapCut app through heavy promotion of the CapCut app on the TikTok platform.   In addition, the design of the CapCut app itself facilitates underage use.  The CapCut app allows individuals to use the app without creating an account.  As a result, underage users can use the app without reporting their age at all.  Accordingly, Defendants not only fail to take adequate measures to discourage underage use, but they have taken active steps that encourage underage use in the way they have designed and promoted the CapCut app.

## V.    CLASS ALLEGATIONS

143. Plaintiffs seek certification of the classes set forth herein pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiffs seek class certification of all claims for relief herein on behalf of a class and subclass defined as follows:

> **Nationwide Class:** All persons who reside in the United States who used the CapCut app after it was launched in the United States.[95]
> Or, in the alternative:

> **Illinois Subclass:** All persons who reside in Illinois and used the CapCut app after the app was launched in the United States.

---

[94] https://www.wsj.com/articles/tiktok-algorithm-sex-drugs-minors-11631052944.

[95] The CapCut app was launched in the United States in 2020.

**California Subclass:** All persons who reside in California and used the CapCut app after the app was launched in the United States.

144.    Plaintiffs are the proposed class representatives for the Nationwide Class. Illinois Plaintiffs are the proposed class representatives for the Illinois Subclass.  California Plaintiffs are the proposed class representatives for the California Subclass.

145.    Plaintiffs reserve the right to modify or refine the definitions of the Class and the Subclasses.

146.    Excluded from the Class and the Subclasses are: (i) any judge or magistrate judge presiding over this action and members of their staff, as well as members of their families; (ii) Defendants, Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) counsel for Defendants; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

147.    **Ascertainability.** The proposed Class and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow Class and Subclass Members to determine if they are part of the Class and/or one of the Subclasses. Further, the Class and Subclasses can be readily identified through records maintained by Defendants.

148.    **Numerosity (Rule 23(a)(1)).** The Class and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of Class and Subclass Members, as herein identified and described, is not known, but download figures indicate that the CapCut

app was downloaded approximately 28 million times in the United States during the last year alone.[96]

149.     **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass Members, including the following:

a.      Whether Defendants engaged in the activities and practices referenced above;

b.      Whether Defendants' activities and practices referenced above constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

c.      Whether Defendants' activities and practices referenced above constitute a violation of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

d.      Whether Defendants' activities and practices referenced above constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*;

e.      Whether Defendants' activities and practices referenced above constitute a violation of the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*;

f.      Whether Defendants' activities and practices referenced above constitute a violation of the California Comprehensive Data Access and Fraud Act, Cal. Pen. C. § 502;

g.      Whether Defendants' activities and practices referenced above constitute a violation of the Right to Privacy under the California Constitution;

h.      Whether Defendants' activities and practices referenced above constitute an intrusion upon seclusion;

i.      Whether Defendants' activities and practices referenced above constitute a violation of the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq.*;

j.      Whether Defendants' activities and practices referenced above constitute a violation of the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq.*;

k.      Whether Defendants' activities and practices referenced above constitute a violation of the California Invasion of Privacy Act, Cal. Pen. Code §§ 630 *et seq.*;

---

[96] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

l.      Whether Defendants' activities and practices referenced above constitute statutory larceny, Cal. Pen. Code §§ 484, 496;

m.    Whether Defendants' activities and practices referenced above constitute conversion;

n.     Whether Defendants' activities and practices referenced above constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

o.     Whether Defendants' activities and practices referenced above constitute a violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, et seq.;

p.     Whether Plaintiffs and members of the Class and Subclass sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount;

q.     Whether Defendants profited from their activities and practices referenced above, and, if so, in what amount; and

r.     What is the appropriate injunctive relief to ensure that Defendants no longer unlawfully: (i) take private and personally identifiable CapCut user data and content – including user/device identifiers, biometric identifiers and information, private videos and private video images, and video viewing histories; (ii) utilize private and personally identifiable CapCut user data and content to develop and patent commercially valuable artificial intelligence technologies; (iii) utilize private and personally identifiable CapCut user data and content to create consumer demand for and use of Defendants' other products; (iv) give access to such private and personally identifiable CapCut user data and content to individuals in China and to third parties either in China or whose data is accessible from within China; (v) cause the diminution in value of CapCut users' private and personally identifiable data and content; (vi) cause injury and harm to CapCut users' devices; (vii) cause CapCut users to incur higher data usage and electricity charges; (viii) retain the unlawfully acquired private and personally identifiable data and content of CapCut users; and (ix) profile and target, based on the above activities, CapCut users with advertisements.

s.     What is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and relevant third parties destroy unlawfully acquired private and personally identifiable CapCut user data and content in their possession, custody or control.

150.    **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of members of the Class and Subclasses because, among other things, Plaintiffs and members of the Class and

Subclasses sustained similar injuries as a result of Defendants' uniform wrongful conduct, and their legal claims all arise from the same events and wrongful conduct by Defendants.

151.     **Adequacy (Rule 23(a)(4)).** Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs' interests do not conflict with the interests of the Class and Subclass Members, and Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class and Subclasses.

152.     **Predominance & Superiority (Rule 23(b)(3)).** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class and Subclass Members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

153.     **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class and Subclasses, making final declaratory and/or injunctive relief appropriate with respect to the Class and Subclasses as a whole.

154. **Particular Issues (Rule 23(c)(4)).** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class and Subclass Members and are capable of class-wide resolution that will significantly advance the litigation.

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030
### (On Behalf of the Plaintiffs and the Class)

155. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

156. The Plaintiffs' and the Class's devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

157. Defendants have exceeded, and continue to exceed, authorized access to the Plaintiffs' and the Class's protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C). Defendants intentionally accessed Plaintiffs' devices without the necessary authorization in order to obtain data that Plaintiffs did not authorize them to take.

158. Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of the Plaintiffs' and the Class's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption. Defendants'

unauthorized access and collection of data (i) frequently and systematically drained Plaintiffs' and the Class Members' devices and batteries, and (ii) caused a diminution in value of Plaintiffs' and Class Members' personal information, both of which occurred to millions of Class Members. In addition, Defendants' unauthorized access to Plaintiffs' devices requires evaluation by professionals to determine potential remedial measures, including potential replacement of their devices.

159.    Defendants' conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), due to the private and personally identifiable data and content of the Plaintiffs and the Class being made available to foreign actors, including the Chinese Communist Party and foreign intelligence services, in locations without adequate legal privacy protections. That this threat is real and imminent is evidenced by the materials cited above.

160.    Accordingly, the Plaintiffs and the Class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

## SECOND CAUSE OF ACTION

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710 *ET SEQ.* (On Behalf of the Plaintiffs and the Class)

161.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

162.    The VPPA states that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S. Code § 2710 (b)(1). Defendants violated this statute by knowingly disclosing personally identifiable information to third parties without informed, written consent.

163. Defendants are "video tape service provider[s]" under 18 U.S.C. § 2710 because they "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." See 18 U.S.C. § 2710(a)(4). In this regard, Defendants are engaged in the business of delivering video content and services to Plaintiffs and the Class. The CapCut app provides edited video content to users, including Plaintiffs, as well as video templates, stock videos contained in CapCut's video library, and other similar audio-visual materials that fall within the scope of the statute. As detailed above, Defendants also enter into agreements with content providers to provide video templates and other audio-visual material to enable users, including Plaintiffs, to access such content through CapCut. Defendants also allow users, including Plaintiffs, to create and share edited videos with a non-public audience.

