UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

EVELIA RODRIGUEZ; ERIKKA WILSON; A.N., A MINOR; AIDEN GUNDLACH; ZACHARY BUCKUS; RAYMON MARINES; J.V. A MINOR; DOMINICK POLIZZI; AND ROBERT KOPLOS on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

BYTEDANCE, INC.; BEIJING DOUYIN INFORMATION SERVICE CO. LTD. F/K/A BEIJING BYTEDANCE TECHNOLOGY CO. LTD.; BYTEDANCE LTD.; BYTEDANCE PTE. LTD.; BEIJING BYTEDANCE TECHNOLOGY CO. LTD.; AND TIKTOK, INC. F/K/A MUSICAL.LY, INC.,

Defendants.

CASE NO. 1:23-CV-04953

JUDGE GEORGIA N. ALEXAKIS

CLASS ACTION

JURY TRIAL DEMANDED

CORRECTED SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 4

II. PARTIES .......... 7

A. Plaintiffs .......... 7

B. Defendants .......... 11

1. Beijing Douyin Information Service Co. Ltd. f/k/a Beijing ByteDance Technology Co. Ltd. .......... 11

2. ByteDance Ltd. .......... 12

3. Beijing ByteDance Technology Co. Ltd. .......... 12

4. ByteDance, Inc. .......... 13

5. ByteDance Pte. Ltd. .......... 13

6. TikTok, Inc. f/k/a Musical.ly, Inc. .......... 13

C. Defendants Operate As A Single Enterprise .......... 13

III. JURISDICTION AND VENUE .......... 14

IV. BACKGROUND .......... 16

A. Defendants Are Part of A China-Based Tech Conglomerate That Markets Multiple Products In The United States. .......... 16

B. In 2020, ByteDance Began Marketing A New App In The United States Designed To Facilitate Video Editing, Which Could Be Used To Create Videos And Post Them On A Variety Of Social Media Apps. .......... 19

C. Defendants Have a History Of Unlawfully and Covertly Collecting Private And Personally Identifiable Data And Content From Users of Their Products .......... 31

D. Defendants Use The CapCut App To Continue And Expand Their Theft Of Users' Private And Personally Identifiable User Data And Content .......... 44

E. Defendants Deceived Users and the Public Regarding CapCut's Data Collection Practices. ........ 49

F. The Threats Posed By CapCut Led Congress to Pass Bipartisan Legislation Requiring Divestiture of the App in the United States. ........ 58

G. Defendants Are Unjustly Profiting While Plaintiffs Suffer Economic Harm. ........ 64

H. Plaintiffs Could not Have Earlier Discovered Defendants' Wrongful Conduct And Defendants Have Fraudulently Concealed Their Unlawful Conduct, Thereby Tolling Any Applicable Statutes of Limitations. ........ 72

I. The Named Plaintiffs Have Been Injured By Defendants' Unlawful Conduct. ........ 73

J. Defendants' Privacy Policies And Terms of Use Do Not Constitute Notice of, Or Consent To, CapCut User Data Theft. ........ 76

K. Defendants Have Failed To Protect the Privacy Rights Of Minors. ........ 78

V. CLASS ALLEGATIONS ........ 79

VI. CAUSES OF ACTION ........ 85

FIRST CAUSE OF ACTION VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 (On Behalf of the Plaintiffs and the Class) ........ 85

SECOND CAUSE OF ACTION VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510 *et seq.* (On Behalf of the Plaintiffs and the Class) ........ 99

THIRD CAUSE OF ACTION VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. §§ 2701 *et seq.* (On Behalf of the Plaintiffs and the Class) ........ 104

FOURTH CAUSE OF ACTION VIOLATION OF THE CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT CAL. PEN. C. § 502 (On Behalf of the California Plaintiffs and the California Subclass) ........ 109

FIFTH CAUSE OF ACTION VIOLATION OF THE RIGHT OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION (On Behalf of the California Plaintiffs and the California Subclass) ........ 113

SIXTH CAUSE OF ACTION INTRUSION UPON SECLUSION (On Behalf of the California Plaintiffs and the California Subclass) ....... 116

SEVENTH CAUSE OF ACTION VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. C. §§ 17200 *et seq*. (On Behalf of the California Plaintiffs and the California Subclass) ....... 119

EIGHTH CAUSE OF ACTION VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW, BUS. & PROF. C. §§ 17500 *et seq*. (On Behalf of the California Plaintiffs and the California Subclass) ....... 134

NINTH CAUSE OF ACTION VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT CALIFORNIA PENAL CODE §§ 630 *et seq.* (On Behalf of the California Plaintiffs and the California Subclass) ....... 144

TENTH CAUSE OF ACTION STATUTORY LARCENY, CAL. PEN. CODE §§ 484, 496 (On Behalf of the California Plaintiffs and the California Subclass) ....... 149

ELEVENTH CAUSE OF ACTION CONVERSION (On Behalf of the California Plaintiffs and the California Subclass) ....... 151

TWELFTH CAUSE OF ACTION RESTITUTION / UNJUST ENRICHMENT (On Behalf of the Plaintiffs and the Class) ....... 151

THIRTEENTH CAUSE OF ACTION VIOLATION OF ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT, 740 ILCS 14/1, *et seq.* (On Behalf of the Illinois Plaintiffs and the Illinois Subclass) ....... 163

REQUEST FOR RELIEF ....... 181

DEMAND FOR JURY TRIAL ....... 183

Plaintiffs, individually and on behalf of all others similarly situated (the "Class"), file this Second Amended Complaint by and through undersigned counsel, against Beijing Douyin Information Service Co. Ltd. f/k/a Beijing ByteDance Technology Co. Ltd. ("Beijing Douyin"); Beijing ByteDance Technology Co. Ltd.; ByteDance, Inc.; ByteDance Ltd.; ByteDance Pte. Ltd. ("ByteDance") and TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok, Inc.") (collectively, "Defendants").

This Second Amended Complaint (SAC) reflects careful consideration of the Court's March 3, 2025 Memorandum Opinion and Order, which dismissed certain of Plaintiffs' claims with leave to amend. As summarized below, this amended pleading incorporates a host of additional factual allegations in response to the Court's ruling:

**Count One – Computer Fraud and Abuse Act.** Count One contains additional allegations demonstrating that CapCut accesses areas outside of the CapCut app without authorization or exceeds authorization, including analysis of the functions in CapCut's source code responsible for such actions and descriptions of the particular areas of Plaintiffs' devices that were accessed and the data contained therein. In addition, Plaintiffs have added allegations contained in Count One and Sections IV.D, IV.F and IV.G that demonstrate that CapCut is a (1) a threat to public safety and/or (2) Plaintiffs suffered loss as defined in the CFAA. This includes an analysis of CapCut's adverse effects on the batteries of user devices and discussion of record evidence supporting the congressional determination that the CapCut app poses a threat to national security and must be divested pursuant to the Protecting Americans from Foreign Adversary Controlled Applications Act (the "Divestiture Act"), which was recently upheld by both the D.C. Circuit and Supreme Court. *See TikTok Inc. v. Garland,* 122 F. 4th 930, 965 (D.C. Cir. 2024), *aff'd*, 145 S. Ct. 57 (2024).

**Counts Two and Nine – Electronic Communications Privacy Act and California Invasion of Privacy Act.** Counts Two and Nine provide additional allegations demonstrating that CapCut intercepts electronic communications "in transit," including discussion of the functions in CapCut's source code responsible for such actions. In addition, Count Nine provides additional allegations that CapCut constitutes an "electronic amplifying device" or "recording device" under CIPA § 632.

**Count Three – Stored Communications Act.** Defendants have narrowed their claim in Count Three under the Stored Communications Act, bringing an SCA claim solely under 18 U.S.C. § 2702(a). Count Three and Section IV.F contain additional allegations demonstrating that CapCut provides third parties unauthorized access to Plaintiffs' data, including a discussion of the CapCut app's functions and the congressional record supporting the Divestiture Act.

**Count Four – California Comprehensive Data Access and Fraud Act.** Count Four and Sections IV.D and IV.G provide additional allegations demonstrating that (1) Defendants accessed user data without permission and (2) Plaintiffs suffered loss under CDAFA, including analysis of loss caused by misappropriation of data as contemplated under California law.

**Count Seven – California Unfair Competition Law.** Count Seven and Section IV.G contain additional allegations demonstrating that Plaintiffs suffered economic injury as a result of Defendants' deceptive, unlawful and unfair practices, including loss of subscription fees Plaintiffs paid to Defendants and costs due to battery drain that they otherwise would not have incurred absent Defendants' deceptive conduct. Count Seven and Section IV.E also contain additional facts regarding Defendants' unfair, deceptive and unlawful business practices, including their omissions regarding their data practices and laws that they violated.

**Count Eight – California False Advertising Law.** As with the UCL claim, Plaintiffs plead additional facts demonstrating economic injury in Count Eight and Section IV.G. In addition, Count Eight and Section IV.E plead additional facts regarding information Defendants omitted and failed to disclose to consumers concerning their data practices and Defendants' obligation to disclose such facts. Among other things, Defendants had a duty to fully and accurately disclose their data practices under California law such as the California Consumer Privacy Act of 2018 (CCPA) and federal law such as the Children's Online Privacy Protection Act (COPPA). Moreover, Defendants affirmatively undertook a duty to fully and accurately disclose their data practices by issuing privacy policies and other statements purporting to do so. Plaintiffs plead additional facts demonstrating that Defendants had a duty to fully and accurately disclose their data practices under applicable law, failed to do so, and that Plaintiffs relied on their omissions, which caused Plaintiffs economic injuries.

**Count Twelve – Unjust Enrichment.** Plaintiffs add allegations in Count Twelve expressly alleging that absent Defendants' omissions, Plaintiffs would not have suffered economic injuries and Defendants would not have received the unjust benefits they received. For example, if Defendants had fully and adequately disclosed their data practices, Plaintiffs would not have downloaded the CapCut app and Defendants would not have received the benefits from harvesting Plaintiffs' data. Similarly, Defendants would not have collected the substantial subscription fees from Plaintiffs that Defendants continue to retain unjustly. Plaintiffs specifically plead that they relied on Defendants' omissions, which caused Plaintiffs economic injuries and caused Defendants to receive unjust benefits.

**Count Thirteen – Illinois Biometric Information Privacy Act.** Plaintiffs narrow their claim in Count Fifteen and do not seek to replead claims under BIPA Sections 15(c) and 15(d), which concern the sale and dissemination of biometric data. However, in addition to bringing claims under BIPA Sections 15(a) and 15(b) which the Court already held were adequately pleaded, Plaintiffs seek to replead their claim under Section 15(e), which addresses Defendants' failure to comply with reasonable industry standards for the protection of biometric data. Accordingly, Plaintiffs have added factual allegations demonstrating that (1) Defendants' biometric data practices violated the reasonable standard of care in the industry in multiple ways, including standards articulated by industry organizations such as the National Institute of Standards and Technology (NIST) and International Organization for Standardization (ISO) as well as standards imposed under applicable law such as the CCPA, and (2) the procedures for collecting and storing user data that Defendants implemented for the CapCut app were not the "same" or "more protective" than those implemented for data collected by the TikTok app, where Defendants represent they spent more than $1.5 billion to wall off user data from access by individuals and entities in China.

Finally, the SAC deletes the Video Privacy Protection Act count that the Court dismissed with prejudice and retains the remaining claims that the Court ruled were adequately pleaded.

## I. INTRODUCTION

1. In 2020, Defendants launched a video editing application, CapCut ("the CapCut app"), in the United States. The app allows users to create, edit and customize videos, which they may then post online on a number of different social media platforms such as Instagram, Facebook, YouTube, Linkedin, and TikTok, the social media platform run by Defendants. Among

other things, the CapCut app allows users to edit videos with various templates, filters, visual effects, and music.

2. The CapCut app has become extremely popular; it is routinely among the top apps in rankings of weekly downloads in the United States and had more than 400 million downloads globally last year alone,[1] making it the fourth most frequently downloaded app in the world.[2] As a result, the CapCut app now has more than 200 million monthly active users and is experiencing exponential growth.[3] The CapCut app is one of the most popular apps for mobile devices in the United States and the world.

3. The CapCut app is "heavily promoted" by Defendant TikTok, Inc. on its social media platform, which has one of the largest user bases in the world.[4] The TikTok, Inc. social media platform allows users to post 60-second videos of activities such as dancing, lip-syncing, and stunts, including videos created using the CapCut app. The TikTok app, like the CapCut app, is among the most downloaded apps available.

4. The CapCut app facilitates the collection of a wide range of private information from users, including their biometric information. However, as noted in a March 19, 2023 article in the *Wall Street Journal*, because CapCut is "a tool app, it has largely avoided regulatory scrutiny over its practice in handling user data."[5]

---

[1] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[2] https://blog.apptopia.com/worldwide-and-us-download-leaders-2022.

[3] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[4] *Id.*

[5] *Id.*

5. The privacy concerns with respect to the CapCut app are particularly significant. Defendants have used automated software, proprietary algorithms, artificial intelligence, facial recognition, and other technologies to commercially profit from Plaintiffs' and Class Members' identities, unique identifying information, biometric data and information, images, video and digital recordings, audio recordings, clipboard data, geolocation, names, e-mail addresses, passcodes, social media accounts, messaging services, telephone numbers, and other private, non-public, or confidential data and information, or meaningful combination thereof, as more fully set forth herein.

6. Defendants, through the CapCut app, collected, captured, obtained, stored and, upon information and belief, disclosed and otherwise disseminated Illinois resident CapCut users' biometric information in violation of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS § 14/1, *et seq.* Public policy in Illinois provides that, given the risks of unwanted data collection, Illinois citizens have the right to make decisions about the fate of their unique biometric identifiers and information. Defendants' actions violated those rights.

7. Defendants unjustly profit from the secret harvesting of a massive array of private and personally identifiable CapCut user data and content that they can use for targeted advertising, improvements to Defendants' artificial intelligence technologies, patent applications, and the development of consumer demand for, and use of, Defendants' other products. In addition, Defendants have collected fees from users for cloud storage service and for additional features and effects that are unavailable with the basic app.

8. Users' data may be utilized for various purposes, including tracking users by age, gender, location, operating system, and interest in order to attract marketing and ad sales. By

collecting and filtering this user data, Defendants are able to utilize the data to, among other things, improve their sophisticated targeted ad and marketing platform that allows their clientele to target demographics with precision.

9. Defendants' conduct violates statutory, constitutional, and common law privacy, data, biometrics and consumer protection laws and should be enjoined.

## II. PARTIES

### A. Plaintiffs

10. **Plaintiff Evelia Rodriguez** is a citizen and resident of Oroville, California. On or about April 13, 2023, Ms. Rodriguez saw an ad on TikTok that showed a video with two pictures of two different people being combined into one image. She wanted to try it, so she downloaded the CapCut app onto her mobile device. Ms. Rodriguez did not read any privacy policy or terms of use for the CapCut app, nor did she see any discernable hyperlinks to or warnings about these items. She asserts claims for the California Subclass and the Nationwide Class as defined below.

11. While Ms. Rodriguez merely wanted to try out the CapCut app by combining two photos from the photo album on her device, the CapCut app gained access to all of the photos and videos on her device. Since that time, Ms. Rodriguez has used the CapCut app to create additional video content.

12. Ms. Rodriguez expected that CapCut would protect and secure her content against access by or disclosure to unauthorized parties. Ms. Rodriguez did not consent to any third parties accessing her content, user data, and highly sensitive biometric identifiers and information.

13. **Plaintiff Erikka Wilson** is a citizen and resident of Chicago, Illinois. She downloaded the CapCut app around March 2023. Ms. Wilson uses the app to edit videos and

images. She does not recall ever reading a privacy policy or terms of use before using the CapCut app. She asserts claims for the Illinois Subclass and the Nationwide Class as defined below.

14. **Plaintiff A.N., a minor,** is a citizen and resident of Chicago, Illinois, who brings this suit by and through her mother and legal guardian, Erikka Wilson, who is, and at all relevant times was, an individual and resident of Chicago, Illinois. A.N. asserts claims for the Illinois Subclass and the Nationwide Class as defined below

15. A.N. uses the CapCut app to edit videos. She is 14 years old and will be in the ninth grade in the Fall, 2023. A.N. used the CapCut app during the seventh and eighth grades.

16. A.N. was able to use the CapCut app without setting up an account or reading a privacy policy or terms of use. A.N. was able to later create an account without obtaining any permission or authorization from a parent.

17. **Plaintiff Aiden Gundlach** is a resident of Crystal Lake, Illinois, and is currently 19 years old. He downloaded and began using the CapCut app on or before March 8, 2020, when he was 15 years old. Mr. Gundlach has been using CapCut for around four years to edit videos related to skateboarding and other content. He did not read any privacy policy or terms of use for the CapCut app, and he does not recall seeing any hyperlinks or notifications about these items. He asserts claims for the Illinois Subclass and the Nationwide Class as defined below.

18. **Plaintiff Zachary Buckus** is a resident of Winthrop Harbor, Illinois. He downloaded and began using the CapCut video editing app on or before November 24, 2021. He began using the free app and switched to using a paid subscription soon after. He continues to subscribe to the paid, CapCut Pro version of the app. Mr. Buckus is over 18 and has been for the full time period he has used CapCut. He uses the app to edit social media, for music promotion,

and other video editing. Mr. Buckus has not read any CapCut terms of use or privacy policy, and he does not recall ever seeing them or being prompted to read or accept them. He asserts claims for the Illinois Subclass and the Nationwide Class as defined below.

19. **Plaintiff Raymon Marines** is a resident of Monrovia, California. He downloaded and began using the CapCut app to edit videos around two years ago, in early to mid-2022. He is an adult, over 18 years old for the duration of his time using CapCut. Mr. Marines began by using the free CapCut app without creating an account. Even without creating an account, he was able to edit videos with CapCut, and the app automatically saved his videos. He then switched to a paid subscription to CapCut Pro, which he has used for around two years. Raymon uses CapCut in his work as a film editor. He has used CapCut to edit videos of himself and other people, and he has used the app on his phone and on his PC computer. Mr. Marines does not recall reading or accepting any privacy policy or terms of use. He asserts claims for the California Subclass and the Nationwide Class as defined below.

20. **Plaintiff J.V., a minor,** is a resident of Monrovia, California. She brings this suit by and through her stepfather and legal guardian, Raymon Marines. J.V. is currently 14 years old. She downloaded and began using the CapCut app in July, 2021, when she was 11 years old, without her parents' knowledge or permission. She continued to use CapCut during much of 2021 and 2022 without her parents' knowledge or consent.

21. J.V. has used the CapCut app for over two and a half years without ever creating an account. She continues to use the app without logging in. The app automatically saves her information and content under a user number. J. V. has used CapCut on her iPad since at least July 29, 2021, and on her phone since at least December 2022. She uses the app to create and edit

videos. She has created fan pages, "get ready with me" videos featuring her face and her putting on makeup, and other content.

22. J.V. has not read any CapCut terms of use or privacy policy, and she does not recall ever being presented with this information. She asserts claims for the California Subclass and the Nationwide Class as defined below.

23. **Plaintiff Dominick Polizzi** is a resident of Woodridge Illinois. He learned about CapCut through seeing advertisements on TikTok. While on TikTok, he saw videos with CapCut banners, advertising to TikTok users that they could download the CapCut app to make certain types of videos. He downloaded the app on his phone on December 16, 2022. He has used the app to edit videos of himself and others. Since downloading the app, Mr. Polizzi has used various CapCut video templates, including templates that morph images of his face to look like he is talking, and templates that render a different background around an image of himself. For these and other videos, Mr. Polizzi often saves them or deletes them and does not post them publicly. He is an adult and has been over 18 years of age for the duration of his time using CapCut. Mr. Polizzi has not read any CapCut terms of use or privacy policy, and he does not recall ever seeing them or being prompted to read or accept them. He expected that CapCut would protect and secure his content and data against unauthorized access. Mr. Polizzi asserts claims for the Illinois Subclass and the Nationwide Class as defined below.

24. Mr. Polizzi is and has been a member of the United States Army and the Illinois National Guard from October 2014 through the present. He holds a security clearance and has access to confidential information, including "Secret" level information and Controlled Unclassified Information ("CUI"). Certain CUI is accessible from his phone.

25. **Plaintiff Robert Koplos** is a resident of Oak View, California. He downloaded the CapCut app on his phone on January 9, 2025. He has used the app to edit videos that include friends and family members. He is an adult and has been over 18 years of age for the duration of his time using CapCut. Mr. Koplos has not read any CapCut terms of use or privacy policy, and he does not recall ever seeing them or being prompted to read or accept them. He expected that CapCut would protect and secure his content and data against unauthorized access. He asserts claims for the California Subclass and the Nationwide Class as defined below.

26. Mr. Koplos is a civilian Deputy Chief in the United States Navy. He has served as a Navy civilian from March 2016 through the present. In this role, he receives highly classified information at the "Secret" classification level, and he has a security clearance for "Secret" level information. He also accesses Controlled Unclassified Information ("CUI"), which, when combined with other CUI, can become classified information. Certain CUI is accessible from his phone.

### B. Defendants

#### 1. Beijing Douyin Information Service Co. Ltd. f/k/a Beijing ByteDance Technology Co. Ltd.

27. Defendant Beijing Douyin Information Service Co. Ltd. f/k/a Beijing ByteDance Technology Co. Ltd. ("Beijing Douyin") is, and at all relevant times was, a privately held company headquartered in Beijing, China. Defendant Beijing Douyin is a subsidiary of Defendant ByteDance Ltd., which is also headquartered in Beijing, China. The Chinese government owns a 1% share of Defendant Beijing Douyin, which has been described as a "golden share" that allows

the Chinese government to, among other things, exercise control over Beijing Douyin.[6] In China, even a minority stake in a private company "makes any state-invested enterprise subject to Beijing's influence and control, no matter how small its investment," because "Chinese law already affords the state privileged status in the governance of any corporation for which it is a shareholder."[7]

**2. ByteDance Ltd.**

28. Defendant ByteDance Ltd. is, and at all relevant times was, a Cayman Islands corporation headquartered in Beijing, China.

29. Defendant ByteDance Ltd. owns 100% of Douyin Group (HK) Ltd. f/k/a ByteDance (HK) Co., Ltd., which is headquartered in Hong Kong. Douyin Group (HK) Co., Ltd. in turn owns 99% of Beijing Douyin Information Service Co. Ltd. ("Beijing Douyin"), which is headquartered in Beijing, China. The remaining 1% is owned by China state-owned entities.

**3. Beijing ByteDance Technology Co. Ltd.**

30. Defendant Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance"), at all relevant times, was a privately held company headquartered in Beijing, China. Defendant Beijing ByteDance was a subsidiary of ByteDance Ltd., which was also headquartered in Beijing, China. In 2022, Beijing ByteDance was renamed Beijing Douyin Information Service Co. Ltd. ("Beijing Douyin").

---

[6] https://www.businessinsider.in/stock-market/news/tiktok-parent-bytedance-has-special-stock-owned-by-chinas-government-heres-how-golden-shares-give-beijing-influence-over-the-social-media-giant-/articleshow/99094188.cms. *See also* https://www.wsj.com/articles/xi-jinpings-subtle-strategy-to-control-chinas-biggest-companies-ad001a63.

[7] U.S.-China Economic and Security Review Commission, 2021 Report to Congress, at 9 (Nov. 2021).

**4. ByteDance, Inc.**

31. Defendant ByteDance, Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in Palo Alto, California. Defendant ByteDance, Inc. is, and at all relevant times was, a wholly owned subsidiary of Defendant ByteDance Ltd.

**5. ByteDance Pte. Ltd.**

32. Defendant ByteDance Pte. Ltd. is, and at all relevant times was, a Singapore private limited company headquartered in Singapore.

**6. TikTok, Inc. f/k/a Musical.ly, Inc.**

33. Defendant TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok, Inc.") is, and at all relevant times was, a California corporation with its principal place of business in Culver City, California.[8] Defendant TikTok, Inc. also maintains offices in Palo Alto, California and Mountain View, California.[9] Defendant TikTok, Inc. is a wholly owned subsidiary of TikTok, LLC, which in turn is a wholly owned subsidiary of TikTok, Ltd., and TikTok, Ltd. – like Defendant ByteDance, Inc. – is a wholly owned subsidiary of Defendant ByteDance Ltd.

**C. Defendants Operate As A Single Enterprise**

34. Defendants do not function as separate and independent corporate entities. To the contrary, company insiders have acknowledged that Defendant TikTok is "tightly controlled" by Defendant ByteDance and its China-based affiliates.[10]

---

[8] https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[9] https://www.washingtonpost.com/technologyD/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/; https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[10] https://www.cnbc.com/2021/06/25/tiktok-insiders-say-chinese-parent-bytedance-in-control.html.

35. At all relevant times, Defendants TikTok, Inc. and ByteDance, Inc. have shared offices in Silicon Valley and also have shared employees. U.S. and China-based employees of the Defendant family of companies perform work concerning the CapCut app that is at the center of the lawsuit.

36. At all relevant times, Defendant ByteDance has directed the operations of Defendants TikTok, Inc. and ByteDance, Inc. with respect to the CapCut app, and Defendants TikTok, Inc. and ByteDance, Inc. have reported to Defendant ByteDance and its China-based affiliates.

37. Defendant ByteDance made key strategy decisions for Defendants TikTok, Inc. and ByteDance, Inc., as well as for offices elsewhere in the world, and Defendants TikTok, Inc., ByteDance, Inc. and the other offices were charged with executing such decisions.

38. At all relevant times, and in connection with the matters alleged herein, each Defendant acted as an agent, servant, partner, joint venturer and/or alter ego of each of the other Defendants and acted in the course and proper scope of such agency, partnership, and relationship and/or in furtherance of such joint venture. Each Defendant acted with the knowledge and consent of the other Defendants and/or directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted and/or participated in the acts or transactions of the other Defendants.

39. At all relevant times, and in connection with the matters alleged herein, Defendants constitute a single enterprise with a unity of interest.

## III. JURISDICTION AND VENUE

40. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the

sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants, and also because more than one Defendant is a citizen or subject of a foreign state.

41. This Court has personal jurisdiction over Defendants because: (i) they transact business in the United States, including in this District; (ii) they have substantial aggregate contacts with the United States, including in this District; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District, and purposely availed themselves of the laws of the United States.

42. This Court further has personal jurisdiction with respect to the claims of the Illinois Subclass (defined below) because Defendants used and disseminated data derived directly from Illinois-based CapCut users and exposed residents of Illinois to ongoing privacy risks within Illinois based on the collection, capture, obtainment, disclosure, redisclosure and dissemination of their biometric identifiers and information. Furthermore, many of the images Defendants used for their unlawful collection, capture and obtainment of biometric identifiers and information were created in Illinois, uploaded from Illinois, and/or managed via Illinois-based user accounts, computers, and mobile devices. Because of the scope and magnitude of Defendants' conduct, Defendants knew that their collection, capture, obtainment, disclosure, redisclosure and dissemination of impacted individuals' biometric identifiers and information would injure Illinois residents and citizens. Defendants knew or had reason to know that collecting, capturing, obtaining, disclosing, redisclosing and disseminating Illinois citizens' and residents' biometric identifiers and information without providing the requisite notice or obtaining the requisite

releases would deprive Illinois citizens and residents of their statutorily-protected privacy rights, neutralize Illinois citizens' and residents' ability to control access to their biometric identifiers and information via their Illinois-managed devices and exposed minors in Illinois to potential surveillance and other privacy harms as they went about their lives within the state.

43. Furthermore, through the CapCut app, Defendants actively collect information harvested from the Illinois-based devices of Illinois residents, including location information based on users' SIM card and/or IP address.

44. Defendants use this harvested information to provide users with location-based services directed toward Illinois.

45. Defendants' deliberate gathering of Illinois users' personally identifiable information is intentionally targeted toward Illinois residents, including Plaintiffs and the Class, and constitutes purposeful activity directed at devices and individuals in Illinois.

46. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in Illinois. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

## IV. BACKGROUND

### A. Defendants Are Part of A China-Based Tech Conglomerate That Markets Multiple Products In The United States.

47. Defendant ByteDance is one of China's largest technology companies with an estimated valuation of $200 billion.[11] In the last year alone, the tech conglomerate achieved a

[11] https://www.hurun.net/en-US/Info/Detail?num=HD7Q8RVHK6WE#totop.

gross operating profit of approximately $25 billion.[12] ByteDance's former CEO, Zhang Yiming, was honored by an organization affiliated with the Chinese Communist Party as one of its "100 outstanding private entrepreneurs."[13] The list is "something of a guide to who is in the good books of the Chinese authorities."[14]

48. Defendant ByteDance makes a variety of video and news-aggregation apps.[15] It "regards its platforms as part of an artificial intelligence company powered by algorithms that 'learn' each user's interests and preferences through repeat interaction."[16] Defendant ByteDance has pursued a strategy of seeking growth in overseas markets, including specifically the United States.[17]

49. Defendant ByteDance has generated billions of dollars in annual revenue for its investors. Investors in Defendant ByteDance and its affiliates include Sequoia Capital China, Russian billionaire Yuri Milner, Japanese technology giant SoftBank, and large private-equity firms such as KKR, General Atlantic, and Hillhouse Capital Group.[18]

---

[12] https://www.economist.com/business/2023/04/13/bytedance-tiktoks-chinese-parent-reports-a-record-profit.

[13] https://weekinchina.com/2018/11/loyalty-points.

[14] *Id.*

[15] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[16] https://www.law360.com/articles/1213180/sens-want-tiktok-investigated -for-national-security-threats; https://www.cotton.senate.gov/?p=press_release&id=1239.

[17] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[18] https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123; https://www.reuters.com/article/us-tiktok-cfius-exclusive/exclusive-us-opens-national-security-investigation-into-tiktok-sources-idUSKBN1XB4IL.

50. ByteDance has expanded its influence and revenue through a series of acquisitions of apps developed in China, growing to be a dominant force in the social media market. For example, in 2016, Defendant ByteDance launched an app called "Douyin" in China. The app allowed users to create videos of themselves and share the videos with friends. The Douyin app mimicked an existing app, Musical.ly, which was created in 2014.[19] In 2017, ByteDance introduced an English-language version of the Douyin app for use outside China under the name "TikTok." ByteDance then acquired the Musical.ly app and merged all existing accounts and data into a single app under the "TikTok" name.[20]

51. The TikTok app has become "one of the world's fastest-growing social media platforms" with a massive American audience.[21] By November 2019, the TikTok app had been downloaded more than 1.3 billion times worldwide, with more than 120 million downloads in the United States alone.[22] The TikTok app dominates its top competitors such as Facebook and Instagram. TikTok recently reported that it has more than 150 million monthly active users in the United States, approaching half of the U.S. population.[23]

---

[19] https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[20] http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

[21] https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[22] *Id.*

[23] https://variety.com/2023/digital/asia/tiktok-150-million-us-monthly-users-government-ban-1235560251/.

