**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EVELIA RODRIGUEZ; ERIKKA WILSON; A.N., A MINOR; AIDEN GUNDLACH; ZACHARY BUCKUS; RAYMON MARINES; J.V. A MINOR; DOMINICK POLIZZI; and ROBERT KOPLOS on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BYTEDANCE, INC.; BEIJING DOUYIN INFORMATION SERVICE CO. LTD. F/K/A BEIJING BYTEDANCE TECHNOLOGY CO. LTD.; BYTEDANCE LTD.; BYTEDANCE PTE. LTD.; BEIJING BYTEDANCE TECHNOLOGY CO. LTD.; AND TIKTOK, INC. F/K/A MUSICAL.LY, INC.,<br><br>Defendants. | Case No. 1:23-CV-04953<br><br>Judge Georgia N. Alexakis |

**PLAINTIFFS' MOTION FOR ALTERNATIVE SERVICE OF PROCESS**
**ON CHINA-BASED DEFENDANTS**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

BACKGROUND ........ 2

I. ByteDance's China-Based Operations ........ 2

II. Service of the China-Based Defendants ........ 7

ARGUMENT ........ 11

I. Federal Rule of Civil Procedure 4(f)(3) Authorizes Service Via Email on the China-Based Entities' Affiliates and/or Their U.S.-Based Counsel ........ 11

II. Service By Email Is Particularly Appropriate Under the Circumstances Here. ........ 14

CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1025 W. Addison St. Apts. Owner, LLC v. Grupo Cinemex, S.A. de C.V.*,
2021 WL 2136073 (N.D. Ill. May 26, 2021) ....................11

*Ballinger v. Top Swords, Inc.,*.
2018 WL 6137617 (N.D. Ga. Sept. 11, 2018) ....................8

*Bowen v. Li*,
2023 WL 2346292 (S.D. Fla. Mar. 3, 2023) ....................11

*In re Cathode Ray Tube Antitrust Litig.*,
2008 WL 4104341 (N.D. Cal. Sept. 3, 2008) ....................13

*Chen v. P'ships and Unincorp. Ass'ns Identified on Schedule A*,
2025 WL 47972 (N.D. Ill. Jan. 8, 2025) ....................2, 12

*FKA Distributing Co., LLC v. Yisi Tech. Co., Ltd.*,
2017 WL 4129538 (E.D. Mo. Sept. 19, 2017) ....................8, 12

*Fourte Int'l Ltd. BVI v. Pin Shine Indus. Co., Ltd.*,
2019 WL 246562 (S.D. Cal. Jan. 17, 2019) ....................12

*In GLG Life Tech Corp. Sec. Litig.*,
287 F.R.D. 262 (S.D.N.Y. 2012) ....................13

*Jackson Lab. v. Nanjing Univ.*,
2018 WL 615667 (D. Me. Jan. 29, 2018) ....................12

*Karsten Mfg. Corp. v. Store*,
2018 WL 8060707 (S.D. Fla. July 26, 2018) ....................12

*Keck v. Alibaba.com, Inc.*,
2017 WL 10820533 (N.D. Cal. Aug. 19, 2020) ....................12

*Leo Middle East FZE v. ZhangEyeglasses*,
2021 WL 11593016 (N.D. Cal. Nov. 2, 2021) ....................8

*Luxottica Grp., S.p.A. v. P'ships*,
391 F. Supp. 3d 816 (N.D. Ill. 2019) ....................12

*MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co., Ltd.*,
2008 WL 5100414 (N.D. Ill. Dec. 1, 2008) ....................12, 13

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)....................14

*NBA Properties, Inc. v. P'ships and Unincorp. Ass'ns Identified in Schedule A*,
549 F. Supp. 3d 790 (N.D. Ill. 2021)....................12, 13

*Oakley, Inc. v. P'ships and Unincorp. Assoc'ns Identified in Schedule "A"*,
2021 WL 2894166 (N.D. Ill. July 9, 2021)....................12, 13

*Ouyeinc Ltd. v. Alucy*,
2021 WL 2633317 (N.D. Ill. June 25, 2021)....................12, 13

*In re Paraquat Prods. Liab. Litig.*,
2021 WL 4775284 (S.D. Ill. Oct. 13, 2021)....................11, 13, 15

*Philip Morris USA Inc. v. Veles Ltd.*,
2007 WL 725412 (S.D.N.Y. Mar. 12, 2007)....................12

*Prod. & Ventures Int'l v. Axus Stationary (Shanghai) Ltd.*,
2017 WL 1378532 (N.D. Cal. Apr. 11, 2017)....................13

*Prof'l Investigating & Consulting Agency, Inc. v. Suzuki*,
2014 WL 48260 (S.D. Ohio Jan. 7, 2014)....................8

