**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EVELIA RODRIGUEZ; ERIKKA WILSON; A.N., A MINOR; AIDEN GUNDLACH; ZACHARY BUCKUS; RAYMON MARINES; AND J.V. A MINOR; DOMINICK POLIZZI; and ROBERT KOPLOS on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BYTEDANCE, INC.; BEIJING DOUYIN INFORMATION SERVICE CO. LTD. F/K/A BEIJING BYTEDANCE TECHNOLOGY CO. LTD.; BYTEDANCE LTD.; BYTEDANCE PTE. LTD.; BEIJING BYTEDANCE TECHNOLOGY CO. LTD.; AND TIKTOK, INC. F/K/A MUSICAL.LY, INC.,<br><br>Defendants. | Case No. 1:23-CV-04953<br><br>Judge Georgia N. Alexakis |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. LEGAL STANDARD ........ 1

III. ARGUMENT ........ 2

A. Plaintiffs Adequately Allege a CFAA Claim. ........ 2

1. Defendants Exceeded any Authorized Access. ........ 2

2. Plaintiffs Suffered Loss. ........ 5

3. CapCut Poses a Threat to Public Safety. ........ 8

B. Plaintiffs Adequately Allege a CDAFA Claim. ........ 12

C. Plaintiffs Adequately Allege ECPA and CIPA Claims. ........ 13

D. Plaintiffs Adequately Allege an SCA Claim. ........ 20

E. Plaintiffs Adequately Allege a UCL Claim. ........ 22

F. Plaintiffs Adequately Allege an FAL Claim. ........ 26

G. Plaintiffs Adequately Allege a Claim for Restitution/Unjust Enrichment. ........ 31

H. Plaintiffs Adequately Allege a Claim Under Illinois BIPA § 15(e). ........ 32

IV. CONCLUSION ........ 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Antonyan v. Ford Motor Co.*,
2022 WL 1299964 (C.D. Cal. Mar. 30, 2022) ....26

*Banowitz v. State Exchange Bank*,
600 F. Supp. 1466 (N.D. Ill. 1985) ....2, 16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ....1

*In re BetterHelp, Inc.*,
2024 WL 4504527 (N.D. Cal. Oct. 15, 2024) ....22

*Bohnak v. Marsh & Mclennan Cos., Inc.*,
79 F. 4th 276 (2d Cir. 2023) ....26

*Boucher v. Fin. Sys. Of Green Bay, Inc.*,
880 F.3d 362 (7th Cir. 2018) ....1

*Braden v. Wal–Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ....2, 16

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) ....31

*Cottle v. Plaid Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ....6, 12

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015) ....24

*Doe v. FullStory*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) ....15

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ....20

*Edwards v. MUBI, Inc.*,
2025 WL 985130 (N.D. Cal. Mar. 31, 2025) ....23

*Fleury v. Union Pac. RR. Co.*,
528 F. Supp. 3d 885 (N.D. Ill. 2021) ....11

*Grisafi v. Sony Electronics Inc.*,
2019 WL 1930756 (D.N.J. 2019) ....................8

*Hodsdon v. Mars, Inc.*,
162 F. Supp. 3d 1016 (N.D. Cal. 2016) ....................30

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ....................27, 30

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) ....................22, 25

*Leitner v. Morsovillo*,
2021 WL 2669547 (W.D. Mo. June 29, 2021) ....................22

*In re LinkedIn User Privacy Litig.*,
2014 WL 1323713 (N.D. Cal. Mar. 28, 2014)....................24

*Mace v. Van Ru Credit Corp.*,
109 F.3d 338 (7th Cir. 1997) ....................7

*In re Meta Healthcare Pixel Litig.*,
713 F. Supp. 3d 650 (N.D. Cal. 2024) ....................12, 13

*Morilha v. Alphabet Inc.*,
2024 WL 5205542 (N.D. Cal. Dec. 23, 2024)....................21

*Owens v. Smith, Gambrell and Russell Int'l, LLP*,
2024 WL 391663 (C.D. Cal. May 30, 2024) ....................26

*Parklane Hosiery Co., Inc. v. Shore*,
439 U.S. 322 (1979)....................12

*In re Path Network, Inc.*,
703 F. Supp. 3d 1046 (N.D. Cal. 2023) ....................17

*Rodriguez v. Google LLC*,
2025 WL 50425 (N.D. Cal. Jan. 7, 2025) ....................13

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*,
786 F.3d 510 (7th Cir . 2015) ....................2

*Smith v. Google, LLC*,
735 F. Supp. 3d 1188 (N.D. Cal. 2024) ....................20

*Sud v. Costco Wholesale Corp.*,
229 F. Supp. 3d 1075 (N.D. Cal. 2017) ....................24

*TikTok Inc. v. Garland*,
122 F. 4th 930 (D.C. Cir. 2024), *aff'd*, 145 S. Ct. 57 (2025)........................................ *passim*

*In re: TikTok, Inc. In-App Browser Privacy Litig.*,
2024 WL 4367849 (N.D. Ill. Oct. 1, 2024)...............................................15, 16, 18

*In re Toyota RAV4 Hybrid Fuel Tank Litig.*,
534 F. Supp. 3d 1067 (N.D. Cal. 2021) .....................................................................30

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...................................................................................................26

*Worix v. MedAssets, Inc.*,
857 F. Supp. 2d 699 (N.D. Ill. 2012) .........................................................................21

*Yockey v. Salesforce, Inc.*,
745 F. Supp. 3d 945 (N.D. Cal. 2024) .......................................................................20

*Zak v. Bose Corp.*,
2019 WL 1437909 (N.D. Ill. Mar. 31, 2019)..............................................................18

**STATUTES**

740 ILCS 14/5(g) ..........................................................................................................11

740 ILCS 14/15(b)(1) ....................................................................................................27

740 ILCS 14/15(e) .........................................................................................................32

18 U.S.C. § 1030(c)(4)......................................................................................................8

18 U.S.C. §1030I(4)(A)(i)(IV)........................................................................................12

18 U.S.C. § 2511(2)(d) ...................................................................................................18

28 U.S.C. § 1030(4)(A)(i)(I)..............................................................................................7

28 U.S.C. § 1030(e)(11)................................................................................................6, 7

Cal. Civ. Code §§ 1798.100, 1798.140(b) .......................................................................27

Cal. Civ. Code § 1798.100(a)(2).....................................................................................34

Cal. Penal Code § 502(e)(1)............................................................................................13

Cal. Penal Code § 631(a) ................................................................................................19

Cal. Penal Code § 632...............................................................................14, 19, 20

15 U.S.C. §§ 6501–05 ........................................................................................................27

Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, 138 Stat. 958 ................................................................................ *passim*

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6)..........................................................................................................1

Fed. R. Civ. P. 26 ..................................................................................................................6

## I. INTRODUCTION

The Second Amended Complaint ("SAC") reflects careful consideration of the Court's Opinion and Order, which provided guidance regarding amendment of claims the Court deemed insufficiently pleaded. In response to the Court's ruling, the SAC incorporates a host of additional factual allegations, which Plaintiffs believe cure the deficiencies the Court identified. This includes (1) a detailed analysis of the areas of Plaintiffs' devices CapCut accesses without authorization and the data accessed (including how CapCut intercepts electronic communications "in transit" and constitutes a "recording device"); (2) industry standards governing Defendants' data practices and breaches of those standards; (3) Defendants' obligations to make full and accurate disclosures regarding their data practices and their failure to do so; (4) additional facts regarding economic injuries Plaintiffs suffered as a result of Defendants' wrongdoing, including subscription fees Plaintiffs paid and an analysis quantifying the costs Plaintiffs incurred as a result of battery drain from Defendants' unauthorized activities; and (5) discussion of congressional findings that CapCut's data practices pose a threat to public safety, as well as recent D.C. Circuit and Supreme Court rulings upholding legislation requiring Defendants to divest CapCut based on those findings. *TikTok Inc. v. Garland*, 122 F. 4th 930 (D.C. Cir. 2024), *aff'd*, 145 S. Ct. 57 (2025). Plaintiffs simultaneously removed other causes of action, including claims under BIPA §§ 15(c) and 15(d) and SCA § 2701. Defendants' motion should be denied.

## II. LEGAL STANDARD

Under Rule 12(b)(6), courts must "accept as true all factual allegations in the complaint and draw all permissible inferences in plaintiffs' favor." *Boucher v. Fin. Sys. Of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather merely "enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiffs are not required "to set forth facts which, because no discovery has yet occurred, are in the exclusive possession of defendants." *Banowitz v. State Exchange Bank*, 600 F. Supp. 1466, 1469 (N.D. Ill. 1985); *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (courts should not dismiss where facts "in the sole possession of defendants").

"Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir . 2015).[1]

## III. ARGUMENT

### A. Plaintiffs Adequately Allege a CFAA Claim.

Consistent with the Court's ruling, the SAC adds allegations establishing that Defendants exceeded authorized access under the CFAA. It also supplements facts supporting CFAA claims under two prongs of the statute, establishing both (1) "loss" and (2) a threat to "public safety".

#### 1. Defendants Exceeded any Authorized Access.

The Court ruled that Plaintiffs must allege "the circumstances surrounding the alleged unauthorized access" such as the "area(s) of plaintiffs' devices defendants supposedly accessed or what type of data defendants sought in exceeding their authorization." ECF 56, at 10. The SAC supplies the missing facts, analyzing CapCut's basic functions. (SAC ¶¶ 249-65.)