164. Throughout the Class Period, Defendants delivered prerecorded video and similar audio-visual materials to CapCut users, including Plaintiffs, making those materials electronically available to Plaintiffs on the CapCut platform.

165. Plaintiffs and the Class are "consumers" under 18 U.S.C. § 2710(a)(1) because they are "subscriber[s] of goods or services" from Defendants. Plaintiffs are registered CapCut users who use the platform through interaction with it. Specifically, Plaintiffs were required to provide personally identifiable information to CapCut in order to sign up, become registered users, and engage in CapCut services, including using and contributing to CapCut's video editing services. Plaintiffs and the Class entered into transactions with Defendants to obtain access to CapCut's content and services and for the purpose of subscribing to CapCut's video editing content and services.

166.    The VPPA defines "personally identifiable information" to "include[] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(1)(3). Defendants "knowingly disclose[d]" to persons users' personally identifiable information.  Plaintiffs' content and information included "personally identifiable information" because, among other things, the content Defendants gave to third parties identified Plaintiffs as having "requested or obtained specific video materials or services." Specifically, Plaintiffs' content and information included personally identifying information as well as information regarding Plaintiffs' downloads, views, edits, "likes" and comments regarding videos, templates and other audio-visual material during the use of Defendants' services.

167.    Defendants' unlawful disclosure of personally identifiable information concerning Plaintiffs was not incident to the "ordinary course of business" of delivering the visual content as that term is defined by the VPPA. See 18 U.S.C. § 2710(a)(2). The disclosure of users' personally identifiable information to third parties not involved in the transactions as alleged herein was not necessary in order for Defendants to deliver services to Plaintiffs.  Moreover, this exception is limited to debt collection activities, order fulfillment, request processing, and the transfer of ownership. 18 U.S.C. § 2710(a)(2).

168.    The VPPA also provides that a video tape service provider may nonetheless disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent...in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S. Code § 2710(b)(2)(A)(i).

169.     Defendants failed to obtain the "informed, written consent" of Plaintiffs "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." See 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

170.     Defendants did not provide Plaintiffs with "an opportunity, in a clear and conspicuous manner, for the consumer[s] to withdraw on a case-by case basis or to withdraw from ongoing disclosures, at the consumer's election." See 18 U.S.C. § 2710(b)(2)(B)(iii).

171.     The VPPA also requires that persons subject to the section "destroy personally identifiable information as soon as practicable, but no later than one year from the date the information is no longer necessary for the purpose for which it was collected." See 18 U.S.C. § 2710(e). Upon information and belief, Defendants maintain rather than destroying users' personally identifiable information under this statute, despite that it is no longer necessary for purposes of delivering the services.

172.     Plaintiffs are "aggrieved person[s]" under the VPPA by Defendants' disclosure of their personally identifiable information under 18 U.S.C. § 2710(b)(1), as alleged herein. Therefore, Plaintiffs may bring an action under § 2710(c) against Defendants.

173.     Plaintiffs may be awarded actual damages, but not less than liquidated damages in an amount of $2,500 per Plaintiff, punitive damages, attorneys' fees and costs, and such other preliminary and equitable relief as the court determines to be appropriate.

### THIRD CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510 *ET SEQ.* (On Behalf of the Plaintiffs and the Class)

174. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

175. The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510, et seq., prohibits the interception of any wire, oral, or electronic communications without the consent of at least one party to the communication. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communications is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

176. "Intercept" is defined as the aural or other acquisition of the contents of any wire, electronic, or oral communications through the use of any electronic, mechanical, or other device. 18 U.S.C. § 2510(4).

177. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

178. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

179. "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence, of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

180.    Defendants are each a "person" for purposes of the ECPA because they are corporations.

181.    The CapCut platform is a "device or apparatus" that is used to intercept a wire, oral, or electronic communication because it is an electronic means of acquiring the contents of users' wire, electronic or oral communications.

182.    Plaintiffs' and Class Members' sensitive personal information and data that were intercepted by Defendants are "electronic communications" within the meaning of 18 U.S.C. § 2510(12).  Among other things, the CapCut platform allows the interception of electronic communication of emails, videos, messages, likes and other electronic communications.

183.    Plaintiff and Class Members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications.  Plaintiffs have an expectation of privacy in such communications, and exercised a reasonable expectation of privacy concerning the transmission of those messages.

184.    Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, or based on information and belief the consent of individuals with which they were communicating, and for the unlawful and/or wrongful purpose of monetizing private information and data.

185.    Defendants' actions were at all relevant times knowing, willful, and intentional, particularly because Defendants are sophisticated parties who know the type of data they intercept through their own products and Defendants purposefully designed the CapCut platform to intercept such data.

186. Neither Plaintiffs nor Class Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. Defendants never sought to, or did, obtain Plaintiffs', Class Members', or third parties', consent to intercept their electronic communications through Defendants' app.

187. The unauthorized interceptions described herein are not covered by any business exception.

188. Defendants' actions violate § 2511(1)(a) of the ECPA because Defendants intentionally endeavored to intercept, and did intercept, messages transmitted by Plaintiffs and the Class using the CapCut platform. Based on information and belief, Defendants intercept videos, emails, messages and other electronic communications by using devices that are distinct from devices associated with the transmission of the communications between sender and recipient.

189. Defendants' acts further violate § 2511(1)(d) of the ECPA because, based on information and belief, information intercepted from Plaintiffs' and Class Members' communications was intentionally used for corporate gain and profit. In the process, Defendants were unjustly enriched by their unauthorized interception of Plaintiffs' and Class Members' electronic communications.

190. Defendants' acts further violate § 2511(1)(c) of the ECPA because, based on information and belief, Defendants intentionally disclosed information intercepted from Plaintiffs' and Class Members' communications to third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens.

191. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are

entitled to: (1) appropriate equitable and declaratory relief, including but not limited to, requiring Defendants to stop intercepting any part of Plaintiffs' and the Class Members' electronic communications; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (3) punitive damages, and (4) reasonable attorneys' fees and other litigation costs reasonably incurred.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. §§ 2701 *ET SEQ.* (On Behalf of the Plaintiffs and the Class)

192.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

193.    The Stored Communications Act ("SCA") allows a private right of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." *See* 18 U.S.C. § 2701(a); *see also* 18 U.S.C. § 2707(a) (cause of action).

194.    The SCA incorporates the definition of "electronic communication" found in the ECPA, which defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

195.    CapCut users transmit a variety of electronic communications in using the CapCut app, including emails, links, draft videos, and other electronic messages and communications. These communications constitute "electronic communications" under the SCA.

196.    The SCA distinguishes between two types of electronic storage. The first is defined as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(l7)(A). The second type is defined as "any storage of such communication by an electronic communication for purposes of backup protection of such communication." 18 U.S.C. § 2510(17)(B). Defendants store content falling within the scope of these provisions of the SCA.