**B. In 2020, ByteDance Began Marketing A New App In The United States Designed To Facilitate Video Editing, Which Could Be Used To Create Videos And Post Them On A Variety Of Social Media Apps.**

52. The TikTok app provided only basic tools to create and edit videos that users then posted on the app. In an ongoing effort to expand its offerings and increase its revenue, ByteDance developed a separate app, CapCut, that had far more sophisticated tools that users could employ to create and edit videos, which could then be posted on TikTok as well as a range of other social media platforms, such as YouTube, Instagram, Linkedin, and Facebook. The CapCut app could be used both by TikTok users and individuals who never downloaded or used the TikTok app.

53. The CapCut app is a "cloud-based online editor"[24] that has "cloud-based tools"[25] that allow users to edit video, photo, and audio files, among other things. Information contained in the cloud is stored on servers in data centers, separate and apart from individual user devices.

54. As discussed more fully below, Defendants maintain that there are several advantages of a "cloud-based" video editor like the CapCut app. First, "cloud-based tools like CapCut" facilitate collaborative editing of the same video by multiple users utilizing different devices: "Cloud collaboration is a virtual method to collaborate with your team members using cloud-based tools like CapCut. This makes content creation more fun and scalable, as the entire team can work on the same project with seamless collaboration."[26] Second, because CapCut is "cloud-based," an individual user can likewise utilize the app using multiple different devices: "As a cloud-based online editor, you can also quickly access your project using any device and easily edit

[24] https://www.capcut.com/resource/edite-pro-business-videos-for-smb-smes.

[25] https://www.capcut.com/tools/cloud-collaboration-platform.

[26] https://www.capcut.com/tools/cloud-collaboration-platform.

and review your video."[27] Finally, because it is "fully cloud-based," CapCut allows users to more easily interact with other online platforms: "CapCut is a fully cloud-based software, meaning it pairs perfectly with many of the channels where ultimately your video content may get uploaded – from TikTok to YouTube and everything in between."[28]

55. The CapCut app was launched in 2020 in the United States. The app allows users to edit videos with various templates, filters, visual effects and music to produce videos that look more professional and have a better chance of going viral on social media platforms.[29] Among other things, users may trim, cut, split or merge videos; change video speed; animate videos using various effects; highlight moments in videos using a freezing feature or slow motion; and add transition effects, music or sounds from a library containing millions of licensed songs.




[27] https://www.capcut.com/resource/edite-pro-business-videos-for-smb-smes.

[28] https://capcut.world/online-video-editor/.

[29] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

The CapCut app is a highly advanced video editing app that exceeds the video editing capabilities available on TikTok; for example, the templates feature employs artificial intelligence to allow users to copy the editing style of existing videos.[30] Videos can be edited on almost any device imaginable using CapCut, including a user's PC (Mac & Windows), mobile phone (Android & iOS), or tablet. Defendants advertise CapCut as "more than your typical video editor," providing "a complete package that includes graphic design, team collaboration, and much more" that uses "advanced AI [artificial intelligence] technology infused at every turn . . . ."[31]

56. In addition, CapCut contains speech recognition technology that allows users to translate voices to text (including translating voices into languages other than the original spoken language) that can be, among other things, used to provide captions for videos. "Powered by automatic speech recognition technology, CapCut recognizes speech in the video or audio, creates captions in seconds, and translates the captions into your target language. The auto-created captions will be displayed on the screen in sync with real-time playback."[32] CapCut's speech to text converter "effectively distinguishes different dialects, languages, and accents with incomparable precision . . . ."[33]

57. CapCut also contains an "audio extractor" to extract audio from user-provided videos, thereby separating the video from the audio and creating a new audio file that may then be edited using the app. CapCut has a variety of tools to edit the extracted audio or audio that is part of a video. Among other things, CapCut has advanced audio editing tools that allow users to edit

[30] https://www.thespl.it/p/capcut-ai-unlocks-human-creativity.

[31] https://www.capcut.com/creative-suite.

[32] https://www.capcut.com/tools/video-to-text.

[33] https://www.capcut.com/tools/speech-to-text-converter.

the pitch of voices contained in audio, distinguish voices from background noise and silence unwanted noise, add voice effects, and tune and transform voices with modulation effects.[34]

58. CapCut can also transform text into human-sounding voices using advanced artificial intelligence technology. CapCut's AI voice generator can create a variety of different kinds of voices using different accents, tones, emotions, and languages. Users can modulate, among other things, voice pitch, volume, speed, and other aspects of sound.[35]

59. CapCut has developed tools that are further customized to interact with various platforms on which users might decide to post their final videos and other audio-visual material. For example, CapCut has tools and templates that facilitate the creation of video and other audio-visual content that are compatible with a variety of other video editors and formats, including TikTok's video editor, YouTube intro maker, Instagram video editor, Facebook video editor, YouTube thumbnails and Instagram reels.[36]

60. Users can employ CapCut to edit videos that have been created using the TikTok video editor. They can also create new videos that can be formatted for use with TikTok and the TikTok video editor. CapCut similarly allows users to create or edit videos that are formatted for use with YouTube, Instagram or Facebook and has "a free thumbnail maker with YouTube thumbnail templates and needed materials."[37]

---

[34] *See, e.g.*, https://www.capcut.com/tools/pitch-changer; https://www.capcut.com/tools/remove-background-noise-from-audio.

[35] *See* https://www.capcut.com/tools/ai-voice-generator.

[36] *See, e.g.*, https://www.capcut.com/create/#social-media.

[37] https://www.capcut.com/create/youtube-thumbnail.

61. CapCut employs artificial intelligence and advanced facial recognition technology to take scans of face geometry that allow users to manipulate facial features appearing in videos or photographs. Multiple reviews of the app have commented on CapCut's facial recognition technology as being an important feature of the app:

- "CapCut's facial recognition technology operates as a boon for photographers aiming for subtlety in enhancement. This technology enables targeted adjustments, guaranteeing that alterations enhance rather than transform. Such precision in portrait editing, where minute changes matter, positions CapCut as an indispensable tool for photographers seeking an ideal blend of artistry and authenticity in their portraits."[38]
- "The success of the Gender Swap Filter on CapCut depends upon its cutting-edge AI technology. Facial Recognition and Landmark Detection: 1. The female-to-male transition process is precisely supported by the filter's AI algorithms, which painstakingly determine and record face features in actual time. 2. Feature Manipulation: AI carefully modifies a user's facial characteristics to give a convincing gender switch while preserving total similarity. 3. Voice Modulation: Vocal modulation is a feature of some filter models that analyzes the user's voice and modifies it to seem less female or feminine."[39]
- "By leveraging advanced facial recognition algorithms and machine learning, CapCut's Gender Swap feature automatically analyzes facial features and applies realistic changes to create a convincing transformation. This filter detects and modifies key facial parts,

[38] https://videolibrarian.com/articles/essays/capcut-for-photographers-revolutionizing-photo-editing/.

[39] https://capcutapkmod.website/gender-swap-filter-on-capcut/.

such as the eyes, nose, and mouth, ultimately producing a visually engaging gender swap effect that you can share on social media or use to enhance your storytelling."[40]

- "Many filters can modify your appearance in a fun way or make you look more attractive through facial recognition."[41]

62. CapCut also contains tools that allow users to communicate with each other or other third parties. For example, when a template is posted on CapCut, users have the ability to like, and comment on, the template.

63. CapCut offers thousands of different templates. Templates employ catchy titles that are designed to convey information regarding the functions of the various templates, such as "video face scanner", "2k face scan," "face scanner gimmic", "face recognition ai effect" and "facial recognition technology" template.[42]

64. In addition, CapCut provides users with an option to collaborate and communicate with other users in the editing process by creating a "space" in the cloud and inviting other users to join. Defendants advertise CapCut as the "best cloud collaboration platform."[43] Once a cloud space is created, invited members can access the space from any device and share draft videos for collaborative editing. Users can invite other users to collaborate in a space by, among other things, selecting an option in CapCut to either send an email invitation or a link to the individual they

---

[40] https://capcuttmod.com/how-to-do-gender-swap-filter-on-tiktok-using-capcut/.

[41] https://sharkapk.com/capcut.

[42] *See, e.g.*, https://www.capcut.com/discover/keyword/video-face-scanner/72368969475; https://www.capcut.com/discover/keyword/face-scanner-gimmic/51956537347; https://www.capcut.com/discover/keyword/2k-face-scan/52329144835; https://www.capcut.com/discover/keyword/face-recognition-ai-effect/70553074179; https://www.capcut.com/discover/keyword/facial-recognition-technology/70888733699.

[43] https://www.capcut.com/tools/cloud-collaboration-platform.

want to invite.[44] Users can then communicate with other users in the space and transfer editing permission to other users so they can edit videos in the space. Users cannot delete a cloud space once it is created.[45]




65. Users can also choose to share videos with other users through the "share for review" function.[46] Users may choose to share videos with other users by, among other things, selecting an option in CapCut to send other users draft or final videos via email or by sending other users a link. Videos may be shared for the purpose of having others participate in the editing process or simply to have others have access to the videos for review. CapCut saves the "share history" of users, including the history of which videos they have shared with others and which videos other users have sent to them to view. In sum, CapCut's cloud collaboration features allow users to work together on videos, communicate with each other, exchange comments and make edits to videos in a shared space.

---

[44] https://www.capcut.com/resource/collaborate-on-capcut-online.

[45] *Id.*

[46] *Id.*




66. CapCut also offers users a library of copyright-free media assets, including stock videos that they can review, select and use in their video editing projects. Defendants represent that the stock videos they offer have no copyright issues because they are created by professional filmmakers and videographers and licensed for use in other projects. In promoting the stock videos, they provide to CapCut users, Defendants state: "Capcut offers a vast selection of stock videos, animations, and effects organized by themes and uses."[47] "CapCut holds all the aces including massive free animated stock videos tailored for content creators. Not only can you use stock videos for direct editing, but trim, crop, add filters and effects, and change backdrops for specific needs."[48] Users can search the library of stock videos provided by Defendants to CapCut users, select and review the videos, and then incorporate the videos provided by CapCut's video

[47] https://www.capcut.com/tools/free-stock-videos.

[48] *Id.*

library into their video editing projects in CapCut and/or utilize the stock videos that are most suitable for their projects.

67. Like user-provided video content, users can edit the stock videos provided by Defendants to produce edited versions of the stock videos using the CapCut app's video editing features. Users can also merge stock video footage into their existing video projects. Defendants describe some potential uses as follows: "Looking for free-to-use stock videos to enhance your editing experience? Want to use free stock videos online for commercial use while eliminating the background from your film footage? CapCut automatically recognizes your movie's faces, enabling you to restyle the backdrop with your chosen images for a better viewing experience."[49]

68. CapCut offers free cloud storage to all users when they sign up for the app.[50] Videos, photos and other data and information stored in the cloud by CapCut are stored independently from user devices on Defendants' servers and are accessible remotely from any device.

69. In promoting its cloud storage services, Defendants state that the privacy of user data saved by CapCut in the cloud is ensured and that user data is safe: "Bring CapCut into your life and enjoy cloud storage for free without compromising on privacy. What's more is that you can access your resources from any device as CapCut is accessible on browsers, Windows, Mac, iOS, and Android devices." "The best cloud storage is secure cloud storage. Bring privacy and security into your life with CapCut's free cloud storage. Simply make your account, and rest assured that your data will remain safe whenever you return!"

---

[49] *Id.*

[50] https://www.capcut.com/tools/free-cloud-storage.

70. Defendants charge users of the CapCut app for additional cloud storage as well as for additional features and effects.[51] Users may obtain additional features and effects by paying for a monthly or yearly subscription to obtain premium features.[52] Likewise, CapCut charges a variable monthly fee to store videos on the cloud that is dependent on the amount of data that is being hosted.[53] In addition, as with the TikTok app, the CapCut app collects data from all users, which Defendants can then monetize in a variety of ways, resulting in significant profits.

71. Defendant ByteDance used a strategy to develop the CapCut app that is similar to the one it employed in developing TikTok, taking an app originally created and developed in China and then marketing it in the United States. In 2017, ByteDance launched the app in China under the brand name Jianying. Jianying quickly rose to the top of the Chinese app charts. Meanwhile, ByteDance extended the app's functionality through, among other things, acquisitions of other Chinese-created technology. In 2018, for instance, ByteDance purchased the startup Shenzhen Lianmeng Technology for $300 million. Shenzhen Lianmeng Technology had previously developed the popular app Faceu, which topped China's free app charts in 2016 and 2017. ByteDance then integrated the firm's technology into Jianying. Once it became the de-facto leader in China, ByteDance sought to market the app in the United States.[54]

[51] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[52] https://www.thespl.it/p/capcut-ai-unlocks-human-creativity.

[53] https://productmint.com/how-does-capcut-make-money/#:~:text=CapCut%20Make%20Money%3F-,CapCut%20makes%20money%20by%20charging%20users%20for%20premium%20features.,a%20monthly%20or%20yearly%20subscription.

[54] https://productmint.com/how-does-capcut-make-money/#:~:text=CapCut%20Make%20Money%3F-,CapCut%20makes%20money%20by%20charging%20users%20for%20premium%20features.,a%20monthly%20or%20yearly%20subscription.

72. ByteDance had one significant advantage in marketing the CapCut app in the United States, that it did not possess when it introduced TikTok to the U.S. marketplace. When the CapCut app was introduced in the United States in 2020, ByteDance was already a leader in the technology space with a leading social media platform, TikTok. ByteDance utilized the popular TikTok app to heavily promote its new CapCut video editing app to users in the United States. For example, videos appearing on TikTok that are edited by CapCut direct viewers to the CapCut app, thereby increasing the number of users downloading the CapCut app.[55]







73. As a result of Defendants' heavy promotion of the CapCut app, it has become one of the most popular apps available in the United States, with more than 200 million monthly active users and global downloads of more than 400 million last year alone.[56]

[55] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[56] *Id.*






[57]

74. Conversely, the CapCut app has allowed Defendants to dramatically increase the number of videos uploaded to TikTok, and thus the amount of profits that Defendants receive through the TikTok app, because the CapCut app facilitates video creation and has features that make it easy for users to upload videos created or edited using CapCut directly to the TikTok app. As explained by one commentator, "Another important aspect to consider is that CapCut acts as a quasi-user acquisition channel for TikTok and thus ByteDance. By making it easier for people to edit videos, TikTok has even more members that will upload videos on its platform. And the more and better content is being produced, the more users TikTok will attract."[58]

---

[57] https://www.thespl.it/p/capcut-ai-unlocks-human-creativity.

[58] https://productmint.com/how-does-capcut-make-money/#:~:text=CapCut%20Make%20Money%3F-,CapCut%20makes%20money%20by%20charging%20users%20for%20premium%20features.,a%20monthly%20or%20yearly%20subscription.

75. The CapCut app has allowed Defendants to expand their data collection activities to new individuals who had not previously downloaded their apps, including the TikTok app. Many users of the CapCut app have never downloaded the TikTok app. Rather, they use the CapCut app to edit videos for their personal use or that they post on other companies' social media apps, such as Instagram, Facebook, YouTube or Linkedin.

76. Unbeknownst to CapCut users, data collected by the CapCut app may be shared with the TikTok app, thereby further maximizing Defendants' profits. Information derived from CapCut users may be used to deliver and evaluate tailored advertisements. In addition, CapCut user data may be shared with third party social network service providers. Unbeknownst to CapCut users, personal and private information may be collected from users even before they set up an account.[59]

77. Defendants have unlawfully accumulated private and personally identifiable data and content from CapCut users from which Defendants are unjustly profiting.

### C. Defendants Have a History Of Unlawfully and Covertly Collecting Private And Personally Identifiable Data And Content From Users of Their Products.

78. Defendants have a history of violating the privacy rights of users of their apps. On November 15, 2020, for example, CBS News 60 Minutes published an investigative report on TikTok that raised significant concerns regarding the privacy of user data collected by the TikTok app. In the report, a former member of the U.S. intelligence community stated that "What makes TikTok particularly concerning is its relationship with the Chinese Communist Party in Beijing, the government of China. The Chinese have fused their government and their industry together so

[59] https://www.nbcnews.com/politics/white-house/white-house-posts-video-created-using-app-owned-tiktoks-parent-company-rcna77333.

that they cooperate to achieve the ends of the state." As the report observed, the TikTok app collected a range of private user data, including "your name, your home address, your personal network, who your friends with, your online viewing habits and a whole host of other pieces of information." In addition, "TikTok asks users for access to their cameras, microphones, photos, videos, and contacts. More obscure data, like 'keystroke patterns,' are collected from everyone using the app." As Senator Josh Hawley noted in the report, the collection of this data was particularly concerning because of TikTok's ownership by ByteDance, "a Chinese parent company that has direct ties to the Chinese Communist Party." As he observed, "under Chinese law, TikTok, ByteDance, the parent, is required to share data with the Chinese Communist Party."

79. China's 2015 National Security Law "requires citizens and organizations to report acts harming national security and to support national security bodies, public security bodies, and military bodies in their work."[60] China's 2017 National Intelligence Law obligates all Chinese organizations and citizens to collaborate with state intelligence operations.[61] All persons and organizations must "support China's intelligence services by secretly turning over data collected in China or overseas."[62] China's 2017 National Cybersecurity Law "compels companies and individuals to make networks, data, and communications available to the police and security

[60] China Law Translate, "National Security Law" (July 1, 2015), available at https://www.chinalawtranslate.com/2015nsl/.

[61] China Law Translate, "PRC National Intelligence Law (as amended in 2018)" (June 27, 2017), available at https://www.chinalawtranslate.com/en/national-intelligencelaw-of-the-p-r-c-2017/.

[62] "TikTok, ByteDance, and Their Ties to the Chinese Communist Party, Submission [No. 34] to the [Australian] Senate Select Committee on Foreign Interference through Social Media" (Mar. 14, 2023), available at https://www.scribd.com/document/633015202/TikTokByteDance-And-Their-Tis-to-the-Chinese-Communist-Party at 22.

services."[63] China's Data Security Law of 2021 gives the government authority "to access and control private data, including China's 'national' data processed overseas."[64] China's Counter Espionage Law of 2023 makes clear that all technological developments, whether designed for civilian or for military use, must be available to state security and intelligence services.[65]

80. As one commentator observed, under this legal framework, "If the Chinese government wants to look at the data that ByteDance is collecting, they can do so, and no one can say anything about it."[66]

81. In particular, the Chinese government has undertaken extensive efforts to develop facial recognition and artificial intelligence technologies utilizing data collected by Chinese companies. As the *New York Times* observed, "Beijing is embracing technologies like facial recognition and artificial intelligence to identify and track 1.4 billion people. It wants to assemble a vast and unprecedented national surveillance system, with crucial help from its thriving technology industry."[67]

82. Moreover, as noted, the Chinese government owns a "golden share" that allows it to exercise control over Defendants' operations and allows it the authority to make appointments to

---

[63] Law Info China, "Cybersecurity Law of the People's Republic of China" (Nov. 7, 2016), available at https://www.lawinfochina.com/Display.aspx?Id=22826&Lib=law&LookType=3.

[64] China Law Translate, "Data Security Law of the PRC" (June 10, 2021), available at https://www.chinalawtranslate.com/en/datasecuritylaw/.

[65] China Law Translate, "People's Republic of China Counter Espionage Law (2023 Ed.)" (Apr. 26, 2023), available at https://www.chinalawtranslate.com/counter-espionage-law2023/.

[66] TikTok insiders say social media company is tightly controlled by Chinese parent ByteDance, CNBC (June 25, 2021).

[67] Paul Monzur, *Inside China's Dystopian Dreams: A.I., Shame and Lots of Cameras*, The New York Times (July 8, 2018).

ByteDance's board of directors. Moreover, the CCP "operates party cells throughout ByteDance's hierarchy, affording it direct access to ByteDance's technology and strategic insights" and goals.[68]

83. As *Forbes* has reported, "[t]hree hundred current employees at TikTok and ByteDance previously worked for Chinese state media publications," and fifty of the "employees [] work for or on TikTok, including a content strategy manager who was formerly a Chief Correspondent for Xinhua News," which the U.S. State Department deems "a foreign government functionary."[69] Fifteen ByteDance employees were employed at the same time by Xinhua and other Chinese state media entities.[70]

84. In June 2022, an article in *Buzzfeed News* further confirmed many of these concerns, citing leaked meeting audio from company employees demonstrating that China-based ByteDance has repeatedly accessed non-public data of U.S. TikTok users; as one insider observed, "Everything is seen in China"; Beijing-based engineers had "access to everything."[71] "[P]ublic reporting revealed that leaked audio from more than 80 internal TikTok meetings, China- based

[68] Foundation for Defense of Democracies, "5 Things to know about Bytedance, TikTok's Parent Company" (Mar. 12, 2024), available at https://www.fdd.org/analysis/2024/03/12/5-things-to-knowabout-bytedance-tiktoks-parent-company.

[69] "LinkedIn Profiles Indicate 300 Current TikTok and ByteDance Employees Used to Work for Chinese State Media—And Some Still Do," Forbes (Aug. 11, 2022), available at https://www.forbes.com/sites/emilybaker-white/2022/08/10/bytedance-tiktok-china-state-media-propaganda/.

[70] *Id.*

[71] https://www.buzzfeednews.com/article/emilybakerwhite/tiktok-tapes-us-user-data-china-bytedance-access.

employees of ByteDance Ltd. repeatedly accessed non public data about U.S. TikTok users, including the physical locations of specific U.S. citizens."[72]

85. Defendants have since acknowledged that ByteDance engineers were involved in developing the algorithms used in TikTok and that China-based employees have had access to user data.[73] Separately, *Forbes* reported in October 2022 that Chinese executives used TikTok "to monitor the personal location of some specific American citizens," leading to an investigation by the U.S. government.[74]

86. In November 2022, the Director of the FBI, Christopher Wray, testified before Congress that the FBI had significant "national security concerns" regarding the TikTok app, including "the possibility that the Chinese government could use it to control data collection on millions of users." As Director Wray observed, Chinese law essentially requires Chinese companies to "do whatever the government wants them to in terms of sharing information or serving as a tool of the Chinese government." "And so that's plenty of reason by itself to be extremely concerned."[75]

87. On December 2, 2022, FBI Director Wray stated that TikTok's data repositories on Americans "are in the hands of a government that doesn't share our values and that has a mission that's very much at odds with what's in the best interests of the United States. . . . The [CCP] has

---

[72] H.R. 118-417, 118th Cong. 2d Sess., at 7, https://www.congress.gov/118/crpt/hrpt417/CRPT-118hrpt417.pdf.

[73] https://www.blackburn.senate.gov/services/files/A5027CD8-73DE-4571-95B0-AA7064F707C1.

[74] https://www.forbes.com/sites/emilybaker-white/2022/10/20/tiktok-bytedance-surveillance-american-user-data/?sh=2a6a7f566c2d. *See also* https://www.nytimes.com/2022/12/22/technology/byte-dance-tik-tok-internal-investigation.html.

[75] https://www.npr.org/2022/11/17/1137155540/fbi-tiktok-national-security-concerns-china.

shown a willingness to steal Americans' data on a scale that dwarfs any other."[76] In testimony before Congress, Director Wray stated that ByteDance "is, for all intents and purposes, beholden to the CCP."[77]

88. On December 16, 2022, Central Intelligence Agency Director William Burns explained that "because the parent company of TikTok is a [PRC] company, the [CCP] is able to insist upon extracting the private data of a lot of TikTok users in this country, and also to shape the content of what goes on to TikTok as well to suit the interests of the Chinese leadership."[78]

89. On March 23, 2023, Secretary of State Antony Blinken testified before the House Committee on Foreign Affairs that TikTok is a threat to national security that should be "ended one way or another."[79]

90. Based on such concerns, TikTok has been banned from government devices. The U.S. Army initially banned the app on government-owned devices based on concerns specific to Defendants and their close relationship to the Chinese government.[80] The U.S. Navy, Marines, Air Force and Coast Guard, as well as the Department of Defense and the Transportation Security Administration have likewise banned the TikTok app due to the risk that user data is being sent to

[76] H.R. 118-417, 118th Cong. 2d Sess., at 8, https://www.congress.gov/118/crpt/hrpt417/CRPT-118hrpt417.pdf.

[77] Worldwide Threats Assessment: Hearing Before the U.S. Senate Select Committee on Intelligence (Mar. 11, 2024).

[78] H.R. 118-417, 118th Cong. 2d Sess., at 10, https://www.congress.gov/118/crpt/hrpt417/CRPT-118hrpt417.pdf.

[79] *Id.* at 10.

[80] https://www.businessinsider.com/us-government-agencies-have-banned-tiktok-app-2020-2.

China.[81] In taking such actions, the U.S. Department of Defense noted TikTok's "ability to convey location, image and biometric data to its Chinese parent company, which is legally unable to refuse to share data with the Chinese Government."[82]

91. Expanding on these measures, United States Senators proposed a bill banning all federal employees from using the TikTok app on government issued phones because it "presents a major security risk."[83] Agreeing with this proposal, President Biden issued a directive in March 2023 ordering that the TikTok app be removed from all government devices.[84]

92. More than 30 state governments in the United States followed federal authorities in banning the TikTok app from government devices, citing privacy concerns.[85] In addition, the State of Montana passed legislation that prohibits TikTok from operating within the State and bans downloads of the app within the State.[86]

93. Based on such national security and privacy concerns, Federal Communications Commissioner Brendan Carr called on the federal government to completely ban the TikTok app in the United States. He also urged Apple and Google to remove it from their app stores, citing its

---

[81] https://www.businessinsider.com/us-government-agencies-have-banned-tiktok-app-2020-2#1-the-navy-banned-tiktok-from-government-devices-1.

[82] https://www.inc.com/jason-aten/the-department-of-defense-is-warning-people-not-to-use-tiktok-over-national-security-concerns.html.

[83] https://www.reuters.com/article/us-usa-china-tiktok/us-senators-seek-to-ban-federalemployees-from-using-tiktok-on-their-phones-idUSKBN20Z1E4.

[84] https://www.cbsnews.com/news/tiktok-banned-us-government-where-else-around-the-world/.

[85] https://news.yahoo.com/map-here-are-the-states-that-have-banned-tik-tok-on-government-devices-162434392.html#:~:text=TikTok%20is%20banned%20on%20state%20devices%20in%20more%20than%2030%20U.S.%20states.

[86] https://www.msn.com/en-us/news/us/montana-becomes-first-state-to-ban-tiktok-after-governor-signs-bill-into-law/ar-AA1bk7FP?ocid=msedgntp&cvid=a464877bbc2c43ab9af8bcae49e2718f&ei=11; https://apnews.com/article/tiktok-ban-montana-bytedance-a79eb96897d206dbe3ef3b188482d912.

"pattern of surreptitious data practices."[87] As Mr. Carr observed, "All the data is available inside China. We're talking search and browsing history, keystroke patterns, biometrics, potentially including face prints and voice prints being available inside Beijing,"[88]

94. Likewise, Senator Marco Rubio and Representative Mike Gallagher introduced legislation to completely ban TikTok "and other social media companies that are effectively controlled by the CCP from operating in the United States."[89]

95. Such concerns regarding Defendants' violations of the privacy of users of their apps are not limited to the United States. Due to similar concerns, the TikTok app has been banned on devices used by staff of the European Parliament, European Commission and the EU Council as well as government devices in Canada and Taiwan.[90] In addition, India completely banned the TikTok app from devices in that country in 2020.[91] And the head of Canada's intelligence agency warned that "there is a very clear strategy on the part of the government of China . . . to be able to acquire . . . personal information from anyone around the world" and that it is "very clear" from TikTok's design that data gleaned from its users "is available to the government of China."[92]

---

[87] https://techcrunch.com/2022/06/28/fcc-commissioner-writes-to-apple-and-google-about-removing-tiktok/#:~:text=An%20FCC%20Commissioner%2C%20Brendan%20Carr,users%27%20data%20up%20until%20January.

[88] https://www.skynews.com.au/world-news/global-affairs/culture-of-lawlessness-whistleblower-makes-explosive-claims-about-the-tiktoks-shocking-links-to-chinese-communist-party/news-story/1c5f2ef3dcbd1faca66318fa7eb524d2?amp.

[89] https://www.npr.org/2022/11/17/1137155540/fbi-tiktok-national-security-concerns-china; *see also* https://www.washingtonpost.com/opinions/2022/11/10/marco-rubio-ban-tiktok-america-china-mike-gallagher/.

[90] *Id.*

[91] *Id.*

[92] Catharine Tunney, Intelligence chief warns Canadians that China can use TikTok to spy on them, CBC News (May 17, 2024), https://perma.cc/C5ZH-QRE7.

96. As authorities have recognized, the privacy concerns are significant, given that Chinese companies have a legal obligation to cooperate with the Chinese government and provide the government with user data they collect. Thus, for example, Senator Hawley has noted: "all it takes is one knock on the door of their parent company, based in China, from a Communist Party official for that data to be transferred to the Chinese government's hands, whenever they need it."[93] As a former TikTok employee acknowledged (as reported in the *Wall Street Journal*): "We're a Chinese company … We answer to China."[94]

97. Indeed, China-based ByteDance exercises significant day-to-day control over operations in the United States of its affiliates. As a recent *Washington Post* story reported based on statements by former and current employees, China signs off on all major decisions regarding American operations including decisions regarding American users' data:

> According to current and former employees who reportedly spoke with the Washington Post: China remains [TikTok's] central hub for pretty much everything . . . . Beijing managers sign off on major decisions involving U.S. operations, including from the teams responsible for protecting Americans' data and deciding which videos should be removed. They lead TikTok's design and engineering teams and oversee the software that U.S. employees use to chat with colleagues and manage their work. They're even the final decision-makers on human resources matters, such as whether an American employee can work remotely.[95]

98. Other reports from former employees are in accord. For example, another recent report quoted employees as stating: "'The Chinese execs, they're in control.' . . . 'The American

---

[93] https://www.nbcnews.com/politics/congress/hawley-takes-aim-tiktok-china-congressional-hearing-n1076586.