*Puris v. TikTok, Inc.*,
No. 1:24-cv-00944 (S.D.N.Y. Feb. 8, 2024)....................4, 5

*Rio Props. v. Riollnt'l Interlink*,
284 F.3d 1007 (9th Cir. 2002)....................14

*Smith v. SMS Group, Inc.*,
2022 WL 15460279 (S.D. Ill. Oct. 27, 2022)....................15

*Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist.*,
482 U.S. 522 (1987)....................15

*Strabala v. Zhang*,
318 F.R.D. 81 (N.D. Ill. 2016)....................11, 12, 13, 15

*Stream SICAV v. Wang*,
949 F. Supp. 2d 264 (S.D.N.Y. 2013)....................13

*Sulzer Mixpac AG v. Medenstar Indus. Co.*,
312 F.R.D. 329 (S.D.N.Y. 2015)....................12

*TikTok Inc. v. Garland*,
122 F. 4th 930 (D.C. Cir. 2024)....................10

*TikTok Inc. v. Garland*,
145 S. Ct. 57 (2025)....................................................................................................10

*TikTok Inc. v. Garland*,
No. 24-1113 (D.C. Cir. July 26, 2024) ..........................................................................5

*TikTok, Inc. v. Garland*,
No. 24-1113 (D.C. Cir. June 20, 2024)...........................................................................3

*Whirlpool Corp. v. Yihanggou Trading Co., Ltd.*,
2021 WL 1837544 (E.D. Tex. May 7, 2021)..................................................................12

*Zisman v. Sieger*,
106 F.R.D. 194 (N.D. Ill. 1985)....................................................................................13

**STATUTES**

Pub. L. No. 118-50, div. H, 138 Stat. 955 ..........................................................................9

## INTRODUCTION

Plaintiffs file this motion seeking the Court's assistance in completing service on the China-based Defendants that have not yet been served.[1] Plaintiffs have served the ultimate parent of the ByteDance group, Defendant ByteDance, Ltd., and Defendants have waived service with respect to Singapore-based Defendant ByteDance Pte. Ltd. as well as all of the U.S.-based Defendants. However, Defendants refuse to waive service with respect to any of the China-based Defendants. As a result, Plaintiffs would need to engage in a lengthy and expensive process to serve these Defendants through the central authority in China, which may take months or years, and may not even be feasible given current events. This issue has become particularly significant given recent developments, including the impending start of discovery and the passage of legislation that would require Defendants to either sell their apps (including CapCut and TikTok) or stop offering them in the United States.[2]

The evidence contained in these Chinese entities' files is likely to be particularly important given that CapCut is "directly run by ByteDance executives in China."[3] Not only are these China-based entities involved in running CapCut's day-to-day operations, but they were heavily involved in the development of the app, which was initially offered solely in China. Moreover, while their ultimate parent has been served, it may be important for the Court to exercise jurisdiction over these entities to ensure that plaintiffs can obtain requested relief,

[1] These are Beijing Douyin Information Service Co. Ltd. f/k/a Beijing ByteDance Technology Co. Ltd. and Beijing ByteDance Technology Co. Ltd.

[2] H.R. 8038, 118th Cong. (2023-2024), Ex. 1.

[3] TikTok Executives Fretted About China Ties of CapCut Editing-App, The Information (2024), https://www.theinformation.com/articles/tiktok-executives-fretted-about-china-ties-of-capcut-editing-app, Ex. 2.

including the deletion of any of plaintiffs' data that was wrongfully obtained—particularly in the event the CapCut app is sold to another party.

Accordingly, Plaintiffs respectfully request that the Court exercise its discretion and authorize alternative service of the China-based Defendants pursuant to FRCP 4(f)(3) through email to the U.S.-based Defendants and their counsel, as other courts have done under similar circumstances. "Courts in this district routinely permit email service in similar circumstances," and the circumstances here are particularly compelling. *See Chen v. P'ships and Unincorp. Ass'ns Identified on Schedule A*, 2025 WL 47972, at *6 (N.D. Ill. Jan. 8, 2025).

## BACKGROUND

### I. ByteDance's China-Based Operations

CapCut is a cloud-based video editing application originally developed in China that allows users to create, edit and customize videos, photos and audio using various templates, filters and visual effects. (Sec. Am. Compl. ¶¶ 1, 53, 55-56, 71, 75.) The CapCut app is owned by ByteDance, one of China's largest technology companies, with direct ties to the Chinese Communist Party (CCP). (*Id.* ¶¶ 27-29, 78.) ByteDance and its China-based affiliates exercise "significant day-to-day control" over CapCut, and directly participate in the operation and marketing of the app in the United States. (*Id.* ¶¶ 34-37, 97-98.)