Fine-grained location data. CapCut accesses fine-grained location data using GPS functionality and Wi-Fi information contained in internal storage on devices to ascertain user

[1] Defendants' "background" section raises disputed issues of fact, showing resolution at the pleading state is inappropriate. Nonetheless, this case is not a mere "copycat" of a TikTok lawsuit Defendants settled for $92 million. While there is overlap in causes of action (which are standard in data privacy cases), this case involves a different app (CapCut) and different factual allegations and causes of action. Indeed, Defendant's conduct here is more egregious because they were on notice of privacy violations and yet did not change their conduct. Nor were the causes of action here added only when the complaint was amended. Most were in the original complaint, including claims under BIPA, the CFAA, CDAFA, UCL, FAL, and for unjust enrichment. Compl., ECF 1.

location using the Access_Fine_Location function. (*Id.* ¶ 250.) CapCut accesses hardware components that collect GPS data, including the GNSS (Global Navigation Satellite System) receiver chip integrated into the phone's motherboard which receives and processes signals from GPS satellites and uses a software engine to calculate the device's precise location, the phone's antenna which receives radio signals from satellites (*id.*), inertial sensors (such as gyroscopes and accelerometers) and network-based location data to improve the accuracy of positioning. (*Id.* ¶ 251.) GPS data is stored in internal memory, often in a non-human-readable proprietary format, only accessible through the device's operating system or dedicated GPS applications. (*Id.*)

Wi-Fi data. The hardware responsible for collecting Wi-Fi signals is a Wireless Network Interface Card (WNIC), often integrated into the device's System-on-a-Chip (SoC). (*Id.* ¶ 252.) The WNIC uses an antenna to transmit and receive radio waves, enabling a device to connect to a Wi-Fi network. Wi-Fi data is stored in encrypted files on a user device.[2] Wi-Fi data CapCut accesses without authorization includes SSID (network name), MAC address of the access point, security settings (encryption type, password), and the IP address assigned by the network. (*Id.*)

Photo and audio files. CapCut gains unauthorized access to areas that store media files, including the entire video and photo libraries contained in storage areas. (*Id.* ¶ 253.) While users can select specific media files to edit, CapCut has functions that exceed authorized access to read external and internal media storage, including Read_External_Storage, Read_Media_Storage, MediaStore.Images.Media, and MediaStore.Video.Media. (*Id.*)[3]

[2] On Windows, Wi-Fi data, including passwords, is stored in encrypted XML files located in C:\ProgramData\Microsoft\Wlansvc\Profiles\Interfaces\[Interface Guid]. On Android devices, Wi-Fi data can be found in the Network & Internet settings, and on iOS devices in the Settings app. (SAC ¶ 252.)

[3] Videos and camera images are in the DCIM (Digital Camera IMages) or a Videos folder. Audio files are stored within a dedicated folder, often named "Music", "Audio", or "Recordings." (SAC ¶ 254.)

Cameras and microphones. CapCut accesses device cameras and microphones without authorization. (*Id.* ¶ 255.) Camera software is stored in internal memory, often within a folder or directory related to applications or system files. System applications like the camera app are stored in separate areas of the device, distinct from CapCut. For example, the iPhone Camera app is a built-in app stored in a folder in the App Library that users cannot delete. (*Id.*)[4]

Other apps. CapCut accesses other apps and software without authorization. (*Id.* ¶ 257.) This includes temporary storage areas such as clipboards where Plaintiffs store data collected from areas outside CapCut, including passwords, credit card or other financial data. (*Id.*) On an iPhone, the clipboard is not an app, but an internal software function where copied content is temporarily stored until overwritten. On Android devices, the clipboard also is not an app, but a system-level feature accessed through the keyboard or clipboard manager apps. (*Id.* ¶ 258.)[5]

Email programs. CapCut gains unauthorized access to areas of Plaintiffs' devices containing email programs, which contain data such as email contacts, address and content that can be used for targeted marketing. (*Id.* ¶ 260.) An email app like Gmail, is installed on internal storage, like any other app. (*Id.* ¶ 261.) The email app's data, including cached emails, attachments, and other settings, is stored in a dedicated folder within internal storage. (*Id.*)

Phone state. CapCut gains unauthorized access to the phone state, which is an area outside of CapCut that stores a variety of device-specific personally identifying information. (*Id.* ¶ 262.) CapCut accesses this area via the Read_Phone_State request and obtains data, including the Mac address, IMEI data, and IMSI data. CapCut accesses MAC addresses of a device's

[4] On Windows, the camera executable file is under C:\Windows\camera.exe. On Android, photos are stored in the DCIM folder and on iOS, in the Photos app library. Audio is in internal storage. (SAC ¶ 256.)

[5] Apps are stored in internal storage in the /data/app directory on Android and a similar location on iOS. On Android, installed apps are stored in the /data/app directory, and on iPhones in the /var/mobile/Applications folder. System apps are located in /system/app or /system/priv-app. (SAC ¶ 259.)

network interfaces via the WifiInfo.getMacAddress() function. (*Id.*) IMEI data is a unique identification number that can be used to track a mobile phone, which CapCut accesses using multiple functions from the TelephonyManager() class. (*Id.* ¶ 263.) IMSI is a 14-15 digit number that identifies a mobile subscriber, which CapCut accesses by running the getSubscriberID() function. (*Id.*) These functions allow CapCut to store phone number, voice mail number, MEID, ICCID, and sim serial number—private data contained in read-only storage areas. (*Id.* ¶ 264.)[6]

Collection when CapCut not in use. CapCut contains Service or IntentService classes in its code and a broadcast receiver the app uses to collect and transmit data without authorization even when the app is not in use. (*Id.* ¶ 265.) The app also contains functions used to trigger unauthorized data collection when the app is not in use, such as JobScheduler, AlarmManager, and WorkManager classes. (*Id.*) These allegations are sufficient to establish unauthorized access.

**2. Plaintiffs Suffered Loss.**

The first CFAA claim in the SAC is based on a "loss" of at least $5,000. (SAC ¶¶ 197-200, 266-73.) In its ruling, the Court indicated Plaintiffs must "show their work" demonstrating that loss from "battery drain was at least $5,000 during any one-year period." ECF 56, at 13. The SAC does so, providing a conservative estimate of $8 million per 100 million users per year caused by unauthorized access overnight when CapCut is not being used, based on testing using Accubattery Pro, an app commonly used to measure battery consumption. (SAC ¶¶ 197-200.)[7] In addition, the SAC pleads losses from subscription fees (ranging from $5.99 to $24.99/month),

[6] On Androids, phone state information is stored in internal storage, specifically the /data/data/com.android.providers.telephony/database/mmssms.db directory. On iphones, IMEI is stored within the device's baseband chip, and IMSI is stored on the device's SIM card. (SAC ¶ 264.)

[7] The SAC states that total energy cost is calculated by multiplying the measured 328.4 milliampere-hour battery drain overnight by a standard voltage of 3.7V for lithium ion batteries, converting units, and multiplying by the average electricity cost in the U.S. ($.179 per Kilowatt hour, per the Bureau of Labor Statistics). The yearly cost is obtained by multiplying by 365 days and the number of users. (SAC ¶ 268.) The analysis is consistent with user comments noting unusual battery drain. (Def. Mem. at 6-7.)

amounting to $100 million in 2023 alone (*id.* ¶ 270), and costs to "restor[e]" systems and data to the state "prior to the offense," under 28 U.S.C. § 1030(e)(11) of the CFAA (*id.* ¶¶ 266-73).

Battery drain. In response, Defendants offer technical criticisms of the SAC's analysis of battery drain more suited to a Rule 26 expert report than a motion to dismiss. *First*, Defendants attempt to explain away the results by arguing that "video editing is resource-intensive" (Def. Mem. at 7), but that is irrelevant because the testing occurred overnight when no video editing occurred. *Second*, Defendants fault the testing for allegedly measuring "foreground", not "background", use. (*Id.* at 6.) This artificial distinction is likewise irrelevant because the testing occurred "when the user is not even utilizing the CapCut app" (SAC ¶¶ 200, 268) and any functions performed during this time—whether labeled "background" or "foreground"—were not directed by any user and were unauthorized. *Third*, Defendants suggest (with no evidence) that the battery drain was not caused by unauthorized access. The SAC explains otherwise: "[t]he costs of battery drain incurred by Plaintiffs are directly caused by the CapCut app's unauthorized access to Plaintiffs' devices and unauthorized collection of user data," "there is no reason for the CapCut app to drain a device's battery when the user is not editing any videos," and "other apps do not cause significant battery drain overnight." (*Id.* ¶¶ 265, 269.) As shown above, CapCut contains functions that collect data when the app is not in use. *Supra* § III.A.1. *Finally*, Defendants argue testing must be done on each user's "own device[]." (Def. Mem. at 7.) But battery drain is caused by the way CapCut functions, and users downloaded the same app. Moreover, technical debates about testing conditions, interpretation, or alleged limitations are all matters of expert opinion or analysis, not a basis for dismissal at the pleading stage.[8]

[8] Plaintiffs need not invoke the risk of identity theft to meet the $5,000 threshold. Nonetheless, the issue was raised in *Cottle* only at a hearing, and *Run the World Inc. v. Jang* only states plaintiff's "identity" and "developer tools and stored code" were "compromised." 2024 WL 4564551, at *4 (N.D. Cal. Aug. 2, 2024).

Fees. Defendants' contention that subscription fees do not constitute a "loss" (Def. Mem. at 5) is inconsistent with the CFAA, which defines "loss" to include "any reasonable cost to any victim." 28 U.S.C. § 1030(e)(11). The fees are "costs" Plaintiffs incurred and thus compensable under the statute. Moreover, while Defendants assert that Plaintiffs "do not allege how CapCut was 'defective'" (*id.*), the SAC contains extensive detail showing how CapCut accesses areas of devices without authorization (SAC ¶¶ 249-65), and states Plaintiffs would not have downloaded CapCut, or paid fees, if they had known the truth about Defendants' data practices (*id.* ¶ 202).

Aggregation. Finally, Defendants argue that Plaintiffs' losses cannot be aggregated to meet the statutory threshold. However, the CFAA expressly states that the required "loss" under the statute is "***loss to 1 or more persons*** during any 1-year period … ***aggregating*** at least $5,000 in value." 28 U.S.C. § 1030(4)(A)(i)(I) (emphasis added). "The plain language of the statute ordinarily controls." *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 343 (7th Cir. 1997).