197.    CapCut allows users to create spaces and invite others to those spaces to participate in electronic communications.  Such electronic exchanges are private and are inaccessible to the general public.

198.    As set forth herein, Plaintiffs did not authorize Defendants to share their content and information with certain third parties, including the Chinese Communist Party.

199.    Plaintiffs are subscribers or customers of CapCut's remote computing service, pursuant to 18 U.S.C. § 2702(a)(2). By virtue of Defendants' conduct in providing the ability to send or receive wire or electronic communications, Defendants provide an electronic communication service within the meaning of the SCA. Plaintiffs are users of CapCut's electronic communication service, pursuant to 18 U.S.C. § 2510(13).

200.    Plaintiffs are subscribers and persons aggrieved by violations of the SCA, pursuant to 18 U.S.C. §§ 2707(a) and 2510(11).

201. By virtue of Defendants' conduct in providing computer storage and processing services by means of an electronic communications system, CapCut is a remote computer service within the meaning of the SCA.

202. Defendants are providers of an electronic communication service to the public, pursuant to 18 U.S.C. §§ 2702(a)(1) and 2510(15).

203. Defendants maintain a facility through which an electronic communication service is provided, pursuant to 18 U.S.C. § 2701(a).

204. Defendants are providers of a remote computing service to the public, pursuant to 18 U.S.C. §§ 2702(a)(2) and 2711(2).

205. Defendants are persons within the meaning of the SCA, pursuant to 18 U.S.C. § 2510(6).

206. Defendants are persons or entities within the meaning of the SCA, pursuant to 18 U.S.C. § 2707(a).

207. Plaintiffs' use of CapCut communications systems and transfers of content and information to CapCut constitute electronic communications, pursuant to 18 U.S.C. § 2501(12).

208. Plaintiffs' electronic communications were in electronic storage, pursuant to 18 U.S.C. § 2501(17).

209. Defendants violated the SCA by knowingly divulging the contents, including content and information, of Plaintiffs' electronic communications while they were in electronic storage to unauthorized parties, including but not limited to the Chinese Communist Party, pursuant to 18 U.S.C. § 2702(a)(1).

210.     Defendants violated the SCA by knowingly divulging the contents, including content and information, of Plaintiffs' electronic communications that were carried or maintained on CapCut's remote computing service to unauthorized parties, including but not limited to the Chinese Communist Party, pursuant to 18 U.S.C. § 2702(a)(2).

211.     As detailed herein, the contents of Plaintiffs' electronic communications that Defendants divulged to unauthorized parties, including messages, photos and videos, were non-public, and Plaintiffs reasonably believed that the contents of these communications would be protected against publication to unauthorized parties.

212.     Defendants knowingly divulged the contents of Plaintiffs' electronic communications to unauthorized parties.  Defendants also failed to effectively audit, limit, or control third parties accessing user information so as to prevent the subsequent disclosure of user information.

213.     As detailed herein, Plaintiffs were not aware of and did not consent to the disclosure of the contents, including content and information, of their electronic communications to unauthorized parties, including the Chinese Communist Party.

214.     As a result of Defendants' violations of the SCA, Plaintiffs have suffered injury, including but not limited to the invasion of Plaintiffs' privacy rights.

215.     Based on information and belief, Defendants profited through their violations of the SCA.  Plaintiffs suffered actual damages, as detailed herein, as a result of these violations, pursuant to 18 U.S.C. § 2707(c).

216.     Plaintiffs are entitled to actual damages, disgorgement of profits made by Defendants as a result of their violations of the SCA, and statutory damages, in an amount not less than $1,000 per Plaintiff.

217.     Plaintiffs are also entitled to other equitable or declaratory relief as may be appropriate, as well as reasonable attorneys' fees and litigation costs, pursuant to 18 U.S.C. § 2707(b).

218.     Defendants' violations of the SCA were committed willfully and intentionally, and therefore Plaintiffs also seek punitive damages pursuant to 18 U.S.C. § 2707(c).

## FIFTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT CAL. PEN. C. § 502
### (On Behalf of the California Plaintiffs and the California Subclass)

219.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein on behalf of the California Subclass.

220.     Defendants' acts violate Cal. Pen. C. § 502(c)(1) because they have knowingly accessed, and continue to knowingly access, data and computers to wrongfully control or obtain data. The California Plaintiffs' and the California Subclass's private and personally identifiable data and content accessed by Defendants – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption – far exceeds any reasonable use of the California Plaintiffs' and the California Subclass's data and content to operate the CapCut app. There is no justification for Defendants' surreptitious collection and transfer of the California Plaintiffs' and the California Subclass's private and personally identifiable data and content from their devices and their other social media accounts and allowing access to that information to individuals and third-party companies in

China that are subject to Chinese law requiring the sharing of such data and content with the Chinese government.

221.    Defendants' acts violate Cal. Pen. C. § 502(c)(2) because they have knowingly accessed and without permission taken, copied, and made use of data from a computer – and they continue to do so. Defendants did not obtain permission to take, copy, and make use of the California Plaintiffs' and the California Subclass's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption – from their devices – and provide access to the Chinese Communist Party or individuals and companies that are subject to Chinese law requiring the sharing of such data and content with the Chinese government. Defendants intentionally accessed Plaintiffs' devices without the necessary authorization in order to obtain data that Plaintiffs did not authorize them to take.

222.    Accordingly, the California Plaintiffs and the California Subclass are entitled to compensatory damages, including "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access," injunctive relief, and attorneys' fees. Cal. Pen. C. § 502(e)(1), (2).

## SIXTH CAUSE OF ACTION

### VIOLATION OF THE RIGHT OF PRIVACY
### UNDER THE CALIFORNIA CONSTITUTION
**(On Behalf of the California Plaintiffs and the California Subclass)**

223.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

224.    The California Constitution expressly provides for a right to privacy: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., art I, § 1.

225.    California Plaintiffs and the California Subclass hold, and at all relevant times held, a legally protected privacy interest in their private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption – on their devices and in their other social media accounts.

226.    California Plaintiffs and the California Subclass have a reasonable expectation of privacy in their data and content under the circumstances present.

227.    The reasonableness of California Plaintiffs' and the California Subclass's expectation of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants accessing private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption – from California Plaintiffs' and the California Subclass's devices and other social media accounts.

228.    Defendants' conduct constitutes and, at all relevant times, constituted a serious invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of – and allow individuals and companies based in China to take and make use of – California Plaintiffs' and the California Subclass's private and personally identifiable data and content. Defendants intentionally invaded California Plaintiffs'

and the California Subclass's privacy interests by intentionally designing the CapCut app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain their private and personally identifiable data and content.

229.    These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. This intrusion is particularly offensive because it included collection of highly sensitive biometric data, videos and audio-visual material not intended for public consumption.  The offensiveness of Defendants' intrusion is heightened by Defendants' making California Plaintiffs' and the California Subclass's private and personally identifiable data and content available to third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted California Plaintiffs' and the California Subclass's devices, which contain California Plaintiffs' and the California Subclass's private and personally identifiable data and content.

230.    Further, Defendants' conduct targeted California Plaintiffs' and California Subclass Members' mobile devices, which the United States Supreme Court has characterized as akin to a feature of human autonomy, and which contain California Plaintiffs' and California Subclass Members' private and personally-identifiable data and information.