[94] https://www.wsj.com/articles/tiktok-looking-at-ways-to-shake-off-its-ties-to-china-11574073001.

[95] D. Harwell and E. Dwoskin, As Washington Wavers on TikTok, Beijing Exerts Control, WASH. POST (Oct. 28, 2022), https://wapo.st/3VjMvLV.

execs are there to smile, look pretty, push away criticism. But ByteDance is still calling the shots behind the scenes.'"[96]

99. Nonetheless, ByteDance has attempted to obscure its ties to China and obscure the fact that user data is available to individuals in China, including the Chinese communist government. For example, it has been reported that TikTok eliminated any reference to China from its U.S. privacy policy sometime in 2019 or thereafter, even though the entities with which the policy stated it may share users' data did not change location.[97]

100. Indeed, TikTok documents demonstrate that TikTok's "messaging" strategy calls for company representatives to "Downplay the parent company ByteDance, downplay the China association, downplay AI."[98] Based on information and belief, Defendants' corporate strategy to downplay the association with China applies equally with respect to the CapCut app.

101. As a result of such allegations, the TikTok app was the subject of multiple class action lawsuits consolidated in a federal multidistrict litigation (MDL) proceeding, which Defendants recently settled for $92 million.[99] After they agreed to settle the litigation, Defendants publicly acknowledged that the TikTok app, which like CapCut has video editing capabilities, "may collect biometric identifiers and biometric information as defined under U.S. laws, such as faceprints and voiceprints, from your User Content."

[96] G. Cain, How China Got Our Kids Hooked on 'Digital Fentanyl', COMMON SENSE (Nov. 16, 2022), https://bit.ly/3VLbUhG.

[97] D. Carroll, Is TikTok a Chinese Cambridge Analytica data bomb waiting to explode?, QUARTZ (May 7, 2019), https://bit.ly/3zDuAqO.

[98] C. Stokel-Walker, Inside TikTok's Attempts to 'Downplay the China Association', GIZMODO (July 27, 2022), https://bit.ly/3EV8XnY.

[99] *In re TikTok, Inc. Consumer Privacy Litig.*, MDL 2948, No. No. 20-cv-4699 (N.D. Ill.).

102. Nonetheless, government authorities' investigation into Defendants' violation of user privacy rights continued. For example, in December 2023, the House Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party sent a letter to the FBI requesting an update on their investigation into the ability of ByteDance, TikTok and the Chinese Communist Party to surveil Americans. In particular, the Committee cited "recent reports that TikTok's internal platform—which houses its most sensitive information—was inspected in person by Chinese Communist Party (CCP) agents in the lead-up to the CCP's 20th National Congress." The Committee noted that, "[u]nder the National Intelligence Law of the People's Republic of China (PRC), ByteDance and TikTok are required to assist in CCP intelligence gathering and to provide the CCP with data—including on Americans. These alarming reports reaffirm our concerns regarding the CCP's ability to use TikTok to spy on Americans and influence the content that they consume."[100]

103. On February 8, 2024, a bipartisan group of congressmen wrote the Commerce Secretary asking her to add ByteDance to the foreign entity list, prohibiting the transfer of U.S. software to ByteDance. The letter noted Congress' concerns with ByteDance applications and their collection of U.S. user data and access to that data by the CCP: "We write to express our grave concern regarding the ongoing operation of ByteDance Ltd. products in the United States, and request action to address critical vulnerabilities created by the company's access to U.S. software.... There are serious issues with access to U.S. user data, and the relationship between ByteDance and the Chinese Communist Party (CCP).... Moreover, any ByteDance data that is viewed, stored, or

[100] chrome-extension://hbgjioklmpbdmemlmbkfckopochbgjpl/https://selectcommitteeon theccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/12.7.23-scc-letter-to-fbi-tiktok.pdf.

that passes through China is subject to the laws of China, a one-party authoritarian state hostile to American democracy. China's court system reports to and falls under the CCP, and China's 2017 National Security Law, National Intelligence Law, and Data Security Law require citizens to hand over data at the government's order… This includes U.S. data, which is made available to employees in China through ByteDance applications and their interaction with software on U.S. devices."[101]

104. In response to these concerns, TikTok sought "to address U.S. national security concerns through an initiative called Project Texas," which arose through the company's discussions with the Committee on Foreign Investment in the United States (CFIUS).[102] TikTok claimed that it spent more than $1.5 billion to address concerns with the TikTok app by creating a new entity, TikTok U.S. Data Security that hosted TikTok user data in the United States, and purporting to impose controls such that TikTok user data could not be accessed by ByteDance in China.[103] According to TikTok, the five "key pillars" of the Project Texas initiative are independent governance, data protection and access control, software assurance, content assurance, and monitoring and compliance.[104]

105. However, despite Defendants' promises, evidence soon emerged that TikTok was not complying with the principles articulated in Project Texas. American consultants for Project

[101] https://docs.google.com/document/d/1uvtbieS2pG_cakIbpErGxUdLdBiJzP5lZKHMS8EvhVQ/edit?pli=1&tab=t.0.

[102] https://usds.tiktok.com/usds-about/.

[103] *Id.*

[104] *Id.*

Texas were caught on leaked recordings admitting that even "with these [Project Texas-approved] tools, there's some backdoor to access user data in almost all of them."[105]

106. The *New York Times* has reported that "TikTok user data [is] shared on" a company platform called "Lark," which "is used every day by thousands of employees of the app's Chinese owner, ByteDance, including by those in China."[106] According to the *Times*, user photos, countries of residence, internet protocol addresses, device and user IDs, and American driver's licenses were all accessible on the Lark platform, "'as were some users' potentially illegal content, such as child sexual abuse materials. In many cases, the information was available in Lark 'groups'—essentially chat rooms of employees—with thousands of members."[107] Lark is operated on servers located in China.

107. After extensive review of the measures Defendants proposed to address the national security concerns and protect users data, CFIUS and the Executive Branch of the U.S. government concluded that Defendants' proposed measures (including Project Texas) were inadequate.

108. The federal government further concluded that Defendants were continuing to violate the data privacy rights of users. On August 8, 2024, the Federal Trade Commission (FTC) brought a civil complaint against TikTok and ByteDance alleging that they violated the privacy rights of children under the Children's Online Privacy Protection Act (COPPA) and associated

---

[105105] Emily Baker-White, Leaked Audio From 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China, Buzzfeed (June 17, 2022), https://perma.cc/7LF4-Y3XD.

[106] "Driver's Licenses, Addresses, Photos: Inside How TikTok Shares User Data," N.Y.

TIMES (May 24, 2023), available at https://www.nytimes.com/2023/05/24/technology/inside-how-tiktok-shares-user-datalark.html.

[107] *Id.*

regulations.[108] Among other things, the FTC alleged that ByteDance was failing to comply with a prior 2019 agreement it executed with the government to settle claims that it was violating COPPA.

**D. Defendants Use The CapCut App To Continue And Expand Their Theft Of Users' Private And Personally Identifiable User Data And Content.**

109. While it has received less scrutiny than the TikTok app, Defendants' CapCut app is no less of a threat to the privacy of its users.[109] CapCut is an app developed by TikTok's Chinese parent, ByteDance, that affords users powerful tools with which they can edit videos that may then be made public on a variety of social media platforms or remain private with the user. CapCut is a separate and distinct app that provides tools to users that are not available on the TikTok app, and which can be used by individuals who never download or utilize the TikTok app. While the CapCut app contains a feature that allows users to post videos directly to TikTok,[110] videos created by CapCut may also be posted to other social media apps, such as YouTube, Instagram, Linkedin and Facebook.

110. Such videos are prominently featured on social media apps like TikTok and YouTube, which offer feeds of recommended videos that are selected based on each user's interests.

111. Such videos are an essential element of certain social media platforms' revenue models (including TikTok's), which rely on targeted advertisements tied to such user-generated content. The greater the number of CapCut-generated videos that are uploaded to TikTok, for example, the greater the revenues received by Defendants from the TikTok app.

---

[108] Complaint, *U.S. v. ByteDance Ltd.*, No. 2:24-06535 (C.D. Cal. Aug. 2, 2024), available at https://www.ftc.gov/system/files/ftc_gov/pdf/bytedance_complaint.pdf.

[109] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[110] https://www.thespl.it/p/capcut-ai-unlocks-human-creativity.

112. By prompting users to view videos with which they are more likely to engage (based on data they collect from users), TikTok and other social media platforms have increased their revenues at a significant pace.

113. The more user data social media platforms such as TikTok have at their disposal, the more efficiently and effectively they can deploy advertising and grow their profits. Thus, to the extent TikTok has access to data from CapCut users, it can grow its revenue and profits even more.

114. Unless publicly shared through the affirmative consent of a CapCut user, videos created using the CapCut app, which often include close-up views of faces and private acts unintended for public consumption, are inherently private, personal and sensitive.

115. Unbeknownst to users of the app, the CapCut app gains access to these private videos. Moreover, the app performs "pre-uploading" of content (videos, etc.), which sends the content to the platform even before the user clicks on "upload" or "post".

116. Likewise, unbeknownst to users, the CapCut app collects a broad array of private and personally identifiable data and content from which Defendants unjustly profit. The CapCut app collects a range of private and personal user data, including photos, audio and videos, as well as location, gender and birthday.[111] The information and data collected by CapCut include highly sensitive biometric identifiers and information that can be used to identify CapCut users. The CapCut app is designed to allow Defendants to possess, capture, and collect such information.

117. CapCut collects personal data from its users to develop a data bank that can then be used for targeted advertising and other purposes.[112]

---

[111] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

[112] https://nerdschalk.com/who-made-capcut/.

118. Plaintiffs, the Class, and the Subclasses have a reasonable expectation of privacy in the private and personally identifiable data and content on their devices.

119. From each device on which the CapCut app is installed, Defendants collect, among other items, the following user data and information:

a. username, password, age/birthday, email address, and profile image;

b. phone and social network contacts;

c. identifier and location information;

d. photos and videos and other user-generated content;

e. audio data;

f. product interaction and usage data;

g. crash data;

h. dump data;

i. performance data; and

j. diagnostics data.[113]

120. Defendants have built into the CapCut app the capacity to collect a range of private and personally identifiable information regarding users, including Mac address, SSID, BSSID, previously configured networks, IMEI information, device ID, IMSI information, phone number, voice mail number, MEID (Mobile Equipment Identifier), ICCID (Integrated Circuit Card Identifier), and SIM serial number.

---

[113] *Id.*

121. In addition, Defendants have built into the CapCut app the capacity to collect fine-grained location information and location updates, access files on user devices and store them, and engage in offline data collection.

122. Collection of physical and digital location tracking data is highly invasive of CapCut users' privacy rights. "Location data is among the most sensitive personal information that a user can share with a company . . . Today, modern smartphones can reveal location data beyond a mere street address. The technology is sophisticated enough to identify on which floor of a building the device is located."[114] Over time, location data reveals private living patterns of CapCut users, including where they work, where they reside, where they go to school, and when they are at each of these locations. Location data, either standing alone, or combined with other information, exposes deeply private and personal information about CapCut users' health, religion, politics and intimate relationships.

123. The fact that CapCut, like TikTok, covertly harvests a wide range of data from users without disclosure is not surprising given that these apps share a common creator (ByteDance) and common technology. As an expert hired by Defendants has observed, "ByteDance has centralized many technology, operating, and business functions into 'shared-service platforms' that can be flexibly deployed to handle many tasks across products—including core engineering tasks.' The Harvard Business Review's description of the 'shared-service platform' across ByteDance's products is consistent with Petitioners' submission to the Committee on Foreign Investment in the United States ('CFIUS') in August 2021, explaining that the TikTok application (and ByteDance's other

[114] https://www.law360.com/consumerprotection/articles/1221312/sens-prod-zuckerberg-why-keep-tracking-user-locations-.

applications) are composed of thousands of 'microservices,' whereby 'small, self-contained teams' can separately develop the software for each service. This approach allows product engineering teams to rapidly leverage technologies across products, in effect integrating the software underlying ByteDance's various apps."[115]

124. Accordingly, multiple experts have expressed concerns regarding CapCut's harvesting of users' personal data. For example, the Special Competitive Studies Project, a technology think tank funded by former Google CEO Eric Schmidt, lists CapCut as one of the Chinese apps that "pose similar challenges" to American security, "particularly with respect to data harvesting, data exploitation, and—possibly—covert influence."[116]

125. Likewise, Defendants' own executives have recognized that the threats posed to consumers and the harms caused by the CapCut app are significant, and indeed even greater than those associated with the TikTok app. Like the TikTok app, CapCut covertly harvests a broad array of user data without authorization. However, CapCut lacks the data protections that Defendants have purported to implement for the TikTok app. As corporate insiders working for Defendants have acknowledged, "unlike TikTok," CapCut is "directly run by ByteDance executives in China" with none of the protections for user data that TikTok claims it has implemented.[117] "In internal meetings between ByteDance and TikTok managers in 2022 and 2023, some TikTok managers

---

[115] Decl. of Randall S. Milch ¶ 25, *TikTok Inc. v. Garland*, No. 24-1113 (D.C. Cir. June 20, 2024).

[116] https://scsp222.substack.com/p/tiktok-is-the-tip-of-the-iceberg.

[117] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

questioned why CapCut was run out of China when TikTok was not ...." Moreover, "TikTok managers have raised questions about CapCut's China-based leadership."[118]

126. As Defendants' executives have acknowledged, "ByteDance executive[s] overseeing CapCut are in China."[119] ByteDance recently "announced that its Beijing-based senior executive, Zhang Nan, would . . . focus primarily on CapCut and its domestic version, Jianying," and "CapCut's product chief, Zhang Xiaoran, is based in Shenzhen, southern China's tech hub."[120] The degree of control by Chinese executives is so great that "[s]ome Tiktok managers have raised questions about CapCut's China-based leadership," noting that "running CapCut out of China could become a lightning rod of criticism for the company."[121]

### E. Defendants Deceived Users and the Public Regarding CapCut's Data Collection Practices.

127. As their internal discussions make clear, Defendants sought to deceive the public regarding CapCut's data collection practices.

128. Defendants had an obligation to fully disclose the data that they were collecting from users, how they were using the data, and measures they were taking to ensure that user data was protected.

129. For example, the California Consumer Privacy Act of 2018 (CCPA) imposes a variety of obligations on Defendants to make full disclosure along with corresponding rights for consumers. Among other things, under the CCPA, Defendants had an obligation to "at or before the point of collection, inform consumers" of the "categories of personal information to be

---

[118] *Id.*

[119] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

[120] *Id.*

[121] *Id.*

collected and the purposes for which the categories of personal information are collected or used and whether that information is sold or shared."[122] The CCPA further requires a company to delete such personal information upon request and requires companies to allow consumers to opt-out of the sale or sharing of their personal information.

130. Similarly, the Children's Online Privacy Protection Act (COPPA) requires website and app operators to obtain verifiable parental consent before collecting personal information from children under 13, provide clear notice of their data practices, and implement security measures to protect the data they collect.[123]

131. Congress passed COPPA, 15 U.S.C. § 6501 *et seq.*, in response to concerns that children's online activities were being tracked by operators of websites and online services. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[124] The standards in COPPA have given rise to accepted norms throughout society for defining the expectations of privacy for minor children.

132. COPPA "prohibits unfair … acts or practices in connection with the collection, use and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1.

133. COPPA provides that "It is unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal

---

[122] Cal. Civ. Code § 1798.100.

[123] Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501–6505.

[124] 144 Cong. Rec. S12787.

information from a child to collect personal information from a child in a manner that violates the regulations prescribed [by the FTC]." 15 U.S.C. § 6502(a).

134. COPPA requires an operator covered by COPPA to give notice to parents and obtain their verifiable consent before collecting children's Personal Information online. 16 C.F.R. §§ 312.4, 312.5. This includes providing clear, understandable, and complete notice of its information practices, including what information the operator collects from children online, how it uses such information, its disclosure practices for such information, and other specific disclosures set forth by COPPA. The operator must provide specific disclosures directly to parents and obtain verifiable parental consent prior to collecting, using, and/or disclosing Personal Information from children.

135. In 2013, COPPA was enhanced to provide further protection for children against online tracking and to "giv[e] parents greater control over the online collection of their children's personal information." The 2013 enhancement widened the definition of children's "Personal Information" to include "persistent identifiers" such as cookies that track a child's activity online, geolocation information, photos, videos, and audio recordings.

136. Pursuant to COPPA Section 1303(c), 15 U.S.C. § 6502(c) and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of COPPA constitutes an unfair act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Violations of COPPA also constitute "unfair practices" under state statutes prohibiting such practices.

137. Defendants further undertook a duty to fully and accurately make disclosures concerning their data practices when they issued privacy policies and other documents purporting

to summarize their data practices, such as the categories of data collected, the ways they used the data, and the dissemination of that data to third parties.

138. While Defendants purported to disclose their data collection practices, they did not fully or accurately do so. Instead, Defendants told the public and users on their website that "CapCut values your privacy and safety, and we believe in data transparency."[125] They further stated they would provide "privacy and security" for user data: "Save your precious memories and private data securely with CapCut's free cloud storage"; "The best cloud storage is secure cloud storage. Bring privacy and security into your life with CapCut's free cloud storage. Simply make your account, and rest assured that your data will be safe whenever you return!"[126]

139. Prior versions of CapCut's privacy policy issued before this lawsuit was filed made similar statements such as: "We are committed to protecting and respecting your privacy."

140. With respect to young users in particular, Defendants represented that they were "deeply committed to protecting the safety of youths on our platform," which they defined as "any person under the age of 18."[127]

141. However, Defendants repeatedly violated their duty to fully and accurately disclose their data practices. For example, Defendants did not disclose that the CapCut app collects biometric identifiers and information, despite the fact that they are well aware of their obligation to do so. In contrast, the privacy policy for Defendants' TikTok app—which also contains a video

---

[125] https://www.capcut.com/legal/webform/privacy-request/en.

[126] https://www.capcut.com/tools/free-cloud-storage.

[127] https://www.capcut.com/clause/community-guideline?lang=en.

editor–discloses that the TikTok app collects "biometric identifiers and biometric information as defined under U.S. laws, such as faceprints and voiceprints."[128]

142. Similarly, Defendants do not disclose that the CapCut app collects fine-grained location data from users. Nor is there any legitimate reason for a video editing app to collect such information. Moreover, in the past, Defendants have failed to disclose that the CapCut app collects any location information from users at all. Again, the TikTok app's privacy policy—in contrast to CapCut—contained at least some disclosure, noting that the TikTok app had collected "precise location information (such as GPS)."[129]

143. Likewise, Defendants did not disclose that they collected metadata from uploaded user content until after this lawsuit was filed. Among other things, such metadata includes data that describes how, when, where, and by whom the piece of user content was created, collected, or modified and how that content is formatted. While Defendants did not make such disclosures for CapCut, the TikTok privacy policy does contain such disclosures, again documenting that Defendants were aware that they should make such disclosures but sought to conceal the full scope of the data collected by the CapCut app from CapCut users.

144. Before this lawsuit was filed, CapCut did not disclose that it collected purchase information, which it collected from users when, among other things, they participated in rewards programs or the CapCut Cloud Space Service. This included information such as payment card information, billing, delivery, and contact information, and what users purchased. Again, TikTok's privacy policy, unlike CapCut's, did disclose the collection of such information from TikTok users.

---

[128] https://www.tiktok.com/legal/page/us/privacy-policy/en.

[129] *See* 1/1/23 TikTok Privacy Policy.

145. Before this lawsuit was filed, CapCut did not disclose that the app would collect users' email contacts. Such information can be extremely valuable to Defendants, furthering their marketing efforts.

146. Before this lawsuit was filed, CapCut did not disclose that the app would collect data that had been copied onto users' clipboards. Such information can include very sensitive information such as passwords, social security numbers, or financial information.

147. These are some of the specific categories of data that CapCut collected, but which Defendants failed to disclose to CapCut users. Moreover, in general, the disclosures Defendants made did not fully or adequately disclose the categories of user data collected, how the data was shared or transferred, and the purposes for which the data was used.

148. Defendants also sought to conceal that the CapCut app was directly controlled by Defendant ByteDance, which is a Chinese company, that user data could be accessed by individuals and entities in China, and that Defendants had an obligation to share user data with the Chinese government and CCP. Indeed, Defendants purposefully sought to mislead users by suggesting that their data would be subject to various protections that did not apply to CapCut users' data.

149. For example, as noted, the CapCut app was heavily promoted on the TikTok app, where users were encouraged to click on a button to download the CapCut app and use its video editing capabilities to post videos on TikTok. The TikTok Hashtags website reports that TikTok users have uploaded 965.6 million posts with "#CapCut" onto the platform and that these videos

have earned 7.7 trillion views.[130] CapCut also has an account on TikTok with more than 18 million followers where users can find tips and other updates about the app.

150. TikTok represented that user data would be subject to extensive protections under "Project Texas", which would wall off data from access by individuals or entities in China. Defendant TikTok stated on its website: "To fulfill our commitments to safeguard U.S. user data, we have a cutting-edge program called 'Project Texas… A central goal of Project Texas is to enhance the way that U.S. user data is protected, including how it is accessed, stored, and shared…. Under Project Texas, protected U.S. user data is afforded enhanced protection…. We are committed to aligning our business practices to widely-accepted privacy principles, such as privacy by design, data minimization, and transparency."[131]

151. TikTok represented that a separate subsidiary called TikTok U.S. Data Security Inc. ("TikTok USDS") had been created to house user data and that there would be independent governance of this subsidiary using U.S.-only personnel, creating physical separation of U.S. data from China-based individuals and entities. TikTok represented that the data would be hosted by a U.S. company—Oracle—which would impose data access and controls to ensure physical separation.[132]

152. TikTok's CEO described these changes as creating "what amounts to a firewall" that "seals off protected U.S. user data from foreign access." "American data [is] stored on

---

[130] https://tiktokhashtags.com/hashtag/capcut/.

[131] https://usds.tiktok.com/safeguarding-us-user-data/.

[132] *Id.*

American soil by an American company overseen by American personnel." This "eliminates the concern" that "US data can be subject to Chinese law."[133]

153. CapCut users were deceived because no such protections were available for data that was uploaded through the CapCut app. As the internal discussions quoted in the press make clear, Defendants' executives were well aware of their deceptive conduct, noting their concern that CapCut was directly run by ByteDance without any of the data protections that applied to data collected through the TikTok app and worrying that this "could become a lightning rod of criticism for the company" if uncovered.[134]

154. Indeed, introduction of the CapCut app had the effect of making the data of TikTok users accessible to individuals and entities in China, thereby circumventing Project Texas and its alleged protections for user data. Defendants used TikTok's powerful marketing platform to encourage consumers to sign up for the CapCut app, which lacked the protections for user data that were implemented for the TikTok app. This included encouraging users to switch to the CapCut app even though they may already have downloaded another video editing app such as TikTok or some other video editing app.

155. As commentators observed, "CapCut has capitalized on sister company TikTok being the face of vertical-video platforms. On TikTok, the official CapCut account has nearly 10 million followers, with its corresponding hashtag hosting thousands of billions of views on videos that have used the editing app. ByteDance self-promotes CapCut within the TikTok app using language like, 'Everyone can be a creator by using CapCut. Start creating your cool video

---

[133] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

[134] TikTok Executives Fretted About China Ties of CapCut Editing-App, Information (2024).

today.'"[135] Moreover, videos edited using CapCut that appeared on the TikTok app would show a button along with phrases such as "try this template" or "editing made easy," which directed users to download the CapCut app.[136]

156. Gaining access to the data of users who signed up for the CapCut app, Defendants then proceeded to utilize the CapCut app to collect user data from millions of individuals in the United States without any of the protections for user data that they were forced to implement with the Tiktok app. All of this was achieved without the knowledge of users, who were kept in the dark by Defendants and deceived into giving them access to their data without adequate data protections. Defendants continue to take extensive efforts to avoid public disclosure of the fact that such protections for user data do not exist with the CapCut app.

157. Another way that Defendants sought to hide the fact that CapCut was controlled by executives in China was to set up a Singapore entity, Defendant ByteDance Pte. Ltd., that they represented—contrary to the truth—controlled the CapCut app. Accordingly, on the app store and other stores offering the CapCut app, the entity listed as owning and controlling the app is ByteDance Pte. Ltd. Likewise, CapCut's privacy policy states that the services are "provided and controlled by Bytedance Pte. Ltd."[137] However, as the recent public disclosures make clear, in fact the CapCut app is "directly run by ByteDance executives in China."[138]

---

[135] How ByteDance Is Expanding Its Reach Beyond TikTok With CapCut—One of the Most Popular Apps in America, Time (Apr. 13, 2023).

[136] TikTok's Chinese Parent Has Another Wildly Popular App in the U.S., Wall St. J. (Mar. 19, 2023).

[137] https://www.capcut.com/clause/privacy-policy.

[138] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

158. Defendants repeatedly denied in public (while acknowledging in private) that ByteDance was controlled by the Chinese government. For example, TikTok's CEO Shou Chew testified before Congress that "ByteDance is not owned or controlled by the Chinese government."[139] Likewise, in response to press inquiries, he stated: "The Chinese government does not directly or indirectly have the right to appoint board members or otherwise have specific rights with respect to any ByteDance entity within the chain of ownership or control over the TikTok entity."[140]

159. Finally, Defendants did not disclose that members of the CCP had access to their facilities, and indeed had significant management roles at Defendants' companies and could access user data. Nor did they disclose that Defendants were subject to Chinese law that required that they provide access to user data to the Chinese government and CCP.

**F. The Threats Posed By CapCut Led Congress to Pass Bipartisan Legislation Requiring Divestiture of the App in the United States.**

160. Ultimately, the concerns regarding the privacy of user data in Defendants' possession, including data collected using the CapCut app, led Congress to pass bipartisan legislation requiring ByteDance and its affiliates to divest all their apps offered in the United States, including the CapCut app.

161. In 2021, President Biden issued an executive order identifying the People's Republic of China as "a foreign adversary" that "continues to threaten the national security, foreign policy, and economy of the United States" through its control of "software applications"

---

[139] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

[140] TikTok Responds to Allegations of Unsecured User Data (July 5, 2022), https://www.searchenginejournal.com/tiktok-responds-user-data/456633/.

used in the United States.[141] The order stated that "software applications" can provide foreign adversaries with "vast swaths of information from users," and that the PRC's "access to large repositories" of such data "presents a significant risk."[142] President Biden directed several executive agencies to provide risk mitigation options, and asked for recommended "executive and legislative actions" to counter risks "associated with connected software applications that are designed, developed, manufactured, or supplied by persons owned or controlled by, or subject to the jurisdiction or direction of, a foreign adversary."[143]

162. At the same time, Congress considered legislation to address the national security risks posed by such applications, including applications owned by Defendants such as CapCut and TikTok. In the process, Congress made extensive findings regarding the national security threats posed by applications owned by Defendants as well as the close relationship between Defendant ByteDance and the CCP. Among other things, Congress observed that "public reporting has repeatedly confirmed" the "tight interlinkages between ByteDance Ltd., TikTok, and the Chinese Communist Party (CCP)."[144] Congress observed that China is "constructing 'massive databases of Americans' personal information' and that 'ByteDance Ltd. has close ties to the CCP, including a cooperation agreement with a security agency and over 130 CCP members in management positions.'"[145]

---

[141] Protecting Americans' Sensitive Data From Foreign Adversaries, Exec. Order No. 14034, 86 Fed. Reg. 31423, 31423 (June 9, 2021).

[142] *Id.*

[143] *Id.*

[144] H.R. 118-417, 118th Cong. 2d Sess., at 3, https://www.congress.gov/118/crpt/hrpt417/CRPT-118hrpt417.pdf.

[145] *Id.* at 7.

163. The congressional findings further note that ByteDance has a Communist Party committee that, as of 2022, was headed by the company's chief editor and included at least 138 employees in the company's Beijing office, including senior corporate managers. Party committees are required for domestic firms in China, and many foreign firms, and have a direct role in advancing CCP ideology and involving themselves in the business decisions of the companies where they are located. Congress found that "the Secretary of ByteDance Ltd.'s CCP committee, Zhang Fuping, also serves as ByteDance Ltd.'s Editor- in-Chief and Vice President and has vowed that the CCP committee would 'take the lead' across 'all product lines and business lines…'"[146]

164. When the legislation was introduced to address the threat to public safety posted by the CapCut app, members of Congress observed that ByteDance "is legally required to support the work of the Chinese Communist Party."[147]

165. In addition, the Chair of the Congressional Committee responsible for crafting the legislation observed after briefings from intelligence and data security experts that CapCut in particular is "spying [on users] by design."[148]

166. The Co-Chair of the Congressional Select Committee on the CCP, Raja Krishnamoorthi, similarly stated: "So long as it is owned by ByteDance and thus required to collaborate with the CCP, TikTok poses critical threats to our national security. Our bipartisan

---

[146] *Id.* at 3.

[147] *See* Press Conference to Introduce the Protecting Americans from Foreign Adversary Controlled Applications Act, China Select Committee (Mar. 6, 2024) (statement of Chairman Gallagher), https://perma.cc/NBC3-H3PB.

[148] Opening Statement of Chair Cathy McMorris Rodgers (Mar. 7, 2024), https://www.congress.gov/118/meeting/house/116945/documents/HHRG-118-IF00-MState-M001159-20240307.pdf.

legislation would protect American social media users by driving the divestment of foreign adversary-controlled apps to ensure that Americans are protected from the digital surveillance and influence operations of regimes that could weaponize their personal data against them. Whether it's Russia or the CCP, this bill ensures the President has the tools he needs to press dangerous apps to divest and defend Americans' security and privacy against our adversaries …"[149]

167. As Congressman Krishnamoorthi later observed on CNN, "The editor in chief of ByteDance is himself the secretary of the very Chinese communist party cell embedded in the leadership of ByteDance. And his duty, according to him, is to make sure that TikTok and other products abide by correct political direction."[150]

168. On April 24, 2024, President Biden signed the Protecting Americans from Foreign Adversary Controlled Applications Act (the "Divestiture Act") into law.[151] The Act identifies the People's Republic of China (PRC) and three other countries as foreign adversaries of the United States and prohibits the distribution or maintenance of "foreign adversary controlled applications."