ByteDance and its China-based affiliates' direct involvement in the operation of CapCut extends back to its origins. In 2017, ByteDance launched the app in China under the brand name Jianying. (*Id.* ¶ 71.) ByteDance extended the app's functionality through, among other things, acquisitions of other Chinese-created technology. (*Id.*) In 2018, for instance, ByteDance purchased the startup Shenzhen Lianmeng Technology, which owned the popular app Faceu, and

integrated the firm's technology into Jianying. (*Id.* ¶¶ 71, 73.) Once it became the de-facto leader in China, ByteDance sought to market the app in the United States.[4] (*Id.*)

ByteDance and its China-based affiliates continue to have a direct role in, and ultimate responsibility for, the operation and marketing of CapCut in the United States. (*Id.* ¶ 36.) As a recent report noted, "ByteDance executive[s] overseeing CapCut are in China."[5] For example, ByteDance recently "announced that its Beijing-based senior executive, Zhang Nan, would … focus primarily on CapCut and its domestic version, Jianying," and "CapCut's product chief, Zhang Xiaoran, is based in Shenzhen, southern China's tech hub."[6] The degree of control by Chinese executives is so great that "[s]ome Tiktok managers have raised questions about CapCut's China-based leadership," noting that "running CapCut out of China could become a lightning rod of criticism for the company."[7] While TikTok claims it spent more than $2 billion to isolate the TikTok app from Chinese access or control and protect user data (a project it calls "Project Texas"), no such measures have been taken with respect to the CapCut app.[8]

Moreover, even with respect to TikTok, the record demonstrates that these efforts have had little effect. Rather, ByteDance and its China-based affiliates are still involved in, and control, operations of their U.S.-based apps, including TikTok. According to reports, "Direction and approvals for all kinds of decision-making, whether it be minor contracts or key strategies,

[4] How Does CapCut Make Money?, https://productmint.com/how-does-capcut-make-money/#:~:text=CapCut%20Make%20Money%3F-,CapCut%20makes%20money%20by%20charging%20users%20for%20premium%20features.,a%20monthly%20or%20yearly%20subscription, Ex. 3.

[5] TikTok Executives Fretted About China Ties of CapCut Editing-App, Information (2024), Ex. 2.

[6] *Id.*

[7] *Id.*

[8] Pet. Br., Doc. #2060743, *TikTok, Inc. v. Garland*, No. 24-1113, at 7-8, 17 (D.C. Cir. June 20, 2024), https://www.courthousenews.com/wp-content/uploads/2024/06/tiktok-ban-brief.pdf.

come from ByteDance's leadership, which is based in China. This results in employees working late hours after long days so they can join meetings with their Beijing counterparts."[9] (*Id.* ¶ 39.)

For example, a June 2022 article in *Buzzfeed News* documented ByteDance's day-to-day control and involvement in its U.S. affiliates' operations, citing leaked audio from more than 80 meetings demonstrating that China-based ByteDance has repeatedly accessed non-public data of U.S. TikTok users. As one insider observed, "Everything is seen in China"; Beijing-based engineers had "access to everything."[10] (*Id.* ¶ 85.) Defendants have since acknowledged that China-based engineers were involved in developing the algorithms used in TikTok and that China-based employees have had access to user data.[11] (*Id.*)

In 2024, the former head of TikTok global business marketing, Katie Puris, made similar allegations in a lawsuit against TikTok, Inc. and ByteDance Ltd. alleging she had been the victim of gender discrimination. According to Ms. Puris, "Despite its attempts to appear independent, TikTok's day-to-day management and business decisions came directly from ByteDance's top-level management in China."[12] While Ms. Puris was an executive at TikTok, Inc., she reported directly to the head of ByteDance in China.[13] Her complaint alleges that Defendant ByteDance "micromanage[d]" her marketing work at Tiktok: "ByteDance leadership questioned and re-

[9] TikTok insiders say social media company is tightly controlled by Chinese parent ByteDance, CNBC (June 25, 2021), https://www.cnbc.com/2021/06/25/tiktok-insiders-say-chinese-parent-bytedance-in-control.html, Ex. 4.

[10] Leaked Audio From 80 Internal TikTok Meetings Shows That US User Data Has Been Repeatedly Accessed From China, Buzzfeed News, June 17, 2021, https://www.buzzfeednews.com/article/emily bakerwhite/tiktok-tapes-us-user-data-china-bytedance-access, Ex. 5.

[11] TikTok, letter to Sens. Blackburn et al. (June 30, 2022), https://www.blackburn.senate.gov/services/files/A5027CD8-73DE-4571-95B0-AA7064F707C1.

[12] Former top TikTok executive sues company for allegedly requiring women to 'remain quiet and humble at all times', Fortune, Feb. 8, 2024, https://fortune.com/2024/02/08/tiktok-executive-lawsuit-bytedance-discrimination-lidong-zhang/, Ex. 6.