Indeed, a contrary interpretation would be inconsistent with the legislative purpose of the CFAA and would bar the vast majority of consumer actions under the statute, given that the entire value of a device is typically less than $5,000. Moreover, Defendants' position would lead to the absurd result that a defendant who caused $5,000 in damages to one individual would be held liable while someone who caused $50 in damages to 1 million individuals would not.

Alternatively, Defendants argue that losses must arise from "a single act" to be aggregated. (Def. Mem. at 6.) However, that is the case here where the losses all arise from the same app. Even those courts that apply a "single act" requirement (Def. Mem. at 6), recognize that distributing a piece of software to multiple customers constitutes a "single act". In *Bowen v. Porsche Cars, N.A., Inc.*, for example, the court held that plaintiffs pleaded "aggregate damages sufficient to meet the $5,000 CFAA minimum" where defendants sent software updates that

damaged multiple plaintiffs' vehicles. 561 F. Supp. 3d 1362, 1371 (N.D. Ga. 2021). In *In re Toys R Us, Inc. Privacy Litigation*, the court likewise held that plaintiffs could aggregate damages where defendants caused identical cookies to be placed on plaintiffs' computers. 2001 WL 34517252 (N.D. Cal. 2001). Finally, in *Mortenson v. Bresnan Communication, L.L.C.*, the court held that losses could be aggregated based on defendant's "single act of installing and distributing the NebuAd Appliance"—a piece of software defendant used to gather data and create profiles of its customers. 2010 WL 5140454, at *7 (D. Mont. Dec. 13, 2010); *Grisafi v. Sony Electronics Inc.*, 2019 WL 1930756, at *5 (D.N.J. 2019) (software update was "a single act sufficient to aggregate claims even though users had to individually agree to install the update").[9]

**3. CapCut Poses a Threat to Public Safety.**

Alternatively, Plaintiffs state a CFAA claim because CapCut poses a "threat to public health or safety" by misappropriating sensitive user data (including biometric data) and by allowing the CCP, Chinese government, and other third parties to access user data without authorization. 18 U.S.C. § 1030(c)(4). The SAC contains additional allegations under this prong of the statute, including discussion of the recent D.C. Circuit decision finding that CapCut poses a threat to national security. (SAC ¶¶ 160-77, 274-86.)

The FBI, intelligence community, and other experts have all warned about the threat posed by ByteDance apps, including CapCut. (*Id.* ¶¶ 78-103, 124.) Indeed, Defendants themselves have acknowledged the threat, spending more than $1.5 billion to wall off user data

[9] Defendants' cases are older outliers and distinguishable. *Jenson v. Cablevision Sys. Corp.*, involved installation of hardware—wireless routers—in homes and the unauthorized broadcast of a public Wi-Fi network. 2017 WL 4325829, at *1 (E.D.N.Y. Sept. 27, 2017). *Halper v. Int'l Web Servs., LLC*, involved malware placed "out into the web" that was accessed under different circumstances—not an app provided under uniform circumstances by the App Store or Google Play. 70 F. Supp. 3d 893, 899 (N.D. Ill. 2014).

collected by the TikTok app from access by ByteDance. (*Id.* ¶ 282.) TikTok's website states that this "unprecedented" effort was necessary "to ensure the safety, privacy, and security of our community," to ensure "data is secure and the platform is free from outside influence," and to insulate TikTok from "any outside pressure to grant unauthorized access to user data or systems."[10] (*Id.*) However, Defendants took no such actions to protect CapCut user data, admitting CapCut "is directly run by ByteDance executives in China." (*Id.* ¶ 125; ECF 70-2.)

The "significant threat to the national security of the United States" posed by ByteDance and its apps, including CapCut, resulted in legislation banning their distribution in the United States. H.R. 8038, 118th Cong. (2023-2024).[11] When the legislation was introduced, members of Congress observed that ByteDance "is legally required to support the work of the Chinese Communist Party" (SAC ¶ 164), and CapCut is "spying [on users] by design" (*id.* ¶ 165).

Congress made extensive findings regarding the threats posed by Defendants' apps. (SAC ¶ 162.) Congress observed that "public reporting has repeatedly confirmed" the "tight interlinkages between ByteDance Ltd., TikTok, and the Chinese Communist Party (CCP)," that China is "constructing 'massive databases of Americans' personal information' and that 'ByteDance Ltd. has close ties to the CCP, including a cooperation agreement with a security agency and over 130 CCP members in management positions.'" (*Id.* ¶¶ 162-63.) Congress found that "the Secretary of ByteDance Ltd.'s CCP committee, Zhang Fuping, also serves as

[10] TikTok Website, https://usds.tiktok.com/usds-about/.

[11] In 2021, President Biden issued an order identifying China as "a foreign adversary" that "threaten[s] the national security, foreign policy, and economy of the United States" by controlling "software applications." (SAC ¶ 161.) The order stated "software applications" provide "vast swaths of information from users," and that China's "access to large repositories" of data "presents a significant risk." (*Id.*)

ByteDance Ltd.'s Editor- in-Chief and Vice President and has vowed that the CCP committee would 'take the lead' across 'all product lines and business lines…'" (*Id.*)[12]

On April 24, 2024, President Biden signed the Protecting Americans from Foreign Adversary Controlled Applications Act (the "Divestiture Act") into law. (*Id.* ¶ 168.) The Act identifies the People's Republic of China (PRC) and three other countries as foreign adversaries and prohibits the distribution or maintenance of "foreign adversary controlled applications," including all apps distributed by ByteDance and its affiliates (including CapCut).[13]

The D.C. Circuit upheld the Act, rejecting Defendants' contention that CapCut does not pose a threat to public safety after holding an original proceeding in which the court received both fact and expert submissions. (SAC ¶¶ 173-74.) The government maintained that, "[b]ased on both public and classified information, the U.S. intelligence community assessed that ByteDance and TikTok pose a threat to U.S. national security" and "[t]he Chinese government's authority over ByteDance enables it to gain access to and exploit" data collected by its apps.[14] (SAC ¶ 173.) The court agreed, finding that, "[g]iven the Government's well-supported concerns about ByteDance, it was necessary for the Act to apply to all ByteDance entities." *TikTok*, 122 F. 4th at 965. The court further found that "the petitioners fail to demonstrate that neither of the Government's two national security concerns implicate CapCut." *Id.*

The court observed that the "PRC maintains a powerful Chinese Communist Party committee 'embedded in ByteDance' through which it can 'exert its will on the company.' As of

[12] H.R. 118-417, 118th Cong. 2d Sess., https://www.congress.gov/118/crpt/hrpt417/CRPT-118hrpt417.pdf, at 3.

[13] Pub. L. No. 118-50, 138 Stat. 958, § 2. The government has taken similar actions in the past, requiring divestiture of a dating app (Grinder) owned by a Chinese company due to the threat to user data (SAC ¶ 171), and prohibiting federal agencies from using telecommunications equipment produced by several entities affiliated with the Chinese government, including Huawei and ZTE (*id.* ¶ 172).

[14] Resp. Br., *TikTok Inc. v. Garland*, No. 24-113, at 15-16, 18 (D.C. Cir. July 26, 2024).

2022, that committee 'was headed by the company's chief editor and comprised at least 138 employees at its Beijing office, including senior company managers.'" *Id.* at 955. The court further found that "the Government's concerns [that user data would be shared with China] are well founded, not speculative." *Id.* at 957. The Supreme Court affirmed. *TikTok*, 145 S. Ct. 57.

In response, Defendants argue CFAA does not cover all threats to public safety, but only "physical" or "life-threatening" harms. (Def. Mem. at 9.) But the statute does not contain any such limitation, which is inconsistent with the plain meaning of "public safety." Moreover, the statute applies to "public health ***or*** safety," not merely "public health," and indeed, courts assessing CFAA claims, the D.C. Circuit's decision affirming the threats posed by CapCut, and Defendants themselves all recognize threats to data privacy constitute a threat to "public safety."

In particular, theft of the biometric and other sensitive data at issue here poses a significant threat to public safety. Statutes like BIPA were enacted to address such threats: "the ***safety or security concerns*** BIPA addresses are the potential ***harms inflicted on members of the public***, such as ***identity theft and economic injuries***, that flow from the unfettered collection and use of biometric information." *Fleury v. Union Pac. RR. Co.*, 528 F. Supp. 3d 885, 892 (N.D. Ill. 2021) (emphasis added). Indeed, BIPA states: "The ***public welfare, security, and safety*** will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g) (emphasis added).

While Defendants rely on *Griffith v. Tiktok, Inc.*, that decision is an outlier, and even there, the court concluded that the exposure of data from individuals who are "federal employees or hold other sensitive positions" can constitute a threat to public safety under the CFAA. 697 F. Supp. 3d 963, 975 (C.D. Cal. 2023). Thus, the court did ***not*** hold that there must be "physical" or

"life-threatening" harm—just the opposite.[15] Moreover, *Griffith* was decided before the D.C. Circuit found that CapCut and other ByteDance apps posed a threat to national security and did not involve the theft of sensitive biometric data.[16] In any event, the SAC includes a military member and government contractor as named plaintiffs, satisfying *Griffith*. (SAC ¶¶ 24, 26.)[17]

### B. **Plaintiffs Adequately Allege a CDAFA Claim.**

Defendants' attempt to dismiss the CDAFA claim should likewise be rejected. In its order, the Court ruled that, as with CFAA, allegations of "loss" should be supplemented. ECF 56, at 15. The SAC contains detailed allegations regarding the loss from battery drain caused by unauthorized access, explaining how CapCut gained such access, and quantifying the cost of battery drain caused by unauthorized access overnight when Plaintiffs were not using the app. (SAC ¶ 344.) The SAC also describes losses from subscription fees, which were more than $100 million in 2023 alone. (*Id.* ¶ 345.) These allegations are sufficient to establish "loss" under CDAFA given that the requirements under CDAFA are fewer than those under CFAA. As Defendants' cases acknowledge, "[u]nlike the CFAA, the CDAFA does not define 'damage' or 'loss,' and does not contain a specific monetary threshold for loss related to violations of the statute"; ***any*** damage or loss is sufficient. *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 487 (N.D. Cal. 2021); *In re Meta Healthcare Pixel Litig.*, 713 F. Supp. 3d 650, 655 (N.D. Cal. 2024).