231.    California Plaintiffs and the California Subclass were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

232.    Defendants' conduct was a substantial factor in causing the harm suffered by California Plaintiffs and the California Subclass.

233.    California Plaintiffs and the California Subclass seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the California Plaintiffs and the California Subclass, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

234.    California Plaintiffs and the California Subclass seek injunctive relief to rectify Defendants' actions, including but not limited to requiring Defendants (a) to stop taking more private and personally identifiable data and content of California Plaintiffs and the California Subclass from their devices and their other social media accounts than is reasonably necessary to operate the CapCut app; (b) to make clear disclosures of California Plaintiffs' and the California Subclass's private and personally identifiable data and content that is reasonably necessary to operate the CapCut app; (c) to obtain California Plaintiffs' and the California Subclass's consent to the taking of their private and personally identifiable data and content; (d) to stop providing access to the California Plaintiffs' private and personally identifiable data and content to individuals in China or transferring such data to servers or companies whose data is accessible from within China; and (e) to recall and destroy California Plaintiffs' and the California Subclass's private and personally identifiable data and content already taken in contravention of California Plaintiffs' and the California Subclass's right to privacy under the California Constitution.

235.    The California Plaintiffs and the California Subclass seek restitution and disgorgement for Defendants' violation of their privacy rights. A person acting in conscious

disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

## SEVENTH CAUSE OF ACTION

### INTRUSION UPON SECLUSION
### (On Behalf of the California Plaintiffs and the California Subclass)

236.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

237.    "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

238.    The California Plaintiffs and the California Subclass have, and at all relevant times had, a reasonable expectation of privacy in their devices and their social media accounts, and their private affairs include their past, present and future activity on their devices and their other media accounts.

239.    The reasonableness of the California Plaintiffs' and the California Subclass's expectations of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' taking of private and personally identifiable data and content from the California Plaintiffs' and the California Subclass's devices and social media accounts.

240.    Defendants intentionally intruded upon the California Plaintiffs' and the California Subclass's solitude, seclusion, and private affairs – and continue to do so – by intentionally designing the CapCut app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain the California Plaintiffs' and the California Subclass's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption.

241.    These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by Defendants' making the California Plaintiffs' and the California Subclass's private and personally identifiable data and content available to third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted the Plaintiffs' and the Class's devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain the California Plaintiffs' and the California Subclass's private and personally identifiable data and content. The California Plaintiffs and the California Subclass were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

242.    Defendants' conduct was a substantial factor in causing the harm suffered by the California Plaintiffs and the California Subclass.

243. The California Plaintiffs and the California Subclass seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the California Plaintiffs and the California Subclass, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

244. The California Plaintiffs and the California Subclass seek injunctive relief to rectify Defendants' actions, including but not limited to requiring Defendants (a) to stop taking more private and personally identifiable data and content from the California Plaintiffs' and the California Subclass's devices and other social media accounts than is reasonably necessary to operate the CapCut app; (b) to make clear disclosures of the California Plaintiffs' and the California Subclass's private and personally identifiable data and content that is reasonably necessary to operate the CapCut app; (c) to obtain the California Plaintiffs' and the California Subclass's consent to the taking of such private and personally identifiable data and content; (d) to stop providing access to the California Plaintiffs' and the California Subclass's private and personally identifiable data and content to individuals in China or transferring such data to servers or companies whose data is accessible from within China; and (e) to recall and destroy the California Plaintiffs' and the California Subclass's private and personally identifiable data and content already taken in contravention of the California Plaintiffs' and the California Subclass's privacy rights.

245. California Plaintiffs and the California Subclass seek restitution and disgorgement for Defendants' intrusion upon seclusion. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties

and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

## EIGHTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. C. §§ 17200 *et seq.* (On Behalf of the California Plaintiffs and the California Subclass)

246. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

247. The Unfair Competition Law, California Business & Professions Code §§ 17200, et seq. (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

248. Defendants acted jointly to violate, and continue to violate, the "unlawful" prong of the UCL through violation of statutes, constitutional provisions, and common law, as alleged herein.

249. Defendants acted jointly to violate, and continue to violate, the "unfair" prong of the UCL because they accessed private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, video viewing histories, electronic communications, and private videos and private video images never intended for public consumption – from the California Plaintiffs' and the California Subclass's devices and other social media accounts under circumstances in which the Plaintiffs and the Class would have no reason to know that such data and content was being taken. This information is property under the laws of California and common law. Defendants' unlawful taking and use of this proper was

immoral, unethical, oppressive, unscrupulous and substantially injurious to California Plaintiffs and the California Subclass. Defendants' unauthorized collection and disclosure of private and personal information was made for their own gain and at the expense of California Plaintiffs and the California Subclass.

250. California Plaintiffs and the California Subclass had no reason to know because (i) there was no disclosure of Defendants' collection and transfer of the California Plaintiffs' and the California Subclass's biometric identifiers and information, and private videos and private video images not intended for public consumption; (ii) there was no disclosure that Defendants had embedded source code within the CapCut app that makes California Plaintiffs' and the California Subclass's private and personally identifiable data and content accessible to third-party companies and individuals based in China where such companies and individuals are subject to Chinese law requiring the sharing of such data and content with the Chinese government; and (iii) there was no effective disclosure of the wide range of private and personally identifiable data and content that Defendants took from the California Plaintiffs' and the California Subclass's devices. Defendants violated, and continue to violate, the "fraudulent" prong of the UCL because (i) Defendants made it appear that the California Plaintiffs' private and personally identifiable data and content would not be collected and transferred unless the California Plaintiffs and the California Subclass chose to do so, but in fact Defendants collected and transferred such data and content without notice or consent; (ii) Defendants made it appear that the California Plaintiffs' and the California Subclass's private and personally identifiable data and content would not be provided to individuals or companies that are subject to Chinese law requiring the sharing of such data and content with the Chinese government; and (iii) Defendants have intentionally refrained

from disclosing the uses to which the California Plaintiffs' and the California Subclass's private and personally identifiable data and content has been put, while simultaneously providing misleading reassurances about Defendants' data collection and use practices. The California Plaintiffs and the California Subclass were misled by Defendants' concealment, and had no reason to believe that Defendants had taken the private and personally identifiable data and content that they had taken or used it in the manner they did.

251.     In addition, Defendants fail to adequately disclose that users' data will be accessible to individuals in China, and ultimately accessible by the Chinese communist government.  To the contrary, Defendants assured California Plaintiffs and the California Subclass of the privacy of their data, while under Chinese law the Chinese government has an absolute right to access users' data.

252.     Defendants' conduct is particularly egregious because these violations extend to underage users whom Defendants acknowledge should not be using the platform.  Indeed, through their promotion on TikTok and other avenues, Defendants have encouraged underage use. Moreover, they have failed to incorporate appropriate age verification and other measures in the CapCut app necessary to prevent underage use and have incorporated features in the design of the CapCut app that actually facilitate underage use.

253.     Defendants were under a duty to disclose the omitted facts because they were under a confidential, contractual or fiduciary relationship with California Plaintiffs and the California Subclass.