169. The Act defines a Foreign Adversary Controlled Application as "a website, desktop application, mobile application, or augmented or immersive technology application that is operated, directly or indirectly" by either of two distinct groups.[152] The first group consists of the

---

[149] Press Release, "Gallagher, Bipartisan Coalition Introduce Legislation to Protect Americans From Foreign Adversary Controlled Applications, Including TikTok" (Mar. 5, 2024), https://selectcommitteeontheccp.house.gov/media/press-releases/gallagher-bipartisan-coalition-introduce-legislation-protect-americans-0.

[150] Transcript, Reps. Gallagher and Krishnamoorthi Interviewed on CNN, CQ Newsmaker Transcripts (Mar. 7, 2024).

[151] Pub. L. No. 118-50, div. H, 138 Stat. 955.

[152] *Id.* § 2(g)(3).

ByteDance group of companies. The second group consists of every covered company that is determined by the President to present a significant threat to national security. Accordingly, the Act expressly applies to all applications operated by Defendants, such as TikTok and CapCut. However, it also provides that in the future the President may designate additional applications operated by other companies, provided the President found that they presented a similar threat to national security.

170. The Act makes it "unlawful for an entity to distribute, maintain, or update" a foreign adversary controlled application.[153] However, Section 2(c) of the Act provides that the prohibitions do not apply where "a qualified divestiture is executed before the date on which a prohibition under subsection (a) would begin to apply."[154] With respect to CapCut, the prohibitions were scheduled to take effect on January 19, 2025 unless there was a qualified divestiture of the app.

171. This was not the first time that the U.S. government had acted to address the threat to members of the public and their data by China-based technology companies. The U.S. government through CFIUS previously required the divestiture of an American dating app (Grinder) that was owned by a Chinese company due to the threat to user data.

172. Similarly, Congress prohibited federal agencies from using telecommunications equipment produced by several entities affiliated with the Chinese government, including Huawei and ZTE.[155] In 2019, Congress required the FCC to create a list of communications equipment or

---

[153] *Id.* § 2(a).

[154] *Id.* § 2(c)(1)(A).

[155] Pub. L. No. 115-232, § 889; *Huawei Techs. USA, Inc. v. U.S.*, 440 F. Supp. 3d 607 (E.D. Tex. 2020).

services that "pose[] an unacceptable risk to the national security" on which federal funds could not be spent.[156] And, in 2021, Congress passed the Secure Equipment Act, specifying that the FCC could not authorize the use of such "covered" equipment.[157]

173. Nonetheless, Defendants challenged the Divestiture Act in an original proceeding before the U.S. Court of Appeals for the D.C. Circuit. As part of the proceeding, the court received several evidentiary submissions and expert declarations. Defendants argued, among other things, that the legislation was overinclusive because it encompassed not only the TikTok app, but also CapCut, which Defendants argued did not pose a threat to national security. The government responded that "[b]ased on both public and classified information, the U.S. intelligence community assessed that ByteDance and TikTok pose a threat to U.S. national security" and "[t]he Chinese government's authority over ByteDance enables it to gain access to and exploit" data collected by all of Defendants' apps.[158]

174. The D.C. Circuit rejected Defendants' arguments, concluding among other things, that Defendants had failed to establish that the government's national security concerns regarding the CapCut app were unsupported. The court found that, "[g]iven the Government's well-supported concerns about ByteDance, it was necessary for the Act to apply to all ByteDance entities." *TikTok Inc. v. Garland*, 122 F. 4th 930, 965 (D.C. Cir. 2024). The court further found that "the petitioners fail to demonstrate that neither of the Government's two national security concerns implicate CapCut." *Id.*

---

[156] Secure and Trusted Communications Networks Act, Pub. L. No. 116-124, § 2, 134 Stat. 158,158–59 (2020).

[157] Pub. L. No. 117-55, 135 Stat. 423, § 2(a) (2021).

[158] Brief of Respondent, *TikTok Inc. v. Garland*, No. 24-113, at 15-16, 18 (D.C. Cir. July 26, 2024).

175. The court found, among other things, that the "PRC maintains a powerful Chinese Communist Party committee 'embedded in ByteDance' through which it can 'exert its will on the company.' As of 2022, that committee 'was headed by the company's chief editor and comprised at least 138 employees at its Beijing office, including senior company managers.'" *Id.* at 955. The court further found that "the Government's concerns [that user data would be shared with China] are well founded, not speculative." *Id.* at 957.

176. Defendants appealed the court's ruling to the Supreme Court of the United States. However, the Supreme Court affirmed the D.C. Circuit's ruling. *TikTok Inc. v. Garland*, 145 S. Ct. 57 (2024).

177. As a result, Defendants took CapCut offline for a period of time on January 19, 2025. However, after President Trump was inaugurated on January 20, he extended the deadline until April 5 in order for Defendants to explore a qualified divestiture.

**G. Defendants Are Unjustly Profiting While Plaintiffs Suffer Economic Harm.**

178. Defendants possess user/device identifiers, biometric identifiers and information, private videos, and private video images and other private user data sufficient to create a file of private and personally identifiable data and content for each CapCut user. Such files can be supplemented over time with additional private and personally identifiable user data and content, and all of this private and personally identifiable data and information has been, is, and will be used for economic and financial gain.

179. Defendants' unlawful possession and control over this data and information make tracking and profiling CapCut users, and targeting them with advertising, much more efficient, effective, and lucrative. Such private and personally identifiable data and content are used to analyze CapCut users' income, consumption habits, and preferences. Such information provides

guidance as to what methods of advertising will be most effective on particular CapCut users, what products – including Defendants' own products – will be most attractive to particular CapCut users, and how much to spend on particular ads. Defendants unjustly have earned and continue to earn substantial profits and revenues from such targeted advertising and from generating increased demand for and use of Defendants' other products.

180. Defendants also unlawfully leverage the private and personally identifiable CapCut user data and content to improve their artificial intelligence technologies and file patent applications, thereby unjustly increasing their past, present and future profits and revenues – and their market value.

181. As described above, CapCut itself is intimately involved with ByteDance's artificial intelligence development. Recently, CapCut has promoted a new service Dreamina, an AI image generator that allows users to create images from text and image prompts. Moreover, as noted CapCut itself incorporates artificial intelligence, with functions such as its AI voice generator, describing itself on its website as an "AI-powered video editor." As commentators have observed, "CapCut has been a forerunner in ByteDance's adoption of generative AI. Since 2022, features like text-to-image conversion and music generation have enriched the user experience . Its current tools also include digital avatars and voiceover editing, among others."[159]

182. Meanwhile, Plaintiffs, the Class and the Subclasses have incurred, and continue to incur, harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, private videos and private video images.

[159] https://kr-asia.com/capcut-leader-zhang-xiaoran-departs-as-bytedance-doubles-down-on-ai.

183. **Loss of Value from Theft of User Data.** Plaintiffs, the Class and the Subclasses also have suffered and continue to suffer harm in the form of diminution of the value of their private and personally identifiable data and content as a result of Defendants' surreptitious and unlawful activities. Plaintiffs' personal and private data has significant commercial value. In 2018, California enacted the California Consumer Privacy Act ("CCPA") which recognizes the significant economic value of such consumer data. The act, among other things, permits businesses to purchase consumer information from consumers directly (Cal. Civ. Code § 1798.125(b)(1)) and permits businesses to assess and appraise consumer data with a monetary value (Cal. Civ. Code § 1798.125(a)(2)).

184. Plaintiffs' personal data has significant value. As commentators have observed, the "world's most valuable resource is no longer oil, but data."[160] "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[161]

185. There is an economic market for consumers' personal data—including the data that Defendants collected from Plaintiffs and Class Members.

---

[160] *The World's Most Valuable Resource is No Longer Oil, But Data*, The Economist (May 6, 2017).

[161] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056-57 (2004).

186. In 2015, *TechCrunch* reported that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data could vary from $15 to more than $40 per user.[162]

187. The Organization for Economic Cooperation and Development (OECD) published a paper in 2013 that examined prices charged by "various online data warehouses" for personal data, reporting: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[163]

188. As Professor Paul M. Schwartz observed, writing in the *Harvard Law Review*: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[164]

189. Similarly, an article published in the *Journal of Economic Literature* observed: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her click throughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[165]

---

[162] Pauline Glickman & Nicholas Glady, *What's the Value of Your Data?*, TechCrunch (Oct. 13, 2015).

[163] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers No. 220 (Apr. 2, 2013).

[164] Paul M. Schwartz, *Property, Privacy, and Personal Information*, 117 Harv. L. Rev. 2056 (2004).

[165] Alessandro Acquisti et al, *The Economics of Privacy*, 54 J. of Econ. Lit. 2, at 444 (June 2016).

190. There is a robust market for user data, which is a valuable commodity. For example, Meta has offered to pay individuals for their voice recordings,[166] and has paid individuals up to $20 a month plus referral fees to install an app that allows Meta to collect data on how individuals use their smartphones.[167] Other companies and apps such as Nielson Data, Killi, DataCoup, and AppOptix offer consumers financial compensation in exchange for their personal data.[168]

191. One study by content marketing agency Fractl has found that an individual's online identity, including hacked financial accounts, can be sold for $1,200 on the dark web.[169]

192. User data—including personal data, engagement data and information, behavioral data, and attitudinal data—constitutes highly valuable information about consumers that companies routinely purchase in the marketplace.

193. Defendants' collection and use of Plaintiffs' and Class members' personal information without authorization is a taking of their property. Plaintiffs and Class members have a right to disgorgement and/or restitution damages for the value of taken information.

194. Plaintiffs have suffered benefit of the bargain damages, in that Defendants took more data than they agreed would be exchanged. These benefit of the bargain damages also include, but are not limited to (1) loss of the promised benefits of the CapCut app, (2) out-of-pocket costs, and (3) loss of control over property which has marketable value.

---

[166] Jay Peters, *Facebook Will Now Pay You for Your Voice Recordings*, The Verge (Feb. 20, 2020).

[167] Choudhury & Browne, *Facebook Pays Teens to Install an App That Could Collect All Kinds of Data*, CNBC (Jan. 29, 2019).

[168] *28 Apps that Pay You for Data Collection: Earn a Passive Income*, Dollar Break (July 7, 2022).

[169] Maria LaMagna, *The sad truth about how much your Google data is worth on the dark web*, MarketWatch (June 6, 2018).

195. Further, Plaintiffs and Class members were denied the benefit of knowledge that their personal information was being collected and shared by Defendants. Therefore, they were unable to mitigate harms they incurred because of Defendants' actions. Defendants' lack of transparency prevented and still prevents Plaintiffs' and Class members' ability to mitigate their damages.

196. Defendants avoided costs they should have incurred because of their own actions—particularly the loss of users which would have resulted from transparent disclosure of Defendants' actions—and transferred those costs to Plaintiffs and Class members. Warning users would have chilled user engagement with the CapCut app and discouraged new users from downloading the app. Defendants were therefore not only able to evade or defer these costs, but continue accruing value. Defendants have thus transferred all the costs imposed by the unauthorized collection and disclosure of users' personal information onto Plaintiffs and Class members. Plaintiffs and the Class have also suffered benefit of the bargain damages, insofar as Defendants took more data than they were authorized to take and used that data for undisclosed and unauthorized purposes. Those benefit of the bargain damages include loss of control over property (their data) that has a marketable value. In addition, Plaintiffs and the Class assigned value to keeping their private data private, which was destroyed when Defendants inappropriately collected their data without adequate notice or authorization and used it for undisclosed purposes.

197. **Data Usage and Electricity Costs.** Plaintiffs, the Class, and the Subclasses have incurred damage to their devices because the battery, memory, CPU and bandwith of Plaintiffs' devices and the Class members' devices have been compromised as a result of Defendants' clandestine and unlawful activities.

198. Users have repeatedly reported abnormal battery draining while using CapCut. For example, an Apple MacBook user reported that while she usually has "full days" of battery life using her computer, when she uses CapCut her laptop "barely lasts an hour on its battery" and she has to "always be plugged in."[170]

199. Other users have observed that the battery drain occurs even at night when the CapCut app is not being used: "Wtf why is capcut draining the Battery at night?!"[171]

200. Testing of the CapCut app shows high battery usage compared to other apps. Moreover, as the results depicted below show, CapCut significantly drains a user's battery overnight when the user is not even utilizing the CapCut app and is deriving no benefit from it. This indicates that the CapCut app is draining user battery to perform clandestine functions that are not being directed or authorized by the user.

[170] https://www.threads.net/@ana.sunshinevisuals/post/C7dDkxwOlL3.

[171] https://www.threads.net/@leylaummels/post/DHYDgdMNoYl.




201. **Subscription Costs and Fees.** Many users pay direct out-of-pocket subscription fees to CapCut for additional services. These Plaintiffs have experienced direct out-of-pocket costs.

202. CapCut has offered subscription packages costing from $5.99/month to $24.99/month. Named Plaintiffs here utilized both yearly and monthly subscription services. Plaintiffs would not have downloaded the CapCut app and incurred these costs if they had known about CapCut's improper data practices.

203. Exacerbating these problems, users have reported that once they give Defendants their payment information, Defendants "make it impossible to cancel" the subscription fees, describing Defendants as "scam artists."[172]

204. **Risk of Identity Theft and Fraud.** Plaintiffs' data is now at risk of identity theft and fraud. This is particularly true, given that Defendants have given access to Plaintiffs' personal data to individuals and entities in China. Moreover, as discussed further below, Plaintiffs have failed to implement adequate measures to ensure that Plaintiffs' data is secure and protected from theft and fraud.

205. The risks of identity theft and fraud are long term and injure users in a variety of ways, including: compromising their financial accounts, marring their credit ratings and history, preventing their ability to get loans, risking fraudulent tax filings, and many other potential hardships. Plaintiffs have already suffered diminished security in their personal affairs and face an expanded and imminent risk of economic harm from identity theft and fraud.

### H. Plaintiffs Could not Have Earlier Discovered Defendants' Wrongful Conduct And Defendants Have Fraudulently Concealed Their Unlawful Conduct, Thereby Tolling Any Applicable Statutes of Limitations.

206. Each unauthorized collection of private data by Defendants is a separate "wrong" that triggers anew the relevant statute of limitations.

207. Plaintiffs, the Class, and the Subclasses were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part. Plaintiffs and Class members could not with due diligence have discovered the full scope of Defendants' conduct,

---

[172] https://www.reddit.com/r/CapCut/comments/16nvx4r/these_guys_are_scam_artists_and_make_it/?rdt=51957.

including because it involves the operation of highly technical proprietary software owned by Defendants and there were no adequate disclosures that would inform a reasonable consumer regarding the facts as alleged in the complaint. Defendants had exclusive knowledge regarding many aspects of the functioning of the software used with the CapCut platform, yet failed to disclose relevant functions of that software to the public. The earliest Plaintiffs and Class members could have known about Defendants' conduct was shortly before the filing of this complaint.

208. In addition, the applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their unlawful conduct alleged above – through, among other things, their obfuscation of the CapCut source code, misleading public statements, and hidden and ambiguous privacy policies and terms of use.

209. As a result of Defendants' fraudulent concealment, Plaintiffs lacked actual or constructive knowledge of the relevant facts giving rise to their claims despite their exercising reasonable diligence in attempting to uncover facts giving rise to the claim.

210. Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiffs, the Class and the Subclasses. Defendants are therefore estopped from relying on any statute of limitations. Defendants' fraudulent concealment is common to the Class and the Subclasses.

**I. The Named Plaintiffs Have Been Injured By Defendants' Unlawful Conduct.**

211. During the time that the CapCut app was installed on plaintiffs' devices, Defendants surreptitiously performed, among others, the following actions without notice to or the knowledge and consent of plaintiffs or, in the case of the minor plaintiffs, their legal guardians: (i) Defendants took plaintiffs' user/device identifiers and private videos and audio-visual material from their devices; (ii) Defendants took plaintiffs' biometric identifiers and information (including

face geometry scans) from plaintiffs' devices and/or videos; (iii) Defendants took plaintiffs' private and personally identifiable data and content from plaintiffs' devices; and (iv) Defendants made some or all such stolen data and content accessible to individuals in China – including individuals under the control of the Chinese government.

212. Defendants performed these acts for the purpose of secretly collecting plaintiffs' private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, and private videos – and using such data and content to track, profile and target plaintiffs with advertisements. Further, Defendants have used plaintiffs' private and personally identifiable data and content for the purpose of developing their artificial intelligence capabilities and patenting commercially valuable technologies. Defendants and others now have access to private and personally identifiable data and content regarding plaintiffs that can be used for further commercial advantage and other harmful purposes. Defendants have profited, and will continue to profit, from these activities.

213. Meanwhile, plaintiffs have incurred harm as a result of Defendants' invasion of their privacy rights through their covert taking of plaintiffs' private and personally identifiable data and content – including their user/device identifiers, biometric identifiers and information, private videos and private video images. Plaintiffs also have suffered harm because Defendants' actions have diminished the value of their private and personally identifiable data and content. Moreover, plaintiffs have suffered injury to their devices. The battery, memory, CPU, and bandwidth of Plaintiffs' devices have been compromised, and as a result, the functioning of those devices has been impaired and slowed, due to Defendants' clandestine and unlawful activities. Named plaintiffs have experienced faster battery drain after downloading the CapCut app. Finally,

Plaintiffs have incurred additional data usage and electricity costs that they and/or their guardians would not have incurred but for Defendants' covert and unlawful actions.

214. Neither Plaintiffs nor, in the case of the minor plaintiffs, their guardians, ever received notice that Defendants would collect, capture, receive, otherwise obtain, store, and/or use their biometric identifiers, face geometry scans, voiceprints or any of their other biometric information. Defendants never informed plaintiffs or their guardians of the specific purpose and length of time for which their biometric identifiers, face geometry scans, or any of their other biometric information would be collected, captured, received, otherwise obtained, stored, and/or used. Neither Plaintiffs nor, in the case of minors, their guardians, ever signed a written release authorizing Defendants to collect, capture, receive, otherwise obtain, store, and/or use their biometric identifiers, face geometry scans, voiceprints, or any of their other biometric information.

215. Based on counsel's investigation and analysis, CapCut deliberately designed its Terms of Service and Privacy Policy to decrease the likelihood that a user will receive, notice, or comprehend its terms and conditions or could provide meaningful, express consent to its conditions, in order to encourage users to sign up and not be deterred by accurate and truthful disclosures.

216. Plaintiffs did not know nor expect that Defendants would collect, store, and use their biometric identifiers and biometric information when they used the CapCut app.

217. Plaintiffs did not receive notice from Defendants (written or otherwise) that Defendants would collect, store, and/or use their biometric identifiers or biometric information. Plaintiffs did not receive notice from Defendants of the specific purpose and length of time that Defendants would collect, store, and/or use their biometric identifiers or biometric information.

Plaintiffs did not give authorization (written or otherwise) for Defendants to collect, store, and/or use their biometric identifiers or biometric information.

218. Plaintiffs were not aware of, nor do they recall seeing, a retention schedule setting out the guidelines for Defendants to permanently destroy biometric identifiers or biometric information.

**J. Defendants' Privacy Policies And Terms of Use Do Not Constitute Notice of, Or Consent To, CapCut User Data Theft.**

219. Defendants have adopted various privacy policies and terms of use for the CapCut app. Certain privacy policies purport to disclose that the CapCut app takes some (but not all) of the private and personally identifiable user data and content above.

220. Because the CapCut app has taken private and personally identifiable user data – including user/device identifiers –before CapCut users are even presented with the option of signing-up for and creating an account, CapCut users have had no notice of, or opportunity to consent to, the privacy policies and terms of use prior to such theft. In addition, Web users have browsed the CapCut site and created content without logging in or creating an account. CapCut users who have not signed up for an account have no notice of, and cannot consent to, the privacy policies and terms of use.

221. Moreover, even at the point at which CapCut users have the option to sign-up and create an account, Defendants do not provide such users actual notice of privacy policies or terms of use. Users were able to access the CapCut platform without having to scroll through and read such policies before they were allowed to sign up for the services. Nor do Defendants present CapCut users with conspicuously located and designed hyperlinks to their privacy policies and terms of use, much less conspicuous warnings accompanying such hyperlinks. The CapCut app

thus allows users to utilize the app without effectively placing them on actual or constructive notice of the privacy policies and terms of use as defined under governing law. This lack of actual or constructive notice deprives CapCut users of the opportunity to accept or reject CapCut's privacy policies and terms of use, rendering such documents unenforceable.

222. Additionally, certain privacy policies and terms of use are ambiguous as to what conduct they purport to cover. Such privacy policies and terms of use are also substantively and procedurally unconscionable. The ambiguities render meaningless the purported disclosures and requirements in the remainder of these documents, and the substantive and procedural unconscionability render such documents unenforceable.

223. Moreover, even if CapCut users had knowingly accepted the terms of use (which they did not), they would have a right to seek public injunctive relief in a court of law because such terms would be unenforceable under California law. *See, e.g., McGill v. Citibank*, 2 Cal. 5th 945 (2017); *Blair v. Rent-A-Center*, 928 F.3d 819 (9th Cir. 2019).

224. Any attempt to surreptitiously secure minor users' "consent" to CapCut's Terms of Use is unlawful and invalid.

225. Defendants do not make any attempt to secure the consent of parents or lawful guardians.

226. Defendants have not obtained consent from the parents or lawful guardians of minor Class Members for their accounts.

227. Defendants fail to make reasonable efforts to ensure that a parent or lawful guardian of minor Class Members receives direct notice of their practices regarding the collection, use, or disclosure of personal and biometric information.

228. Defendants do not at any point contact the parents or lawful guardians of minor Class Members to give them notice and do not even ask for contact information for the parents or lawful guardians of Class Members.

229. Thus, Defendants have no means of obtaining verifiable parental consent for minor Class Members, or the consent of any lawful guardian, before any collection, use, or disclosure of the personal information of minor Class Members.

230. None of the Plaintiffs or Class Members consented, and/or did not give effective or legally binding consent, to any of the wrongful conduct alleged in this complaint. Moreover, to the extent Defendants contend otherwise, all Plaintiffs who used CapCut as minors expressly disaffirm and disavow any such alleged consent.

**K. Defendants Have Failed To Protect the Privacy Rights Of Minors.**

231. Indeed, while Defendants recognize that individuals under age 13 should not be using the CapCut app at all and that the app is not suitable for such underage users, the app does not perform age verification to prevent underage users from using the app. Nor does it take steps necessary to ensure that minor users have obtained parental consent to use the app. Accordingly, Defendants have subjected underage users to a range of privacy violations unnecessarily because Defendants have failed to implement appropriate age verification measures that would prevent them from using the app. The CapCut app does not contain parental controls that are provided by other Internet-based platforms and apps.

232. Defendants' failure to discourage underage use appears to be intentional. Among other things, as noted above, the TikTok app, which itself is heavily used by younger users, including users below the age of 13, actively promotes use of the CapCut app, which is owned by the same corporate group.

233. As the *Wall Street Journal* has observed, "through its powerful algorithms, TikTok can quickly drive minors—among the biggest users of the app—into endless spools of content about sex and drugs."[173] In fact, the FTC previously took action against TikTok for its failure to protect children, resulting in a settlement with the FTC and the imposition of a then-record civil Children's Online Privacy Protection Act (COPPA) penalty and recently filed a lawsuit alleging that Defendants failed to comply with the terms of that settlement and continue to violate the privacy rights of minors. Having lured large numbers of children to the TikTok platform through its powerful algorithms, including children under the age of 13, Defendants then channeled those same underage users to the CapCut app through heavy promotion of the CapCut app on the TikTok platform. In addition, the design of the CapCut app itself facilitates underage use. The CapCut app allows individuals to use the app without creating an account. As a result, underage users can use the app without reporting their age at all. Accordingly, Defendants not only fail to take adequate measures to discourage underage use, but they have taken active steps that encourage underage use in the way they have designed and promoted the CapCut app.

## V. CLASS ALLEGATIONS

234. Plaintiffs seek certification of the classes set forth herein pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"). Specifically, Plaintiffs seek class certification of all claims for relief herein on behalf of a class and subclass defined as follows:

> **Nationwide Class:** All persons who reside in the United States who used the CapCut app after it was launched in the United States.[174]
> Or, in the alternative:

[173] https://www.wsj.com/articles/tiktok-algorithm-sex-drugs-minors-11631052944.

[174] The CapCut app was launched in the United States in 2020.

> **Illinois Subclass:** All persons who reside in Illinois and used the CapCut app after the app was launched in the United States.
>
> **California Subclass:** All persons who reside in California and used the CapCut app after the app was launched in the United States.

235. Plaintiffs are the proposed class representatives for the Nationwide Class. Illinois Plaintiffs are the proposed class representatives for the Illinois Subclass. California Plaintiffs are the proposed class representatives for the California Subclass.

236. Plaintiffs reserve the right to modify or refine the definitions of the Class and the Subclasses.

237. Excluded from the Class and the Subclasses are: (i) any judge or magistrate judge presiding over this action and members of their staff, as well as members of their families; (ii) Defendants, Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (iii) persons who properly execute and file a timely request for exclusion from the class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) counsel for Defendants; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

238. **Ascertainability.** The proposed Class and Subclasses are readily ascertainable because they are defined using objective criteria so as to allow Class and Subclass Members to determine if they are part of the Class and/or one of the Subclasses. Further, the Class and Subclasses can be readily identified through records maintained by Defendants.

239. **Numerosity (Rule 23(a)(1)).** The Class and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of Class and Subclass Members, as herein identified and described, is not known, but download figures indicate that the CapCut

app was downloaded approximately 28 million times in the United States during the last year alone.[175]

240. **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass Members, including the following:

a. Whether Defendants engaged in the activities and practices referenced above;

b. Whether Defendants' activities and practices referenced above constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

c. Whether Defendants' activities and practices referenced above constitute a violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*;

d. Whether Defendants' activities and practices referenced above constitute a violation of the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*;

e. Whether Defendants' activities and practices referenced above constitute a violation of the California Comprehensive Data Access and Fraud Act, Cal. Pen. C. § 502;

f. Whether Defendants' activities and practices referenced above constitute a violation of the Right to Privacy under the California Constitution;

[175] https://www.wsj.com/articles/tiktoks-chinese-parent-has-another-wildly-popular-app-in-the-u-s-e14c41fc.

g. Whether Defendants' activities and practices referenced above constitute an intrusion upon seclusion;

h. Whether Defendants' activities and practices referenced above constitute a violation of the California Unfair Competition Law, Bus. & Prof. C. §§ 17200 *et seq.*;

i. Whether Defendants' activities and practices referenced above constitute a violation of the California False Advertising Law, Bus. & Prof. C. §§ 17500 *et seq.*;

j. Whether Defendants' activities and practices referenced above constitute a violation of the California Invasion of Privacy Act, Cal. Pen. Code §§ 630 *et seq.*;

k. Whether Defendants' activities and practices referenced above constitute statutory larceny, Cal. Pen. Code §§ 484, 496;

l. Whether Defendants' activities and practices referenced above constitute conversion;

m. Whether Defendants' activities and practices referenced above constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

n. Whether Defendants' activities and practices referenced above constitute a violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/1, et seq.;

o. Whether Plaintiffs and members of the Class and Subclass sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount;

p. Whether Defendants profited from their activities and practices referenced above, and, if so, in what amount; and

q. What is the appropriate injunctive relief to ensure that Defendants no longer unlawfully: (i) take private and personally identifiable CapCut user data and content – including user/device identifiers, biometric identifiers and information, private videos and private video images, and video viewing histories; (ii) utilize private and personally identifiable CapCut user data and content to develop and patent commercially valuable artificial intelligence technologies; (iii) utilize private and personally identifiable CapCut user data and content to create consumer demand for and use of Defendants' other products; (iv) give access to such private and personally identifiable CapCut user data and content to individuals in China and to third parties either in China or whose data is accessible from within China; (v) cause the diminution in value of CapCut users' private and personally identifiable data and content; (vi) cause injury and harm to CapCut users' devices; (vii) cause CapCut users to incur higher data usage and electricity charges; (viii) retain the unlawfully acquired private and personally identifiable data and content of CapCut users; and (ix) profile and target, based on the above activities, CapCut users with advertisements.

r. What is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and relevant third parties destroy unlawfully acquired private and personally identifiable CapCut user data and content in their possession, custody or control.

241. **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of members of the Class and Subclasses because, among other things, Plaintiffs and members of the Class and Subclasses sustained similar injuries as a result of Defendants' uniform wrongful conduct, and their legal claims all arise from the same events and wrongful conduct by Defendants.

242. **Adequacy (Rule 23(a)(4)).** Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs' interests do not conflict with the interests of the Class and Subclass Members, and Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Class and Subclasses.

243. **Predominance & Superiority (Rule 23(b)(3)).** In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class and Subclass Members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides

the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

244. **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class and Subclasses, making final declaratory and/or injunctive relief appropriate with respect to the Class and Subclasses as a whole.

245. **Particular Issues (Rule 23(c)(4)).** Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class and Subclass Members and are capable of class-wide resolution that will significantly advance the litigation.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 (On Behalf of the Plaintiffs and the Class)

246. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

247. The Plaintiffs' and the Class's devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

248. Defendants have exceeded, and continue to exceed, authorized access to the Plaintiffs' and the Class's protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C). Defendants intentionally accessed Plaintiffs' devices without the necessary authorization in order to obtain data that Plaintiffs did not authorize them to take.

249. **Unauthorized Access.** In performing its functions, the CapCut app obtained unauthorized access to multiple areas of Plaintiffs' devices outside the CapCut app, including the following.

250. Areas Containing Fine-Grained Location and Wi-Fi Data. First, the CapCut app gained unauthorized access to areas in user devices responsible for collecting fine-grained location and Wi-Fi data. Among other things, the CapCut app uses GPS functionality and Wi-Fi information contained in internal storage on local devices to ascertain user location. User devices continuously collect course and fine-grained location data that is used for a variety of purposes independent of the CapCut app. The CapCut app contains various LocationManager functions that the app uses to request location information present on Plaintiffs' devices outside of the Capcut app. These functions allow the CapCut app to request very specific location-related updates. The CapCut app accesses both fine-grained location data and course location data using the ACCESS_FINE_LOCATION and ACCESS_COARSE_LOCATION functions.