[13] Compl., *Puris v. TikTok, Inc.*, No. 1:24-cv-00944 (S.D.N.Y. Feb. 8, 2024), https://www.wigdorlaw.com/wp-content/uploads/2024/02/Puris-v.-TikTok-Complaint.pdf, at ¶ 74, Ex. 7.

analyzed each component of previously approved marketing plans."[14] In an amended complaint, Ms. Puris further alleged that she had been in contact with a senior leader in the United States who told her that China-based control of the platform had become "more extreme" since she left the company and that "they put in leaders that dictate the way they want out of China."[15]

As a recent *Washington Post* story reported based on statements by former and current employees, ByteDance and its China-based affiliates sign off on all major decisions regarding American operations including decisions regarding American users' data:

> According to current and former employees who reportedly spoke with the Washington Post: China remains [TikTok's] central hub for pretty much everything … . Beijing managers sign off on major decisions involving U.S. operations, including from the teams responsible for protecting Americans' data and deciding which videos should be removed. They lead TikTok's design and engineering teams and oversee the software that U.S. employees use to chat with colleagues and manage their work. They're even the final decision-makers on human resources matters, such as whether an American employee can work remotely.[16]
> (Sec. Am. Compl. ¶ 97.)

Thus, the U.S. government recently confirmed that, "[b]ased on both public and classified information, the U.S. intelligence community assessed that ByteDance and TikTok pose a threat to U.S. national security" because, among other things, "[t]he Chinese government's authority over ByteDance enables it to gain access to and exploit [user] information."[17]

One of ByteDance's China-based affiliates that is directly involved in the matters at issue in this case is Defendant Beijing Douyin Information Service Co. Ltd. (Beijing Douyin), a privately-held company headquartered in Beijing that is ultimately owned by Defendant

---

[14] *Id.* ¶¶ 53-54.

[15] Former TikTok Exec Accuses Company Of 'Lying' About China-Based ByteDance's Control, Forbes, https://www.msn.com/en-us/money/companies/former-tiktok-exec-accuses-company-of-lying-about-china-based-bytedance-s-control/ar-BB1lUMJV?ocid=entnewsntp&pc=LCTS&cvid=5d5c1eee191c49c3b449ee494f87a3d6&ei=10, Ex. 8.

[16] As Washington Wavers on TikTok, Beijing Exerts Control, Wash. Post (Oct. 28, 2022), https://wapo.st/3VjMvLV, Ex. 9.

[17] Brief of Respondent, *TikTok Inc. v. Garland*, No. 24-1113, at 15-16, 18 (D.C. Cir. July 26, 2024).

ByteDance Ltd. (*Id.* ¶ 27.) As alleged in the complaint, Beijing Douyin is one of the channels through which the Chinese government and CCP gain access to CapCut user data. Unbeknownst to CapCut users, the Chinese government owns a 1% share of Defendant Beijing Douyin, which has been described as a "golden share" that allows the Chinese government to exercise control over Beijing Douyin.[18] (*Id.*) In China, even such a minority stake in a private company "makes any state-invested enterprise subject to Beijing's influence and control, no matter how small its investment," because "Chinese law already affords the state privileged status in the governance of any corporation for which it is a shareholder."[19] (*Id.*) Beijing Douyin is also involved in ByteDance's research on artificial intelligence, which the complaint alleges profited from the collection of data from CapCut users. (*Id.* ¶ 542.)

Company insiders have also acknowledged that TikTok, which is used to market CapCut in the United States, is "tightly controlled" by Defendant ByteDance and its China-based affiliates.[20] (*Id.* ¶ 39.) Indeed, the level of involvement of ByteDance and its affiliates in the U.S.-based entities is so great, that there is no real corporate separation. According to a report by CNBC: "The former employees who spoke to CNBC said the boundaries between TikTok and ByteDance were so blurry as to be almost non-existent."[21] "The lines are so indistinct that

[18] TikTok parent ByteDance has special stock owned by China's government. Here's how "golden shares" give Beijing influence over the social-media giant, Business Insider, Mar. 29, 2023, https://markets.businessinsider.com/news/stocks/tiktok-ban-bytedance-golden-shares-chinese-government-communist-party-board-2023-3, Ex. 10.

[19] U.S.-China Economic and Security Review Commission, 2021 Report to Congress, at 9 (Nov. 2021).

[20] TikTok insiders say social media company is tightly controlled by Chinese parent ByteDance, CNBC, June 25, 2021, https://www.cnbc.com/2021/06/25/tiktok-insiders-say-chinese-parent-bytedance-in-control.html, Ex. 4.