[15] Nor do the other cases Defendants cite. (Def. Mem. at 9.) *Mitra* and *Vaquero* happened to involve data relating to emergency services or oil and gas facilities, but did not address the scope of the "public safety" requirement or whether data relating to other topics would constitute a threat to public safety. Likewise, *Colorado Republican Committee v. Doe* stated only: "[a]s a matter of first impression, this Court concludes, for the reasons previously stated, that an act of unauthorized access 'involves' the factor of 'a threat to public health or safety' when the access itself creates that threat, but not when a third-party's foreseeable reaction to the unauthorized access creates that threat." 2016 WL 3922156, at *2 (D. Colo. July 21, 2016). It did not impose a "physical" threat requirement.

[16] Defendants are likely collaterally estopped from arguing there is no public threat, given their loss on this issue in the D.C. Circuit and Supreme Court. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322 (1979).

[17] *Griffith* is also at odds with the CFAA's plain language, which states that harm occurs when there is a threat to "*public* health or safety," 18 U.S.C. §1030(c)(4)(A)(i)(IV)—not harm to a particular individual.

As the Court recognized, under CDAFA, Plaintiffs may recover any "consequential damages incurred." ECF 56, at 14. The statute authorizes recovery of any "damage or loss" that occurs "by reason of a violation." Cal. Penal Code § 502(e)(1). As discussed above, this includes battery drain costs and subscription fees. However, courts have held that this also includes other losses pleaded here. For example, the court in *Meta Healthcare*, held that any of the following injuries were sufficient to state a claim under CDAFA: "(i) [defendant] occupied storage space on [plaintiffs'] devices without authorization; (ii) [defendant's] acts caused their devices to work slower; (iii) [defendant's] acts used computer resources of the device; and (4) [defendant] unjustly profited from the data taken." 713 F. Supp. 3d at 655. Plaintiffs suffered similar losses here, where CapCut's unauthorized access caused Plaintiffs' devices to work slower, utilized computer resources, and created unjust profits through, for example, development of artificial intelligence like CapCut's new AI image generator, Dreamina AI. (SAC ¶¶ 213, 417, 488.) *Rodriguez v. Google LLC*, 2025 WL 50425, at *10 (N.D. Cal. Jan. 7, 2025) (CDAFA loss where Google used plaintiff data) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)).

Finally, CDAFA states that Plaintiffs may recover "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." Cal Pen. C. § 502(e)(1). Plaintiffs allege they are entitled to such sums as well. (SAC ¶ 350.)[18]

## C. Plaintiffs Adequately Allege ECPA and CIPA Claims.

With respect to Plaintiffs ECPA and CIPA § 631 claims, the Court stated Plaintiffs must make "clear whether any communications were intercepted while in transit" or in "real-time" and

[18] Defendants' cases are distinguishable. In *Nowak v. Xapo, Inc.*, the only "loss" was from "hiring an investigative firm to trace stolen funds." 2020 WL 6822888, at *5 (N.D. Cal. Nov. 20, 2020). In *Pratt v. Higgins*, plaintiff failed to allege that the "hacking caused any cognizable loss," stating whether defendants caused damage would be "determined at trial." 2023 WL 4564551, at *9 (N.D. Cal. July 17, 2023).

allege the "specific mechanism by which defendants contemporaneously redirected their communications to third parties." ECF 56, at 19. The Court also stated that the allegations under CIPA § 632 that CapCut constitutes an "electric amplifying device or recording device… lack[] sufficient detail." *Id.* at 20-21. The SAC supplies the missing allegations.

**ECPA and CIPA § 631 – Interception in Transit.** As alleged in the SAC, "[t]he CapCut app contains various functions to send and receive information in real time such as the Service component, Broadcast Receivers, and data collection triggers. Functions such as the Service or IntentService classes in the code allow the CapCut app to collect and transmit data even when the app is not in use.'" (SAC ¶¶ 295-96.) In addition, CapCut gains access to other apps on user devices that send and receive electronic communications such as email and text programs. (*Id.* ¶¶ 260-61.) As a result, "the CapCut platform allows the interception of electronic communication of emails, videos, messages, likes and other electronic communications." (*Id.* ¶ 295.) "The CapCut app thus obtains the contents of users' electronic communications as they are sent in real time in transit." (*Id.* ¶ 300.) As the chair of the committee that drafted the Divestiture Act observed after briefings from experts, CapCut is "'spying [on users] by design.'" (*Id.* ¶ 301.)

In addition, "users can send and receive email invitations to join a space to jointly collaborate on editing videos. Users then may exchange other communications in the space to edit the video. Once a draft video is completed, users can 'directly share the video with team members or share it with external members via link or email to invite them for comments, facilitating quick integration of modification suggestions.'"[19] (*Id.* ¶ 299.) Because CapCut is a cloud-based app, these communications are captured in real-time in the cloud. (*Id.* ¶¶ 54, 65.)

[19] https://www.capcut.com/resource/collaborate-on-capcut-online.

Moreover, "CapCut saves the 'share history' of users, including the history of which videos they have shared with others and which videos other users have sent to them to view." (*Id.* ¶ 65.)

Courts have ruled similar allegations sufficient under the ECPA and CIPA—including in cases involving other apps distributed by these same Defendants. *E.g.*, *In re: TikTok, Inc. In-App Browser Privacy Litig.*, 2024 WL 4367849 (N.D. Ill. Oct. 1, 2024) (denying TikTok's motion to dismiss ECPA and CIPA claims); *Doe v. FullStory*, 712 F. Supp. 3d 1244, 1259-61 (N.D. Cal. 2024) (denying TikTok's motion to dismiss); *Brown*, 685 F. Supp. 3d at 933-39 & n.11.

In *JI v. Naver Corporation*, for example, the court held that plaintiffs adequately pleaded that another China-based video editor violated the ECPA and CIPA where the complaint "include[d] the allegation that Defendants 'used one or more devices linked to the domain obs-us.line-apps.com to intercept and obtain videos contained within otherwise encrypted messages while such messages are, and at all relevant times, were in transit …." 2023 WL 6466211, at *10 (N.D. Cal. Oct. 3, 2023). The allegations here are even more extensive, stating not only that Defendants intercept electronic communications, including email and video content, "in real time in transit" (SAC ¶ 300), but also documents specific mechanisms by which interception occurs.

In *A.D. v. Aspen Dental Management, Inc.*, the court similarly concluded that the complaint sufficiently alleged "communications were intercepted in transit" under CIPA where plaintiff "contend[ed] that [defendant] both 'use[d] source code to commandeer the User's computing device, causing the device to contemporaneously and invisibly re-direct the Users' communications to third parties' and 'employed ... tracking technologies, to intercept, duplicate, and re-direct Plaintiffs' ... Private Information' to third parties." 2024 WL 4119153, at *7 (N.D. Ill. Sept. 9, 2024). Here, the complaint not only contains such allegations, but identifies responsible functions in the code. (SAC ¶¶ 260-61, 295-96.)

In *Campbell v. Facebook Inc.*, the court held that Facebook intercepted messages "in transit" by performing an additional scan of the messages because "interception occurs" when communications are "'redirected in any way.'" 77 F. Supp. 3d 836, 840 (N.D. Cal. 2014). The court noted, "allegation[s] that users' messages were intercepted in transit is to be taken as true at this stage," and the issue is "better addressed as part of a motion for summary judgment." *Id*.

Finally, in *In re: TikTok, Inc. In-App Browser Privacy Litigation,* the court rejected similar arguments by these Defendants, denying TikTok's motion to dismiss claims under the ECPA and CIPA. 2024 WL 4367849 (N.D. Ill. Oct. 1, 2024). The court observed that "plaintiffs have affirmatively alleged that their 'text written' on third-party websites … was both recorded and transmitted to the company," and that "[t]hese allegations, taken as true, are sufficient to state an 'interception' of 'communications' within the meaning of the statute." *Id.* at *11.

Plaintiffs have thus pleaded sufficient facts to establish ECPA and CIPA claims—particularly given that many of the relevant facts are in Defendants' "exclusive possession". *Banowitz*, 600 F. Supp. at 1469; *Braden*, 588 F.3d at 598. As the *TikTok* court observed, there is a "'chicken and the egg' problem that frequently arises in data-privacy cases, in which plaintiffs often lack knowledge of when or how their data is being used by the defendant's platform and can only find out through discovery." 2024 WL 4367849, at *5. "Given this informational asymmetry," courts decline "to require Plaintiffs to provide detailed facts about the time and circumstances of their injury at the pleading stage." *Id.* Nor is there any inconsistency in the SAC's allegation that CapCut accesses communications in transit and in storage (Def. Mem. at 13): the app does both. Nonetheless, Plaintiffs may plead such theories in the alternative.

**ECPA and CIPA § 631 – Contents of Communications.** Indeed, most of Defendants' memorandum addresses issues the Court did ***not*** find problematic. For example, Defendants

argue that Plaintiffs "do not plausibly allege the interception of the 'contents' of any communication." (Def. Mem. at 13.) However, the SAC states that CapCut "obtains the ***contents*** of users' electronic communications as they are sent in real time in transit." (SAC ¶ 300 (emphasis added).) The SAC explains that CapCut "allows the interception of electronic communication of emails, videos, messages, likes and other electronic communications." (*Id.* ¶ 295.) It describes how CapCut "gained unauthorized access to areas of Plaintiffs' devices containing email programs located outside the CapCut app." (*Id.* ¶ 260.) It alleges that CapCut accesses draft videos shared by users using email and that, because CapCut is a cloud-based app, these communications are captured in real time. (*Id.* ¶¶ 54, 65, 299.) And, as Defendants acknowledge (Def. Mem. at 13), the SAC describes the specific functions that perform these tasks. (*Id.*; *supra* § III.A.) Indeed, the *Naver* court held that software, like CapCut, that "intercepted actual videos" satisfied the "contents" requirement. 2023 WL 6466211, at *10. Moreover, Congress intended "a broad interpretation of 'content'" under the ECPA (and SCA). *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1069 (N.D. Cal. 2023).