254.     California Plaintiffs and the California Subclass have been harmed and have suffered economic injury as a result of Defendants' UCL violations. First, California Plaintiffs and

the California Subclass have suffered harm in the form of diminution of the value of their private and personally identifiable data and content. California Plaintiffs and the California Subclass have a property interest in the personally identifiable information and other personal information taken by Defendants. There is a market for such data and California Plaintiffs and the California Subclass have been deprived of the money or property they would have received for the data improperly collected by Defendants. Second, they have suffered harm to their devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images.

255. Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from their targeted advertising, improvements to their artificial intelligence technologies, their patent applications, fees Defendants charged California Plaintiffs for additional services and storage, and the increased consumer demand for and use of Defendants' other products. California Plaintiffs and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

256. California Plaintiffs and the California Subclass lack an adequate remedy at law and thus are entitled to seek equitable relief. Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data and content collection and use practices, and will not recall and destroy California Plaintiffs' and the California Subclass's

wrongfully collected private and personally identifiable data and content. Due to the ongoing nature of the harm, damages will be insufficient to address it.  Accordingly, injunctive relief is appropriate.

257.    Further, California Plaintiffs and the California Subclass are entitled to restitution as the available damages and remedies are inadequate to return to California Plaintiffs and the California Subclass the value of the information taken by Defendants, including for use in developing their artificial intelligence systems.  California Plaintiffs and the California Subclass are entitled to restitution for Defendants' unjust enrichment in a sum that is not identical to the legal damages suffered.

### NINTH CAUSE OF ACTION

**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING
LAW, BUS. & PROF. C. §§ 17500 *et seq.*
(On Behalf of the California Plaintiffs and the California Subclass)**

258.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

259.    California's False Advertising Law (the "FAL") – Cal. Bus. & Prof. Code §§ 17500, et seq. – prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services. Defendants' advertising and other statements regarding CapCut are, and at all relevant times were, highly misleading. Defendants do not disclose at all, or do not meaningfully disclose, the private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, video viewing history, electronic communications, and private videos and private video images never intended for public consumption – that they have collected and transferred from the California Plaintiffs' and the California Subclass's devices and other social media accounts. Nor do Defendants disclose that

the Plaintiffs' and the Class's private and personally identifiable data and content has been made available to the Chinese Communist Party and foreign government entities. To the contrary, Defendants deny such allegations.

260.    Reasonable consumers, like the California Plaintiffs and the California Subclass, are – and at all relevant times were – likely to be misled by Defendants' misrepresentations. Reasonable consumers lack the means to verify Defendants' representations concerning their data and content collection and use practices, or to understand the fact or significance of Defendants' data and content collection and use practices.

261.    California Plaintiffs and the California Subclass have been harmed and have suffered economic injury as a result of Defendants' misrepresentations. First, they have suffered harm in the form of diminution of the value of their private and personally identifiable data and content. California Plaintiffs and the California Subclass have a property interest in the personally identifiable information and other personal information taken by Defendants. There is a market for such data and California Plaintiffs and the California Subclass have been deprived of the money or property they would have received for the data improperly collected by Defendants. Second, they have suffered harm to their devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants accessing their private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption.

262.     Defendants, as a result of their misrepresentations, have been able to reap unjust profits and revenues. This includes Defendants' profits and revenues from their targeted advertising, improvements to their artificial intelligence technologies, their patent applications, their fees and service charges, and the increased consumer demand for and use of Defendants' other products and services. California Plaintiffs and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

263.     Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data and content collection and use practices, and will not recall and destroy California Plaintiffs' and the California Subclass's wrongfully collected private and personally identifiable data and content. Accordingly, injunctive relief is appropriate.

## TENTH CAUSE OF ACTION

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### CALIFORNIA PENAL CODE §§ 630 *ET SEQ.*
### (On Behalf of the California Plaintiffs and the California Subclass)

264.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

265.     The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

266.    Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

267.    Cal. Pen. Code § 632(a) imposes liability upon: "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio."

268.    California Plaintiffs and the California Subclass have an expectation of privacy in messages, videos, and recordings, and they exercised a reasonable expectation of privacy concerning the transmission of those messages.

269.    Under either section of the CIPA quoted above, a defendant must show it had the consent of all parties to a communication.  However, without the consent of either the sender or recipient, Defendants intercepted and recorded videos, URLs, comments, likes, and other messages and electronic communications transmitted using the CapCut platform without California Plaintiffs' and the California Subclass's consent or knowledge.

270.     Defendants knowingly and intentionally used and continue to use the CapCut app platform and associated servers and other computer devices, to read, attempt to read, learn, attempt to learn, eavesdrop, record, and/or use electronic communications containing private data from California Plaintiffs and California Subclass Members, while these electronic communications were and are in transit, without the authorization or consent of California Plaintiffs or California Subclass Members.  Defendants profited and continue to profit as a result of these repeated and systemic violations of CIPA. Defendants' unlawful conduct harmed and continues to harm California Plaintiffs.

271.     The communications intercepted by Defendants include "contents" of electronic communications exchanged between California Plaintiffs and California Subclass Members, on the one hand, and third parties including both users and on-users of the CapCut app through shared communications.  Defendants recorded and stored such private message content, separate from the process of transmitting the message to the intended recipient.  Defendants purposefully designed the CapCut platform in a way that they knew California Plaintiffs' and the California Subclass's privacy rights would be violated, in that their messages would be unlawfully intercepted and recorded.  The defective and unlawful design of the CapCut platform directly facilities Defendants' unlawful conduct.

272.     The following constitute "machine[s], instrument[s], or contrivance[s], under Cal. Penal Code § 631(a): (a) California Plaintiff's and California Subclass Members' personal computing devices; (b) the computer codes and programs Defendants used to effectuate the interception of communications; (c) Defendants' servers; (d) and the plan Defendants carried out to effectuate the interception of the communications that were exchanged with California

Plaintiffs and California Subclass Members. In the alternative, Defendants' purposeful scheme that facilitated its interceptions falls under the broad statutory catch-all category of "any other manner".

273. The private data Defendants collected constitutes "confidential communications," as that term is used in Cal. Pen. Code § 632(a), because California Plaintiffs and California Subclass Members have an objectively reasonable expectation of privacy in their communications not being disseminated by Defendants.

274. Neither California Plaintiffs nor the California Subclass Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. Nor, based on information and belief, did third parties receiving the communications.

275. The unauthorized interceptions described herein are not covered by any business exception because the interceptions were not required to facilitate the communications.

276. California Plaintiffs and California Subclass Members have suffered loss because of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their private data. California Plaintiffs and the California Subclass have a property right in their private communications, videos and messages such that interception of those messages violated those rights and therefore caused them injuries and damages. California Plaintiffs and the California Subclass suffered further economic injury as a result of Defendants' unlawful and unauthorized interceptions and recordings of communications. The battery, memory, CPU and bandwidth of their cellular devices have been compromised and they incurred additional data and electricity costs that they otherwise would not have.

277.     Pursuant to Cal. Pen. Code § 637.2, California Plaintiffs and California Subclass Members have been injured by the violations of Cal. Pen. Code §§ 631, 632, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive or other equitable relief.