251. The hardware component responsible for collecting GPS data on a smartphone is a GNSS (Global Navigation Satellite System) receiver chip (or chipset) integrated into the phone's motherboard. The chip (or chipset) receives and processes signals from GPS satellites and uses a software engine to calculate the device's position based on the received data. The phone also has an antenna, typically located along the edges or back of the phone, to receive radio signals from satellites. In addition to GNSS, smartphones also use inertial sensors (such as gyroscopes and accelerometers) and network-based location data to improve the accuracy of positioning. GPS data on a device is typically stored within the device's internal memory, often in a binary format or proprietary structure, accessible through the device's operating system or dedicated GPS

applications. The data is therefore typically stored in a non-human-readable format, meaning it is not directly accessible or understandable without the appropriate software or tools. Accordingly, the CapCut app must first access areas of the operating system or dedicated GPS applications on user devices in order to be able to access this information stored in internal memory. GPS data typically includes latitude and longitude coordinates, timestamps, and other relevant metadata.

252. Similarly, the hardware responsible for collecting Wi-Fi signals on a smartphone is a Wireless Network Interface Card (WNIC), often integrated into the smartphone's System-on-a-Chip (SoC). The WNIC uses an antenna to transmit and receive radio waves, enabling the smartphone to connect to a Wi-Fi network. Wi-Fi information is stored in encrypted files on a user device that CapCut accesses in order to obtain the information. For example, on Windows, Wi-Fi information, including passwords, is stored in encrypted XML files located in C:\ProgramData\Microsoft\Wlansvc\Profiles\Interfaces\[Interface Guid]. On an Android device, saved Wi-Fi passwords can be found in the Network & Internet settings, and on an iOS device (such as an iPhone), they can be found in the Settings app under Wi-Fi. Wi-Fi data includes SSID (network name), MAC address of the access point, security settings (encryption type, password), and potentially the IP address assigned by the network.

253. <u>Areas Storing Video, Photo and Audio Files</u>. Second, the CapCut app gained unauthorized access to areas that store media files on user devices, including the entire video and photo libraries contained outside the CapCut app in storage areas on Plaintiffs' devices. While users may choose to edit specific media files they select in the CapCut app, the CapCut app has functions that exceed authorized access and read external storage and media storage on storage chips contained in user devices, including READ_EXTERNAL_STORAGE and

READ_MEDIA_STORAGE. The MediaStore function in the CapCut app also allows the app to access local files on the device. The CapCut app uses both the MediaStore.Images.Media and MediaStore.Video.Media functions to access areas of the device where images and videos are stored.

254. Videos and camera images are generally found in the DCIM folder (Digital Camera IMages) or a Videos folder on user devices. Audio files are typically stored within a dedicated folder, often named "Music", "Audio", or "Recordings,' located within the device's internal storage. For example, on an iOS device, by default, audio files are saved in the available storage of the device, denoted as "On My iPhone" in the Files app. On Android devices, audio files are usually saved in the "Internal Storage" or "On My Device" section. Videos, photos and audio may also be stored in external storage on an SD card, for example. An SD card (Secure Digital card) is a small, portable, non-volatile flash memory card used for storing digital data, like photos, videos, and other files, in devices like cameras, phones, and tablets. Video files stored on a device can come in various formats, with MP4 (MPEG-4, Part 14), MOV (QuickTime File Format), WMV (Windows Media Video), WebM, and AVCHD (Advanced Video Coding High Definition) being some of the most common. Photo files stored on a device are commonly in formats like JPEG (.jpg or .jpeg), PNG (.png), HEIF (.heic or .heif), TIFF (.tif or .tiff), BMP (.bmp), GIF (.gif), AVIF (.avif), and SVG (.svg). Audio files stored on a device can come in various formats, including MP3, AAC, WAV, AIFF, ALAC, FLAC, and OGG Vorbis.

255. <u>Cameras and Microphones</u>. Third, the CapCut app gained unauthorized access to the physical cameras and microphones that are built into user devices and are located outside the CapCut app. This involves accessing both software and hardware components of phones and

microphones incorporated into user devices. The camera hardware on a smartphone, including the lens, image sensor, and other components, is typically packaged together into a single module that connects to the phone's main board through a ribbon cable. Smartphone microphones are typically located near the bottom of the phone, often on the back, and connect to the phone's audio processing unit via a circuit board. The software (or app) for the camera is typically stored in the device's internal memory, often within a folder or directory related to applications or system files. System applications like the camera app are typically stored in separate areas of the device with separate folders, separate and distinct from user-uploaded apps such as CapCut. For example, the Camera app on an iPhone is a built-in app that users cannot delete that is stored in a folder within the App Library. On Windows, the camera executable file is often found under C:\Windows\camera.exe.

256. As noted, the CapCut app can also access photos taken using Plaintiffs' cameras and audio recordings using the microphone on Plaintiffs' devices. For example, as noted, on Android devices, photos taken with the camera are usually stored in the DCIM folder, which is located on the device's internal storage. On iOS devices, photos are stored in the Photos app library, which is typically located in the Pictures folder on the device. Audio captured by a microphone is stored as digital data, typically within the device's internal storage

257. <u>Other apps and software</u>. Fourth, the CapCut app gained unauthorized access to other apps and software that were present and functioning on user devices. This includes, among other things, the clipboards on Plaintiffs' devices where Plaintiffs stored data collected from areas outside the CapCut app. A clipboard is a temporary storage area that holds recently copied or cut

text, images, or other data, allowing users to paste them into another location. This frequently includes sensitive data such as passwords, credit card or other financial information.

258. On an iPhone, the clipboard isn't an app, but rather an internal software function where copied content is temporarily stored until overwritten. Similarly, on Android smartphones, the clipboard isn't a standalone app, but rather a system-level feature accessed through the keyboard or by using third-party clipboard manager apps.

259. Apps are typically stored in files in internal storage within the /data/app directory on Android and a similar location on iOS. As noted, system apps are typically stored separately from user-installed apps. On Android, installed apps are primarily stored in the /data/app directory, while on iPhones, apps are stored in the /var/mobile/Applications folder. System apps are typically located in /system/app or /system/priv-app. Each app typically has a folder, within which you can find the app itself (e.g., MyAppName.app). On the same level as the app folder, you typically find a Documents folder where the app stores its data.

260. Email programs. Fifth, the CapCut app gained unauthorized access to areas of Plaintiffs' devices containing email programs located outside the CapCut app. In this manner, CapCut gained access to data such as user email contacts, including email addresses, which can be used for targeted marketing.

261. An email application itself, like Gmail, Outlook, or a third-party email client, is installed on a device's internal storage, just like any other app. The email application's data, including cached emails, attachments, and other settings, is stored in a dedicated folder or cache within the phone's internal storage.

262. Phone State. Sixth, the CapCut app gained unauthorized access to the phone state, which is an area of the device outside of the CapCut app that stores a variety of device-specific personally identifying information that the CapCut app accesses and stores. The app accesses this area of the phone without authorization via the READ_PHONE_State request. The CapCut app utilizes this access to obtain information about the device such as the Mac address, IMEI information, and IMSI information. MAC addresses of a device's network interfaces are accessed by the CapCut app via the WifiInfo.getMacAddress() function. The CapCut app can also request all configured networks as well as SSID and BSSID, which provides further information on the network ID that the mobile belongs to.

263. IMEI information is part of the device's telephony information. It is a unique identification or serial number that can be used to track a mobile phone. This information is accessed by multiple functions in the CapCut app from the TelephonyManager() class. IMSI (International Mobile Subscriber Identifier) is a number of 14-15 digits which identifies a mobile subscriber. It is made up of several parts, including a country code, network code, and an individual string of digits identifying each particular card within the mobile network. The CapCut app accesses the IMSI number by running the getSubscriberID() function.

264. These functions allow the CapCut app to request and store the phone number, voice mail number, MEID (Mobile Equipment Identifier), ICCID (Integrated Circuit Card Identifier), and sim serial number, private information unnecessary to the normal functioning of the CapCut app. Information such as the IMSI and IMEI data accessed by the CapCut app without authorization is contained on read-only storage areas that are separate from where the CapCut app is stored. For example, on an Android, phone state information, including device

identifiers, is stored within the device's internal storage, specifically within the /data/data/com.android.providers.telephony/database/mmssms.db directory. On an iphone, the IMEI is stored within the device's baseband chip, which is responsible for cellular communication; the IMSI is stored in an area on the device's SIM card.

265. Collection of Data When CapCut App is Not in Use. The CapCut app continues unauthorized access even when the app is not in use. The CapCut app contains Service or IntentService classes in the code that allow it to collect and transmit data even when the app is not in use. The CapCut app also has instances of a broadcast receiver, which can cause the app to collect and transmit data. Finally, the CapCut app also contains functions that can be used to trigger collection of data at times when the app is not in use, such as JobScheduler, AlarmManager, and WorkManager classes. All of these functions allow the app to store data and collect information, including data and information described above, when the CapCut app is not in use. Defendants do not have authorization for such covert collection of data when the CapCut app is not in use.

266. **Economic Loss.** Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of the Plaintiffs' and the Class's private and personally identifiable data and content never intended for public consumption. Defendants' unauthorized access and collection of data (i) frequently and systematically drained Plaintiffs' and the Class Members' devices and batteries, (ii) resulted in out-of-pocket costs in the form of subscription fees for software that was defective and allowed Defendants to gain unauthorized access, (iii) caused a diminution in value of Plaintiffs' and Class Members' personal information, and (iv) increased the

risk of further identity theft and fraud, all of which costs were incurred by millions of Class Members. In addition, Defendants' unauthorized access to Plaintiffs' devices requires evaluation by professionals to determine potential remedial measures, including potential replacement of their devices.

267. As noted above, the CapCut app causes unnecessary drain on user device batteries due to its covert harvesting of user data, which caused Plaintiffs to incur unnecessary electricity costs. The drain on user devices' batteries is frequent and systemic; as shown by the analysis presented above, the CapCut app significantly drains the batteries of user devices even when it is not in use overnight.

268. This battery drain results in costs to Plaintiffs well above $5,000. The 328.4 milliampere-hour battery drain measured overnight for the CapCut app translates to millions of dollars in electricity costs each year from overnight battery drain alone. Assuming a standard voltage of 3.7V for lithium ion batteries contained in smartphones, the total energy cost from overnight battery drain can be readily determined by multiplying the measured 328.4 mAh value by the voltage, converting units, and multiplying by the average electricity cost in the U.S. ($.179 per Kilowatt hour, as provided by the Bureau of Labor Statistics). The aggregate yearly cost can then be obtained by multiplying by 365 days and the number of users. This calculation yields damages of approximately $8 million per year for 100 million users.

269. However, the total costs incurred by Plaintiffs as a result of Defendants' wrongful conduct are even greater than this figure given that this estimate is conservative and does not include costs incurred for battery drain occurring during the day, or when the app is being used, or other costs associated with the utilization of computer resources. The costs of battery drain

incurred by Plaintiffs are directly caused by the CapCut app's unauthorized access to Plaintiffs' devices and unauthorized collection of user data. For example, there is no reason for the CapCut app to drain a device's battery when the user is not editing any videos, and as noted in the analysis above, other apps do not cause significant battery drain overnight.

270. Subscribers who paid money for the CapCut app further suffered economic loss because they paid for software installed on their devices (the CapCut app) that was defective and allowed Defendants to gain unauthorized access and/or exceed authorized access, collecting data from their devices on an ongoing basis without authorization. As a result, they suffered direct economic losses while Defendants directly economically benefited. CapCut has offered subscription packages costing from $5.99/month to $24.99/month. Defendants have collected millions of dollars in fees from Plaintiffs and Class members. In 2023, CapCut reported that it had earned over $100 million in consumer spending, mostly through subscriptions.[176] This figure is likely much greater now, as CapCut has increased its subscription prices. Had Plaintiffs known that the CapCut app would obtain unauthorized access to their devices or exceed authorized access, they would not have installed the app on their devices and would not have incurred these subscription charges.

271. Defendants' theft of Plaintiffs' data further caused Plaintiffs economic loss in the form of diminution of the value of their personal data that was collected by the CapCut app by unauthorized access or by exceeding authorized access to Plaintiffs' devices. As the examples provided in Section IV.G above demonstrate, there is a robust market for user data, with multiple

---

[176] https://techcrunch.com/2023/10/16/bytedances-video-editor-capcut-targets-businesses-with-ai-ad-scripts-and-ai-generated-presenters/.

companies such as Meta, Nielson Data, Killi, DataCoup, and AppOptix offering to buy such data, and data from a single user being sold for as much as $1,200.

272. In addition, Plaintiffs are at increased risk of identity theft and fraud as the result of CapCut's collection of their data without authorization. Plaintiffs have already suffered diminished security in their personal affairs and face an expanded and imminent risk of economic harm from identity theft and fraud.

273. Plaintiffs' losses flow from a common source—Defendants' CapCut app. Plaintiffs' losses in the aggregate exceed $5,000.

274. **Threat to Public Safety.** Defendants' conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), providing an independent basis for CFAA liability, due to the private and personally identifiable data and content of the Plaintiffs and the Class being made available to foreign actors, including the Chinese Communist Party and foreign intelligence services, in locations without adequate legal privacy protections. That this threat is real and imminent is evidenced by the materials cited above.

275. As noted, the threat to public safety posed by the CapCut app has resulted in legislation banning the app from distribution in the United States. In passing the legislation, Congress made a determination that the CapCut app posed such a significant threat to public safety that its distribution in the United States must be terminated unless there is an ownership change such that Defendants no longer own or control the app. The legislation was specifically designed to address the "significant threat to the national security of the United States."[177]

[177] H.R. 8038, 118th Cong. (2023-2024).

276. The threat to public safety recognized by Congress is demonstrated by an analysis of the CapCut app and its data collection practices. As noted above, Congress concluded that all of the apps owned by Defendants collect a broad range of data from users without authorization. The D.C. Circuit relied on this record as well as evidentiary submissions made by Defendants and the U.S. government in affirming the legislation and concluding in particular that there was sufficient threat to public safety posed by the CapCut app in particular such that legislation banning the distribution of the app was warranted and was not overbroad insofar as it extended to the CapCut app.

277. A second and independent threat to public safety is demonstrated by the nature of Defendants in the ByteDance group of companies and their relationship with the Chinese Communist Party. As noted, Congress has documented that Defendant ByteDance and the CCP have a close working relationship and that there are at least 130 high-level CCP officials who are integrated into the company, obtaining access to data collected from users by Defendants' apps. In addition, Congress found that the CCP has a significant role in dictating policy at Defendants' companies, which Defendants' executives themselves have publicly acknowledged.

278. As a result of this independent threat to public safety, Congress determined that Defendants should be required to divest *all* apps that they owned and controlled—not just TikTok or the CapCut app. Accordingly, the legislation expressly requires divestiture of all apps that Defendants own or control that are offered in the United States.

279. Based on this evidentiary record, multiple courts have rejected Defendants' contention that the CapCut app does not pose a threat to public safety. For example, the D.C. Circuit determined that Defendants had failed to demonstrate that the CapCut app did not pose a

threat to public safety after hearing Defendants' evidence. The Court rejected Defendants' argument that the legislation banning distribution of CapCut was overbroad because CapCut posed no threat to public safety.

280. The court found that, "[g]iven the Government's well-supported concerns about ByteDance, it was necessary for the Act to apply to all ByteDance entities." *TikTok Inc. v. Garland*, 122 F. 4th 930, 965 (D.C. Cir. 2024). The court further found that "the petitioners fail to demonstrate that neither of the Government's two national security concerns implicate CapCut." *Id.* The court found, among other things, that the "PRC maintains a powerful Chinese Communist Party committee 'embedded in ByteDance' through which it can 'exert its will on the company.' As of 2022, that committee 'was headed by the company's chief editor and comprised at least 138 employees at its Beijing office, including senior company managers.'" *Id.* at 955.

281. Defendants appealed that decision to the Supreme Court of the United States, which affirmed the lower court's ruling. These rulings concluding that CapCut poses a threat to public safety are binding on Defendants.

282. Defendants themselves have recognized the threat to public safety. For example, in recognition of the threat to public safety posed by allowing ByteDance to access user data, TikTok agreed to spend more than $1.5 billion to wall off U.S. user data from ByteDance and China in what it called Project Texas. TikTok's website tells its users that this "unprecedented" $1.5 billion effort was necessary "to ensure the safety, privacy, and security of our community," to ensure "data is secure and the platform is free from outside influence," and to insulate TikTok from "any outside pressure to grant unauthorized access to user data or systems."[178] While Congress

[178] TikTok Website, https://usds.tiktok.com/usds-about/.

determined that these measures were insufficient to mitigate the threat to public safety and included the TikTok application within the scope of the Divestiture Act, they show that Defendants themselves recognize that this threat to public safety exists and warrants the significant expenditure of funds in order to mitigate the risk.

283. In contrast, as Defendants' executives themselves have recognized, the threat to the public posed by the CapCut app is completely unchecked. As corporate insiders have recognized, "CapCut—unlike TikTok itself—is directly run by ByteDance executives in China."[179] Accordingly, as Defendants' executives have recognized, the threat to public safety posed by the CapCut app continues unabated.

284. In addition to the threat to public safety posed by access to user data by China-based ByteDance, there is a third and independent threat to public safety posed by the type of data that was taken without authorization in this case. Among the data that was taken from areas without authorization was biometric data such as voiceprints and face scans. Unauthorized access to such data poses a threat to public safety because it can be used to cause significant injuries to the public such as identity theft and economic injuries. *Fleury v. Union Pac. RR. Co.*, 528 F. Supp. 3d 885, 892 (N.D. Ill. 2021).

285. The Illinois BIPA statute therefore contains express legislative findings that: "The public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g). As such statutes recognize, unauthorized access to biometric identifiers and information

---

[179] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

poses a particular threat to the public because of its utility in identity theft and causing economic injuries to the public. Indeed, this is the reason such statutes have been enacted, in order to address the unique public threat posed by the unauthorized collection and/or improper handling of biometric identifiers and information.

286. Accordingly, the Plaintiffs and the Class are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

## SECOND CAUSE OF ACTION

## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510 *et seq.* (On Behalf of the Plaintiffs and the Class)

287. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

288. The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510, *et seq.*, prohibits the interception of any wire, oral, or electronic communications without the consent of at least one party to the communication. The statute confers a civil cause of action on "any person whose wire, oral, or electronic communications is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

289. "Intercept" is defined as the aural or other acquisition of the contents of any wire, electronic, or oral communications through the use of any electronic, mechanical, or other device. 18 U.S.C. § 2510(4).

290. "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

291. "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

292. "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence, of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

293. Defendants are each a "person" for purposes of the ECPA because they are corporations.

294. The CapCut platform is a "device or apparatus" that is used to intercept a wire, oral, or electronic communication because it is an electronic means of acquiring the contents of users' wire, electronic or oral communications.

295. Plaintiffs' and Class Members' sensitive personal information and data that were intercepted by Defendants are "electronic communications" within the meaning of 18 U.S.C. § 2510(12). Among other things, the CapCut platform allows the interception of electronic communication of emails, videos, messages, likes and other electronic communications.

296. The CapCut app contains various functions to send and receive information in real time such as the Service component, Broadcast Receivers, and data collection triggers. Functions such as the Service or IntentService classes in the code allow the CapCut app to collect and transmit data even when the app is not in use.

297. Plaintiff and Class Members reasonably believed that Defendants were not intercepting, recording, or disclosing their electronic communications. Plaintiffs have an

expectation of privacy in such communications, and exercised a reasonable expectation of privacy concerning the transmission of those messages.

298. Plaintiffs' and Class Members' electronic communications were intercepted during transmission, without their consent, or based on information and belief the consent of individuals with which they were communicating, and for the unlawful and/or wrongful purpose of monetizing private information and data.

299. Using the CapCut app, users can send and receive email invitations to join a space to jointly collaborate on editing videos. Users then may exchange other communications in the space to edit the video. Once a draft video is completed, users can "directly share the video with team members or share it with external members via link or email to invite them for comments, facilitating quick integration of modification suggestions."[180]

300. The CapCut app thus obtains the contents of users' electronic communications as they are sent in real time in transit. It therefore "intercepts" the contents of Plaintiffs' electronic communications. As noted above, ByteDance runs the CapCut app, and as Congress found in requiring divestiture of the CapCut app, ByteDance has a Communist Party committee that, as of 2022, was headed by the company's chief editor and included at least 138 employees in the company's Beijing office, including senior corporate managers. Congress found that "the Secretary of ByteDance Ltd.'s CCP committee, Zhang Fuping, also serves as ByteDance Ltd.'s Editor- in-Chief and Vice President and has vowed that the CCP committee would 'take the lead' across 'all product lines and business lines…'"[181]

---

[180] https://www.capcut.com/resource/collaborate-on-capcut-online.

[181] *Id.* at 3.

301. In addition, the Chair of the Congressional Committee responsible for crafting the legislation observed after briefings from intelligence and data security experts that CapCut is "spying [on users] by design."[182]

302. Courts considering this congressional record agree, finding that the "PRC maintains a powerful Chinese Communist Party committee 'embedded in ByteDance' through which it can 'exert its will on the company.' As of 2022, that committee 'was headed by the company's chief editor and comprised at least 138 employees at its Beijing office, including senior company managers.'" *TikTok Inc. v. Garland*, 122 F. 4th 930, 955 (D.C. Cir. 2024).

303. Defendants' executives likewise acknowledge that the CapCut app is in fact "directly run by ByteDance executives in China" who have direct access to user data.[183]

304. Defendants' actions were at all relevant times knowing, willful, and intentional, particularly because Defendants are sophisticated parties who know the type of data they intercept through their own products and Defendants purposefully designed the CapCut platform to intercept such data.

305. Neither Plaintiffs nor Class Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. Defendants never sought to, or did, obtain Plaintiffs', Class Members', or third parties', consent to intercept their electronic communications through Defendants' app.

---

[182] Opening Statement of Chair Cathy McMorris Rodgers (Mar. 7, 2024), https://www.congress.gov/118/meeting/house/116945/documents/HHRG-118-IF00-MState-M001159-20240307.pdf.

[183] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

306. The unauthorized interceptions described herein are not covered by any business exception.

307. Defendants' actions violate § 2511(1)(a) of the ECPA because Defendants intentionally endeavored to intercept, and did intercept, messages transmitted by Plaintiffs and the Class using the CapCut platform. Based on information and belief, Defendants intercept videos, emails, messages and other electronic communications by using devices that are distinct from devices associated with the transmission of the communications between sender and recipient.

308. Defendants' acts further violate § 2511(1)(d) of the ECPA because, based on information and belief, information intercepted from Plaintiffs' and Class Members' communications was intentionally used for corporate gain and profit. In the process, Defendants were unjustly enriched by their unauthorized interception of Plaintiffs' and Class Members' electronic communications. Defendants' acts further violate § 2511(1)(c) of the ECPA because, based on information and belief, Defendants intentionally disclosed information intercepted from Plaintiffs' and Class Members' communications to third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens.

309. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are entitled to: (1) appropriate equitable and declaratory relief, including but not limited to, requiring Defendants to stop intercepting any part of Plaintiffs' and the Class Members' electronic communications; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by

Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; (3) punitive damages, and (4) reasonable attorneys' fees and other litigation costs reasonably incurred.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE STORED COMMUNICATIONS ACT, 18 U.S.C. §§ 2701 *et seq.* (On Behalf of the Plaintiffs and the Class)

310. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

311. The Stored Communications Act ("SCA") provides that "(1) a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service; and (2) a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service." 18 U.S.C. 2702(a); *see also* 18 U.S.C. § 2707(a) (private cause of action).

312. The SCA incorporates the definition of "electronic communication" found in the ECPA, which defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

313. CapCut users transmit a variety of electronic communications in using the CapCut app, including emails, links, draft videos, and other electronic messages and communications. These communications constitute "electronic communications" under the SCA.

314. For example, CapCut allows users to create "spaces" and invite others to those spaces to participate in electronic communications on its "cloud collaboration platform."[184] Users can invite other users to collaborate in a space by, among other things, selecting an option in CapCut to either send an email invitation or a link to the individual they want to invite.[185] Users can then communicate with other users in the space and transfer editing permission to other users so they can edit videos in the space. Users can also exchange videos with other individuals through electronic communications. Such electronic exchanges are private and are inaccessible to the general public and constitute "electronic communications" under the SCA.

315. The SCA distinguishes between two types of electronic storage. The first is defined as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17)(A). The second type is defined as "any storage of such communication by an electronic communication for purposes of backup protection of such communication." 18 U.S.C. § 2510(17)(B). Defendants store content falling within the scope of these provisions of the SCA.

316. As set forth herein, Plaintiffs did not authorize Defendants to share their content and information with certain third parties, including the Chinese government or members of the Chinese Communist Party.

317. As noted above, ByteDance runs the CapCut app, and as Congress found in requiring divestiture of the CapCut app, ByteDance has a Communist Party committee on site that, as of 2022, was headed by the company's chief editor and included at least 138 individuals in

[184] https://www.capcut.com/tools/cloud-collaboration-platform.

[185] https://www.capcut.com/resource/collaborate-on-capcut-online.

the company's Beijing office, including senior corporate managers. Congress found that "the Secretary of ByteDance Ltd.'s CCP committee, Zhang Fuping, also serves as ByteDance Ltd.'s Editor- in-Chief and Vice President and has vowed that the CCP committee would 'take the lead' across 'all product lines and business lines…'"[186]

318. The Chair of the Congressional Committee responsible for crafting the legislation observed after briefings from intelligence and data security experts that CapCut is "spying [on users] by design."[187]

319. Courts considering this congressional record agree, finding that the "PRC maintains a powerful Chinese Communist Party committee 'embedded in ByteDance' through which it can 'exert its will on the company.' As of 2022, that committee 'was headed by the company's chief editor and comprised at least 138 employees at its Beijing office, including senior company managers.'" *TikTok Inc. v. Garland*, 122 F. 4th 930, 955 (D.C. Cir. 2024).

320. Defendants' executives likewise acknowledge that the CapCut app is in fact "directly run by ByteDance executives in China" who have direct access to user data.[188] Under Chinese law, therefore, ByteDance must provide access to users' electronic communications to the Chinese government.

321. Plaintiffs are subscribers or customers of CapCut's remote computing service, pursuant to 18 U.S.C. § 2702(a)(2). By virtue of Defendants' conduct in providing the ability to

---

[186] *Id.* at 3.

[187] Opening Statement of Chair Cathy McMorris Rodgers (Mar. 7, 2024), https://www.congress.gov/118/meeting/house/116945/documents/HHRG-118-IF00-MState-M001159-20240307.pdf.

[188] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

send or receive wire or electronic communications, Defendants provide an electronic communication service within the meaning of the SCA. Plaintiffs are users of CapCut's electronic communication service, pursuant to 18 U.S.C. § 2510(13).

322. Plaintiffs are subscribers and persons aggrieved by violations of the SCA, pursuant to 18 U.S.C. §§ 2707(a) and 2510(11).

323. By virtue of Defendants' conduct in providing computer storage and processing services by means of an electronic communications system, CapCut is a remote computer service within the meaning of the SCA.

324. Defendants are providers of an electronic communication service to the public, pursuant to 18 U.S.C. §§ 2702(a)(1) and 2510(15).

325. Defendants are providers of a remote computing service to the public, pursuant to 18 U.S.C. §§ 2702(a)(2) and 2711(2).

326. Defendants are persons within the meaning of the SCA, pursuant to 18 U.S.C. § 2510(6).

327. Defendants are persons or entities within the meaning of the SCA, pursuant to 18 U.S.C. § 2707(a).

328. Plaintiffs' use of CapCut communications systems and transfers of content and information to CapCut constitute electronic communications, pursuant to 18 U.S.C. § 2501(12).

329. Plaintiffs' electronic communications were in electronic storage, pursuant to 18 U.S.C. § 2501(17).

330. Defendants violated the SCA by knowingly divulging the contents, including content and information, of Plaintiffs' electronic communications while they were in electronic

storage to unauthorized parties, including but not limited to the members of the Chinese Communist Party, pursuant to 18 U.S.C. § 2702(a)(1).

331. Defendants violated the SCA by knowingly divulging the contents, including content and information, of Plaintiffs' electronic communications that were carried or maintained on CapCut's remote computing service to unauthorized parties, including but not limited to members of the Chinese Communist Party, pursuant to 18 U.S.C. § 2702(a)(2).

332. As detailed herein, the contents of Plaintiffs' electronic communications that Defendants divulged to unauthorized parties, including messages, photos and videos, were non-public, and Plaintiffs reasonably believed that the contents of these communications would be protected against publication to unauthorized parties.

333. Defendants knowingly divulged the contents of Plaintiffs' electronic communications to unauthorized parties. Defendants also failed to effectively audit, limit, or control third parties accessing user information so as to prevent the subsequent disclosure of user information.

334. As detailed herein, Plaintiffs were not aware of and did not consent to the disclosure of the contents, including content and information, of their electronic communications to unauthorized parties, including members of the Chinese Communist Party.

335. As a result of Defendants' violations of the SCA, Plaintiffs have suffered injury, including but not limited to the invasion of Plaintiffs' privacy rights.

336. Defendants profited through their violations of the SCA. Plaintiffs suffered actual damages, as detailed herein, as a result of these violations, pursuant to 18 U.S.C. § 2707(c).

337. Plaintiffs are entitled to actual damages, disgorgement of profits made by Defendants as a result of their violations of the SCA, and statutory damages, in an amount not less than $1,000 per Plaintiff.

338. Plaintiffs are also entitled to other equitable or declaratory relief as may be appropriate, as well as reasonable attorneys' fees and litigation costs, pursuant to 18 U.S.C. § 2707(b).

339. Defendants' violations of the SCA were committed willfully and intentionally, and therefore Plaintiffs also seek punitive damages pursuant to 18 U.S.C. § 2707(c).

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE CALIFORNIA COMPREHENSIVE DATA ACCESS AND FRAUD ACT CAL. PEN. C. § 502
**(On Behalf of the California Plaintiffs and the California Subclass)**

340. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein on behalf of the California Subclass.

341. Defendants' acts violate Cal. Pen. C. § 502(c)(1) because they have knowingly accessed, and continue to knowingly access, data and computers to wrongfully control or obtain data. The California Plaintiffs' and the California Subclass's private and personally identifiable data and content accessed by Defendants – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption – far exceeds any reasonable use of the California Plaintiffs' and the California Subclass's data and content to operate the CapCut app. There is no justification for Defendants' surreptitious collection and transfer of the California Plaintiffs' and the California Subclass's private and personally identifiable data and content from their devices and their other social media accounts and allowing access to that information to individuals and third-party companies in

China that are subject to Chinese law requiring the sharing of such data and content with the Chinese government.