[21] *Id.*

multiple employees described having email addresses for both companies. One employee said that recruiters often find themselves looking for candidates for roles at both companies."[22]

Other reports from former employees are in accord. For example, another recent report quoted employees as stating: "'The Chinese execs, they're in control.' … 'The American execs are there to smile, look pretty, push away criticism. But ByteDance is still calling the shots behind the scenes.'"[23] (*Id.* ¶ 98.) As a former TikTok employee acknowledged (as reported in the *Wall Street Journal*): "We're a Chinese company … We answer to China."[24] (*Id.* ¶ 96.) This record demonstrates that the China-based entities were significantly involved in, and are in possession of significant information regarding, the events alleged in the complaint.

## II. Service of the China-Based Defendants

Nonetheless, Defendants steadfastly refuse to waive service for the China-based entities. In their complaint, Plaintiffs named six Defendants, two of which are China-based entities that have not yet been served. As described in the first status report to the Court, after the complaint was filed, Defendants waived service on behalf of the two U.S.-based entities, ByteDance, Inc. and TikTok, Inc., as well as a Singapore-based entity, ByteDance Pte. Ltd., that is listed as offering CapCut in various app stores in the United States. (ECF No. 14, at 5.) Plaintiffs were also able to serve ByteDance Ltd., the ultimate parent of all the Defendants, which is incorporated in the Cayman Islands. However, Defendants have refused to waive service for the two Defendants based in China—Beijing Douyin Information Service Co. Ltd. and Beijing ByteDance Technology Co. Ltd.—even after Plaintiffs served ByteDance Ltd., which is the

[22] *Id.*

[23] How China Got Our Kids Hooked on 'Digital Fentanyl', Common Sense (Nov. 16, 2022), https://bit.ly/3VLbUhG, Ex. 11.

[24] TikTok Looking at Ways to Shake Off Its Ties to China, WSJ, Nov. 18, 2019, https://www.wsj.com/articles/tiktok-looking-at-ways-to-shake-off-its-ties-to-china-11574073001, Ex. 12.

ultimate parent of these China-based entities. Defendants assert that the China-based companies are "not proper parties" because they allegedly "do not publish or operate the CapCut app in the United States." (10/20/23 email, Ex. 13.) The record refutes this assertion, which in any event is more properly raised in opposition to the complaint, not as a basis for refusing service.

As a result, Plaintiffs would be required to serve these Defendants through the Chinese central authority, which would be unreasonably time-consuming and complex. Indeed, in discussing this issue with Defendants' counsel, they have indicated that plaintiffs in other litigation against TikTok have been unable to effect service on China-based entities through the Chinese central authority. Service requires that all documents be written in Mandarin Chinese and would likely require amendment of the complaint. (Tucker Decl. ¶¶ 7-8, Ex. 14.)[25] The documents are then provided to a central authority, which may take months or years to serve them. (*Id.* ¶ 9 (service takes 5-8 months, but can take more than a year)); *Ballinger v. Top Swords, Inc.*,.2018 WL 6137617, at *3 (N.D. Ga. Sept. 11, 2018) (service in China "routinely took more than a year"); *FKA Distributing Co., LLC v. Yisi Tech. Co., Ltd.*, 2017 WL 4129538, at *2 (E.D. Mo. Sept. 19, 2017) ("China has been taking up to one year or more to process documents served under the Hague Convention"); *Leo Middle East FZE v. ZhangEyeglasses*, 2021 WL 11593016 (N.D. Cal. Nov. 2, 2021) (citing service delays of one to two years in China); *Prof'l Investigating & Consulting Agency, Inc. v. Suzuki*, 2014 WL 48260, at *1 (S.D. Ohio Jan. 7, 2014) (noting service delays of one and a half years in China). Even then, there is no guarantee that service will be successful: "A party may spend months, or years, attempting to serve process in China without any success." (Tucker Decl. ¶ 13, Ex. 14.)

[25] *See* HCCH, China-Central Authority and practical information, https://www.hcch.net/en/states/authorities/details3/?aid=490.

As the parties indicated in their first status report to the Court, plaintiffs engaged in discussions with Defendants in an attempt to get them to waive service for the China-based Defendants, underscoring their "'duty to avoid unnecessary expenses of serving the summons' pursuant to Federal Rule of Civil Procedure 4(d)(1)." (ECF No. 14, at 5.) The parties agreed to mediate the dispute while they briefed the motion to dismiss and continued to discuss the issue of service; the Court scheduled the next status hearing on October 18, 2024. (ECF No. 20.) However, on August 23, 2024, the case was reassigned, and the October hearing date was stricken. (ECF No. 52.) The Court has now ruled on the motion to dismiss, and the parties have not come to a resolution. Defendants confirmed in discussions before and during the April 17, 2025 status hearing that they will not waive service of the China-based Defendants.