**ECPA and CIPA § 631 – Party Exception and Redirection to Third Parties.**

Defendants also seek to recycle their argument that CapCut is a "party" to communications and thus the "party exception" applies. (Def. Mem. at 13.) The Court did not identify this as grounds for dismissal—for good reason. As Defendants acknowledge (*id.*), the SAC alleges CapCut accesses other apps on user devices such as email and text programs. (SAC ¶¶ 54, 65, 260, 296, 299.) While Defendants assert these allegations are "not the model of clarity" (Def. Mem. at 13), they are clear: "the CapCut app gained unauthorized access to areas of Plaintiffs' devices containing email programs located outside the CapCut app." (SAC ¶ 260.) Moreover, as Defendants acknowledge, the SAC identifies functions in CapCut that access email and "'receive

information [or data] in real time,'" including the "Service Component, Broadcast Receivers and data collection triggers'" (Def. Mem. at 13, quoting SAC ¶ 296), and describes how they "'allow the app to store data and collect information … outside the app'" (*id.*, quoting SAC ¶ 265).

The same is true of emails users send to share draft videos with family or friends who are also CapCut users.[20] (*See* Def. Mem. at 12.) Those communications are not with Defendants, but with other third parties, and the SAC alleges that CapCut accesses the content of those communications including draft videos without user consent. (SAC ¶ 54, 65, 99.) Indeed, the *TikTok* court rejected a similar argument when Defendants made it there, holding that "TikTok was not a 'party' to [users'] communications on the [TikTok] in-app browser." 2024 WL 4367849, at *12. As the court explained, citing the same case Defendants cite, "[t]he term 'party' is not defined in the Wiretap Act, but courts have interpreted it as "'one who takes part in the conversation.'" *Id.* (quoing *Zak v. Bose Corp.*, 2019 WL 1437909, at *3 (N.D. Ill. Mar. 31, 2019)). An app through which communications flow does not "take[] part" in the conversation, but rather is "merely the 'conduit or host' for their communication." *Id.* Numerous courts are in accord. *E.g.*, *Facebook Tracking Internet Tracking Litig.*, 956 F.3d 589, 606 (9th Cir. 2020) (plaintiffs "sufficiently alleged that Facebook's tracking and collection practices violated the Wiretap Act and CIPA"); *Campbell*, 77 F. Supp. 3d at 840 (Facebook "intercepted" user messages when it performed additional scan); *Naver*, 2023 WL 6466211, at *10 (video editor).[21]

[20] Defendants fault the SAC for not stating that named plaintiffs "sent or received email invitations or exchanged any communications with other users in the app." (Def. Mem. at 12.) However, the *TikTok* court rejected a similar argument, citing the same case law. 2024 WL 4367849, at *7. Moreover, the SAC alleges that certain named plaintiffs routinely use the app, including as part of their video editing business. (*E.g.*, SAC ¶ 19 ("Raymon uses CapCut in his work as a film editor").) In any event, the named plaintiffs all have email and text programs, which the SAC alleges CapCut accesses. (SAC ¶¶ 260-61, 295-96.)

[21] In *Zac*, the court found the app at issue was a "party" to communications because plaintiffs chose to send information about songs to the app, which displayed the data. 2019 WL 1437909, at *9. In any event, the ECPA also prohibits the party exception where, as here, "such communication is intercepted for the purpose of committing any criminal or tortious act" in violation of law. 18 U.S.C. § 2511(2)(d).

In any event, the SAC further alleges that Defendants gave third parties real-time access, stating that CCP members are on site at Defendants' facilities in positions that give them access to the communications in real-time. (SAC ¶¶ 300-04.) Federal authorities have found that "[t]he Chinese government's authority over ByteDance enables it to gain access to and exploit" data collected by its apps.[22] (*Id.* ¶ 173.) The D.C. Circuit agreed, finding that the "PRC maintains a powerful Chinese Communist Party committee 'embedded in ByteDance' through which it can 'exert its will on the company.'" *TikTok*, 122 F. 4th at 955.[23] While Defendants assert these are "generalizations" and that the Court "already rejected" them (Def. Mem. at 14), the SAC contains detailed allegations regarding the precise number of CCP members on site and their positions based on congressional findings, which the Court did not "reject". Moreover, since the Court issued its ruling, the D.C. Circuit has found that these facts are "well founded," and, as a result, Defendants must divest the CapCut app.[24] In any event, details regarding the precise data exchanged with the PRC or CCP would be in Defendants' sole possession.

**CIPA § 632 - Eavesdropping and Recording.** Defendants similarly question whether Plaintiffs have adequately pleaded that Defendants "use[d] an electronic amplifying or recording device to eavesdrop" under CIPA § 632(a). However, as described, the SAC adds significant details regarding the functions the CapCut app uses to access user communications, and in doing so acts as a "recording device". The CapCut app's persistent data collection and transmission functions, among other functions built it into the app, render it an electronic amplifying or

---

[22] Resp. Br., *TikTok Inc. v. Garland*, No. 24-113, at 15-16, 18 (D.C. Cir. July 26, 2024).

[23] If Defendants were "parties", they would still be liable because § 631 imposes liability on anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section." Cal. Penal Code § 631(a).

[24] Defendants assert "there is no evidence that ByteDance or TikTok have shared U.S. user data with the Chinese government" (Def. Mem. at 14), but the U.S. government has found that a "powerful Chinese Communist Party committee" is on site at ByteDance with CCP members placed in positions of authority, including "senior company managers'" and "the company's chief editor." *TikTok*, 122 F. 4th at 955.

recording device under Cal. Penal Code § 632. (SAC ¶ 467.) CapCut uses these functions to access the contents of a range of communications. Among other things, "CapCut saves the 'share history' of users, including the history of which videos they have shared with others and which videos other users have sent to them to view." (*Id.* ¶ 65.)

Courts have repeatedly held that software like CapCut constitutes a recording device under CIPA § 632. *See, e.g.*, *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1080 (N.D. Cal. 2023) ("software is a device under section 632(a)"); *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 955 (N.D. Cal. 2024) (defendant's chat "software qualifies as a device under Section 632"); *Brown*, 685 F. Supp. 3d at 939 (denying summary judgment CIPA § 632 claim involving Google); *Smith v. Google, LLC*, 735 F. Supp. 3d 1188, 1199-1200 (N.D. Cal. 2024) (denying motion to dismiss § 632 claim that Google analytics improperly recorded information); *Griffith*, 697 F. Supp. 3d at 972-74 (plaintiff "plausibly alleges a violation of CIPA based on § 632" in case against TikTok). Moreover, while Defendants claim that CapCut is the "only" device at issue (Def. Mem. 15), it also utilizes users' smartphones to accomplish many of these tasks.

In sum, "'all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA.'" *Yockey*, 745 F. Supp. 3d at 956. Moreover, while Defendants claim there is nothing "confidential" about the communications, they include "sensitive" and "private" emails and texts, including attached draft videos, and contrary to their suggestion, Defendants were ***not*** a party to the communications. (Def. Mem. at 15-16.)

D. **Plaintiffs Adequately Allege an SCA Claim.**

In its prior ruling, the Court indicated Plaintiffs must plead additional allegations showing that the CCP or other third parties were provided access to user communications. ECF 56, at 21. The SAC cures this deficiency by pleading additional facts.

As described in the SAC and above, CapCut collects the contents of communications both in transit and from storage, including emails and draft videos shared with others through CapCut's cloud-based functions. (SAC ¶¶ 257-61.) Indeed, the Divestiture Act is expressly premised on the ongoing access to user communications and control that the CCP and Chinese government exercise over Defendant ByteDance. (*Id.* ¶¶ 168-70.) The Divestiture Act requires divestiture of ***all*** of the ByteDance apps, including TikTok and CapCut, because of—among other things—the "tight interlinkages between ByteDance Ltd., TikTok, and the Chinese Communist Party (CCP)," including the presence of CCP officials on site, with access to user data collected by the ByteDance apps. (*Id.* ¶ 162.) The Act specifically defines a "Covered Company" as one that operates an app that "permits a user to create an account or profile to generate, share, and view text, images, videos, real-time communications, or similar content." Pub. L. No. 118-50, 138 Stat. 958, § 2(A)(i). It addresses "foreign adversary control of a substantial medium of ***communication***." *TikTok*, 122 F. 4th at 961 (emphasis added). The D.C. Circuit found that these facts are "well founded, ***not*** speculative." *Id.* at 957 (emphasis added).

Moreover, it is not just the "Chinese government" (Def. Mem. at 18) that accesses communications, but also members of the CCP—including "a powerful Chinese Communist Party committee" "'embedded in ByteDance'" that includes "senior company managers." (SAC ¶¶ 317-20.)[25] Defendants' attempt to reargue these factual issues by citing materials they submitted in litigation over the Divestiture Act is no basis for dismissal (Def. Mem. at 18-19 &

[25] This is therefore not a case where plaintiffs allege only that defendant "might have granted others access," *Morilha v. Alphabet Inc.*, 2024 WL 5205542, at *3 (N.D. Cal. Dec. 23, 2024), or merely "failed to protect the data," *Worix v. MedAssets, Inc.*, 857 F. Supp. 2d 699, 703 (N.D. Ill. 2012). Likewise, as noted above, the SAC alleges that "contents" of communications, such as email text and videos were shared, and Congress intended a "broad interpretation" of "content" under the statutes. *Supra* § III.C; Def. Mem. at 19.

n.12)—those materials are outside the complaint, and the courts rejected their arguments.[26] In any event, as with the wiretapping claims, such disputes over facts largely in the possession of Defendants make dismissal inappropriate. *See Leitner v. Morsovillo*, 2021 WL 2669547, at *3 (W.D. Mo. June 29, 2021) (SCA count raised "fact-intensive inquiries which are better suited for resolution at a later stage of this litigation"); *In re BetterHelp, Inc.*, 2024 WL 4504527, at *2 (N.D. Cal. Oct. 15, 2024) (defendant's "argument that it did not divulge information 'while in electronic storage' presents factual issues not appropriately resolved at the pleading stage").