278.     California Plaintiffs and California Subclass Members have also suffered irreparable injury from these unauthorized acts of disclosure; their personal, private, and sensitive data have been collected, viewed, accessed, stored, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, California Plaintiffs and California Subclass Members have no adequate remedy at law, California Plaintiffs and California Subclass Members are entitled to injunctive relief.

## ELEVENTH CAUSE OF ACTION

### STATUTORY LARCENY, CAL. PEN. CODE §§ 484, 496
### (On Behalf of the California Plaintiffs and the California Subclass)

279.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

280.     Cal. Pen. Code § 496 imposes liability upon: "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained[.]"

281.     Cal. Pen. Code § 484, which defines "theft", states in pertinent part: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall

knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

282.    Under California law, California Plaintiffs and California Subclass Members have a property interest in their personal information and private data.  Defendants profited and continue to profit as a result of these repeated and systemic violations.  Defendants' unlawful conduct harmed and continues to harm California Plaintiffs.

283.    Defendants acted in a manner constituting theft by surreptitiously taking California Plaintiffs' and California Subclass Members' private data through the CapCut platform under false pretenses, with the specific intent to deprive California Plaintiffs and California Subclass Members of their property.

284.    California Plaintiffs and California Subclass Members did not consent to any of Defendants' actions in taking California Plaintiffs' and California Subclass Members' private data.

285.    Pursuant to Cal. Pen. Code § 496(c), California Plaintiffs and California Subclass Members are entitled to treble damages, as well as attorneys' fees and costs, for injuries sustained as a result of Defendants' violations of Cal. Pen. Code § 496(a).

TWELFTH CAUSE OF ACTION

CONVERSION
(On Behalf of the California Plaintiffs and the California Subclass)

286.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

287. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications. California Plaintiffs' and California Subclass Members' private data is their property under California law.

288. Defendants unlawfully intercepted, collected, used, and exercised dominion and control over California Plaintiffs' and California Subclass Members' private data without authorization, including California Plaintiffs' and California Subclass Members' confidential communications.

289. Defendants wrongfully exercised control over California Plaintiffs' and California Subclass Members' private data, and have not returned such private data.

290. California Plaintiff and California Subclass Members have been damaged as a result of Defendants' unlawful conversion of their property.

## THIRTEENTH CAUSE OF ACTION

### RESTITUTION / UNJUST ENRICHMENT
**(On Behalf of the Plaintiffs and the Class)**

291. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

292. Plaintiffs and the Class have conferred substantial benefits on Defendants by downloading and using the CapCut app. These include the Defendants accessing the Plaintiffs' and the Class's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption. Such benefits also include the revenues and profits resulting from Defendants' collection and use of such data and content for Defendants' targeted-advertising, improvements to their artificial intelligence technologies, their patent applications, fees

Defendants charged Plaintiffs for additional services and storage, and the increased consumer demand for and use of Defendants' other products.

293. Defendants have knowingly and willingly accepted and enjoyed these benefits.

294. Defendants either knew or should have known that the benefits rendered by the Plaintiffs and the Class were given with the expectation that Defendants would not take and use the Plaintiffs' and the Class's private and personally identifiable data and content that Defendants have taken and used without permission. For Defendants to retain the aforementioned benefits under these circumstances is inequitable.

295. Through deliberate violation of the Plaintiffs' and the Class's privacy interests, and statutory and constitutional rights, Defendants each reaped benefits that resulted in each Defendant wrongfully receiving profits.

296. Equity requires disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiffs and the Class.

297. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, the Plaintiffs and the Class are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants through this inequitable conduct.

## FOURTEENTH CAUSE OF ACTION

### VIOLATION OF ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT, 740 ILCS 14/1, *et seq.*
### (On Behalf of the Illinois Plaintiffs and the Illinois Subclass)

298. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

299.     In 2008, Illinois enacted the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, et seq. to address the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information." Illinois House Transcript, 2008 Reg. Ses. No. 276. The Illinois Legislature recognized the importance of protecting the privacy of individuals' biometric data, finding that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse [and] is at heightened risk for identity theft ...." Id. As the Illinois Supreme Court has recognized, through the BIPA, "our General Assembly has codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information." Rosenbach v. Six Flags Entm't Corp., 129 N.E.3d 1197, 1206 (Ill. 2019).BIPA protects "biometric identifiers" and "biometric information." Biometric identifiers consist of "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10.  A "scan" under BIPA means to examine by observation or checking, or systematically in order to obtain data especially for display or storage. In re Facebook Biometric Information Privacy Litigation, No. 15-cv-03747-JD, 2018 WL 2197546, *3 (N.D. Cal. May 14, 2018). "Geometry" under BIPA is the relative arrangement of parts or elements. Id. Neither the term "scan" nor the term "geometry" require "actual or express measurements of spatial quantities like distance, depth, or angles." Id. Biometric information constitutes "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10.

300.    BIPA makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative." 740 ILCS 14/15(b).

301.    At all relevant times, the Illinois Plaintiffs were residents of Illinois and each is a "person" and/or a "customer" within the meaning of BIPA. 740 ILCS 14/15(b). The minor Illinois Plaintiffs' legal guardians are their "legally authorized representative[s]" within the meaning of BIPA, and served in such capacity at all times relevant to this action. *Id.*

302.    Each Defendant is, and at all relevant times was, a "corporation, limited liability company, association, or other group, however organized," and thus is, and at all relevant times was, a "private entity" under the BIPA. 740 ILCS 14/10.

303.    The Illinois Plaintiffs and the Illinois Subclass had their "biometric identifiers," including their face geometry scans and voiceprints, as well as their "biometric information" collected, captured, received, or otherwise obtained by Defendants as a result of the Illinois Plaintiffs' and the Illinois Subclass's use of the CapCut app. 740 ILCS 14/10.  In addition, Defendants used Plaintiffs' and Class Members' biometric identifiers and information in operating the CapCut app and in generating significant revenue and profits.

304.    At all relevant times, Defendants systematically and surreptitiously collected, captured, received or otherwise obtained the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" without first obtaining signed written releases, as required by 740 ILCS 14/15(b)(3), from any of them or their "legally authorized representatives."

305.    In fact, Defendants failed to properly inform the Illinois Plaintiffs and the Illinois Subclass, or any of their parents, legal guardians, or other "legally authorized representatives," in writing (or in any other way) that the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" were being "collected or stored" by Defendants. Nor did Defendants inform the Illinois Plaintiffs and the Illinois Subclass, or any of their parents, legal guardians, or other "legally authorized representatives," in writing of the specific purpose and length of term for which the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" were being "collected, stored and used" as required by 740 ILCS 14/15(b)(1)-(2).  Nor did Defendants obtain from the Illinois Plaintiffs or the Illinois Subclass the specific written release required by 740 ILCS 14/15(b)(3).  The Illinois Plaintiffs did not provide consent to the collection or use of biometric identifiers or biometric information.

306.    Defendants did not properly inform the Illinois Plaintiffs and the Illinois Subclass in writing of this collection, the specific purpose and length of term for which these biometric identifiers were collected, stored or used, and without obtaining the specific written release as required by BIPA.