342. As further discussed in Section IV.E and Count One above, Defendants' acts violate Cal. Pen. C. § 502(c)(2) because they have knowingly accessed and without permission taken, copied, and made use of data from a computer – and they continue to do so. Defendants did not obtain permission to take, copy, and make use of the California Plaintiffs' and the California Subclass's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption – from their devices – and provide access to the Chinese Communist Party or individuals and companies that are subject to Chinese law requiring the sharing of such data and content with the Chinese government. Defendants intentionally accessed Plaintiffs' devices without the necessary authorization in order to obtain data that Plaintiffs did not authorize them to take.

343. Plaintiffs have experienced damage and losses as a result of Defendants' violation of the statute. Among other things, as explained above and in Section IV. G and Count One, Defendants' unauthorized access and collection of data (i) frequently and systematically drained Plaintiffs' and the Class Members' devices and batteries, (ii) resulted in out-of-pocket costs in the form of subscription fees for software that was defective and allowed Defendants to gain unauthorized access, and (iii) caused a diminution in value of Plaintiffs' and Class Members' personal information, and (iv) increased the risk of further identity theft and fraud, all of which costs were incurred by millions of Class Members. Plaintiffs also intend to seek sums reasonable

and necessary to verify whether their data or devices were or were not altered, deleted, damaged, or destroyed by the CapCut app's access to their devices.

344. As noted in Count One above, the economic loss to Plaintiffs from overnight battery drain alone resulting from Defendants' violations amounts to at least $8 million, which is a conservative estimate that does not cover all of the damages and losses Plaintiffs suffered.

345. As further noted in Count One, due to Defendants' conduct, Plaintiffs incurred losses in the form of subscription fees they paid for Defendants' defective software. Defendants collected approximately $100 million in such fees in 2023 alone, a sum that is likely much greater for subsequent years.

346. While Plaintiffs suffered multiple types of losses as catalogued above, under CDAFA, damage or loss from the misappropriation of Plaintiffs' data is sufficient to state a claim. California law considers user data to be a form of property and specifically contemplates that it may be bought or sold on the marketplace. For example, the CCPA permits businesses to purchase consumer information from consumers directly (Cal. Civ. Code § 1798.125(b)(1)) and permits businesses to assess and appraise consumer data with a monetary value (Cal. Civ. Code § 1798.125(a)(2)).

347. As described above, there is a robust market for user data. Accordingly, Meta has offered consumers $20/month for access to data regarding how they use their smartphones,[189] and other companies such as Nielson Data, Killi, DataCoup, and AppOptix likewise offer consumers

[189] Choudhury & Browne, *Facebook Pays Teens to Install an App That Could Collect All Kinds of Data*, CNBC (Jan. 29, 2019).

financial compensation in exchange for their personal data,[190] with payments reaching $1,200 for a single individual's data.

348. Defendants obtained access to certain categories of Plaintiffs' data, which as noted has value and an established market, and in exchange provided Plaintiffs with certain services provided by the CapCut app. However, by accessing data without authorization, Defendants violated this bargain and obtained more data than they were entitled to receive under the basic terms offered to consumers. Moreover, Defendants utilized Plaintiffs' own devices to accomplish this unauthorized taking. As a result, and as described above, Defendants imposed costs on Plaintiffs through additional electricity costs as a result of battery drainage, as well as the use of computing resources and slower performance of user devices. At the same time, Defendants' unjustly profited from their unauthorized taking of this data.

349. CDAFA does not place limitations on the types of "damage or loss" recoverable under the statute. The statute authorizes recovery of any "damage or loss" that occurs "by reason of a violation" of CDAFA. Cal. Penal Code § 502(e)(1).

350. In addition, the statute specifically entitles California Plaintiffs and the California Subclass to "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access," injunctive relief, and attorneys' fees. Cal. Pen. C. § 502(e)(1), (2).

---

[190] *28 Apps that Pay You for Data Collection: Earn a Passive Income*, Dollar Break (July 7, 2022).

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE RIGHT OF PRIVACY UNDER THE CALIFORNIA CONSTITUTION (On Behalf of the California Plaintiffs and the California Subclass)

351. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

352. The California Constitution expressly provides for a right to privacy: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., art I, § 1.

353. California Plaintiffs and the California Subclass hold, and at all relevant times held, a legally protected privacy interest in their private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption – on their devices and in their other social media accounts.

354. California Plaintiffs and the California Subclass have a reasonable expectation of privacy in their data and content under the circumstances present.

355. The reasonableness of California Plaintiffs' and the California Subclass's expectation of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants accessing private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption – from California Plaintiffs' and the California Subclass's devices and other social media accounts.

356. Defendants' conduct constitutes and, at all relevant times, constituted a serious invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of – and allow individuals and companies based in China to take and make use of – California Plaintiffs' and the California Subclass's private and personally identifiable data and content. Defendants intentionally invaded California Plaintiffs' and the California Subclass's privacy interests by intentionally designing the CapCut app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain their private and personally identifiable data and content.

357. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. This intrusion is particularly offensive because it included collection of highly sensitive biometric data, videos and audio-visual material not intended for public consumption. The offensiveness of Defendants' intrusion is heightened by Defendants' making California Plaintiffs' and the California Subclass's private and personally identifiable data and content available to third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted California Plaintiffs' and the California Subclass's devices, which contain California Plaintiffs' and the California Subclass's private and personally identifiable data and content.

358. Further, Defendants' conduct targeted California Plaintiffs' and California Subclass Members' mobile devices, which the United States Supreme Court has characterized as akin to a feature of human autonomy, and which contain California Plaintiffs' and California Subclass Members' private and personally-identifiable data and information.

359. California Plaintiffs and the California Subclass were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

360. Defendants' conduct was a substantial factor in causing the harm suffered by California Plaintiffs and the California Subclass.

361. California Plaintiffs and the California Subclass seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the California Plaintiffs and the California Subclass, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

362. California Plaintiffs and the California Subclass seek injunctive relief to rectify Defendants' actions, including but not limited to requiring Defendants (a) to stop taking more private and personally identifiable data and content of California Plaintiffs and the California Subclass from their devices and their other social media accounts than is reasonably necessary to operate the CapCut app; (b) to make clear disclosures of California Plaintiffs' and the California Subclass's private and personally identifiable data and content that is reasonably necessary to operate the CapCut app; (c) to obtain California Plaintiffs' and the California Subclass's consent to the taking of their private and personally identifiable data and content; (d) to stop providing access to the California Plaintiffs' private and personally identifiable data and content to

individuals in China or transferring such data to servers or companies whose data is accessible from within China; and (e) to recall and destroy California Plaintiffs' and the California Subclass's private and personally identifiable data and content already taken in contravention of California Plaintiffs' and the California Subclass's right to privacy under the California Constitution.

363. The California Plaintiffs and the California Subclass seek restitution and disgorgement for Defendants' violation of their privacy rights. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

## SIXTH CAUSE OF ACTION

## INTRUSION UPON SECLUSION
**(On Behalf of the California Plaintiffs and the California Subclass)**

364. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

365. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

366. The California Plaintiffs and the California Subclass have, and at all relevant times had, a reasonable expectation of privacy in their devices and their social media accounts, and their

private affairs include their past, present and future activity on their devices and their other media accounts.

367. The reasonableness of the California Plaintiffs' and the California Subclass's expectations of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' taking of private and personally identifiable data and content from the California Plaintiffs' and the California Subclass's devices and social media accounts.

368. Defendants intentionally intruded upon the California Plaintiffs' and the California Subclass's solitude, seclusion, and private affairs – and continue to do so – by intentionally designing the CapCut app, including all associated code, to surreptitiously obtain, improperly gain knowledge of, review, and retain the California Plaintiffs' and the California Subclass's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption.

369. These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by Defendants' making the California Plaintiffs' and the California Subclass's private and personally identifiable data and content available to third parties, including the Chinese Communist Party and foreign governmental entities whose interests are opposed to those of United States citizens. The intentionality of Defendants' conduct, and the steps they have taken to disguise and deny it, also demonstrate the highly offensive nature of their conduct. Further, Defendants' conduct targeted the Plaintiffs' and the Class's devices, which the United

States Supreme Court has characterized as almost a feature of human anatomy, and which contain the California Plaintiffs' and the California Subclass's private and personally identifiable data and content. The California Plaintiffs and the California Subclass were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

370. Defendants' conduct was a substantial factor in causing the harm suffered by the California Plaintiffs and the California Subclass.

371. The California Plaintiffs and the California Subclass seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the California Plaintiffs and the California Subclass, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

372. The California Plaintiffs and the California Subclass seek injunctive relief to rectify Defendants' actions, including but not limited to requiring Defendants (a) to stop taking more private and personally identifiable data and content from the California Plaintiffs' and the California Subclass's devices and other social media accounts than is reasonably necessary to operate the CapCut app; (b) to make clear disclosures of the California Plaintiffs' and the California Subclass's private and personally identifiable data and content that is reasonably necessary to operate the CapCut app; (c) to obtain the California Plaintiffs' and the California Subclass's consent to the taking of such private and personally identifiable data and content; (d) to stop providing access to the California Plaintiffs' and the California Subclass's private and personally identifiable data and content to individuals in China or transferring such data to servers or companies whose data is accessible from within China; and (e) to recall and destroy the

California Plaintiffs' and the California Subclass's private and personally identifiable data and content already taken in contravention of the California Plaintiffs' and the California Subclass's privacy rights.

373. California Plaintiffs and the California Subclass seek restitution and disgorgement for Defendants' intrusion upon seclusion. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. C. §§ 17200 *et seq.*
## (On Behalf of the California Plaintiffs and the California Subclass)

374. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

375. The Unfair Competition Law, California Business & Professions Code §§ 17200, et seq. (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

376. Defendants acted jointly to violate, and continue to violate, the "unlawful" prong of the UCL through violation of statutes, constitutional provisions, and common law, as alleged herein.

377. Defendants acted jointly to violate, and continue to violate, the "unfair" prong of the UCL because they accessed private and personally identifiable data and content – including

user/device identifiers, biometric identifiers and information, video viewing histories, electronic communications, and private videos and private video images never intended for public consumption – from the California Plaintiffs' and the California Subclass's devices and other social media accounts under circumstances in which the Plaintiffs and the Class would have no reason to know that such data and content was being taken. This information is property under the laws of California and common law. Defendants' unlawful taking and use of this proper was immoral, unethical, oppressive, unscrupulous and substantially injurious to California Plaintiffs and the California Subclass. Defendants' unauthorized collection and disclosure of private and personal information was made for their own gain and at the expense of California Plaintiffs and the California Subclass.

378. Among other things, Defendants have engaged in the following unlawful and unfair business acts and practices:

a. Failing to comply with § 1798.100(b) of the California Consumer Privacy Act;

b. Invasion of privacy under the common law and California Constitution, Art. I, § 1;

c. Failing to comply with the Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501–6505;

d. Failing to provide adequate security for the data they have collected;

e. Deceiving the public and users and failing to provide full and adequate disclosure regarding Defendants' data practices;

f. Deceiving the public and users in marketing the CapCut app;

g. Omitting, suppressing and concealing that they did not comply with common law and statutory duties pertaining to the personal information of Plaintiffs and members of the Class, including duties imposed by the California Constitution, Art. I, § 1; and the CCPA, Cal. Civ. Code § 1798.100(b);

h. Providing access to users' data to the Chinese government and CCP;

i. Violating the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

j. Violating the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*;

k. Violating the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*;

l. Violating the California Comprehensive Data Access and Fraud Act, Cal. Pen. C. §§ 502;

m. Violating the California Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq.*;

n. Violating statutory larceny, Cal. Pen. Code §§ 484, 496; and

o. Converting Plaintiffs' and Class Members' data to their own uses.

379. California Plaintiffs and the California Subclass had no reason to know because (i) there was no disclosure of Defendants' collection and transfer of the California Plaintiffs' and the California Subclass's biometric identifiers and information, and private videos and private video images not intended for public consumption; (ii) there was no disclosure that Defendants had embedded source code within the CapCut app that makes California Plaintiffs' and the California Subclass's private and personally identifiable data and content accessible to third-party

companies and individuals based in China where such companies and individuals are subject to Chinese law requiring the sharing of such data and content with the Chinese government; and (iii) there was no effective disclosure of the wide range of private and personally identifiable data and content that Defendants took from the California Plaintiffs' and the California Subclass's devices. Defendants violated, and continue to violate, the "fraudulent" prong of the UCL because (i) Defendants made it appear that the California Plaintiffs' private and personally identifiable data and content would not be collected and transferred unless the California Plaintiffs and the California Subclass chose to do so, but in fact Defendants collected and transferred such data and content without notice or consent; (ii) Defendants made it appear that the California Plaintiffs' and the California Subclass's private and personally identifiable data and content would not be provided to individuals or companies that are subject to Chinese law requiring the sharing of such data and content with the Chinese government; and (iii) Defendants have intentionally refrained from disclosing the uses to which the California Plaintiffs' and the California Subclass's private and personally identifiable data and content has been put, while simultaneously providing misleading reassurances about Defendants' data collection and use practices. The California Plaintiffs and the California Subclass were misled by Defendants' concealment, and had no reason to believe that Defendants had taken the private and personally identifiable data and content that they had taken or used it in the manner they did.

380. In addition, Defendants fail to adequately disclose that users' data will be accessible to individuals in China, and ultimately accessible by the Chinese communist government. To the contrary, Defendants assured California Plaintiffs and the California Subclass of the privacy of

their data, while under Chinese law the Chinese government has an absolute right to access users' data.

381. Defendants' conduct is particularly egregious because these violations extend to underage users whom Defendants acknowledge should not be using the platform. Indeed, through their promotion on TikTok and other avenues, Defendants have encouraged underage use. Moreover, they have failed to incorporate appropriate age verification and other measures in the CapCut app necessary to prevent underage use and have incorporated features in the design of the CapCut app that actually facilitate underage use.

382. Defendants were under a duty to disclose the omitted facts because they were under a confidential, contractual or fiduciary relationship with California Plaintiffs and the California Subclass.

383. In addition, Defendants had an obligation to fully disclose the data that they were collecting from users, how they were using the data, and measures they were taking to ensure that user data was protected under the California Consumer Privacy Act of 2018 (CCPA). Among other things, under the CCPA, a business (a) "that collects a consumer's personal information shall, at or before the point of collection, inform customers as to the categories of personal information to be collected and the purposes for which the categories of personal information shall be used"; and (b) "shall not collect additional categories of personal information or use personal information collected for additional purposes without providing the consumer with notice consistent with this section."[191]

[191] Cal. Civ. Code § 1798.100.

384. CCPA defines "personal information" as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."[192] Personal information includes, among other things, "[b]iometric information." CCPA states that "[b]iometric information includes, but is not limited to, imagery of the iris, retina, fingerprint, face, hand, palm, vein patterns, and voice recordings, from which an identifier template, such as a faceprint, a minutiae template, or a voiceprint, can be extracted, and keystroke patterns or rhythms, gait patterns or rhythms, and sleep, health, or exercise data that contain identifying information."[193]

385. As alleged herein, in violation of the CCPA, Defendants collected the personal information of Plaintiffs and members of the Class without providing the information and disclosures required by the CCPA. Among other things, defendants failed to accurately inform Plaintiffs and the class as to the categories of personal information to be collected and the purposes for which the categories of personal information were to be used.

386. Among the many categories of personal data that Defendants collected from Plaintiffs and Class members without adequate disclosure are Plaintiffs' and Class members' biometric data and information. Under the broad definition contained in the CCPA, biometric data includes "imagery" of the face contained in photos and videos and "voice recordings" as well as actual "faceprints" and "voiceprints" that are "extracted" from such images and voice recordings.[194]

[192] *Id.* § 1798.100(o)(1).

[193] *Id.* § 1798.140(c).

[194] *Id.*

387. As further alleged herein, Defendants further violated CCPA by using the personal information they collected from Plaintiffs and the Class for undisclosed purposes without providing the requisite notice.

388. Defendants' above-described conduct was unlawful under the CCPA and further constitutes an unfair practice in violation of the UCL because the practices and acts were immoral, unethical, oppressive, unscrupulous and substantially caused injuries to Plaintiffs and members of the Class and violated established public policy. These acts caused substantial injury to Plaintiffs and members of this Class and resulted in loss of money or property by Plaintiffs and members of the Class.

389. Defendants had a further duty to fully and adequately disclose their data practices under the Children's Online Privacy Protection Act (COPPA), which requires adequate disclosures and explicit and verifiable consent for collection of data for individuals under 13 years of age.[195]

390. Persistent identifiers have been included within the definition of "Personal Information" that operators of websites and online services are barred by COPPA from collecting from children under thirteen years old without verifiable parent consent. Persistent identifiers include data collected by CapCut such as IP addresses or IMEI numbers.

391. COPPA violations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (the 'FTC Act'), 15 U.S.C. § 57a(a)(1)(B)." Accordingly, a violation of COPPA constitutes an unfair trade practice under Section 5 of the FTC Act as well as under state consumer protection acts such as the UCL, frequently called "little FTC acts."

[195] Children's Online Privacy Protection Act of 1998, 15 U.S.C. 6501–6505.

392. Defendants also undertook a duty to fully and accurately make disclosures concerning their data practices when they issued privacy policies and other documents purporting to summarize their data practices, such as the categories of data collected, the ways they used the data, and the dissemination of that data to third parties.

393. While Defendants purported to disclose their data collection practices, they did not accurately or fully do so. Instead, Defendants told the public and users on their website that "CapCut values your privacy and safety, and we believe in data transparency."[196] They further stated they would provide "privacy and security" for user data: "Save your precious memories and private data securely with CapCut's free cloud storage" and "The best cloud storage is secure cloud storage. Bring privacy and security into your life with CapCut's free cloud storage. Simply make your account, and rest assured that your data will be safe whenever you return!"[197]

394. Prior versions of CapCut's privacy policy issued before this lawsuit was filed made similar statements: "We are committed to protecting and respecting your privacy."

395. However, as described more fully above, Defendants repeatedly violated their duty to fully and accurately disclose their data practices. For example, Defendants did not disclose that they collect biometric identifiers and information, despite the fact that they are well aware of their obligation to do so. In contrast, the privacy policy for Defendants' TikTok app—which also contains a video editor--discloses that the TikTok app collects "biometric identifiers and biometric information as defined under U.S. laws, such as faceprints and voiceprints."[198]

---

[196] https://www.capcut.com/legal/webform/privacy-request/en.

[197] https://www.capcut.com/tools/free-cloud-storage.

[198] https://www.tiktok.com/legal/page/us/privacy-policy/en.

396. Defendants do not disclose that they collect fine-grained location data from users, and in the past, did not disclose that they collected any location information at all. Again, the TikTok app's privacy policy—in contrast to CapCut—contains at least some disclosure, noting that the app may collect "precise location information (such as GPS)."[199]

397. Defendants did not disclose that they collected metadata from uploaded user content until after this lawsuit was filed. While Defendants did not make such disclosures for CapCut, the TikTok privacy policy does contain some disclosure, again documenting that Defendants were aware that they should make such disclosures but sought to conceal the full scope of the data collected by CapCut from CapCut users.

398. Before this lawsuit was filed, CapCut did not disclose that it collected purchase information, which it collected from users when, among other things, they participated in rewards programs or the CapCut Cloud Space Service. This included information such as payment card information, billing, delivery, and contact information, and what users purchased. Again, TikTok's privacy policy, unlike CapCut's, did contain some disclosure regarding the collection of such information from TikTok users.

399. Before this lawsuit was filed, CapCut did not disclose that the app would collect users' email contacts.

400. These are some examples of the specific categories of data that CapCut collected, but which Defendants failed to disclose to CapCut users. Moreover, in general, the disclosures Defendants have made do not fully or adequately disclose the categories of user data collected, how the data is shared or transferred, and the purposes for which the data is used.

[199] *See* 1/1/23 TikTok Privacy Policy.

401. Defendants also sought to conceal that the CapCut app was directly controlled by Defendant ByteDance, which is a Chinese company, and that user data could be accessed by individuals and entities in China and that Defendants had an obligation to share user data with the Chinese government and CCP. Indeed, Defendants purposefully sought to reassure users that their data would be subject to various protections that did not apply to CapCut users' data.

402. For example, as noted, the CapCut app was heavily promoted on the TikTok app, where users were encouraged to click on a button to download the CapCut app and use its video editing capabilities to post videos on TikTok. Also on the TikTok app and website were representations that user data would be subject to extensive protections under "Project Texas" to wall off data from access by individuals or entities in China. Defendant TikTok stated on its website: "To fulfill our commitments to safeguard U.S. user data, we have a cutting-edge program called 'Project Texas... A central goal of Project Texas is to enhance the way that U.S. user data is protected, including how it is accessed, stored, and shared.... Under Project Texas, protected U.S. user data is afforded enhanced protection.... We are committed to aligning our business practices to widely-accepted privacy principles, such as privacy by design, data minimization, and transparency."[200]

403. TikTok represented that a separate subsidiary called TikTok U.S. Data Security Inc. ("TikTok USDS") had been created to house user data and that there would be independent governance of this subsidiary using U.S.-only personnel, creating physical separation of U.S. data from China-based individuals and entities. TikTok represented that the data would be hosted by a

[200] https://usds.tiktok.com/safeguarding-us-user-data/.

U.S. company—Oracle—which would impose data access and controls to ensure physical separation.[201]

404. TikTok's CEO described these changes as creating "what amounts to a firewall" that "seals off protected U.S. user data from foreign access." "American data [is] stored on American soil by an American company overseen by American personnel." This "eliminates the concern" that "US data can be subject to Chinese law."[202]

405. CapCut users were deceived because no such protections were available for data that was uploaded through the CapCut app. As the internal discussions quoted in the press make clear, Defendants' executives were well aware of their deceptive conduct, noting their concern that CapCut was directly run by ByteDance without any of the data protections that applied to data collected through the TikTok app and worrying that this would be a "lightning rod" if it ever became public.

406. Indeed, the CapCut app was purposefully designed to circumvent any barriers to access to user data by individuals and entities in China. Defendants used TikTok's powerful marketing platform to encourage consumers to sign up for the CapCut app, which lacked the protections for user data that were implemented for the TikTok app. This included encouraging users to switch to the CapCut app even though they may already have downloaded another video editing app such as TikTok or some other video editing app.

407. As commentators observed, "CapCut has capitalized on sister company TikTok being the face of vertical-video platforms. On TikTok, the official CapCut account has nearly 10

---

[201] *Id.*

[202] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

million followers, with its corresponding hashtag hosting thousands of billions of views on videos that have used the editing app. ByteDance self-promotes CapCut within the TikTok app using language like, 'Everyone can be a creator by using CapCut. Start creating your cool video today.'"[203] Moreover, videos edited using CapCut that appeared on the TikTok app would show a button along with phrases such as "try this template" or "editing made easy," which directed users to download the CapCut app.[204]

408. Gaining access to the data of users who signed up for the CapCut app, Defendants then proceeded to utilize the CapCut app to collect user data from millions of individuals in the United States without any of the protections for user data that they were forced to implement with the Tiktok app. All of this was achieved without the knowledge of users, who were kept in the dark by Defendants and deceived into giving them access to their data without adequate data protections. Defendants continue to make extensive efforts to avoid public disclosure of the fact that such protections for user data do not exist with the CapCut app.

409. Another way that Defendants sought to hide the fact that CapCut was controlled by executives in China was to set up a Singapore entity, Defendant ByteDance Pte. Ltd., that they represented—contrary to the truth—controlled the CapCut app. Accordingly, on the app store and other stores offering the CapCut app, the entity listed as owning and controlling the app is ByteDance Pte. Ltd. Likewise, CapCut's privacy policy states that the services are "provided and

[203] How ByteDance Is Expanding Its Reach Beyond TikTok With CapCut—One of the Most Popular Apps in America, Time (Apr. 13, 2023).

[204] TikTok's Chinese Parent Has Another Wildly Popular App in the U.S., Wall St. J. (Mar. 19, 2023).

controlled by Bytedance Pte. Ltd."[205] However, as the recent public disclosures make clear, in fact the CapCut app is "directly run by ByteDance executives in China."[206]

410. Defendants repeatedly denied in public (while acknowledging in private) that ByteDance was controlled by the Chinese government. For example, TikTok's CEO Shou Chew testified before Congress that "ByteDance is not owned or controlled by the Chinese government."[207] Likewise, in response to press inquiries, he stated: "The Chinese government does not directly or indirectly have the right to appoint board members or otherwise have specific rights with respect to any ByteDance entity within the chain of ownership or control over the TikTok entity."[208] This is part of a conscious "messaging" strategy, whereby Defendants "[d]ownplay the parent company ByteDance, downplay the China association, downplay AI."[209]

411. Finally, Defendants did not disclose that members of the CCP had access to their facilities, and indeed had significant management roles at the companies in which they could access user data. Nor did they disclose that they were subject to Chinese law that required that they provide access to user data to the Chinese government and CCP.

412. California Plaintiffs and the California Subclass have been harmed and have suffered economic injury as a result of Defendants' UCL violations. Defendants' omissions regarding their data practices and unfair, deceptive and unlawful practices caused Plaintiffs'

---

[205] https://www.capcut.com/clause/privacy-policy.

[206] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

[207] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

[208] TikTok Responds to Allegations of Unsecured User Data (July 5, 2022), https://www.searchenginejournal.com/tiktok-responds-user-data/456633/.

[209] C. Stokel-Walker, Inside TikTok's Attempts to 'Downplay the China Association', GIZMODO (July 27, 2022), https://bit.ly/3EV8XnY.

economic injuries. Plaintiffs would not have downloaded the CapCut app if Defendants had fully and accurately disclosed their data practices and would not have incurred economic injuries. Plaintiffs relied on Defendants' omissions and this reliance was justifiable and reasonable.

413. First, Plaintiffs who are subscribers to CapCut have suffered direct out-of-pocket expenses. Subscribers pay a monthly or yearly subscription fee to Defendants for additional services and features. Plaintiffs would not have paid those fees, or at a minimum would not have paid as much, had they been aware of Defendants' widespread covert harvesting of their data. Defendants' unlawful collection of Plaintiffs' data, at a minimum, reduced the value of the subscription services for which Defendants charged Plaintiffs. Defendants earned approximately $100 million from subscription fees in 2023 alone.

414. Second, Plaintiffs have suffered harm to their devices and incurred unnecessary costs as a result of Defendants' unlawful collection of their data. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. As noted above, the costs due to overnight battery drain alone are more than $8 million per year per 100 million users. Additional economic injuries are caused by daytime battery drain and battery drain during use of the CapCut app as well as the drain on computer resources caused by the data collection functions in the CapCut app. These unnecessary costs Plaintiffs incurred were directly caused by Defendants' wrongful conduct, including their improper collection of Plaintiffs' data. Plaintiffs would not have downloaded the CapCut app at all had they known that Defendants' malicious app would collect their data without authorization, leading to these unnecessary costs.

415. Third, Plaintiffs have suffered harm in the form of diminution of the value of their private and personally identifiable data and content. Under California law, Plaintiffs have a property interest in the personally identifiable information and other personal information taken by Defendants. There is a market for such data and Plaintiffs have been deprived of the money or property they would have received for the data improperly collected by Defendants.

416. Fourth, Plaintiffs have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content—including user/device identifiers, biometric identifiers and information, and private videos and private video images.

417. Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from their targeted advertising, improvements to their artificial intelligence technologies, their patent applications, fees Defendants charged California Plaintiffs for additional services and storage, and the increased consumer demand for and use of Defendants' other products. California Plaintiffs and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

418. California Plaintiffs and the California Subclass lack an adequate remedy at law and thus are entitled to seek equitable relief. Unless restrained and enjoined, Defendants will continue to fail to adequately disclose their private and personally identifiable data and content collection and use practices, and will not recall and destroy California Plaintiffs' and the California Subclass's wrongfully collected private and personally identifiable data and content. Due to the ongoing nature of the harm, damages will be insufficient to address it. Accordingly, injunctive relief is appropriate.

419. Further, California Plaintiffs and the California Subclass are entitled to restitution as the available damages and remedies are inadequate to return to California Plaintiffs and the California Subclass the value of the information taken by Defendants, including for use in developing their artificial intelligence systems. California Plaintiffs and the California Subclass are entitled to restitution for Defendants' unjust enrichment in a sum that is not identical to the legal damages suffered.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW, BUS. & PROF. C. §§ 17500 *et seq.*
**(On Behalf of the California Plaintiffs and the California Subclass)**

420. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

421. California's False Advertising Law (the "FAL") – Cal. Bus. & Prof. Code §§ 17500, et seq. – prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services. Defendants' advertising and other statements regarding CapCut are, and at all relevant times were, highly misleading.

422. As discussed in Count Seven and Section IV.E above, Defendants had a duty to fully and accurately disclose their data practices for multiple reasons, but failed to do so.

423. First, Defendants had an obligation to fully disclose the data that they were collecting from users, how they were using the data, and measures they were taking to ensure that user data was protected under the California Consumer Privacy Act of 2018 (CCPA). Among other things, under the CCPA, a business (a) "that collects a consumer's personal information shall, at or before the point of collection, inform customers as to the categories of personal information to be collected and the purposes for which the categories of personal information

shall be used"; and (b) "shall not collect additional categories of personal information or use personal information collected for additional purposes without providing the consumer with notice consistent with this section."[210]

424. CCPA defines "personal information" as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."[211] Personal information includes, among other things, "[b]iometric information." CCPA states that "[b]iometric information includes, but is not limited to, imagery of the iris, retina, fingerprint, face, hand, palm, vein patterns, and voice recordings, from which an identifier template, such as a faceprint, a minutiae template, or a voiceprint, can be extracted, and keystroke patterns or rhythms, gait patterns or rhythms, and sleep, health, or exercise data that contain identifying information."[212]

425. As alleged herein, in violation of the CCPA, Defendants collected the personal information of Plaintiffs and members of the Class without providing the information and disclosures required by the CCPA. Among other things, defendants failed to accurately inform Plaintiffs and the class as to the categories of personal information to be collected and the purposes for which the categories of personal information were to be used.

426. Among the many categories of personal data that Defendants collected from Plaintiffs and Class members without adequate disclosure are Plaintiffs' and Class members' biometric data and information. Under the broad definition contained in the CCPA, biometric

[210] Cal. Civ. Code § 1798.100.

[211] *Id.* § 1798.100(o)(1).

[212] *Id.* . § 1798.140(c).

data includes "imagery" of the face contained in photos and videos and "voice recordings" as well as actual "faceprints" and "voiceprints" that are "extracted" from such images and voice recordings.[213]

427. As further alleged herein, Defendants further violated CCPA by using the personal information they collected from Plaintiffs and the Class for undisclosed purposes without providing the requisite notice.