Moreover, intervening events have made it even more critical that service on these remaining Defendants be completed at this juncture. Congress recently passed, and President Biden signed, legislation—the Protecting Americans from Foreign Adversary Controlled Applications Act (the "Divestiture Act")—that requires Defendants to either divest their apps, including both TikTok and CapCut, or cease offering them in the United States.[26]

In passing the Act, Congress found, among other things, that China is "constructing 'massive databases of Americans' personal information' and that 'ByteDance Ltd. has close ties to the CCP, including a cooperation agreement with a security agency and over 130 CCP members in management positions.'"[27] As the Chair of the Committee responsible for drafting the legislation observed, CapCut, in particular, is "spying [on users] by design."[28]

[26] *See* Pub. L. No. 118-50, div. H, 138 Stat. 955.

[27] H.R. 118-417, 118th Cong. 2d Sess., at 7, https://www.congress.gov/118/crpt/hrpt417/CRPT-118hrpt417.pdf, Ex. 1.

[28] Opening Statement of Chair Cathy McMorris Rodgers (Mar. 7, 2024), https://www.congress.gov/118/meeting/house/116945/documents/HHRG-118-IF00-MState-M001159-20240307.pdf.

While Defendants challenged the litigation in the courts, they were unsuccessful in doing so. After an original proceeding in which the court accepted evidence and expert testimony, the D.C. Circuit rejected Defendants' arguments, concluding, among other things, that Defendants had failed to establish that the government's national security concerns regarding the CapCut app and its data collection practices were unsupported. The court found that, "[g]iven the Government's well-supported concerns about ByteDance, it was necessary for the Act to apply to all ByteDance entities." *TikTok Inc. v. Garland*, 122 F. 4th 930, 965 (D.C. Cir. 2024). The court further found that "the petitioners fail to demonstrate that neither of the Government's two national security concerns implicate CapCut." *Id.*

The court observed that the "PRC maintains a powerful Chinese Communist Party committee 'embedded in ByteDance' through which it can 'exert its will on the company.' As of 2022, that committee 'was headed by the company's chief editor and comprised at least 138 employees at its Beijing office, including senior company managers.'" *Id.* at 955. Accordingly, it concluded that "the Government's concerns [that user data would be shared with the Chinese government and CCP] are well founded, not speculative." *Id.* at 957. The Supreme Court affirmed the D.C. Circuit's ruling. *TikTok Inc. v. Garland*, 145 S. Ct. 57 (2025).

Accordingly, while President Trump has extended the deadline for divestiture under the legislation until May 10, 2025, by the time the China-based entities are served through the Chinese central authority, they may no longer be involved with CapCut and/or operations in the United States. Defendants have assured plaintiffs that they will not object to discovery from these entities. Nonetheless, to the extent disputes emerge, it will not be feasible to serve these companies through the Chinese central authority without unnecessarily delaying the proceedings. Moreover, in order to ensure the enforcement of injunctive relief requested in the complaint

(such as ensuring that any wrongfully-obtained user data possessed by these entities is destroyed), the Court would have to exercise jurisdiction over the China-based companies. Plaintiffs therefore ask the Court to allow them to serve these Defendants through alternative means pursuant to Fed. R. Civ. P. 4(f)(3).

## ARGUMENT

### I. Federal Rule of Civil Procedure 4(f)(3) Authorizes Service Via Email on the China-Based Entities' Affiliates and/or Their U.S.-Based Counsel.

Rule 4(f)(3) allows the Court to authorize service of process on foreign defendants by any "means not prohibited by international agreement as may be directed by the court." Fed. R. Civ. P. 4(f)(3). "The decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the 'sound discretion of the district court.'" *Strabala v. Zhang*, 318 F.R.D. 81, 114 (N.D. Ill. 2016); *see also 1025 W. Addison St. Apts. Owner, LLC v. Grupo Cinemex, S.A. de C.V.*, 2021 WL 2136073, at *8 (N.D. Ill. May 26, 2021) (same).

"Alternative service is neither a last resort nor extraordinary relief, but instead is merely one means among several which enables service of process on an international defendant." *1025 W. Addison*, 2021 WL 2136073, at *8 (internal quotation and citation omitted), quoting *Rio Props. v. Riollnt'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002); *In re Paraquat Prods. Liab. Litig.*, 2021 WL 4775284, at *2 (S.D. Ill. Oct. 13, 2021) (same).