Finally, as with the ECPA and CIPA claims, Plaintiffs adequately plead "access" to their communications. (Def. Mem. at 19.) Nor are the allegations limited to access to "spaces" where videos are shared (*id.*), but rather include email and text programs. *See supra* §§ III.A, III.C.

E. **Plaintiffs Adequately Allege a UCL Claim.**

The Court ruled that the UCL claim lacked "details" regarding the "economic loss" Plaintiffs suffered under the UCL. ECF 56, at 31. "[T]here are innumerable ways in which economic injury from unfair competition may be shown." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011). Even an "identifiable trifle" of economic injury is sufficient. *Id.* at 324. Plaintiffs have added the following allegations to the SAC in response to the Court's ruling.

**Subscription Fees.** CapCut subscribers have suffered direct out-of-pocket losses. (SAC ¶ 413.) Subscribers pay a monthly or yearly subscription fee for additional services and features, ranging from $5.99/month to $24.99/month. (*Id.* ¶ 202.) Plaintiffs would not have paid those fees had they been aware of Defendants' covert harvesting of their data. (*Id.*) Defendants earned

[26] Defendants' attempt to rewrite quotes in the SAC such as the "spying by design" comment likewise fail (Def. Mem. at 18); the full statement is clear and makes two points—(1) ByteDance apps spy by design and (2) are legally required to do so: "Apps like TikTok, Lemon8 and CapCut are spying by design… they have to—it is required by law in China." Cathy McMorris Rodgers Statement 4 (Mar. 7, 2024), https://www.congress.gov/118/meeting/house/116945/documents/HHRG-118-IF00-MState-M001159-20240307.pdf (Ex. A); SAC ¶ 165.

approximately $100 million from subscription fees in 2023 alone. (*Id.* ¶ 345.) Thus, Plaintiffs "lost money" in the form of fees they paid, thereby stating a claim under the UCL.

Defendants mischaracterize the theory underlying this claim as a "benefit of the bargain" theory premised on the notion that "[plaintiffs'] data lost value"—not so. (Def. Mem. at 22.) As courts have observed, this is a "'price premium theory' of economic injury," where a plaintiff alleges that he would not have paid as much or would not have paid at all if he had been aware of omitted facts regarding the services provided, which "'is cognizable under California's UCL[.]'" *Edwards v. MUBI, Inc.*, 2025 WL 985130, at *9 (N.D. Cal. Mar. 31, 2025), quoting *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1219 (C.D. Cal. 2017). In *MUBI*, for example, the court denied defendant's motion to dismiss a UCL claim where plaintiffs alleged they "'suffered an injury in fact and lost money or property as a result of [MUBI's] practice of disclosing their personal information'" because they "'paid more in subscription fees than they would have had they been previously aware of'" this practice. *Id.* Likewise, in *Stark v. Patreon, Inc.*, the court held plaintiffs adequately pleaded a "straightforward theory of economic harm" under the UCL where they "allege[d] that if [Defendant] had disclosed the manner in which it shared user data with Facebook, they would not have paid [Defendant] subscription fees, or at least not in the same amounts." 635 F. Supp. 3d 841, 854 (N.D. Cal. 2022). In *In re Adobe Sys., Inc. Privacy Litigation*, the court held that a UCL claim could proceed where "[f]our of the six Plaintiffs allege they personally spent more on Adobe products than they would had they known Adobe was not providing the reasonable security Adobe represented it was providing," including subscription fees for "Creative Cloud Service" and "Adobe Illustrator." 66 F. Supp. 3d 1197, 1224 (N.D. Cal. 2014). And in *Doe v. Tenet Healthcare Corp.*, plaintiffs suffered UCL loss where they alleged "they would not have sought medical services from Defendants had they

known of Defendants' collection and transmission of their PHI and PII." 2025 WL 1635956, at *21 (E.D. Cal. June 9, 2025). The injury is ***not*** diminution in value of data, but rather that plaintiffs would not have paid ***fees*** if they knew about defendants' data privacy violations. That is the case here where Plaintiffs allege they "would not have downloaded the CapCut app and incurred these costs if they had known about CapCut's improper data practices." (SAC ¶ 202.)

Defendants also argue that Plaintiffs failed to adequately prove reliance, which the Court did not even identify as an issue under the UCL claim. However, a plaintiff may prove reliance "by simply proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015); *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1083 (N.D. Cal. 2017) (same). "That one would have behaved differently can be presumed, or at least inferred, when the omission is material." *Daniel*, 806 F.3d at 1225. That is the case here where the SAC alleges material omissions. (SAC ¶ 202.) Moreover, Defendants' contention that the "general" allegation that Plaintiffs would not have downloaded CapCut, or paid fees, is "defeated" by the "specific" allegation that they received "additional features" from paying fees is nonsensical: Plaintiffs allege they would not have used CapCut at all if they knew the truth about the services.[27]

**Battery Drain/Device Costs.** As noted, the SAC adds an analysis of the costs of battery drain caused by CapCut's unauthorized collection of user data, with overnight battery drain alone

[27] Defendants' cases are inapposite. For example, *In re LinkedIn User Priv. Litig.* acknowledges that "[e]conomic harm based on the 'benefit of the bargain' theory Plaintiff proffers has been recognized as a viable basis for standing." 932 F. Supp. 2d 1089, 1093 (N.D. Cal. 2013). The court only dismissed without prejudice because plaintiffs brought claims "primarily based on an alleged breach of contract" after a data breach, yet identified nothing in the contract relating to security. *Id.* Once plaintiffs amended and identified an alleged misrepresentation, the court allowed the UCL claim to proceed. *In re LinkedIn User Privacy Litig.*, 2014 WL 1323713, at *4 (N.D. Cal. Mar. 28, 2014). Here, in contrast, Plaintiffs allege they would not have used the app at all if they had known the truth about Defendants' privacy violations. *See Adobe*, 466 F. Supp. 3d at 1224. In any event, the additional services subjected Plaintiffs to greater unauthorized data collection, including from added cloud storage, which was ***not*** secure as promised.

costing more than $8 million per year per 100 million users. (SAC ¶ 414.) These unnecessary costs were directly caused by Defendants' wrongful conduct, including their improper collection of Plaintiffs' data. (*Id.*) Plaintiffs would not have downloaded CapCut had they known that it would collect their data without authorization. (*Id.*) In response, Defendants repeat their arguments that battery drain may not have been caused by unauthorized conduct and that each individual's device must be tested (Def. Mem. at 20), which are no basis for dismissal.

**Benefit-of-the-Bargain Damages.** As *Kwikset* observes, plaintiffs can show economic loss under a "benefit of the bargain" theory by alleging they "surrender[ed] in a transaction more, or acquire[d] in a transaction less, than he or she otherwise would have." 51 Cal. 4th at 323. Thus, the court in *Naver* held that "Defendants' collection and use of [plaintiffs'] data deprived them of the benefit of their bargain" and that "California law recognizes this economic injury as sufficient to pursue UCL and FAL claims." 2023 WL 6466211, at *9. Likewise, the court in *In re Meta Pixel Tax Filing Cases* held: "[i]f a user shares information with the expectation that it will be protected but the recipient does not actually protect it, then the user has surrendered in that transaction more than she otherwise would have. This constitutes an injury to money or property under *Kwikset*." 724 F. Supp. 3d 987, 1024 (N.D. Cal. 2024).[28] The same is true here, where Plaintiffs allege that "they have suffered benefit of the bargain damages, in that Defendants took more data than they agreed would be exchanged" (SAC ¶ 194) and "deceived [Plaintiffs] into giving them access to their data without adequate data protections" (*id.* ¶ 156).

**Identity Theft.** Finally, Plaintiffs allege an increased risk of identity theft as a result of Defendants' unauthorized data collection. While Defendants argue the allegations are

[28] This is distinct from diminution in market value. There could be no diminution of value of Plaintiffs' data in the marketplace and Plaintiffs would still be entitled to benefit of the bargain damages because they received ***less in services from defendants*** than they had bargained for in exchange for access to their data or because ***defendants took more*** than they were entitled to receive under the bargain.

"unsupported by any facts" (Def. Mem. at 21), the SAC contains detailed facts regarding Defendants' inadequate data protections (*infra* § III.H) and transmission of data to China where protections are not as strong as in the U.S. (SAC ¶¶ 204-05.) Likewise, while Defendants argue recovery is available only if identity theft has already occurred, courts have held sums necessary to prevent future identity theft (e.g., "credit monitoring") constitute UCL "loss". *Owens v. Smith, Gambrell and Russell Int'l, LLP*, 2024 WL 391663, at *14 (C.D. Cal. May 30, 2024).[29]

## F. Plaintiffs Adequately Allege an FAL Claim

The Court indicated Plaintiffs must plead additional details regarding their reliance on Defendants' omissions in support of their FAL claim. Specifically, the court noted that "'[t]o plausibly allege a fraudulent omission, the omission must either (1) "be contrary to a representation actually made by the defendant," or (2) "an omission of a fact the defendant was obliged to disclose.'" ECF 56, at 33, citing *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 865 (9th Cir. 2018). The Court observed that "Plaintiffs have not pointed to any contrary representation, nor have they alleged why defendants were obligated to disclose their data-collection practices …." *Id.* The SAC contains allegations supporting each of these alternative theories.[30]

**Obligation To Disclose.** The SAC identifies multiple ways in which Defendants were under an obligation to disclose their data collection practices but failed to do so. *First*, Defendants had an obligation to fully disclose the "categories of personal information" CapCut

---

[29] The Supreme Court has stated data exposure is a "concrete" harm under Article III even when it has "not (yet) been used for injurious purposes such as identity theft." *Bohnak v. Marsh & Mclennan Cos., Inc.*, 79 F. 4th 276, 279 (2d Cir. 2023) (citing *TransUnion*, 594 U.S. at 425). Defendants' two cases were decided before *TransUnion*, and one (*Birdsong*) had nothing to do with identity theft. Because these grounds are sufficient to show "loss", Plaintiffs do not rely on diminution of value of their data or invasion of privacy.