307.    BIPA also makes it unlawful for a private entity "in possession of a biometric identifier or biometric information" to "sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information." 740 ILCS 14/15(c).

308.    Defendants are, and at all relevant times were, "in possession of" the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers," including but not limited to their face geometry scans, and "biometric information." Defendants profited from such "biometric identifiers" and "biometric information" by using them for targeted advertising, improvements to Defendants' artificial intelligence technologies, Defendants' patent applications, and the generation of increased demand for and use of Defendants' other products. 740 ILCS 14/15(c).  In addition, as noted above Defendants profited from Plaintiffs' biometric identifiers and information by using them in operating the CapCut app, from which they generated significant revenue and profits.

309.    Finally, BIPA prohibits private entities "in possession of a biometric identifier or biometric information" from "disclos[ing], redisclos[ing], or otherwise disseminat[ing] a person's or a customer's biometric identifier or biometric information unless" any one of four enumerated conditions are met. 740 ILCS 14/15(d)(1)-(4). None of such conditions are met here.

310.    Defendants possess, disclose, redisclose and disseminate, and at all relevant times possessed, disclosed, redisclosed and disseminated, the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers," including but not limited to their face geometry scans, and "biometric information" without the consent of any of them or their "legally authorized representatives." 740 ILCS 14/15(d)(1). Moreover, the disclosures and redisclosures did not "complete[] a financial transaction requested or authorized by" the Illinois Plaintiffs, the Illinois Subclass or any of their legally authorized representatives. 740 ILCS 14/15(d)(2). Nor are, or at any relevant times were, the disclosures and redisclosures "required by State or federal law or municipal ordinance." 740 ILCS

14/15(d)(3). Finally, at no point in time were the disclosures ever "required pursuant to a valid warrant or subpoena issued by a court of competent jurisdiction." 740 ILCS 14/15(d)(4).

311.    BIPA mandates that a private entity "in possession of biometric identifiers or biometric information" "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a). But Defendants do not publicly provide any written policy establishing any retention schedule or guidelines for permanently destroying the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information." 740 ILCS 14/15(a).

312.    BIPA also commands private entities "in possession of a biometric identifier or biometric information" to: (1) store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information. 740 ILCS 14/15(e). Based on the facts alleged herein, including Defendants' lack of an adequate public written policy, their failure to inform CapCut users that Defendants obtain such users' "biometric identifiers" and "biometric information," their failure to obtain written consent to collect or otherwise obtain CapCut users' "biometric identifiers" and "biometric information," and their unauthorized dissemination of CapCut users' "biometric identifiers" and "biometric

information," Defendants have violated this provision too. In addition, Defendants' data processing and storage practices have made that data available to third parties, including third parties based in China.

313. Defendants recklessly or intentionally violated each of BIPA's requirements and infringed the Illinois Plaintiffs' and the Illinois Subclass's rights to keep their immutable and uniquely identifying biometric identifiers and biometric information private. As individuals subjected to each of Defendants' BIPA violations above, the Illinois Plaintiffs and the Illinois Subclass are and have been aggrieved. 740 ILCS 14/20.

314. Indeed, Defendants have unlawfully collected, possessed, stored, disseminated, used and profited from Illinois Plaintiffs' and the Illinois Subclass's biometric identifiers (such as face geometry scans and voiceprints of CapCut users), and the biometric information derived therefrom, in multiple ways.

315. First, Defendants' BIPA and other biometrics-related violations are established by the functionality and code of the cloud-based CapCut app itself, which takes scans of users' face geometry and captures users' voiceprints.

316. The CapCut app uses an advanced video editor and camera face filters. Employing this technology, CapCut users edit their videos to, among other things, morph their face into another face; change the size, shape, height and width of their face; change particular features of their face (e.g., eyes, ears, nose, lips, mouth, cheeks), including the size and shape of such facial features; and so on. Users thereby create videos in which their faces and specific facial features take on a variety of dimensions and appearances. The CapCut app examines, detects and localizes the face and the arrangement of its various parts (e.g., the eyes, ears, nose, lips, mouth, cheeks) relative

to the other parts, and then tracks the face and its various parts (and their relative arrangement) while in motion.

317.     Indeed, as evidenced by the CapCut app's code and as discussed above, the CapCut app collects a variety of personally identifiable information from users that can be used to identify individual users such as unique device identifiers, addresses, and other personally identifiable information.  The CapCut app's collection of biometric identifiers and biometric information is therefore consistent with the general design and functioning of the app.

318.     Second, Defendants' BIPA and other biometrics-related violations are further established by their ongoing work in China, which includes the application of facial recognition technology to CapCut users' videos by highly-trained engineers skilled in computer vision, convolutional neural network and machine learning.

319.     Defendants' artificial intelligence work within China, which is closely tied to their United States operations, is among the most sophisticated in the world. "ByteDance has received accolades for being a top AI innovator from CBInsight who recognized the company on its 2018 AI 100 List as well as from Fast Company, who placed it on its most innovative companies list. In 2016, it founded its AI Lab, a research division led by Wei-Ying Ma, formerly of Microsoft Research Asia. The Lab's primary focus has been on developing innovative technologies to enhance ByteDance's content platforms."[97]

320.     Defendants employ engineers in fields such as computer vision, convolutional neural network, and machine learning, all of which are used to generate the face geometry scans

---

[97] https://www.forbes.com/sites/bernardmarr/2018/12/05/ai-in-china-how-buzzfeed-rival-bytedance-uses-machine-learning-to-revolutionize-the-news/?sh=16a0c3ed40db.

that Defendants derive from the videos of CapCut users. Defendants' China-based engineering team includes multiple researchers who perform work in these areas.

321.     For example, Wei-Ying Ma served as a Beijing Douyin Vice President and led the AI Lab in Beijing since 2017. He is known for having developed an image retrieval system called NeTra, which is a tool for navigating very large image databases. Ma delivered a keynote speech at a Taipei Web Conference in which he acknowledged that Defendants use facial recognition technology and face geometry scans on their enormous and ever-growing database of face images from user videos. During his speech, Ma used visual representations that show facial recognition and face geometry scans being performed on specific regions of face images, describing the "video understanding tasks" and analysis that are performed, and how they "convert this video into a structural representation."[98]

322.     Defendant ByteDance processes and analyzes users' videos received from around the world at its facilities in China. *TechNode* reported that one of its vice presidents publicly told a gathering that ByteDance required more chips to continue uploading, processing and analyzing its vast database of videos accumulated from around the world. This vice president stated that "'Bytedance has the largest number of users in the world whose videos need to be analyzed and processed and uploaded, and we are purchasing a large number of chips.'"[99]

---

[98] https://www.youtube.com/watch?v=2D29f4-J2mw (at 18:18 – 19:17).

[99] https://technode.com/2018/04/24/bytedance-jinri-toutiao-ai-chips/.