428. Second, Defendants had a duty to fully and adequately disclose their data practices under the Children's Online Privacy Protection Act (COPPA), which requires adequate disclosures and explicit and verifiable consent for collection of data for individuals under 13 years of age.[214]

429. Persistent identifiers have been included within the definition of "Personal Information" that operators of websites and online services are barred by COPPA from collecting from children under thirteen years old without verifiable parent consent. Persistent identifiers include data collected by CapCut such as IP addresses or IMEI numbers.

430. Third, Defendants also undertook a duty to fully and accurately make disclosures concerning their data practices when they issued privacy policies and other documents purporting to summarize their data practices, such as the categories of data collected, the ways they used the data, and the dissemination of that data to third parties.

431. While Defendants purported to disclose their data collection practices, they did not accurately or fully do so. Instead, Defendants told the public and users on their website that

---

[213] *Id.*

[214] Children's Online Privacy Protection Act of 1998, 15 U.S.C. 6501–6505.

"CapCut values your privacy and safety, and we believe in data transparency."[215] They further stated they would provide "privacy and security" for user data: "Save your precious memories and private data securely with CapCut's free cloud storage" and "The best cloud storage is secure cloud storage. Bring privacy and security into your life with CapCut's free cloud storage. Simply make your account, and rest assured that your data will be safe whenever you return!"[216]

432. Prior versions of CapCut's privacy policy issued before this lawsuit was filed made similar statements: "We are committed to protecting and respecting your privacy."

433. However, as described more fully above, Defendants repeatedly violated their duty to fully and accurately disclose their data practices. For example, Defendants did not disclose that they collect biometric identifiers and information, despite the fact that they are well aware of their obligation to do so. In contrast, the privacy policy for Defendants' TikTok app—which also contains a video editor--discloses that the TikTok app collects "biometric identifiers and biometric information as defined under U.S. laws, such as faceprints and voiceprints."[217]

434. Defendants do not disclose that they collect fine-grained location data from users, and in the past, did not disclose that they collected any location information at all. Again, the TikTok app's privacy policy—in contrast to CapCut--contains at least some disclosure, noting that the app may collect "precise location information (such as GPS)."[218]

435. Defendants did not disclose that they collected metadata from uploaded user content until after this lawsuit was filed. While Defendants did not make such disclosures for

[215] https://www.capcut.com/legal/webform/privacy-request/en.

[216] https://www.capcut.com/tools/free-cloud-storage.

[217] https://www.tiktok.com/legal/page/us/privacy-policy/en.

[218] *See* 1/1/23 TikTok Privacy Policy.

CapCut, the TikTok privacy policy does contain some disclosure, again documenting that Defendants were aware that they should make such disclosures but sought to conceal the full scope of the data collected by CapCut from CapCut users.

436. Before this lawsuit was filed, CapCut did not disclose that it collected purchase information, which it collected from users when, among other things, they participated in rewards programs or the CapCut Cloud Space Service. This included information such as payment card information, billing, delivery, and contact information, and what users purchased. Again, TikTok's privacy policy, unlike CapCut's, did contain some disclosure regarding the collection of such information from TikTok users.

437. Before this lawsuit was filed, CapCut did not disclose that the app would collect users' email contacts.

438. These are some examples of the specific categories of data that CapCut collected, but which Defendants failed to disclose to CapCut users. Moreover, in general, the disclosures Defendants have made do not fully or adequately disclose the categories of user data collected, how the data is shared or transferred, and the purposes for which the data is used.

439. Defendants also did not disclose and sought to conceal that the CapCut app was directly controlled by Defendant ByteDance, which is a Chinese company, and that user data could be accessed by individuals and entities in China and that Defendants had an obligation to share user data with the Chinese government and CCP. Indeed, Defendants purposefully sought to reassure users that their data would be subject to various protections that did not apply to CapCut users' data.

440. For example, as noted, the CapCut app was heavily promoted on the TikTok app, where users were encouraged to click on a button to download the CapCut app and use its video editing capabilities to post videos on TikTok. Also on the TikTok app and website were representations that user data would be subject to extensive protections under "Project Texas" to wall off data from access by individuals or entities in China. Defendant TikTok stated on its website: "To fulfill our commitments to safeguard U.S. user data, we have a cutting-edge program called 'Project Texas.. A central goal of Project Texas is to enhance the way that U.S. user data is protected, including how it is accessed, stored, and shared.... Under Project Texas, protected U.S. user data is afforded enhanced protection.... We are committed to aligning our business practices to widely-accepted privacy principles, such as privacy by design, data minimization, and transparency."[219]

441. TikTok represented that a separate subsidiary called TikTok U.S. Data Security Inc. ("TikTok USDS") had been created to house user data and that there would be independent governance of this subsidiary using U.S.-only personnel, creating physical separation of U.S. data from China-based individuals and entities. TikTok represented that the data would be hosted by a U.S. company—Oracle—which would impose data access and controls to ensure physical separation.[220]

442. TikTok's CEO described these changes as creating "what amounts to a firewall" that "seals off protected U.S. user data from foreign access." "American data [is] stored on

[219] https://usds.tiktok.com/safeguarding-us-user-data/.

[220] *Id.*

American soil by an American company overseen by American personnel." This "eliminates the concern" that "US data can be subject to Chinese law."[221]

443. CapCut users were deceived because no such protections were available for data that was uploaded through the CapCut app. As the internal discussions quoted in the press make clear, Defendants' executives were well aware of their deceptive conduct, noting their concern that CapCut was directly run by ByteDance without any of the data protections that applied to data collected through the TikTok app and worrying that this would be a "lightning rod" if it ever became public.

444. Indeed, the CapCut app was purposefully designed to circumvent any barriers to access to user data by individuals and entities in China. Defendants used TikTok's powerful marketing platform to encourage consumers to sign up for the CapCut app, which lacked the protections for user data that were implemented for the TikTok app. This included encouraging users to switch to the CapCut app even though they may already have downloaded another video editing app such as TikTok or some other video editing app.

445. As commentators observed, "CapCut has capitalized on sister company TikTok being the face of vertical-video platforms. On TikTok, the official CapCut account has nearly 10 million followers, with its corresponding hashtag hosting thousands of billions of views on videos that have used the editing app. ByteDance self-promotes CapCut within the TikTok app using language like, 'Everyone can be a creator by using CapCut. Start creating your cool video today.'"[222] Moreover, videos edited using CapCut that appeared on the TikTok app would show a

---

[221] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

[222] How ByteDance Is Expanding Its Reach Beyond TikTok WithCapCut—One of the Most Popular Apps in America, Time (Apr. 13, 2023).

button along with phrases such as "try this template" or "editing made easy," which directed users to download the CapCut app.[223]

446. Gaining access to the data of users who signed up for the CapCut app, Defendants then proceeded to utilize the CapCut app to collect user data from millions of individuals in the United States without any of the protections for user data that they were forced to implement with the Tiktok app. All of this was achieved without the knowledge of users, who were kept in the dark by Defendants and deceived into giving them access to their data without adequate data protections. Defendants continue to take extensive efforts to avoid public disclosure of the fact that such protections for user data do not exist with the CapCut app.

447. Another way that Defendants sought to hide the fact that CapCut was controlled by executives in China was to set up a Singapore entity, Defendant ByteDance Pte. Ltd., that they represented—contrary to the truth—controlled the CapCut app. Accordingly, on the app store and other stores offering the CapCut app, the entity listed as owning and controlling the app is ByteDance Pte. Ltd. Likewise, CapCut's privacy policy states that the services are "provided and controlled by Bytedance Pte. Ltd."[224] However, as the recent public disclosures make clear, in fact the CapCut app is "directly run by ByteDance executives in China."[225]

448. Defendants repeatedly denied in public (while acknowledging in private) that ByteDance was controlled by the Chinese government. For example, TikTok's CEO Shou Chew

---

[223] TikTok's Chinese Parent Has Another Wildly Popular App in the U.S., Wall St. J. (Mar. 19, 2023).

[224] https://www.capcut.com/clause/privacy-policy.

[225] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

testified before Congress that "ByteDance is not owned or controlled by the Chinese government."[226] Likewise, in response to press inquiries, he stated: "The Chinese government does not directly or indirectly have the right to appoint board members or otherwise have specific rights with respect to any ByteDance entity within the chain of ownership or control over the TikTok entity."[227] This is part of a conscious "messaging" strategy, whereby Defendants "[d]ownplay the parent company ByteDance, downplay the China association, downplay AI."[228]

449. Finally, Defendants did not disclose that members of the CCP had access to their facilities, and indeed had significant management roles at the companies in which they could access user data. Nor did they disclose that they were subject to Chinese law that required that they provide access to user data to the Chinese government and CCP.

450. Accordingly, for multiple reasons, Defendants had a duty to fully and accurately disclose their data practices. However, Defendants did not do so, committing omissions of fact that Defendants were obligated to disclose.

451. Defendants' omissions directly caused Plaintiffs economic injury. Had Defendants fully and accurately disclosed their data practices, Plaintiffs would not have downloaded the CapCut app and would not have incurred economic injuries. Plaintiffs relied on Defendants' omissions, and this reliance was justifiable and reasonable.

[226] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

[227] TikTok Responds to Allegations of Unsecured User Data (July 5, 2022), https://www.searchenginejournal.com/tiktok-responds-user-data/456633/

[228] C. Stokel-Walker, Inside TikTok's Attempts to 'Downplay the China Association', GIZMODO (July 27, 2022), https://bit.ly/3EV8XnY.

452. As described in Count Seven and Section IV.G above, California Plaintiffs and the California Subclass have been harmed and have suffered economic injury as a result of Defendants' omissions. First, they have suffered economic harm in the form of subscription fees Plaintiffs paid that they would not have incurred if they had been fully informed regarding CapCut's data practices. Second, Plaintiffs have incurred costs associated with unnecessary battery drain and use of computer resources. As demonstrated by the analysis contained in Count Seven and Section IV.G, the economic injury from overnight battery drain alone is significant. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, Plaintiffs have suffered economic injury in the form of diminution of the value of their private and personally identifiable data and content. California Plaintiffs and the California Subclass have a property interest in the personally identifiable information and other personal information taken by Defendants. There is a market for such data and California Plaintiffs and the California Subclass have been deprived of the money or property they would have received for the data improperly collected by Defendants. Fourth, Plaintiffs have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and content—including user/device identifiers, biometric identifiers and information, and private videos and private video images.

453. Defendants' failure to disclose the truth regarding their data collection practices directly caused Plaintiffs' injuries. Plaintiffs would not have downloaded the CapCut app and thus would not have suffered these economic injuries if Defendants had fully and accurately disclosed their data collection practices.

454. Defendants, as a result of their omissions and deceptive, unfair and unlawful practices, have been able to reap unjust profits and revenues. This includes Defendants' profits and revenues from their targeted advertising, improvements to their artificial intelligence technologies, their patent applications, their fees and service charges, and the increased consumer demand for and use of Defendants' other products and services. California Plaintiffs and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

455. Unless restrained and enjoined, Defendants will continue to fail to fully and accurately disclose their data practices, and will not recall and destroy California Plaintiffs' and the California Subclass's wrongfully collected private and personally identifiable data and content. Accordingly, injunctive relief is appropriate.

## NINTH CAUSE OF ACTION

## VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT CALIFORNIA PENAL CODE §§ 630 *et seq.* (On Behalf of the California Plaintiffs and the California Subclass)

456. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

457. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

458. Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

459. The CapCut app satisfies Cal. Pen. Code § 631(a)'s definition of a "machine, instrument, or contrivance, or in any other manner." In addition, the CapCut app further satisfies this definition because it is programmed and intended to cause other machines, instruments, contrivances to obtain and learn the contents of Plaintiffs' and Class Members' communications, such as Plaintiffs' and Class Members' computers, tablets, and/or mobile devices.

460. Cal. Pen. Code § 632(a) imposes liability upon: "A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio."

461. California Plaintiffs and the California Subclass have an expectation of privacy in messages, videos, and recordings, and they exercised a reasonable expectation of privacy concerning the transmission of those messages.

462. Under either section of the CIPA quoted above, a defendant must show it had the consent of all parties to a communication. However, without the consent of either the sender or recipient, Defendants intercepted and recorded videos, URLs, comments, likes, and other messages and electronic communications transmitted using the CapCut platform without California Plaintiffs' and the California Subclass's consent or knowledge.

463. Defendants knowingly and intentionally used and continue to use the CapCut app platform and associated servers and other computer devices, to read, attempt to read, learn, attempt to learn, eavesdrop, record, and/or use electronic communications containing private data from California Plaintiffs and California Subclass Members, while these electronic communications were and are in transit, without the authorization or consent of California Plaintiffs or California Subclass Members. Defendants profited and continue to profit as a result of these repeated and systemic violations of CIPA. Defendants' unlawful conduct harmed and continues to harm California Plaintiffs.

464. The communications intercepted by Defendants include "contents" of electronic communications exchanged between California Plaintiffs and California Subclass Members, on the one hand, and third parties including both users and on-users of the CapCut app through shared communications. Defendants recorded and stored such private message content, separate from the process of transmitting the message to the intended recipient. Defendants purposefully designed the CapCut platform in a way that they knew California Plaintiffs' and the California Subclass's privacy rights would be violated, in that their messages would be unlawfully intercepted and recorded. The defective and unlawful design of the CapCut platform directly facilities Defendants' unlawful conduct.

The following constitute "machine[s], instrument[s], or contrivance[s], under Cal. Penal Code § 631(a): (a) California Plaintiff's and California Subclass Members' personal computing devices; (b) the computer codes and programs Defendants used to effectuate the interception of communications, including the CapCut app; (c) Defendants' servers; (d) and the plan Defendants carried out to effectuate the interception of the communications that were exchanged with California Plaintiffs and California Subclass Members. In the alternative, Defendants' purposeful scheme that facilitated its interceptions falls under the broad statutory catch-all category of "any other manner".

465. Defendants also violated Cal. Pen. Code § 632(a), which applies to a person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication. The private data Defendants collected constitutes "confidential communications," as that term is used in Cal. Pen. Code § 632(a), because California Plaintiffs and California Subclass Members have an objectively reasonable expectation of privacy in their communications not being disseminated by Defendants.

466. The following constitute an "electronic amplifying or recording device" under Cal. Penal Code § 632: (a) California Plaintiff's and California Subclass Members' personal computing devices; (b) the computer codes and programs Defendants used to effectuate the interception of communications, including the CapCut app; (c) Defendants' servers; (d) and the plan Defendants carried out to effectuate the interception of the communications that were exchanged with California Plaintiffs and California Subclass Members. Courts have repeatedly held that software

like the CapCut app is an "electronic amplifying or recording device" under Cal. Penal Code § 632.

467. The CapCut app contains mechanisms to capture sensitive user data, including keystrokes, location data, and media content, and transmit such information without user consent. The Capcut app's persistent background data collection and asynchronous data transmission functions, among other things, render it an electronic amplifying or recording device under Cal. Penal Code § 632.

468. The CapCut app obtains the contents of users' electronic communications as they are sent in transit. It therefore "intercepts" the contents of Plaintiffs' electronic communications. As noted above, ByteDance runs the CapCut app, and as Congress found in requiring divestiture of the CapCut app, there are more than 130 members of the CCP embedded in ByteDance who therefore have access to CapCut user data in real-time, including electronic communications intercepted by the CapCut app. Moreover, the CapCut app is "run directly" by ByteDance executives in China who have access to user data.

469. Neither California Plaintiffs nor the California Subclass Members consented to Defendants' interception, disclosure, and/or use of their electronic communications. Nor, based on information and belief, did third parties receiving the communications.

470. The unauthorized interceptions described herein are not covered by any business exception because the interceptions were not required to facilitate the communications.

471. California Plaintiffs and California Subclass Members have suffered loss because of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their private data. California Plaintiffs and the California Subclass have a property right in their

private communications, videos and messages such that interception of those messages violated those rights and therefore caused them injuries and damages. California Plaintiffs and the California Subclass suffered further economic injury as a result of Defendants' unlawful and unauthorized interceptions and recordings of communications. The battery, memory, CPU and bandwidth of their cellular devices have been compromised and they incurred additional data and electricity costs that they otherwise would not have.

472. Pursuant to Cal. Pen. Code § 637.2, California Plaintiffs and California Subclass Members have been injured by the violations of Cal. Pen. Code §§ 631, 632, and each seeks damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive or other equitable relief.

473. California Plaintiffs and California Subclass Members have also suffered irreparable injury from these unauthorized acts of disclosure; their personal, private, and sensitive data have been collected, viewed, accessed, stored, and used by Defendants, and have not been destroyed. Due to the continuing threat of such injury, California Plaintiffs and California Subclass Members have no adequate remedy at law, California Plaintiffs and California Subclass Members are entitled to injunctive relief.

## TENTH CAUSE OF ACTION

### STATUTORY LARCENY, CAL. PEN. CODE §§ 484, 496
### (On Behalf of the California Plaintiffs and the California Subclass)

474. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

475. Cal. Pen. Code § 496 imposes liability upon: "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or

extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained[.]"

476. Cal. Pen. Code § 484, which defines "theft", states in pertinent part: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

477. Under California law, California Plaintiffs and California Subclass Members have a property interest in their personal information and private data. Defendants profited and continue to profit as a result of these repeated and systemic violations. Defendants' unlawful conduct harmed and continues to harm California Plaintiffs.

478. Defendants acted in a manner constituting theft by surreptitiously taking California Plaintiffs' and California Subclass Members' private data through the CapCut platform under false pretenses, with the specific intent to deprive California Plaintiffs and California Subclass Members of their property.

479. California Plaintiffs and California Subclass Members did not consent to any of Defendants' actions in taking California Plaintiffs' and California Subclass Members' private data.

480. Pursuant to Cal. Pen. Code § 496(c), California Plaintiffs and California Subclass Members are entitled to treble damages, as well as attorneys' fees and costs, for injuries sustained as a result of Defendants' violations of Cal. Pen. Code § 496(a).

## ELEVENTH CAUSE OF ACTION

## CONVERSION
**(On Behalf of the California Plaintiffs and the California Subclass)**

481. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

482. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things such as data or communications. California Plaintiffs' and California Subclass Members' private data is their property under California law.

483. Defendants unlawfully intercepted, collected, used, and exercised dominion and control over California Plaintiffs' and California Subclass Members' private data without authorization, including California Plaintiffs' and California Subclass Members' confidential communications.

484. Defendants wrongfully exercised control over California Plaintiffs' and California Subclass Members' private data, and have not returned such private data.

485. California Plaintiff and California Subclass Members have been damaged as a result of Defendants' unlawful conversion of their property.

## TWELFTH CAUSE OF ACTION

## RESTITUTION / UNJUST ENRICHMENT
**(On Behalf of the Plaintiffs and the Class)**

486. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

487. Plaintiffs and the Class have unknowingly conferred substantial benefits on Defendants by downloading and using the CapCut app. These include the Defendants accessing the Plaintiffs' and the Class's private and personally identifiable data and content – including user/device identifiers, biometric identifiers and information, and private videos and private video images never intended for public consumption. As discussed more fully in Section IV.G above, this data is considered property under California law, has substantial monetary value, can be sold in robust markets, and Defendants unjustly retained those benefits at the expense of Plaintiffs and Class Members.

488. Such benefits also include the revenues and profits resulting from Defendants' collection and use of such data and content for Defendants' targeted-advertising, improvements to their artificial intelligence technologies, their patent applications, fees Defendants charged Plaintiffs for additional services and storage, and the increased consumer demand for and use of Defendants' other products. As noted above, including in Section IV.G, the CapCut app itself incorporates substantial artificial intelligence technology. However, Defendants' many other businesses and products also incorporate artificial intelligence and have significantly benefited from the data Defendants collected from Plaintiffs and the Class Members.

489. Such benefits also include the substantial subscription fees Defendants collected from Plaintiffs. As noted above, these amounted to more than $100 million in 2023 alone and are likely even greater in subsequent years given that Defendants continue to increase the fees they charge for CapCut subscriptions.

490. Defendants have knowingly and willingly accepted and enjoyed these benefits. Defendants unjustly retained these benefits without providing compensation to Plaintiffs and Class Members.

491. Defendants either knew or should have known that the benefits rendered by the Plaintiffs and the Class were given with the expectation that Defendants would not take and use the Plaintiffs' and the Class's private and personally identifiable data and content that Defendants have taken and used without permission. For Defendants to retain the aforementioned benefits under these circumstances is inequitable.

492. Through deliberate violation of the Plaintiffs' and the Class's privacy interests, and statutory and constitutional rights, Defendants each reaped benefits that resulted in each Defendant wrongfully receiving profits.

493. As described above and in Count Seven, Defendants committed multiple unlawful acts that caused them to wrongfully receive unjust benefits. Among other things, Defendants committed the following unlawful and wrongful acts:

a. Failing to comply with § 1798.100(b) of the California Consumer Privacy Act;

b. Invasion of privacy under the common law and California Constitution, Art. I, § 1;

c. Failing to comply with the Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501–6505;

d. Failing to provide adequate security for the data they have collected;

e. Deceiving the public and users and failing to provide full and adequate disclosure regarding Defendants' data practices;

f. Deceiving the public and users in marketing the CapCut app;

g. Omitting, suppressing and concealing that they did not comply with common law and statutory duties pertaining to the personal information of Plaintiffs and members of the Class, including duties imposed by the California Constitution, Art. I, § 1; and the CCPA, Cal. Civ. Code § 1798.100(b);

h. Providing access to users' data to the Chinese government and CCP;

i. Violating the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

j. Violating the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*;

k. Violating the Stored Communications Act, 18 U.S.C. §§ 2701 *et seq.*;

l. Violating the California Comprehensive Data Access and Fraud Act, Cal. Pen. C. §§ 502;

m. Violating the California Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq.*;

n. Violating statutory larceny, Cal. Pen. Code §§ 484, 496; and

o. Converting Plaintiffs' and Class Members' data to their own uses.

494. Defendants had an obligation to fully disclose the data that they were collecting from users, how they were using the data, and measures they were taking to ensure that user data was protected under the California Consumer Privacy Act of 2018 (CCPA). Among other things,

under the CCPA, a business (a) "that collects a consumer's personal information shall, at or before the point of collection, inform customers as to the categories of personal information to be collected and the purposes for which the categories of personal information shall be used"; and (b) "shall not collect additional categories of personal information or use personal information collected for additional purposes without providing the consumer with notice consistent with this section."[229]

495. As alleged herein, in violation of the CCPA, Defendants collected the personal information of Plaintiffs and members of the Class without providing the information and disclosures required by the CCPA. Among other things, defendants failed to accurately inform Plaintiffs and the class as to the categories of personal information to be collected and the purposes for which the categories of personal information were to be used.

496. Among the many categories of personal data that Defendants collected from Plaintiffs and Class members without adequate disclosure are Plaintiffs' and Class members' biometric data and information. Under the broad definition contained in the CCPA, biometric data includes "imagery" of the face contained in photos and videos and "voice recordings" as well as actual "faceprints" and "voiceprints" that are "extracted" from such images and voice recordings.[230]

497. As further alleged herein, Defendants further violated CCPA by using the personal information they collected from Plaintiffs and the Class for undisclosed purposes without providing the requisite notice.

[229] Cal. Civ. Code § 1798.100.

[230] *Id.*

498. Defendants' above-described conduct was unlawful under the CCPA and further constitutes an unfair practice in violation of the UCL because the practices and acts were immoral, unethical, oppressive, unscrupulous and substantially injuries to Plaintiffs and members of the Class and violated established public policy. These wrongful acts caused substantial injury to Plaintiffs and members of this Class and resulted in significant economic benefits for Defendants.

499. Defendants had a further duty to fully and adequately disclose their data practices under the Children's Online Privacy Protection Act (COPPA), which requires adequate disclosures and explicit and verifiable consent for collection of data for individuals under 13 years of age.[231]

500. Persistent identifiers have been included within the definition of "Personal Information" that operators of websites and online services are barred by COPPA from collecting from children under thirteen years old without verifiable parent consent. Persistent identifiers include data collected by CapCut such as IP addresses or IMEI numbers.

501. While the TikTok app has a separate data collection policy for users under 13, the CapCut app does not.

502. COPPA violations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (the 'FTC Act'), 15 U.S.C. § 57a(a)(1)(B)." Accordingly, a violation of COPPA constitutes an unfair trade practice under Section 5 of the FTC Act as well as under state consumer protection acts such as the UCL, frequently called "little FTC acts." Defendants violation of COPPA resulted in the wrongful collection of minors' data, providing an unjust benefit for Defendants.

[231] Children's Online Privacy Protection Act of 1998, 15 U.S.C. 6501–6505.

503. Defendants also undertook a duty to fully and accurately make disclosures concerning their data practices when they issued privacy policies and other documents purporting to summarize their data practices, such as the categories of data collected, the ways they used the data, and the dissemination of that data to third parties.

504. While Defendants purported to disclose their data collection practices, they did not accurately or fully do so. As described more fully above, Defendants repeatedly violated their duty to fully and accurately disclose their data practices. For example, Defendants did not disclose that they collect biometric identifiers and information, despite the fact that they are well aware of their obligation to do so. In contrast, the privacy policy for Defendants' TikTok app—which also contains a video editor—discloses that the TikTok app collects "biometric identifiers and biometric information as defined under U.S. laws, such as faceprints and voiceprints."[232]

505. Defendants do not disclose that they collect fine-grained location data from users, and in the past, did not disclose that they collected any location information at all. Again, the TikTok app's privacy policy—in contrast to CapCut—contains at least some disclosure, noting that the app may collect "precise location information (such as GPS)."[233]

506. Defendants did not disclose that they collected metadata from uploaded user content until after this lawsuit was filed. While Defendants did not make such disclosures for CapCut, the TikTok privacy policy does contain some disclosure, again documenting that Defendants were aware that they should make such disclosures but sought to conceal the full scope of the data collected by CapCut from CapCut users.

---

[232] https://www.tiktok.com/legal/page/us/privacy-policy/en.

[233] *See* 1/1/23 TikTok Privacy Policy.

507. Before this lawsuit was filed, CapCut did not disclose that it collected purchase information, which it collected from users when, among other things, they participated in rewards programs or the CapCut Cloud Space Service. This included information such as payment card information, billing, delivery, and contact information, and what users purchased. Again, TikTok's privacy policy, unlike CapCut's, did contain some disclosure regarding the collection of such information from TikTok users.

508. Before this lawsuit was filed, CapCut did not disclose that the app would collect users' email contacts.

509. These are some examples of the specific categories of data that CapCut collected, but which Defendants failed to disclose to CapCut users. Moreover, in general, the disclosures Defendants have made do not fully or adequately disclose the categories of user data collected, how the data is shared or transferred, and the purposes for which the data is used.

510. Defendants also sought to conceal that the CapCut app was directly controlled by Defendant ByteDance, which is a Chinese company, and that user data could be accessed by individuals and entities in China and that Defendants had an obligation to share user data with the Chinese government and CCP. Indeed, Defendants purposefully sought to reassure users that their data would be subject to various protections that did not apply to CapCut users' data.

511. For example, as noted, the CapCut app was heavily promoted on the TikTok app, where users were encouraged to click on a button to download the CapCut app and use its video editing capabilities to post videos on TikTok. Also on the TikTok app and website were representations that user data would be subject to extensive protections under "Project Texas" to wall off data from access by individuals or entities in China. Defendant TikTok stated on its

website: "To fulfill our commitments to safeguard U.S. user data, we have a cutting-edge program called 'Project Texas… A central goal of Project Texas is to enhance the way that U.S. user data is protected, including how it is accessed, stored, and shared…. Under Project Texas, protected U.S. user data is afforded enhanced protection…. We are committed to aligning our business practices to widely-accepted privacy principles, such as privacy by design, data minimization, and transparency."[234]

512. TikTok represented that a separate subsidiary called TikTok U.S. Data Security Inc. ("TikTok USDS") had been created to house user data and that there would be independent governance of this subsidiary using U.S.-only personnel, creating physical separation of U.S. data from China-based individuals and entities. TikTok represented that the data would be hosted by a U.S. company—Oracle—which would impose data access and controls to ensure physical separation.[235]

513. TikTok's CEO described these changes as creating "what amounts to a firewall" that "seals off protected U.S. user data from foreign access." "American data [is] stored on American soil by an American company overseen by American personnel." This "eliminates the concern" that "US data can be subject to Chinese law."[236]

514. CapCut users were deceived because no such protections were available for data that was uploaded through the CapCut app. As the internal discussions quoted in the press make clear, Defendants' executives were well aware of their deceptive conduct, noting their concern that

---

[234] https://usds.tiktok.com/safeguarding-us-user-data/.

[235] *Id.*

[236] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

CapCut was directly run by ByteDance without any of the data protections that applied to data collected through the TikTok app and worrying that this would be a "lightning rod" if it ever became public.

515. Indeed, the CapCut app was purposefully designed to circumvent any barriers to access to user data by individuals and entities in China. Defendants used TikTok's powerful marketing platform to encourage consumers to sign up for the CapCut app, which lacked the protections for user data that were implemented for the TikTok app. This included encouraging users to switch to the CapCut app even though they may already have downloaded another video editing app such as TikTok or some other video editing app.

516. As commentators observed, "CapCut has capitalized on sister company TikTok being the face of vertical-video platforms. On TikTok, the official CapCut account has nearly 10 million followers, with its corresponding hashtag hosting thousands of billions of views on videos that have used the editing app. ByteDance self-promotes CapCut within the TikTok app using language like, 'Everyone can be a creator by using CapCut. Start creating your cool video today.'"[237] Moreover, videos edited using CapCut that appeared on the TikTok app would show a button along with phrases such as "try this template" or "editing made easy," which directed users to download the CapCut app.[238]

517. Gaining access to the data of users who signed up for the CapCut app, Defendants then proceeded to utilize the CapCut app to collect user data from millions of individuals in the

---

[237] How ByteDance Is Expanding Its Reach Beyond TikTok WithCapCut—One of the Most Popular Apps in America, Time (Apr. 13, 2023).

[238] TikTok's Chinese Parent Has Another Wildly Popular App in the U.S., Wall St. J. (Mar. 19, 2023).

United States without any of the protections for user data that they were forced to implement with the Tiktok app. All of this was achieved without the knowledge of users, who were kept in the dark by Defendants and deceived into giving them access to their data without adequate data protections. Defendants continue to take extensive efforts to avoid public disclosure of the fact that such protections for user data do not exist with the CapCut app.