"By design, Rule 4(f)(3) was adopted in order to provide a modern flexibility and discretion to the federal courts in today's digital age in dealing with questions of alternative methods of service of process in foreign countries." *Bowen v. Li*, 2023 WL 2346292, at *1 (S.D. Fla. Mar. 3, 2023), quoting *Philip Morris USA Inc. v. Veles Ltd.*, 2007 WL 725412, at *8 (S.D.N.Y. Mar. 12, 2007) (internal quotations and citation omitted). Accordingly, "'[d]istrict courts have found broad discretion under Rule 4(f)(3) to authorize other methods of service that

are consistent with due process and are not prohibited by international agreements.'" *Id.* As a result, courts have approved "a wide range of alternative methods [of service] including email." *Philip Morris*, 2007 WL 725412, at *8.

In particular, courts exercising their discretion under Rule 4(f)(3) have repeatedly concluded that service by email is an appropriate means of service on China-based entities. *See, e.g., Chen*, 2025 WL 47972, at *6; *NBA Properties, Inc. v. P'ships and Unincorp. Ass'ns Identified in Schedule A*, 549 F. Supp. 3d 790, 797 (N.D. Ill. 2021) (ordering that "service be effected by alternative means (*i.e.*, email)" on Chinese defendant); *Oakley, Inc. v. P'ships and Unincorp. Assoc'ns Identified in Schedule "A"*, 2021 WL 2894166 (N.D. Ill. July 9, 2021); *Ouyeinc Ltd. v. Alucy*, 2021 WL 2633317 (N.D. Ill. June 25, 2021); *Hangzhou Chic Intelligent Tech. Co. v. P'ships and Unincorp. Assoc'ns Identified on Schedule* A, 2021 WL 1222783 (N.D. Ill. Apr. 1, 2021); *Strabala v. Zhang*, 318 F.R.D. 81, 115 (N.D. Ill. 2016) (upholding email service on China-based entities, noting "service of process by e-mail has been upheld in circumstances similar to those here"); *MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co., Ltd.*, 2008 WL 5100414, at *2 (N.D. Ill. Dec. 1, 2008) (authorizing service on Chinese companies by email, noting "[t]he Hague Convention does not prohibit service by e-mail or facsimile").[29]

---

[29] *See also, e.g., Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 331 (S.D.N.Y. 2015) ("China's objection to service by postal mail does not cover service by email, and these forms of communication differ in relevant respects. Email communications may be more reliable than long-distance postal communications, and the arrival of an email at its destination address may be more readily tracked."); *Jackson Lab. v. Nanjing Univ.*, 2018 WL 615667, at *4 (D. Me. Jan. 29, 2018) ("[A] number of courts … have held that service by email is permissible pursuant to Rule 4(f)(3) on defendants residing in China and other countries that have objected to Article 10 of the Service Convention."); *Whirlpool Corp. v. Yihanggou Trading Co., Ltd.*, 2021 WL 1837544 (E.D. Tex. May 7, 2021); *Fourte Int'l Ltd. BVI v. Pin Shine Indus. Co., Ltd.*, 2019 WL 246562 (S.D. Cal. Jan. 17, 2019); *Karsten Mfg. Corp. v. Store*, 2018 WL 8060707 (S.D. Fla. July 26, 2018); *FKA Dist. Co., LLC v. Yisi Tech. Co., Ltd.*, 2017 WL 4129538 (E.D. Mich. Sept. 19, 2017); *Keck v. Alibaba.com, Inc.*, 2017 WL 10820533 (N.D. Cal. Aug. 19, 2020) (electronic message).

The court in *Luxottica Grp., S.p.A. v. P'ships*, 391 F. Supp. 3d 816 (N.D. Ill. 2019) declined to allow service by email, suggesting that China's objection to service through "postal channels" could extend to email communications under certain circumstances. However, as the court in *NBA Properties* observed,

Likewise, courts have held that service on a corporate affiliate of a foreign corporation is an appropriate means of accomplishing service. *See, e.g.*, *Zisman v. Sieger*, 106 F.R.D. 194, 199-200 (N.D. Ill. 1985) (service accomplished within United States on local agent of foreign defendant renders Hague Service Convention inapplicable); *Stream SICAV v. Wang*, 949 F. Supp. 2d 264, 277-80 (S.D.N.Y. 2013) (authorizing service of corporate subsidiary's executive who lived in China through service of subsidiary's U.S. parent and its counsel); *In re Cathode Ray Tube Antitrust Litig.*, 2008 WL 4104341 (N.D. Cal. Sept. 3, 2008) (authorizing service of foreign defendant through domestic subsidiary and counsel).