[30] As Defendants' cases recognize, "'[r]eliance is proved by showing that the defendant's misrepresentation or nondisclosure was "an immediate cause" of the plaintiff's injury-producing conduct.'" *Antonyan v. Ford Motor Co.*, 2022 WL 1299964, at *4 (C.D. Cal. Mar. 30, 2022). The Court similarly observed: "a plaintiff must have experienced an injury 'as a result of [defendants'] unfair competition. In other words, 'actual reliance is required to have standing to sue under the … FAL.'" ECF 56, at 32.

collects (including "[b]iometric information," face "imagery", "voice recordings," or any media from which such data can be "extracted"), "purposes for which" the data was used, and measures they took to ensure data was protected under the California Consumer Privacy Act (CCPA). Cal. Civ. Code §§ 1798.100, 1798.140(b); SAC ¶¶ 423-25.[31] *Second*, Defendants had a duty under the Children's Online Privacy Protection Act (COPPA) to make adequate disclosures and obtain explicit and verifiable parental consent for collection of data from individuals under 13 years of age. (SAC ¶¶ 428-29, citing 15 U.S.C. §§ 6501–05.) *Third*, as the Court concluded in its order, Plaintiffs adequately pleaded that Defendants collected their biometric identifiers under BIPA § 15, which imposes a statutory obligation to make a variety of disclosures, including that Plaintiffs' "biometric identifier or biometric information is being collected or stored." 740 ILCS 14/15(b)(1). *Finally*, Defendants undertook a duty to fully and accurately disclose their data practices when they issued privacy policies, website statements, and other documents purporting to summarize their practices. (*Id.* ¶ 430.) Defendants failed to do so, thereby violating the duty they assumed. (*Id.* ¶¶ 425-30.) *Hodsdon*, 891 F.3d at 865; ECF 56, at 33.

**Contrary Representations.** The SAC alleges Defendants also made representations that are contrary to information that they failed to disclose. (SAC ¶¶ 425-30.) Among other things, Defendants told the public and users on their website that "CapCut values your privacy and safety, and we believe in data transparency."[32] (*Id.* ¶ 431.) They further stated they would provide "privacy and security" for user data: "Save your precious memories and private data securely with CapCut's free cloud storage" and "The best cloud storage is secure cloud storage.

[31] Defendants Bytedance, Inc. and TikTok Inc. are located in California. (SAC ¶¶ 31, 33.)

[32] https://www.capcut.com/legal/webform/privacy-request/en.

Bring privacy and security into your life with CapCut's free cloud storage. Simply make your account, and rest assured that your data will be safe whenever you return!"[33] (*Id.*)

However, as described in the SAC, Defendants did not provide "data transparency" or "privacy and security," collecting data without authorization. (*Id.* ¶ 433.) For example:

- Defendants did not disclose that CapCut collects biometric data. In contrast, Defendants' TikTok app discloses that it collects "biometric identifiers and biometric information as defined under U.S. laws, such as faceprints and voiceprints."[34] (*Id.*)

- Defendants did not disclose that they collect fine-grained location data from users, and in the past, did not disclose that they collected any location information at all. Again, the TikTok app's privacy policy—in contrast to CapCut—states that the app may collect "precise location information (such as GPS)."[35] (*Id.* ¶ 434.)

- Defendants did not disclose that they collected metadata from uploaded user content before this lawsuit was filed. (*Id.* ¶ 435.) In contrast, the TikTok privacy policy does contain some disclosure, underscoring that Defendants sought to conceal the scope of data collected from CapCut users. (*Id.*)

- CapCut did not disclose that it collected purchase information (such as payment card information, billing, delivery, and items purchased) before this lawsuit was filed. (*Id.* ¶ 436.) TikTok's privacy policy, unlike CapCut's, did contain some disclosure of the collection of such data from TikTok users. (*Id.*)

- CapCut did not disclose it would collect users' email contacts before this lawsuit was filed. (*Id.* ¶ 437.) As noted, such data can be used for targeted advertising.

More generally, the disclosures Defendants made do not fully disclose the categories of user data collected, how the data is shared, or the purposes for which the data is used. (*Id.* ¶ 438.)

Defendants also failed to disclose that CapCut is controlled by ByteDance, which is a Chinese company, that user data was accessed in China, and that Defendants had an obligation to share user data with the Chinese government and CCP. (*Id.* ¶ 439.) Indeed, Defendants sought to deceive TikTok users, promising that TikTok user data would not be sent to China where data

[33] https://www.capcut.com/tools/free-cloud-storage.
[34] https://www.tiktok.com/legal/page/us/privacy-policy/en.
[35] *See* 1/1/23 TikTok Privacy Policy.

protections are non-existent, while simultaneously attempting to induce them to use CapCut, which had no such protections and was directly run out of China. (*Id.* ¶¶ 440, 444-46.) TikTok's website stated that it had undertaken a $1.5 billion project that would "safeguard U.S. user data," enhance the way that U.S. user data is protected, including how it is "accessed, stored and shared," and was "committed to aligning our business practices to widely-accepted privacy principles, such as privacy by design, data minimization, and transparency."[36] (*Id.*) It represented that a separate subsidiary called TikTok U.S. Data Security Inc. had been created to house user data hosted by a U.S. company (Oracle), imposing data access and controls and creating physical separation of U.S. data from China. (*Id.* ¶ 441.) TikTok's CEO described these changes as: creating "what amounts to a firewall" that "seals off protected U.S. user data from foreign access"; "American data [is] stored on American soil by an American company overseen by American personnel"; this "eliminates the concern" that "US data can be subject to Chinese law."[37] (*Id.* ¶ 442.) Users were deceived because TikTok encouraged them to download CapCut, which contained no such protections. (*Id.* ¶ 443.) Defendants' executives were aware their conduct was deceptive, worrying this would be a "lightning rod" if it ever became public. (*Id.*)

Another way Defendants hid the fact that CapCut was controlled by executives in China was to set up a Singapore entity, ByteDance Pte. Ltd., that they represented—contrary to the truth—controlled CapCut. Thus, the entity listed as owning and controlling CapCut on the App Store is ByteDance Pte. Ltd. (SAC ¶ 447.) Likewise, CapCut's privacy policy states that the services are "provided and controlled by Bytedance Pte. Ltd." (*Id.*) However, as Defendants admit in private, in fact CapCut is "directly run by ByteDance executives in China." (*Id.*)

[36] https://usds.tiktok.com/safeguarding-us-user-data/.
[37] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

Defendants also denied in public (while admitting in private) that ByteDance is controlled by the Chinese government. (*Id.* ¶ 448.) For example, TikTok's CEO testified before Congress that "ByteDance is not owned or controlled by the Chinese government."[38] (*Id.*) This is part of a conscious "messaging" strategy, whereby Defendants "[d]ownplay the parent company ByteDance, downplay the China association, downplay AI."[39] (*Id.*)

Finally, Defendants did not disclose that members of the CCP had access to their facilities, and indeed had significant roles in which they could access user data. (*Id.* ¶ 449.) Nor did they disclose that they were subject to Chinese law requiring that they provide access to user data to the Chinese government and CCP. (*Id.*) The SAC alleges that Plaintiffs relied on Defendants' omissions and that they caused Plaintiffs economic injury. (*Id.* ¶ 451.)

Defendants ignore these allegations and instead argue that the FAL "does not contemplate omissions" or, alternatively, that omissions must relate to a "safety hazard" or an issue "central to the product's function." (Def. Mem. at 24.) These assertions are contrary to the law cited in the Court's order, which is clear that Plaintiffs can bring an omissions claim under the FAL[40] and that Plaintiffs need not demonstrate a "safety hazard." ECF 56, at 33. The language regarding "safety hazards" comes from cases involving products that allegedly caused

[38] 2/24/23 S. Chew Tr., TikTok CEO Testifies to Congress.

[39] C. Stokel-Walker, Inside TikTok's Attempts to 'Downplay the China Association', GIZMODO (July 27, 2022), https://bit.ly/3EV8XnY.

[40] While Defendants note the district court in *Hodsdon* stated "many courts" have ruled that businesses that "omitted a material fact" have "not stated a claim under the FLA" (Def. Mem. at 24), the very next sentence states: "Other courts have reached the opposite conclusion," *Hodsdon v. Mars, Inc.*, 162 F. Supp. 3d 1016, 1023 (N.D. Cal. 2016). Moreover, the court was addressing situations where—unlike here—defendants made no affirmative "statement at all." *Id.* The Ninth Circuit's decision on appeal, which this Court adopted, acknowledged that "pure omissions" cases may be brought under the FAL. Likewise, Defendants' assertion in a footnote that one of the "*LiMandri*" factors must apply is wrong. (Def. Mem. at 24 n.13.) As one court recently observed, "the *Wilson* and *Hodsdon* tests, on the one hand, and the *LiMandri* test, on the other, represent ***alternative*** means of pleading a pure-omission claim." *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1102 (N.D. Cal. 2021) (emphasis added). In any event, most if not all *LiMandri* factors apply here because Defendants made incomplete and inaccurate disclosures.

physical injury and is not relevant here. In any event, the omissions are central to CapCut and constitute such a hazard that Congress has passed legislation requiring divestiture of the app.