323.     As the United States National Security Adviser noted, Defendants are "getting

facial recognition" on millions of Americans as well as mapping their relationships, and then

sending all of this "intimate data" back to China for processing through their apps.[100]

324.     The potential applications and uses of this data are reflected in patent applications

filed by Defendants' sister company ByteDance Network Technology Co., Ltd. The underlying

technology in these patent applications involves age, race, and emotion detection through face

images, including those derived from videos. The specific patent applications address topics such as

facial image identification;[101] use of images and a facial recognition model to determine ethnic

information, race and age;[102] use of face and body images, and a facial recognition model, to

determine age;[103] use of image and audio data sets to determine age;[104] use of face images extracted

from videos to determine age;[105] facial expression recognition methods;[106] use of facial images

---

[100] https://www.forbes.com/sites/zakdoffman/2020/07/15/tiktok-trump-warning-facial-recognition-data-sends-china-ban/?sh=33766e422dea.

[101] Publication No. WO2020037963A1, https://patents.google.com/patent/WO2020037963A1/en.

[102] Publication No. CN110046571A, available at https://patents.google.com/patent/CN110046571A/en.

[103] Publication No. CN109993150A, available at https://patents.google.com/patent/CN109993150A/zh.

[104] Publication No. CN110321863A, available at https://patents.google.com/patent/CN110321863A/en.

[105] Publication No. CN110163170A, available at https://patents.google.com/patent/CN110163170A/en; Publication No. CN110188660A, available at https://patents.google.com/patent/CN110188660A/en.

[106] Publication No. CN110097004A, available at https://patents.google.com/patent/CN110097004A/en.

extracted from videos to determine emotions; [107] and use of face images extracted from video segments to identify a face characteristic. [108]

325.    ByteDance Network Technology Co., Ltd. has filed additional patent applications for a method for voice extraction involving voiceprints,[109] a voice recognition method,[110] and an age recognition method based on audio.[111] This is consistent with reporting that Defendant ByteDance "uses various AI technologies in its services [including] voice recognition ...."[112] During Wei-Ying Ma's keynote speech at a Taipei Web Conference (above), he discussed the use of audio to identify speakers and published a slide during his speech entitled "Speaker Identification" that stated: "Detect identity, age, gender of speakers."[113]

326.    As commentators have recognized, "TikTok's owner, Beijing-based ByteDance, is a hit app factory that has spent the last decade learning how to use artificial intelligence, machine learning, and facial recognition to figure out what people like and serve them endless streams of entertainment tailored to their interests and emotions."[114]

---

[107] Publication No. CN110175565A, available at
https://patents.google.com/patent/CN110175565A/en.

[108] Publication No. CN110163171A, available at
https://patents.google.com/patent/CN110163171A/en.

[109] Publication No. CN110503961A, available at
https://patents.google.com/patent/CN110503961A/en.

[110] Publication No. WO2019214628A1, available at
https://patents.google.com/patent/WO2019214628A1/en.

[111] Publication No. CN110335626A, available at
https://patents.google.com/patent/CN110335626A/en.

[112] https://medium.com/syncedreview/intel-and-bytedance-partner-on-ai-lab-b678036cbda4.

[113] https://www.youtube.com/watch?v=2D29f4-J2mw (at 30:04).

[114] https://www.bloomberg.com/news/newsletters/2019-10-29/worries-that-tiktok-is-a-threat-to-national-security-have-merit.

327. Nor is this the first time that ByteDance has used unscrupulous methods to advance the development of its artificial intelligence technology. Recently, OpenAI suspended ByteDance's account following reports that ByteDance was "secretly" using OpenAI's "GPT" artificial intelligence technology to build its own rival chatbot service.[115] ByteDance has been building its own large-language model as part of a "high-priority" and "secretive" internal initiative. Reports indicate that ByteDance has used OpenAI's "GPT" to both train its model and evaluate its development, which would violate OpenAI's terms of service.[116]

328. Finally, Defendants' BIPA and other biometrics-related violations are also established by Defendants' legal and political obligations to accumulate and share data, including biometric data, to assist the Chinese government in developing artificial intelligence and population surveillance and control technologies.

329. On behalf of themselves and the Illinois Subclass, the Illinois Plaintiffs seek: (1) injunctive and equitable relief as is necessary to protect the interests of the Illinois Plaintiffs and the Illinois Subclass by requiring Defendants to comply with BIPA's requirements; (2) $1,000.00 or actual damages, whichever is greater, for each negligent violation of BIPA by Defendants; (3) $5,000.00 or actual damages, whichever is greater, for each intentional or reckless violation of BIPA by Defendants; and (4) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses. 740 ILCS 14/20(1)-(4).

---

[115] https://nypost.com/2023/12/18/business/openai-suspends-bytedances-account-after-it-allegedly-used-gpt-to-build-rival-ai-product-report/.

[116] *Id.*

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief against Defendants as set forth below:

A.      Entry of an order certifying the proposed class and subclasses pursuant to Federal Rule of Civil Procedure 23;

B.      Entry of an order appointing Plaintiffs as representatives of the class and subclasses;

C.      Entry of an order appointing Plaintiffs' counsel as co-lead counsel for the class and subclasses;

D.      Entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

       i.      enjoining Defendants, their affiliates, associates, officers, employees and agents from transmitting CapCut user data and content to China or to other locations or facilities where such CapCut user data and content is accessible from within China;

       ii.      enjoining Defendants, their affiliates, associates, officers, employees and agents from taking CapCut users' private draft videos (including any frames, digital images or other content from such videos) and biometric identifiers and information, including scans of facial geometry and voiceprints, without advance notice to, and the prior written consent of, such CapCut users or their legally authorized representatives (and, for the Illinois Subclass, without being in compliance with BIPA);

       iii.      enjoining Defendants, their affiliates, associates, officers, employees and agents from taking physical/digital location tracking data, device ID data, electronic communications, personally identifiable data and any other CapCut user data and content except that for which appropriate notice and consent is provided and which Defendants can show to be reasonably necessary for the lawful operation of the CapCut app within the United States;

iv.     enjoining Defendants from taking and transmitting more private and personally-identifiable data than is reasonably necessary for operation of the Defendants' apps;

v.      enjoining Defendants from taking and transmitting to anyone else the above-described user data;

vi.     mandating that Defendants, their affiliates, associates, officers, employees and agents recall and destroy the CapCut user data and content already taken in violation of law;

vii.    mandating that Defendants, their affiliates, associates, officers, employees and agents remove from the CapCut app all software development kits based in China or whose data is otherwise accessible from within China;

viii.   mandating that Defendants, their affiliates, associates, officers, employees and agents implement protocols to ensure that no CapCut user data and content is transmitted to, or otherwise accessible from within, China;

ix.     mandating that Defendants, their affiliates, associates, officers, employees and agents hire third-party monitors for a period of at least three years to ensure that all of the above steps have been taken; and

x.      mandating that Defendants, their affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court and counsel for the Plaintiffs in the form of a declaration under oath that the above steps have been satisfied.

E.      Entry of judgment in favor of each Class and Subclass Member for damages suffered as a result of the conduct alleged herein, including compensatory, statutory, and punitive damages, restitution, and disgorgement, to include interest and prejudgment interest;

F.      Award Plaintiffs reasonable attorneys' fees and costs; and

G.      Grant such other and further legal and equitable relief as the court deems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated this 1st day of February, 2024     Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Steve W. Berman
    Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Jeannie Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Douglas G. Smith
AURELIUS LAW GROUP LLC
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@aureliuslawgroup.com

*Attorneys for Plaintiffs and the Class*