518. Another way that Defendants sought to hide the fact that CapCut was controlled by executives in China was to set up a Singapore entity, Defendant ByteDance Pte. Ltd., that they represented—contrary to the truth—controlled the CapCut app. Accordingly, on the app store and other stores offering the CapCut app, the entity listed as owning and controlling the app is ByteDance Pte. Ltd. Likewise, CapCut's privacy policy states that the services are "provided and controlled by Bytedance Pte. Ltd."[239] However, as the recent public disclosures make clear, in fact the CapCut app is "directly run by ByteDance executives in China."[240]

519. Defendants repeatedly denied in public (while acknowledging in private) that ByteDance was controlled by the Chinese government. For example, TikTok's CEO Shou Chew testified before Congress that "ByteDance is not owned or controlled by the Chinese government."[241] Likewise, in response to press inquiries, he stated: "The Chinese government does not directly or indirectly have the right to appoint board members or otherwise have specific rights with respect to any ByteDance entity within the chain of ownership or control over the

---

[239] https://www.capcut.com/clause/privacy-policy.

[240] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024).

[241] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

TikTok entity."[242] This is part of a conscious "messaging" strategy, whereby Defendants "[d]ownplay the parent company ByteDance, downplay the China association, downplay AI."[243]

520. Finally, Defendants did not disclose that members of the CCP had access to their facilities, and indeed had significant management roles at the companies in which they could access user data. Nor did they disclose that they were subject to Chinese law that required that they provide access to user data to the Chinese government and CCP.

521. Defendants' omissions, failure to fully and adequately disclose their data practices, and unfair, deceptive and unlawful business practices directly caused Plaintiffs' economic injuries and directly provided Defendants with economic benefits that were wrongfully obtained and which Defendants continue to retain. Had Defendants fully and accurately disclosed their data practices, Plaintiffs would not have downloaded the CapCut app, Plaintiffs would not have incurred economic injuries, and Defendants would not have obtained unjust benefits, including hundreds of millions of dollars in subscription fees, Plaintiffs' valuable data, and significant economic benefits resulting from Defendants' use of that wrongfully-obtained data for targeting advertising, development of artificial intelligence, and other purposes. Plaintiffs relied on Defendants' omissions, and this reliance was justifiable and reasonable.

522. Equity requires disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiffs and the Class.

---

[242] TikTok Responds to Allegations of Unsecured User Data (July 5, 2022), https://www.searchenginejournal.com/tiktok-responds-user-data/456633/.

[243] C. Stokel-Walker, Inside TikTok's Attempts to 'Downplay the China Association', GIZMODO (July 27, 2022), https://bit.ly/3EV8XnY.

523. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, the Plaintiffs and the Class are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants through this inequitable conduct.

## THIRTEENTH CAUSE OF ACTION

### VIOLATION OF ILLINOIS'S BIOMETRIC INFORMATION PRIVACY ACT, 740 ILCS 14/1, *et seq.*
### (On Behalf of the Illinois Plaintiffs and the Illinois Subclass)

524. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

525. In 2008, Illinois enacted the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, et seq. to address the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information." Illinois House Transcript, 2008 Reg. Ses. No. 276. The Illinois Legislature recognized the importance of protecting the privacy of individuals' biometric data, finding that "[b]iometrics are unlike other unique identifiers that are used to access finances or other sensitive information." 740 ILCS 14/5(c). "For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse [and] is at heightened risk for identity theft ...." *Id.* As the Illinois Supreme Court has recognized, through the BIPA, "our General Assembly has codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information." *Rosenbach v. Six Flags Entm't Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019).BIPA protects "biometric identifiers" and "biometric information." Biometric identifiers consist of "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. A "scan" under BIPA means to examine by observation or checking, or systematically

in order to obtain data especially for display or storage. *In re Facebook Biometric Information Privacy Litigation*, No. 15-cv-03747-JD, 2018 WL 2197546, *3 (N.D. Cal. May 14, 2018). "Geometry" under BIPA is the relative arrangement of parts or elements. *Id.* Neither the term "scan" nor the term "geometry" require "actual or express measurements of spatial quantities like distance, depth, or angles." *Id.* Biometric information constitutes "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10.

526. BIPA makes it unlawful for any private entity to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first: (1) informs the subject . . . in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject . . . in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative." 740 ILCS 14/15(b).

527. At all relevant times, the Illinois Plaintiffs were residents of Illinois and each is a "person" and/or a "customer" within the meaning of BIPA. 740 ILCS 14/15(b). The minor Illinois Plaintiffs' legal guardians are their "legally authorized representative[s]" within the meaning of BIPA, and served in such capacity at all times relevant to this action. *Id.*

528. Each Defendant is, and at all relevant times was, a "corporation, limited liability company, association, or other group, however organized," and thus is, and at all relevant times was, a "private entity" under the BIPA. 740 ILCS 14/10.

529. **Section 15(a).** BIPA mandates that a private entity "in possession of biometric identifiers or biometric information" "develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a). But Defendants do not publicly provide any written policy establishing any retention schedule or guidelines for permanently destroying the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information." 740 ILCS 14/15(a).

530. **Section 15(b).** The Illinois Plaintiffs and the Illinois Subclass had their "biometric identifiers," including their face geometry scans and voiceprints, as well as their "biometric information" collected, captured, received, or otherwise obtained by Defendants as a result of the Illinois Plaintiffs' and the Illinois Subclass's use of the CapCut app. 740 ILCS 14/10. In addition, Defendants used Plaintiffs' and Class Members' biometric identifiers and information in operating the CapCut app and in generating significant revenue and profits.

531. At all relevant times, Defendants systematically and surreptitiously collected, captured, received or otherwise obtained the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" without first obtaining signed written releases, as required by 740 ILCS 14/15(b)(3), from any of them or their "legally authorized representatives."

532. In fact, Defendants failed to properly inform the Illinois Plaintiffs and the Illinois Subclass, or any of their parents, legal guardians, or other "legally authorized representatives," in writing (or in any other way) that the Illinois Plaintiffs' and the Illinois Subclass's "biometric

identifiers" and "biometric information" were being "collected or stored" by Defendants. Nor did Defendants inform the Illinois Plaintiffs and the Illinois Subclass, or any of their parents, legal guardians, or other "legally authorized representatives," in writing of the specific purpose and length of term for which the Illinois Plaintiffs' and the Illinois Subclass's "biometric identifiers" and "biometric information" were being "collected, stored and used" as required by 740 ILCS 14/15(b)(1)-(2). Nor did Defendants obtain from the Illinois Plaintiffs or the Illinois Subclass the specific written release required by 740 ILCS 14/15(b)(3). The Illinois Plaintiffs did not provide consent to the collection or use of biometric identifiers or biometric information.

533. Defendants did not properly inform the Illinois Plaintiffs and the Illinois Subclass in writing of this collection, the specific purpose and length of term for which these biometric identifiers were collected, stored or used, and without obtaining the specific written release as required by BIPA.

534. Indeed, Defendants have unlawfully collected, possessed, stored, disseminated, used and profited from Illinois Plaintiffs' and the Illinois Subclass's biometric identifiers (such as face geometry scans and voiceprints of CapCut users), and the biometric information derived therefrom, in multiple ways.

535. First, Defendants' BIPA and other biometrics-related violations are established by the functionality and code of the cloud-based CapCut app itself, which takes scans of users' face geometry and captures users' voiceprints.

536. The CapCut app uses an advanced video editor and camera face filters. Employing this technology, CapCut users edit their videos to, among other things, morph their face into another face; change the size, shape, height and width of their face; change particular features of

their face (e.g., eyes, ears, nose, lips, mouth, cheeks), including the size and shape of such facial features; and so on. Users thereby create videos in which their faces and specific facial features take on a variety of dimensions and appearances. The CapCut app examines, detects and localizes the face and the arrangement of its various parts (e.g., the eyes, ears, nose, lips, mouth, cheeks) relative to the other parts, and then tracks the face and its various parts (and their relative arrangement) while in motion.

537. Indeed, as evidenced by the CapCut app's code and as discussed above, the CapCut app collects a variety of personally identifiable information from users that can be used to identify individual users such as unique device identifiers, addresses, and other personally identifiable information. The CapCut app's collection of biometric identifiers and biometric information is therefore consistent with the general design and functioning of the app.

538. Second, Defendants' BIPA and other biometrics-related violations are further established by their ongoing work in China, which includes the application of facial recognition technology to CapCut users' videos by highly-trained engineers skilled in computer vision, convolutional neural network and machine learning.

539. Defendants' artificial intelligence work within China, which is closely tied to their United States operations, is among the most sophisticated in the world. "ByteDance has received accolades for being a top AI innovator from CBInsight who recognized the company on its 2018 AI 100 List as well as from Fast Company, who placed it on its most innovative companies list. In 2016, it founded its AI Lab, a research division led by Wei-Ying Ma, formerly of Microsoft Research

Asia. The Lab's primary focus has been on developing innovative technologies to enhance ByteDance's content platforms."[244]

540. Defendants employ engineers in fields such as computer vision, convolutional neural network, and machine learning, all of which are used to generate the face geometry scans that Defendants derive from the videos of CapCut users. Defendants' China-based engineering team includes multiple researchers who perform work in these areas.

541. For example, Wei-Ying Ma served as a Beijing Douyin Vice President and led the AI Lab in Beijing since 2017. He is known for having developed an image retrieval system called NeTra, which is a tool for navigating very large image databases. Ma delivered a keynote speech at a Taipei Web Conference in which he acknowledged that Defendants use facial recognition technology and face geometry scans on their enormous and ever-growing database of face images from user videos. During his speech, Ma used visual representations that show facial recognition and face geometry scans being performed on specific regions of face images, describing the "video understanding tasks" and analysis that are performed, and how they "convert this video into a structural representation."[245]

542. Defendant ByteDance processes and analyzes users' videos received from around the world at its facilities in China. *TechNode* reported that one of its vice presidents publicly told a gathering that ByteDance required more chips to continue uploading, processing and analyzing its vast database of videos accumulated from around the world. This vice president stated that

[244] https://www.forbes.com/sites/bernardmarr/2018/12/05/ai-in-china-how-buzzfeed-rival-bytedance-uses-machine-learning-to-revolutionize-the-news/?sh=16a0c3ed40db.

[245] https://www.youtube.com/watch?v=2D29f4-J2mw (at 18:18 – 19:17).

"'Bytedance has the largest number of users in the world whose videos need to be analyzed and processed and uploaded, and we are purchasing a large number of chips.'"[246]

543. As the United States National Security Adviser noted, Defendants are "getting facial recognition" on millions of Americans as well as mapping their relationships, and then sending all of this "intimate data" back to China for processing through their apps.[247]

544. The potential applications and uses of this data are reflected in patent applications filed by Defendants' sister company ByteDance Network Technology Co., Ltd. The underlying technology in these patent applications involves age, race, and emotion detection through face images, including those derived from videos. The specific patent applications address topics such as facial image identification;[248] use of images and a facial recognition model to determine ethnic information, race and age; [249] use of face and body images, and a facial recognition model, to determine age; [250] use of image and audio data sets to determine age; [251] use of face images extracted

[246] https://technode.com/2018/04/24/bytedance-jinri-toutiao-ai-chips/.

[247] https://www.forbes.com/sites/zakdoffman/2020/07/15/tiktok-trump-warning-facial-recognition-data-sends-china-ban/?sh=33766e422dea.

[248] Publication No. WO2020037963A1, https://patents.google.com/patent/WO2020037963A1/en.

[249] Publication No. CN110046571A, available at https://patents.google.com/patent/CN110046571A/en.

[250] Publication No. CN109993150A, available at https://patents.google.com/patent/CN109993150A/zh.

[251] Publication No. CN110321863A, available at https://patents.google.com/patent/CN110321863A/en.

from videos to determine age;[252] facial expression recognition methods;[253] use of facial images extracted from videos to determine emotions;[254] and use of face images extracted from video segments to identify a face characteristic.[255]

545. ByteDance Network Technology Co., Ltd. has filed additional patent applications for a method for voice extraction involving voiceprints,[256] a voice recognition method,[257] and an age recognition method based on audio.[258] This is consistent with reporting that Defendant ByteDance "uses various AI technologies in its services [including] voice recognition ...."[259] During Wei-Ying Ma's keynote speech at a Taipei Web Conference (above), he discussed the use of audio to identify speakers and published a slide during his speech entitled "Speaker Identification" that stated: "Detect identity, age, gender of speakers."[260]

546. As commentators have recognized, "TikTok's owner, Beijing-based ByteDance, is a hit app factory that has spent the last decade learning how to use artificial intelligence, machine

---

[252] Publication No. CN110163170A, available at https://patents.google.com/patent/CN110163170A/en; Publication No. CN110188660A, available at https://patents.google.com/patent/CN110188660A/en.

[253] Publication No. CN110097004A, available at https://patents.google.com/patent/CN110097004A/en.

[254] Publication No. CN110175565A, available at https://patents.google.com/patent/CN110175565A/en.

[255] Publication No. CN110163171A, available at https://patents.google.com/patent/CN110163171A/en.

[256] Publication No. CN110503961A, available at https://patents.google.com/patent/CN110503961A/en.

[257] Publication No. WO2019214628A1, available at https://patents.google.com/patent/WO2019214628A1/en.

[258] Publication No. CN110335626A, available at https://patents.google.com/patent/CN110335626A/en.

[259] https://medium.com/syncedreview/intel-and-bytedance-partner-on-ai-lab-b678036cbda4.

[260] https://www.youtube.com/watch?v=2D29f4-J2mw (at 30:04).

learning, and facial recognition to figure out what people like and serve them endless streams of entertainment tailored to their interests and emotions."[261]

547. Nor is this the first time that ByteDance has used unscrupulous methods to advance the development of its artificial intelligence technology. Recently, OpenAI suspended ByteDance's account following reports that ByteDance was "secretly" using OpenAI's "GPT" artificial intelligence technology to build its own rival chatbot service.[262] ByteDance has been building its own large-language model as part of a "high-priority" and "secretive" internal initiative. Reports indicate that ByteDance has used OpenAI's "GPT" to both train its model and evaluate its development, which would violate OpenAI's terms of service.[263]

548. Third, Defendants' BIPA and other biometrics-related violations are also established by Defendants' legal and political obligations to accumulate and share data, including biometric data, to assist the Chinese government in developing artificial intelligence and population surveillance and control technologies.

549. Finally, many companies offering video editors expressly acknowledge that such apps collect biometric identifiers and biometric information and at least attempt to make required disclosures and take other actions in compliance with statutes like BIPA. For example, in addition to the TikTok privacy policy which acknowledges that the app collects biometric information, the privacy policy for Adobe's video and photo editor states that it collects:

---

[261] https://www.bloomberg.com/news/newsletters/2019-10-29/worries-that-tiktok-is-a-threat-to-national-security-have-merit.

[262] https://nypost.com/2023/12/18/business/openai-suspends-bytedances-account-after-it-allegedly-used-gpt-to-build-rival-ai-product-report/.

[263] *Id.*

> Biometric identifiers or information as defined under US laws (e.g., faceprints and voiceprints from your user Content, as defined in the Adobe General Terms of Use) and precise geolocation. …[264]

Similarly, the privacy policy for the Captions video editor states:

> To enable certain features, such as our augmented reality features and voice to text, we may generate biometric information from your face or voice.[265]

Accordingly, there is a general recognition that video and photo editors collect biometric identifiers and biometric information such as scans of face geometry and voiceprints. Nonetheless, Defendants failed to make the required disclosures under BIPA.

550. **Section 15(e).** BIPA also commands private entities "in possession of a biometric identifier or biometric information" to: (1) store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information. 740 ILCS 14/15(e). Based on the facts alleged herein, including Defendants' lack of an adequate public written policy, their failure to inform CapCut users that Defendants obtain such users' "biometric identifiers" and "biometric information," their failure to obtain written consent to collect or otherwise obtain CapCut users' "biometric identifiers" and "biometric information," and their unauthorized dissemination of CapCut users' "biometric identifiers" and "biometric information," Defendants have violated this provision too. In addition, Defendants'

---

[264] Adobe Privacy Policy, https://www.adobe.com/privacy/policy.html.

[265] Captions Privacy Policy, https://www.captions.ai/legal/privacy#:~:text=Information%20We%20Automatically%20Collect&text=Biometric%20Information%3A%20To%20enable%20certain,from%20your%20face%20or%20voice.

data processing and storage practices have made that data available to third parties, including third parties based in China.

551. Defendants violated Section 15(e)'s requirements to "(1) store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and (2) store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information" in multiple ways. 740 ILCS 14/15(e).

552. Failure to Comply With Reasonable Industry Standards. Various organizations such as the National Institute of Standards and Technology (NIST) and International Organization for Standardization (ISO) have developed standards to safeguard sensitive data, including biometric data.[266] In addition, compliance with the reasonable standard of care in the industry includes compliance with various laws and regulations such as the CCPA governing sensitive information, including biometric data and information.

553. One requirement of the reasonable standard of care in the industry is to obtain explicit informed consent before collecting biometric data, outlining how the data will be used and stored. An organization collecting biometric information has an obligation to "[p]rovide the subject the means to control his/her biometric information during its lifecycle. This means that the biometric system owner shall obtain consent when biometric information is collected."[267] This is an important safeguard so that companies publicize the measures they take to safeguard biometric

[266] *See, e.g.*, https://www.nist.gov/speech-testimony/standards-biometric-technologies.

[267] ISO/IEC 24745:2022(E), Information security, cybersecurity and privacy protection — Biometric information protection at 25 (2022).

data and information so that consumers know that they are reliable before they consent to provide access to their data. If the measures are inadequate, consumers can prevent their data from being collected and subjected to unsafe storage and use conditions. Here, however, Defendants provided no such notice and description of how they store and use biometric data and information. In particular, users were not informed that their data could be accessed by companies in China, that numerous members of the CCP were working onsite at these companies, that CapCut was run directly out of China, or that Chinese law required that the government and CCP be given access to user data.

554. Organizations also have an obligation under the reasonable standard of care to "[p]rovide a mechanism for consent withdrawal" by users who have had their biometric data collected.[268] Here, however, because Defendants deny that they collect biometric data or information, they provide no such mechanism.

555. A second requirement of the reasonable standard of care in the industry is that companies collect only that biometric data that is necessary and use it only for the specified purpose, avoiding unnecessary data aggregation. For example, the CCPA provides that "[a] business shall not collect additional categories of sensitive personal information or use sensitive personal information collected for additional purposes that are incompatible with the disclosed purpose for which the sensitive personal information was collected without providing the consumer with notice consistent with this section." Cal. Civ. Code § 1798.100(a)(2). It further states that "A business' collection, use, retention, and sharing of a consumer's personal information shall be reasonably necessary and proportionate to achieve the purposes for which the

[268] *Id.* at 26.

personal information was collected or processed, or for another disclosed purpose that is compatible with the context in which the personal information was collected, and not further processed in a manner that is incompatible with those purposes." *Id.* § 1798.100(c). While some collection of biometric data and information is inherent in a video editor like the CapCut app, and required for its functions, as pleaded above, Defendants use data for other purposes, violating the reasonable standard of care in the industry. Moreover, "[u]nauthorized collection of biometric information without justification has strong impacts on the biometric information privacy of the individual. Even if an organization had the subject's consent to create BRs [biometric references], it should still only extract the minimum amount of biometric information necessary to fulfill the intended purposes."[269]

556. A third requirement of the reasonable standard of care in the industry is that companies implement measures for secure storage and transmission. Among other things, companies should implement robust encryption methods for both stored and transmitted biometric data, ensuring that it is unreadable by unauthorized parties. Here, Defendants do not indicate that they encrypt biometric data and information, and indeed they continue to take the position that they do not collect such information. Moreover, Defendants acknowledge that "the transmission of information via the internet is not completely secure" and accordingly state that they "cannot guarantee the security of … information transmitted via the Services."[270]

557. Not only should biometric data and information be encrypted but the reasonable standard of care in the industry requires that it be stored separately from other personal identifying

[269] *Id.* at 24.

[270] https://www.capcut.com/clause/privacy-policy.

information. "Organizations should keep the collected biometric information logically or physically separate from the subject's other PII to reduce the impact on the subject's privacy of a compromise of the combined information."[271]

558. A fourth requirement of the reasonable standard of care in the industry is that companies limit access to biometric data and implement access controls and authentication for biometric data and information. Companies should limit access to biometric data to only those individuals and entities with a need for such data and require strict authentication mechanisms to prevent unauthorized access. Companies should not put users' biometric data at unnecessary risk. Moreover, "[w]hen transferring information biometric information to other organizations, each party involved in the processing of the biometric information shall agree to be bound by contract or obligation to protect such information. The transfer of biometric information shall only take place with the consent of the subject unless consent is implied by the provision of a service requested by the subject."[272]

559. Here, Defendants have violated the reasonable standard of care in multiple ways. The reasonable standard of care within the industry required Defendants to take measures to prevent access to Defendants' biometric identifiers and biometric information by individuals or entities in jurisdictions with laws that are less protective of such data, including China. Defendants themselves recognized that this was the standard of care, implementing an elaborate system to protect TikTok user data from exposure to individuals and entities in China (including the CCP), called Project Texas, which entailed among other things, creating a new U.S.-based entity isolated

[271] ISO/IEC 24745:2022(E) at 24.

[272] https://www.capcut.com/clause/privacy-policy.

from Defendants' China-based entities, hosting that data with Oracle solely in the United States and setting up barriers to access and the transfer of that data to individuals or entities in China.

560. Indeed, Defendants claim that they have spent more than $1.5 billion to safeguard TikTok user data from access by individuals and entities in China. Moreover, as noted, executives at TikTok specifically expressed concern that such measures were not taken with respect to CapCut user data, given that CapCut was being run directly out of China. Defendants recognized that in order to comply with the reasonable standard of care they had an obligation to take such measures. However, they did not do so with respect to CapCut user data.

561. Moreover, Defendants failure to restrict access so that ByteDance entities in China, in particular, violates the reasonable standard of care in the industry. As noted, Congress made a determination that the ByteDance entities in China are so inherently untrustworthy that legislation should require that they divest interest in any U.S.-based apps, including TikTok and CapCut, so that there is no possibility that these companies would have access to U.S. user data. The reasons for this conclusion are fully documented in the congressional record, which notes among other things the history of privacy violations by these companies and their close relationship with the CCP, including a standing committee of the CCP and more than 130 members of the CCP on site at ByteDance. While Defendants have attempted to challenge this factual record in court, they have failed. Both the U.S. Court of Appeals for the D.C. Circuit and the Supreme Court of the United States concluded that the risks to user data posed by Defendants, including specifically risks to CapCut user data, supported legislation requiring that Defendants divest their interest in all apps that collect U.S. user data, including CapCut.

562. However, even if there were any justification for allowing access to users' biometric data by individuals or entities in China, Defendants violated reasonable industry standards by failing to obtain users' consent to having their data made accessible by individuals or entities located in China, much less members of the CCP located in China.

563. A fifth requirement of the reasonable standard of care in the industry is that companies conduct regular security audits to identify vulnerabilities and ensure systems are up-to-date with the latest security patches in order to protect biometric data and information. Here, again, because Defendants continue to deny that they collect biometric data and information there is no evidence that they have taken any measures to specifically address the safety and security of users' biometric data and information.

564. A sixth requirement of the reasonable standard of care in the industry is that companies establish clear policies for retention of biometric data and information, ensuring data is retained only for the necessary period and securely destroyed when no longer needed. Similarly, the CCPA provides that businesses must disclose "[t]he length of time the business intends to retain each category of personal information, including sensitive personal information, or if that is not possible, the criteria used to determine that period provided that a business shall not retain a consumer's personal information or sensitive personal information for each disclosed purpose for which the personal information was collected for longer than is reasonably necessary for that disclosed purpose." Cal. Civ. Code § 1798.100(a)(3). Here, Defendants deny that they collect biometric information, and accordingly there is no evidence they have established retention policies for biometric data or imposed any limits on the retention of such data and information.

565. A seventh requirement of the reasonable standard of care in the industry is transparency and accountability. Consumers should be provided with clear and easy-to-understand information about how their biometric data is collected, used, and maintained, and company employees should be held accountable for data handling practices. Here, however, Defendants are not transparent: they deny they collect biometric data and information and conceal that fact from the public. In addition, because they deny that they collect biometric data and information, there is no evidence they have adequate procedures in place to hold employees accountable for implementing appropriate procedures to safeguard such sensitive data.

566. Finally, an eighth requirement of the reasonable standard of care in the industry is that companies adhere to relevant regulations and laws for the protection of users' biometric data, such as the CCPA, EU's General Data Protection Regulation, and BIPA. Here, however, Defendants deny that they collect biometric data or information and thus there is no evidence that they even attempt to comply with applicable laws and regulations governing biometric data and information.

567. Failure to Protect CapCut Users' Biometric Data in a Manner that is "the Same As Or More Protective" Than Other Sensitive Data. Defendants have also violated the second prong of Section 15(e), which requires that Defendants "store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information." Defendants violated this provision by failing to adopt the "same" or "more protective" measures to store, transmit and protect CapCut users' biometric data than they did for biometric and other user data collected from TikTok users. As Defendants' executives recognized,

CapCut user data (including biometrics) was not subject to the "same" or "more protective" measures than TikTok users' data. To be clear, Plaintiffs do not believe that the measures Defendants have taken to safeguard TikTok users' data are sufficient to meet industry standards. Indeed, the Committee on Foreign Investment in the United States (CFIUS) concluded after "detailed" and "intensive" analysis that the proposed measures were "insufficient", and Congress likewise concluded they were inadequate in extending the legislative ban to the TikTok app as well as CapCut.[273] Nonetheless, the record demonstrates that the measures Defendants have taken to protect CapCut users' data are not the "same" or "more protective" than those Defendants have taken to protect TikTok users' data: they are demonstrably ***less*** protective than the extensive measures Defendants have taken with respect to TikTok users' data. Accordingly, Defendants also violated Section 15(e) in this separate and independent way.

568. Defendants also violated the reasonable standard of care in the industry by retaining Plaintiffs' biometric data and information for longer than necessary to operate the CapCut app.

569. This is particularly concerning now that the CapCut app may cease to operate in the United States. Injunctive relief should be implemented to ensure that, in the event the app is no longer available, all user data is destroyed and not retained by any of Defendants, their affiliates, officers or employees.

570. Defendants' violations of Section 15(e) are further confirmed by the record amassed by Congress in support of legislation barring distribution of the CapCut app in the United States. As Congress concluded, the public threat of having private and personal

[273] *See Garland*, 122 F.4th at 942-44.

information of CapCut users in the hands of Defendants is significant and was significant enough in their view that they sought to prevent Defendants from accessing private and personal information of individuals in the United States by barring distribution of the CapCut app in the United States. This congressional determination further demonstrates that Defendants have failed to comply with the reasonable standard of care in the industry by failing to protect all of Plaintiffs' personal and private information and data, including Plaintiffs' biometric information and data.

571. Defendants recklessly or intentionally violated each of BIPA's requirements and infringed the Illinois Plaintiffs' and the Illinois Subclass's rights to keep their immutable and uniquely identifying biometric identifiers and biometric information private. As individuals subjected to each of Defendants' BIPA violations above, the Illinois Plaintiffs and the Illinois Subclass are and have been aggrieved. 740 ILCS 14/20.

572. On behalf of themselves and the Illinois Subclass, the Illinois Plaintiffs seek: (1) injunctive and equitable relief as is necessary to protect the interests of the Illinois Plaintiffs and the Illinois Subclass by requiring Defendants to comply with BIPA's requirements; (2) $1,000.00 or actual damages, whichever is greater, for each negligent violation of BIPA by Defendants; (3) $5,000.00 or actual damages, whichever is greater, for each intentional or reckless violation of BIPA by Defendants; and (4) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses. 740 ILCS 14/20(1)-(4).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief against Defendants as set forth below:

A. Entry of an order certifying the proposed class and subclasses pursuant to Federal Rule of Civil Procedure 23;

B. Entry of an order appointing Plaintiffs as representatives of the class and subclasses;

C. Entry of an order appointing Plaintiffs' counsel as co-lead counsel for the class and subclasses;

D. Entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

i. enjoining Defendants, their affiliates, associates, officers, employees and agents from transmitting CapCut user data and content to China or to other locations or facilities where such CapCut user data and content is accessible from within China;

ii. enjoining Defendants, their affiliates, associates, officers, employees and agents from taking CapCut users' private draft videos (including any frames, digital images or other content from such videos) and biometric identifiers and information, including scans of facial geometry and voiceprints, without advance notice to, and the prior written consent of, such CapCut users or their legally authorized representatives (and, for the Illinois Subclass, without being in compliance with BIPA);

iii. enjoining Defendants, their affiliates, associates, officers, employees and agents from taking physical/digital location tracking data, device ID data, electronic communications, personally identifiable data and any other CapCut user data and content except that for which appropriate notice and consent is provided and which Defendants can show to be reasonably necessary for the lawful operation of the CapCut app within the United States;

iv. enjoining Defendants from taking and transmitting more private and personally-identifiable data than is reasonably necessary for operation of the Defendants' apps;

v. enjoining Defendants from taking and transmitting to anyone else the above-described user data;

vi. mandating that Defendants, their affiliates, associates, officers, employees and agents recall and destroy the CapCut user data and content already taken in violation of law;

vii. mandating that Defendants, their affiliates, associates, officers, employees and agents remove from the CapCut app all software development kits based in China or whose data is otherwise accessible from within China;

viii. mandating that Defendants, their affiliates, associates, officers, employees and agents implement protocols to ensure that no CapCut user data and content is transmitted to, or otherwise accessible from within, China;

ix. mandating that Defendants, their affiliates, associates, officers, employees and agents hire third-party monitors for a period of at least three years to ensure that all of the above steps have been taken; and

x. mandating that Defendants, their affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court and counsel for the Plaintiffs in the form of a declaration under oath that the above steps have been satisfied.

E. Entry of judgment in favor of each Class and Subclass Member for damages suffered as a result of the conduct alleged herein, including compensatory, statutory, and punitive damages, restitution, and disgorgement, to include interest and prejudgment interest;

F. Award Plaintiffs reasonable attorneys' fees and costs; and

G. Grant such other and further legal and equitable relief as the court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated this 4th day of April, 2025

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Jeannie Evans
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Douglas G. Smith
ALPHEUS LLC
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@alpheusllc.com

*Attorneys for Plaintiffs and the Class*