Finally, service on a foreign defendant through its U.S. counsel is also appropriate, and indeed a "'common form of service under Rule 4(f)(3).'" *1025 W. Addison Street*, 2021 WL 21336073, at *9; *id.* at *7 ("[C]ourts have found that the Hague Service Convention does not prohibit service on a foreign defendant through its U.S. counsel."); *In re Paraquat*, 2021 WL 4775284, at *3 (same); *In GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 267 (S.D.N.Y. 2012) (authorizing service on CEO living in China through his company's U.S. counsel and its U.S. registered agent); *Prod. & Ventures Int'l v. Axus Stationary (Shanghai) Ltd.*, 2017 WL 1378532, at *4 (N.D. Cal. Apr. 11, 2017) ("Service upon a foreign defendant's counsel based in the United States is a common form of substituted service under Rule 4(f)(3) and it comports with due process."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2008 WL 4104341, at *1 (N.D. Cal.

---

this was contrary to other decisions such as *Strabala* and *MacLean-Fogg*, the weight of authority from other jurisdictions, and the plain language of that term: "[T]he most natural understanding of 'postal channels' applies only to material that is physically delivered by letter carrying authorities. In other words, 'postal channels' does not refer to alternate forms of communication, including email, notice by publication, or service by social media." 549 F. Supp. 3d at 798. *See also, e.g.*, *Oakley*, 2021 WL 2894166, at *5 (similarly rejecting *Luxottica's* reasoning); *Hangzhou Chic*, 2021 WL 1222783, at *3. In any event, the court did not adopt an absolute prohibition on service by email: "[n]owhere does *Luxottica Group* suggest that service by email is prohibited, by the Hague Convention or otherwise." *Ouyeinc*, 2021 WL 2633317, at *3.

Sept. 3, 2008) (service on U.S.-based affiliates or counsel does not implicate Hague Convention because "[t]he Hague Convention applies only when transmittal abroad is required").

Service of process by email or through Defendants' U.S.-based counsel here is consistent with due process and "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The China-based Defendants have been on notice of this litigation since it was filed because their corporate parent, ByteDance Ltd. is also named as a Defendant, has been served, and is participating in the proceedings. In addition, three other affiliates of the China-based entities, two U.S.-based entities (ByteDance, Inc. and Tiktok, Inc.) and a Singapore-based Defendant (ByteDance Pte. Ltd.), have also been served and are participated in these proceedings. All of these entities are represented by the same counsel. Accordingly, service of process via email upon ByteDance's U.S.-based counsel would provide the China-based Defendants with reasonable notice and an opportunity to respond. *See Rio Props.*, 284 F.3d at 1017-18 ("To be sure, the Constitution does not require any particular means of service of process, only that the method selected be reasonably calculated to provide notice and an opportunity to respond.").

## II. Service By Email Is Particularly Appropriate Under the Circumstances Here.

The unique circumstances of this case make alternative service particularly appropriate.

*First*, the Divestiture Act requires Defendants to sell CapCut or cease offering the app in the United States. Accordingly, control over CapCut may soon change hands and/or the China-based entities may cease doing business in the United States. Indeed, the legislation requires divestiture of all apps owned or controlled by ByteDance and its affiliates. As a result, there soon may be no need for Defendants to maintain any presence in this country.

*Second*, discovery will commence soon. Plaintiffs extended the briefing schedule for the motion to dismiss in order to afford the parties an opportunity to attempt to mediate the dispute. Mediation has occurred without success, and the Court has ruled on the motion and put in place a discovery schedule. Under the circumstances, alternative service is necessary "to ensure the orderly and expeditious resolution of this litigation" and "comports with the Court's goal to secure 'the just, speedy, and inexpensive determination of every action and proceeding.'" *Smith v. SMS Group, Inc.*, 2022 WL 15460279, at *2 (S.D. Ill. Oct. 27, 2022) (quoting FRCP 1).

*Finally*, it is unlikely Plaintiffs would be able to serve the China-based Defendants before Defendants are required to divest the CapCut app or cease offering the app in the United States. This is particularly true, given the current trade disputes between the United States and China. Accordingly, the delay inherent in serving the China-based Defendants would be particularly harmful here. "Court-directed service pursuant to Rule 4(f)(3) is appropriate when, for example, 'there is a need for speed that cannot be met by following the Hague Convention methods.'" *Strabala*, 318 F.R.D. at 114; *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist.*, 482 U.S. 522, 542-3 (1987) (noting "the overriding interest in the 'just, speedy, and inexpensive determination' of litigation"); *In re Paraquat*, 2021 WL 4775284, at *3 (alternative service warranted where service would take "16 weeks or longer").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion, and authorize alternative service of the China-based Defendants pursuant to FRCP 4(f)(3) through email to the U.S.-based Defendants or their counsel.

Dated: April 21, 2025

Respectfully submitted,

By: */s/ Jeannie Evans*

Jeannie Evans (Bar No. 6296339)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Steve W. Berman (Bar No. 3126833)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Douglas G. Smith (Bar No. 6238127)
ALPHEUS LLC
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@alpheusllc.com

*Counsel for Plaintiffs and the Class*