**Economic Loss and Reliance.** Finally, Defendants repeat their arguments that Plaintiffs fail to adequately plead economic loss and reliance. Defendants' arguments lack merit for the same reasons stated above with respect to Plaintiffs' UCL claim. *See supra* § III.E.

### G. Plaintiffs Adequately Allege a Claim for Restitution/Unjust Enrichment.

Plaintiffs' unjust enrichment claim is adequately pleaded for similar reasons. As with the FAL claim, the Court concluded that "plaintiffs have not plausibly pled that they relied on a misrepresentation or omission when deciding to use the CapCut app." ECF 56, at 36. However, the SAC pleads several ways in which Defendants had a duty to disclose information regarding their data practices that they failed to disclose. (SAC ¶¶ 494-503.) In the alternative, the SAC identifies representations that are contradicted by information Defendants omitted. (*Id.* ¶¶ 504-21.) In both cases, the SAC pleads that Plaintiffs relied on Defendants' omissions and suffered injury as a result. *See id.*; *supra* §§ III.E-F. Defendants do not explain how Plaintiffs have failed to comply with the Court's requirements in the lone paragraph in which they address this count.

Moreover, contrary to Defendants' suggestion, unjust enrichment is a stand-alone cause of action and is not "premised" on other counts such as the UCL or FAL. Indeed, the very case Defendants cite recognizes that "unjust enrichment" is "an independent cause of action." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). Nonetheless, even if unjust enrichment were somehow premised on another cause of action, it could just as easily be premised on a cause of action like larceny, which the Court already ruled may proceed and which does not require an actionable misrepresentation or omission, but rather only that Defendants stole Plaintiffs' data and unjustly profited from it.

### H. Plaintiffs Adequately Allege a Claim Under Illinois BIPA § 15(e).

Finally, in its Order, the Court found that "Plaintiffs complaint contains no allegations describing the industry standard of care" under BIPA § 15(e). ECF 56, at 47. The SAC supplies such allegations and adequately pleads that Defendants violated BIPA § 15(e) by failing to (1) use the "reasonable standard of care" within the industry for storing, transmitting or protecting biometric data or, alternatively, (2) store, transmit or protect biometric data in a manner that is the same as or more protective than the manner in which they store, transmit, or protect other confidential and sensitive information. 740 ILCS 14/15(e). *See Naver*, 2023 WL 6466211, at *13 (denying motion to dismiss); *Figueroa*, 454 F. Supp. 3d at 785 (same).[41]

**Failure to Comply with Reasonable Industry Standards.** The SAC identifies various organizations such as the National Institute of Standards and Technology (NIST) and International Organization for Standardization (ISO) that have developed standards to safeguard sensitive data, including biometric data.[42] In addition, it identifies laws and regulations such as the CCPA that govern Defendants' conduct and inform industry standards. (SAC ¶ 552.)

These standards require that Defendants: (1) obtain explicit informed consent before collecting biometric data, outlining how the data will be used and stored (*id.* ¶ 553); (2) "[p]rovide a mechanism for consent withdrawal" (*id.* ¶ 554); (3) collect only that biometric data that is "necessary" and use it only for the "specified purpose," "avoiding unnecessary data

[41] In a footnote, Defendants suggest that the Court's Order did not resolve the proper interpretation of the collection of "biometric identifiers within the meaning of BIPA" and that they intend to try to reargue the issue on a factual record based on the Ninth Circuit's decision in *Zellmer* and dispute whether the biometric identifiers at issue here "can identify a person." However, as the Court's Order recognized, "scans of facial geometry and voiceprints are straightforwardly 'biometric identifiers under the text"—i.e., the statute defines such data as "biometric identifiers." ECF 56, at 40. There is no factual issue to resolve. In any event, as the SAC alleges, the scans of facial geometry and voiceprints CapCut takes can identify a person, either alone or in conjunction with all the other data CapCut collects.

[42] ISO/IEC 24745:2022(E), Information security, cybersecurity and privacy protection—Biometric information protection (2022) (Ex. B); NIST, Standards for Biometric Technologies, https://www.nist.gov/speech-testimony/standards-biometric-technologies (Ex.C).

aggregation" (*id.* ¶ 555); (4) implement adequate measures for "secure storage and transmission", including "encrypt[ing] biometric data" (*id.* ¶ 556); (5) store biometric data "separately from other personal identifying information" (*id.* ¶ 557); (6) "limit access" to biometric data and implement "access controls and authentication" (*id.* ¶ 558); (7) conduct "regular security audits" to identify vulnerabilities and ensure systems are up-to-date with the "latest security patches" (*id.* ¶ 563); (8) establish "clear policies" for retention of biometric data, ensuring it is retained only for the necessary period and securely destroyed when no longer needed (*id.* ¶ 564); (9) act with transparency and accountability (*id.* ¶ 565), and (10) adhere to relevant laws and regulations (*id.* ¶ 566). The SAC contains detailed allegations regarding the measures for storage and transfer of biometric data, collecting more data than necessary, failing to encrypt and audit data, failing to segregate data, and transferring data to jurisdictions with laws that are less protective of such data, including China. (*E.g.*, *id.* ¶¶ 553-66.)

Defendants object to certain of the requirements on the ground that they relate to disclosure and informed consent and thus allegedly "repackage" claims under other BIPA sections. (Def. Mem. at 26-27.) However, as the standards observe, such measures are important to "'[p]rovide the subject the means to control his/her biometric information during its lifecycle.'" (SAC ¶ 553.) In any event, most requirements do not relate to disclosure, but rather "secure storage and transmission,"[43] "encrypt[ing] biometric data", "limiting access" to biometric data and "implementing controls", "segregating" it from other personal identifying

[43] "When transferring biometric information to other organizations, each party involved in the processing of the biometric information shall agree to be bound by contract or obligation to protect such information. The transfer of biometric information shall only take place with the consent of the subject unless consent is implied by the provision of a service requested by the subject." SAC ¶ 558; FTC Release, https://www.ftc.gov/system/files/ftc_gov/pdf/p225402biometricpolicystatement.pdf (Ex. D).

information,[44] conducting "regular security audits," having "clear policies," and "limiting collection" of biometric information.[45] (*Id.* ¶¶ 553-66.) Defendants also attempt to argue the facts, stating that two requirements—encryption and audits—are "unsupported". (Def. Mem. at 28.) However, the ISO recommends using "both encryption and a MAC or digital signature" and "authenticated encryption as in standardized ISO/IEC 19772," and NIST recommends companies "provide mechanisms for compliance, audit, and verification."[46]

Finally, Defendants argue that the laws Plaintiffs cite are not applicable to them or are vague. (*Id.* at 30.) Defendants are wrong—the CCPA governs entities operating in California, such as ByteDance, Inc. and Tiktok, Inc. (SAC ¶¶ 31, 33.) And Defendant TikTok was recently fined $610 million under the GDPR specifically for transferring user data to China.[47] In any event, § 15(e) invokes industry "standards" without any requirement that they be legally binding.

**Failure to Protect Biometric Data in a Manner that is "the Same As Or More Protective" Than Other Sensitive Data.** Defendants have also violated the second prong of § 15(e), which requires that Defendants "store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits and protects other confidential and sensitive information." Defendants failed to adopt the "same" or "more protective" measures to store,

[44] "Organizations should keep the collected biometric information logically or physically separate from the subject's other PII to reduce the impact on the subject's privacy of a compromise of the combined information." ISO/IEC 24745:2022(E) at 24 (Ex. B).

[45] The CCPA provides that "[a] business shall not collect additional categories of sensitive personal information or use sensitive personal information collected for additional purposes that are incompatible with the disclosed purpose for which the sensitive personal information was collected without providing the consumer with notice consistent with this section." Cal. Civ. Code § 1798.100(a)(2).

[46] ISO/IEC 24745:2022(E) (Ex. B); NIST, Standards for Biometric Technologies (Ex. C).

[47]IDPC Press Release, Irish Data Protection Commission fines TikTok €530 million and orders corrective measures following Inquiry into transfers of EEA User Data to China (May 2, 2025) (Ex. E); TikTok fined 530 million euros by E.U. regulator over data protection, NBC News (May 2, 2025) (Ex. F). The Court can take judicial notice of the regulatory IDPC press release cited herein.

transmit and protect CapCut users' biometric data than they did for biometric and other user data collected from TikTok users. Any alleged CapCut data protections are demonstrably less protective than the $1.5 billion effort Defendants have taken with respect to TikTok users' data. While Defendants assert that Plaintiffs "leap to the conclusion" that Defendants must take the "same" or "more protective" measures for CapCut user data, that is what § 15(e) says. (*Id.* ¶ 567.) Nor is this claim based on a single article stating that public disclosure of ByteDance's relationship with China would be a "lightning rod" for the company.[48] As noted, TikTok claims it has spent more than $1.5 billion to wall off data from China; no such precautions have been made regarding CapCut; CapCut has not set up a separate subsidiary to house user data in the United States; to the contrary, executives acknowledge the app is run by executives in China; CapCut does not make any disclosures that it collects biometric data like TikTok does; and there is no evidence that CapCut even attempts to take adequate measures to protect biometric data, given that it continues to deny that it even collects such data. (*Id.* ¶¶ 550-72.) While many of these failures apply to ***all*** data, this includes biometric data, satisfying § 15(e).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

[48] While the article does not mention the words "data security," the context of the article makes clear that is among the reasons for concern: the article contrasts the measures TikTok took to wall itself off from ByteDance, and as described in the SAC, those measures were designed to protect user data.

Dated: June 30, 2025

Respectfully submitted,

By: <u>*/s/ Jeannie Evans*</u>

Jeannie Evans (Bar No. 6296339)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4962
Facsimile: (708) 628-4952
jeannie@hbsslaw.com

Steve W. Berman (Bar No. 3126833)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Douglas G. Smith
ALPHEUS LLC
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
Telephone: (312) 451-6708
dsmith@alpheusllc.com

*Counsel for Plaintiffs and the Class*